# REPORTS.

## HALE & A. *v.* EVERETT & A.

1. Article VI, in the bill of rights of the N. H. constitution, while it empowers the legislature to authorize the several towns, parishes, bodies corporate, or religious societies within the State, to make adequate provision, at their own expense, for the support and maintenance of public protestant teachers of piety, religion, and morality, does not directly, and was not intended to, and does not by implication, forbid the legislature to authorize such towns, &c., or religious societies, to make provision for the support of any other religious teachers besides protestants.

2. Under Sec. V of part second of said constitution, the legislature is as fully empowered to authorize such towns, parishes, bodies corporate, or religious societies, to make provision for the support of any other religious teachers besides protestants, if they think it for the welfare or benefit of the state to do so, as it is by Art. VI of part first to make provision for the support of protestant teachers.

3. The third paragraph in Art. VI of the bill of rights, which declares that every denomination of Christians demeaning themselves quietly, &c., shall be equally under the protection of the law, and that no subordination of any one sect or denomination to another shall ever be established by law, was designed to show that, although the framers of the constitution had a preference for the protestant religion rather than the Roman catholic, and were willing to encourage the former as far as consistent, yet that they held the rights of conscience of both to be alike and the same. The same rights of conscience are guaranteed to all.

4. Articles XIV, XXIX, XLII, and LXI, of part second of the constitution, providing that the governor, councillors, senators, and representatives. must be "of the protestant religion," were designed to require a positive and affirmative test, and not merely the negative qualification of not. being a Roman catholic.

5. The right of holding these offices is a civil or political right, which may be surrendered to the government or to society in order to secure the protection of other rights (Art. III, bill of rights), or the government may abridge or take away such rights for sufficient cause; for though such rights may be considered as natural rights (Art. II, bill of rights), yet they are not of the class of natural rights which are held to be "unalienable," like the rights of conscience. (Art. IV, bill of rights.)

6. The rights of conscience, which are held to be not only natural, essential, and inherent (Art. II, bill of rights), but also " unalienable," not capable of being surrendered voluntarily, or of being taken away or abridged by the government, " because no equivalent can be given or received for them " (Art. IV, bill of rights), are set forth and declared specifically in Art. V of the bill of rights; and nothing contained in Art. VI of the bill of rights, or in any other article of the constitution, was intended to conflict or interefere with, or to modify the declaration of the rights of conscience there made.

7. The term Christian in our constitution is used in its ordinary sense, to designate one who believes or assents to the truth of the doctrines of Christianity, as taught by Jesus Christ in the New Testament.

8. The term protestant is used in the same instrument in its ordinary sense, meaning to include all Christians who deny the authority of the pope of Rome,—Christians in this country and in western Europe being divided into Roman catholic and protestant.

9. But neither the term Roman catholic nor protestant is broad enough to include any who do not, nominally, at least, assent to the truth of Christianity as a distinct system of religion ;—a Mahometan, a Jew, a pagan, or an infidel cannot properly be called either a catholic or a protestant, not being a Christian.

10. The political or conventional use of the word Christian, denoting one who assents to the truth of the doctrines of the religion of Christ, or who, being born of Christian parents or in a Christian country, does not profess any other religion or belong to any of the other religious divisions of men, is the sense in which the word is ordinarily used in constitutions and statutes and legal documents, and referring to those commonly known as nominally Christian, rather than to those who, professing the faith of some particular church, are termed Christians, in the theological or sacred sense of the term.

11. But when the children of protestant parents, or those born in a protestant country, renounce that religion, and voluntarily elect and adopt and profess some other religion, they cannot any longer be reckoned or assumed to be of the protestant religion ; and so of all the denominations of Christians, and all other systems of religion.

12. By the act of 1819, all power to build meeting-houses and to support

religious teachers was taken from the towns where it had been placed by the law of 1791, and was conferred upon religious societies; and any religious sect, as well as any denomination of Christians, was authorized to form such a society.

13. Under the acts of 1819 and 1827, religious sects or denominations of Christians were alone authorized to form religious societies, and the limited corporate powers that were conferred upon them did not in any way take away or change their character as sectarian or denominational societies.

14. When a society, of a particular religious sect or denomination, is formed with a strictly sectarian or denominational name descriptive of the fundamental doctrines of the sect to which it belongs, it will be presumed that it was constituted for the purpose of promoting the vital and fundamental doctrines of such sect or denomination.

15. In such case, where a conveyance is made to, or a trust created for the benefit or use of such religious society, by its denominational name, with no other particular designation in the deed of the tenets or doctrines which it is to be used to advance and support, the denominational name may be a sufficient guide as to the nature of the trust, so far as respects doctrines which are admitted to be fundamental.

16. In such case, those having control of property held in trust for the benefit of such religious society may be restrained from applying the property, or the use of it, to the promotion of religious tenets and doctrines clearly opposed and adverse to the fundamental doctrines and faith of such sect or denomination, at the time, and immediately after, such trust was created.

17. Where the original trustees, appointed by the founder of a religious charity or trust, applied the fund to the support of certain religious doctrines, and that application had been long continued, and had always been acquiesced in by the founders of the charity or trust, a court of equity will not allow such application to be changed or interfered with, unless such change is clearly required by the plainly expressed intention of the donor.

18. It is not the province of courts of justice to decide or to inquire what system of religious faith is most consistent, or what religious doctrines are true or what are false, in any case, and it seldom becomes necessary for courts to discuss or to examine the creeds, or confessions, or systems of faith of the different religious sects, in determining questions of law except in cases where they are called upon to see that a trust or charity is administered according to the intention of the original founders.

19. A Congregational society is usually made up of the church with which it is connected, and of those who worship with the church and assist in supporting the preaching and public worship of the church; and though

the minister is settled by the society, he becomes the pastor of the church as well as of the society, and the society generally has no creed or published religious opinions distinct from the church; and to find what are the religious opinions of a Congregational society, we must look at the creed, or confession, or doctrines of the church with which it is connected, which is the centre and foundation of the whole. This holds true of all who adopt the distinctive Congregational polity, whether known as orthodox Congregationalists, Baptists, and others, or those known as liberal Congregationalists, such as Unitarians, Universalists, and others.

20. In case of a division of a religious society or corporation, where both parties still adhere to the tenets, doctrines, and discipline of the organization, the property should be divided between them in proportion to their numbers at the time of the separation.

21. Members who secede from a church organization or a religious society, thereby forfeit all right to any part of the property, rights, or privileges of such church or society.

22. Whether there has been a secession from a church or religious society is a question of fact, to be settled upon evidence of the acts and intention of the parties.

23. Deists, theists, free religionists, and other infidels, though they may be Unitarians in some sense, are not Unitarian Christians.

DOE, J., dissenting.

IN EQUITY. The bill is as follows: Samuel Hale and Augustus Rollins, of Rollinsford, in said county; John W. Kingman, of Durham, in said county; Nathaniel R. Hill, of South Newmarket, in the county of Rockingham; Benjamin Barnes, and eleven others, of Dover, in said county, members of "The First Unitarian Society of Christians in Dover" aforesaid, and owners of pews in the meeting-house of said society in said Dover, complain against Chas. E. Everett and fifty-two others, all of said Dover, claiming to be members of the said First Unitarian Society of Christians in Dover; and as members of an independent religious society, of which Francis E. Abbott is the preacher; against said Abbott as such preacher; and against Francis E. Abbott, of said Dover, and against Jasper H. York, George L. Folsom, and Carl H. Horsch, all of said Dover, wardens of said First Unitarian Society of Christians in Dover aforesaid; and say that they are members of said society, and holders and owners of sixty pews, and said defendants are owners of five pews in the meeting-house of said society; that said society, in the month of September, 1827, was duly formed, constituted, and became a body corporate under the name of The First Unitarian Society of Christians in Dover, under and by virtue of an act of the legislature of the state of New Hampshire, entitled "An act empowering religious

associations to assume and exercise corporate powers," approved July
3, A. D. 1827, whereby " The members of any religious sect or denom-
ination of Christians in this state are authorized to associate and form
a society for the purpose of erecting and maintaining a house of publick
religious worship, a parsonage house, and other necessary buildings
connected therewith, and for supporting the ministry in such society,"
and from that time down to the time of the filing of this bill has con-
tinued to keep up and maintain, and still does keep up and maintain,
its corporate name and organization as " The First Unitarian Society
of Christians in Dover;" that at a meeting of said society, duly holden at
said Dover on the sixth day of November, A. D. 1827, the following
votes were passed, to wit,—

VOTED, " That in the views of the society it is expedient that there
should be a house built for the accommodation of its members in their
public worship." " That there be a committee formed for raising, by
subscription, the sum of $10,000, for the purpose of purchasing a lot
of land and thereon building a house for the above purpose, and that
that sum be divided into 100 shares of $100 each." " That Jacob M.
Currier, J. S. Durell, Matthew Bridge, J. B. H. Ordiorne, and Eri
Perkins be a committee to superintend said subscription."

That, in pursuance of said votes so passed, a meeting-house was
erected upon Locust street in said Dover, during the year A. D. 1828,
or about that time, by subscribers to stock in the same, nearly all of
the subscribers to said stock being at the time members of said society;
that the lot of land upon which said meeting-house was erected, and now
stands, was conveyed by the Dover Manufacturing Company, by. deed,
dated June 10th, 1828, to William Hale, Jacob M. Currier, George
Andrews, Eri Perkins, and John B. H. Ordiorne, and their successors,
as trustees of said society, "for the use of the stockholders or proprie-
tors of the meeting-house to be erected thereon, their heirs and assigns,
and under such regulations, conditions, and restrictions, for the sale
and occupancy of the pews in said house, as may be prescribed by a
majority of the votes of said stockholders, at any time previous to the
sale or disposal of the pews in said house;" that, at a meeting of said
stockholders, duly called and holden at said Dover, on the 6th day of
March, 1829, and prior to the sale of any of the pews in said house,
among other things, it was voted,—" That the general custody of said
house shall be under the control of the First Unitarian Society of Chris-
tians in Dover;" that a public sale of the pews in said house was holden
March 17, 1829, and certificates of ownership given by the trustees hold-
ding said meeting-house lot to persons so purchasing pews in said house,
subject to all liabilities, agreeably to the regulations and conditions as
adopted by said stockholders for the sale of said pews; that said meeting-
house was dedicated to the worship of God on the 18th day of Feb-
ruary, A. D. 1829, by ministers of the Unitarian denomination of
Christians, according to the forms observed by that denomination; that
the main purpose and design in forming said society was the promotion

of religious knowledge and Christian virtues by the maintenance of public worship, and the erection of a meeting-house for that purpose, where the doctrines of the Christian religion should be publicly taught and inculcated, as cherished by the sect of Christians known as Unitarians; that said society, from the date of its formation in September, A. D. 1827, down to the time of the dedication of said meeting-house, regularly maintained public Christian worship in said Dover on the Sabbath, and had preaching by regularly ordained ministers of the Unitarian denomination of Christians, who there at such meetings preached and taught the doctrines of Christianity, as holden by that sect of Christians called Unitarian; that, from the time of the dedication of said meeting-house down to the 31st day of August, 1864, said society regularly maintained Christian worship on the Sabbath in said meeting-house, and during nearly all that time had preaching in said house by ministers of the said Unitarian denomination of Christians, regularly ordained and installed over said society as its pastors by other clergymen of said denomination; and that, during that portion of the time between the dedication of said house and said 31st day of August, 1864, when said society have been without settled ministers, they have uniformly had preaching on the Sabbath, in said house, from ministers of said denomination, and both said last named ministers, and all the settled ministers of said society, have, up to that date, preached and inculcated in said house on the Sabbath, and at all other times have publicly and privately taught and inculcated, the doctrines of Christianity, as believed and taught by the denomination of Christians called and known as Unitarian.

That on said 31st day of August, A. D. 1864, said Francis E. Abbott was ordained and installed over said society by a council of Unitarian ministers, as its pastor, and continued so to act and to preach in said house on the Sabbath down to the 31st day of March, A. D. 1868, when his connection with said society, as its pastor, was dissolved by mutual consent; that, although said Abbott, at the time of his said ordination and installation, and for a long time after, professed to believe and teach the doctrines of Christianity as received and taught by said Unitarian denomination, yet the said Abbott, before the dissolution of his connection with said society as its pastor as aforesaid, openly and publicly and repeatedly disavowed his belief in those doctrines, and in the pulpit, in said house, on Sunday, the 29th day of March, A. D. 1868, in a public discourse by him then and there preached to said society, declared that he was neither a Unitarian nor a Christian, declared his disbelief in the doctrine of the Lordship and Messiahship of Jesus, and that the writings of some men now living are as highly inspired and as sacred as the Bible, and declared the doctrine " that whenever a human soul has uttered its sincere and brave faith in the divine, and thus bequeathed to us the legacy of inspired words, there is the Holy Bible;" that said Abbott has, both before and since said 29th day of March, in his public discourses preached in said Dover, and in articles published by him in divers newspapers and periodicals,

proclaimed that Christianity is only one among many religions, and that it is partly true and partly false ; that he is neither a Unitarian nor a Christian, but stands outside of Christianity ; that he rejects Christianity ; "that religion has no more to do with Jesus than it has with Judas ;" that "it leaves the soul alone with God ;" that "it acknowledges no leader, is loyal to no master, imitates no exemplar, looks to no redeemer, needs no saviour, knows no Christ ;" that Jesus himself was not a Christian, but a simple theist, and that he, the said Abbott, believes Christianity to be a perversion of theism, and that said Abbott still continues to make these and similar statements as his religious belief; all of which statements so made by said Abbott, and the doctrines therein contained, the plaintiffs say are wholly different from, and opposed to, and in contradiction of the religious belief of that sect of Christianity called Unitarian, and of Christianity itself.

That at the annual meeting of said society, holden on the 30th day of March, 1868, said Jasper H. York, George L. Folsom, and Carl H. Horsch were chosen wardens of said society ; that at a meeting of said society, holden on the 13th day of April, 1868, by adjournment from said annual meeting, a resolution referring to said Francis E Abbott, as follows, to wit,—"Resolved, That the wardens be authorized and instructed to hire Rev. Francis E. Abbott to preach in their church the ensuing year,"—was offered and rejected by a major vote of the society ; that at said meeting, immediately upon the rejection of said resolution, the following vote was passed, to wit,—Voted, "That the wardens be authorized and instructed to employ none other than Unitarian Christians to supply the desk in this house ;" that, upon the passage of said vote, the wardens aforesaid tendered their resignation, which was at once accepted by the society, and the meeting adjourned to April 27, 1868, at which time a meeting of said society was holden, and said York, Folsom, and Horsch were declared elected wardens of said society, and have ever since exercised and performed, and still lay claim to exercise and perform, the powers and duties of wardens of said society.

That said wardens, upon their election, April 27, 1868, together with the other individual defendants named, save said Abbott, took, have since held, and still hold possession of said meeting-house, and, well knowing the belief and public and private teachings of said Abbott to be in accordance with the views as hereinbefore set forth as proclaimed and preached by him, have suffered, allowed, encouraged, and employed said Abbott, and his associates and fellow-disbelievers in Christianity, to occupy the said house and the pulpit therein on the Sabbath, not for the purpose of teaching and inculcating the doctrines of Christianity as holden and taught by that sect of Christians called Unitarians, but for the purpose of denouncing those doctrines, and attempting to prove them to be untrue, and are proposing and intending to allow said Abbott to continue to do so in future, notwithstanding the plaintiffs did protest both to said wardens and to said Abbott against his, said Abbott's, preaching in said house, within a few days after said 27th day of April ; that said Abbott and his associates and fellow disbelievers in

Christianity have occupied said house and pulpit on the Sabbath, and preached therefrom, since said 27th day of April, under the encouragement and authority of said wardens and said other defendants save said Abbott, not to said Unitarian society, but, as said Abbott and said wardens claim, to an independent society, and said Abbott is proposing and intending to continue to do so in future; that the said preaching of said Abbott and his associates during that time has not been in conformity to the views of that denomination of Christians called Unitarian, but in condemnation and rejection of those views and of Christianity generally, and has had to a great extent for its object an attempt to show that those doctrines were false and unworthy of belief, and that Christianity is but one among many religions, and is partly true and partly false.

That said plaintiffs do not know who compose said independent society to which said Abbott claims to be preaching, but believe the same to be made up of said defendants save said Abbott.

That in pursuance of the conditions upon which the pews in said meeting-house were sold by said stockholders who built the same, and of the by-laws of said society, at the annual meeting of said society, holden March 30, 1868, it was voted,—" That the wardens be authorized and instructed to make out pew taxes against each and every owner of pews in the church for the entire amount now due on each pew, and if said tax is not paid within four weeks from the date of presenting the tax bill, then each and every pew, upon which any tax due may not have been paid, shall be advertised, and notice given that said pews shall be sold at auction at such day as may be designated by the wardens;" that said wardens claim that there are due from the plaintiffs, as owners of pews in said house, taxes of a considerable amount, and have presented bills therefor demanding payment, and giving notice that unless payment of the same is made within four weeks from the time of presenting said bills the said pews will be sold to pay said taxes, and said plaintiffs have refused and still refuse to pay said pew taxes because they believe that they would be applied by said wardens to pay for the preaching of said Abbott as aforesaid in said house.

All of which is in violation of the duties of said Jasper H. York, George L. Folsom, and Carl H. Horsch, as wardens of said society, and in violation and disregard of the rights of said plaintiffs, and is depriving the plaintiffs of the right and privilege of worshipping and having preached to them on the Sabbath, in their said meeting-house, as is their right, the doctrines and truth of Christianity, as cherished by that sect of Christians called Unitarian, of which sect of Christians said plaintiffs aver themselves to be members, and in the faith of which sect they are believers, and in violation of the design, purpose, and spirit with which said house was erected and dedicated, and said society formed and made a body corporate, and in violation of the law of the state under which said society was established and made a body corporate, and in violation and disregard of the votes hereinbefore set forth, which were passed at the annual meeting of said society, holden on the 30th day of March,

1868, by the terms of which the resolution to authorize and instruct said wardens to hire said Abbott to preach in the church of said society, for the year then ensuing, was rejected, and said wardens were, by the vote of said meeting, authorized and instructed to employ none other than Unitarian Christians to supply the pulpit or desk in the meeting-house of said society.

Wherefore said plaintiffs pray that said Jasper H. York, George L. Folsom, and Carl H. Horsch, as wardens of said society, and each of them, and all said defendants save said Abbott, may be forever enjoined, restrained, and forbidden to hire, employ, allow, suffer, or permit said Abbott, or any of his associates and fellow disbelievers in Christianity, to preach in said meeting-house of said society, or to in any way occupy the same, and that said Abbott be forever enjoined, restrained, and forbidden to preach in said meeting-house, or in any way to occupy the same, and that said wardens, and each of them, may be enjoined and restrained and forbidden to collect and pay said taxes for the support of said Abbott's preaching, and for such other relief as may be just.

*Answer of all the defendants except Francis E. Abbott.*

The said defendants, for answer to the plaintiffs' said bill, say, that in the autumn of 1827 there was formed in said Dover a religious association, and that it became a body corporate under the name of the "First Unitarian Society of Christians in Dover;" that the said Nathaniel R. Hill was once a member of said association, but that many years ago he removed to the town of South Newmarket, where he has since resided, and during all of that time has never acted with said association; that Calvin Hale, some twelve years since, commenced attending the Episcopal meeting in said Dover, has since supported the same, has rarely attended service at the house in controversy, and a few times contributed to its support; that the other plaintiffs, and the defendants except said Abbott, and many others, are members of said association; that all of the living, acting members of said association will number some      persons; that the defendants, or any of them, are not members of an independent religious association; that said religious association, so formed in 1827, has been maintained, continued, and now exists, although for the past few years it has been very weak, feeble, and with great effort has supported religious worship in its house; that at a meeting of said association, duly holden at said Dover, on the 6th day of November, A. D. 1827, the following votes were passed:

Voted,—" That, in the views of the society, it is expedient that there should be a house built for the accommodation of its members in their public worship; that there be a committee formed for raising, by subscription, the sum of $10,000, for the purpose of purchasing a lot of land and thereon building a house for the above purpose, and that that sum be divided into 100 shares of $100 each; that Jacob M. Currier,

J. S. Durell, Matthew Bridge, J. B. H. Ordiorne, and Eri Perkins be a committee to superintend said subscription."

That, in pursuance of said votes so passed, a meeting-house was erected upon Locust street, in said Dover, during the year A. D. 1828, or about that time, by subscribers to stock in the same, nearly all the subscribers to said stock being at the time members of said society; that the lot of land upon which said meeting-house was erected, and now stands, was conveyed by the Dover Manufacturing Company, by deed dated June 10, 1828, to William Hale, Jacob M. Currier, George Andrews, Eri Perkins, and John B. H. Ordiorne, and their successors, as trustees of said society, "for the use of the stockholders or proprietors of the meeting-house to be erected thereon, their heirs and assigns, and under such regulations, conditions, and restrictions, for the sale and occupancy of the pews in said house, as may be prescribed by a majority of the votes of said stockholders, at any time previous to the sale or disposal of the pews in said house;" that a meeting of said stockholders, duly called and holden at said Dover on the 6th day of March, 1829, and prior to the sale of any of the pews in said house, among other things, it was voted, "That the general custody of said house shall be under the control of the First Unitarian Society of Christians in Dover;" that a public sale of the pews in said house was holden March 17, 1829, and certificates of ownership given, by the trustees holding said meeting-house lot, to persons so purchasing pews in said house; that some of the regulations and conditions adopted by the stockholders, and subject to which said pews were sold, are as follows:

ART. 1. The *general custody* of said house shall be under the *control* of the "First Unitarian Society of Christians in Dover."

ART. 2. The pews Nos. 35, 61, on the plan of said house, hereto annexed, shall be considered as free seats, and under the control of said society, and pews Nos. 1, 62, 88, 13, on said plan shall be considered as the exclusive property of said society, when and *so long* as they shall maintain *public religious worship* in said house.

Articles 3, 4, provide for sale of pews, subject to conditions. Pew tax to be paid on the first day of April annually, to be appropriated for the support of *religious worship* in said house, *under the direction* of the "First Unitarian Society of Christians in Dover." That all of the trustees, to whom was made the conveyance of the meeting-house lot, are deceased, and Eri Perkins, and         have been chosen as, and are now their successors.

That the purpose and design of forming said society is stated in the articles of agreement, as follows: " Believing that the public worship of GOD has a salutary influence upon society, by awakening and diffusing *moral* and *religious* affections, and considering there are many persons in this place who are unprovided with such means of *religious instructions* and accommodations for *public worship* as are *most congenial* with their own convictions of truth and duty,—Therefore the *subscribers*,

for *their mutual and better accommodation* in the premises, do hereby unite and form themselves into a *religious* society by the name and style of the First Unitarian Society of Christians in Dover, and do hereby agree to be governed in their associate capacity by such rules and by-laws as said society may from time to time establish. *Such persons* as are desirous of uniting with them, may become members of said society by subscribing this agreement." That nowhere in any of the proceedings of said association, in its formation, in the building of the house of worship, in any of its proceedings since, or in any of its records, has there been anything done, or any language used, unless it be in the name of the association, to indicate that the association was Unitarian, or in any respect sectarian ; but the terms employed have been *public worship, religious worship,* and *public religious worship ;* that said association have always maintained *public worship* in said house, but have never been exclusive, sectarian, or limited to Christian worship, and persons of various religious faiths have preached in said house ; that it is not true that said Abbott was ordained and installed as pastor of said association by a council of Unitarian ministers, but, on the contrary, he expressly declined to present any credentials to, or to be interrogated by, any council whatever ; that Mr. Abbott is a progressive thinker and a progressive man, and not of such conservative tendencies as to always and forever remain unchanged and fixed in all of his opinions ; that he is free in his thought, and free in his speech, honest, sincere, truthful, and clear in his expression ; that the quotations in the bill, purporting to be from his sermons, are garbled extracts, and taken alone are deceptive, tending, if not designed, to misrepresent the sentiment, tone, and spirit of his ministrations ; that his views, fully and fairly expressed, are not peculiar to him, but are substantially held by many clergymen and others who call themselves Unitarians, and, as such, are fellowshipped by Unitarians ; that Unitarians have no rule of faith, or creed of doctrines ; that if there is any one thing in which they are agreed, it is " in believing and insisting that each and every rational and moral being, male and female, is under the highest obligations to form his or her own opinions about *religion,* and to *worship God* according to their own convictions of truth and duty ;" that we are not only members of said association, but that we are Unitarians ; that we have never adopted Mr. Abbott's theology, or committed ourselves to it, or the theology of any other man ; that it was our pleasure to hear him preach the present year ; that we have hired him and placed him in our meeting-house to preach and conduct our *public religious services* the present year ; that he is preaching for us under an agreement for one year ; that other Unitarians, and other members of said association, and other pew-owners in said house, sympathize and are interested with us, and attend *religious* worship in said house, who are not made parties to said bill ; that there is a majority of the acting members of said association who sympathize, act, and are interested with us ; that we represent the majority of the members of said association who were present and voted at the last parish meeting

of said association, and by our votes (being a majority of all the votes cast) was passed, on the 27th day of April, 1868, a preamble and resolution, of which the following is a copy:

"WHEREAS, differences of feeling and sentiment have arisen, and now exist, among the members of the First Unitarian Society of Christians in Dover, so much so that a division of the society seems imminent, now, therefore, for the purpose of conciliating and harmonizing said differences,—*Resolved*, That each of the two divisions of said society be entitled to the use of its meeting-house one half of the time, alternating each forenoon and afternoon ; and that each division may have the use of it at any time when not used by the other, and in case both divisions should desire to use it the same evening, that division which the last preceding evening had the use of it shall yield to the other ; and that the pew-rents be applied to lighting and heating the house."

That this resolution was passed by a vote of fifty-three yeas to forty-six nays; that among the nays was that of John T. Gibbs, who left worship in said house more than twenty years ago very much offended, connected himself with another religious body, and, as we believe, has not been in said house since until the time of said parish meeting, or in any way acted with said association ; that a Mr. Tredick voted with the nays, who had left town, and removed to Massachusetts, and was, as we believe, induced to return by family friends simply to vote at that parish meeting; that there are others who voted with the nays under similar circumstances ; that, under and by virtue of said vote, we have occupied said meeting-house one half of the time and no more ; that said society, when united and worshipping together in said house, have not, for some ten years last past, held there but one service each Sabbath ; that the persons who are named in the plaintiffs' bill as wardens have solicited subscriptions of the plaintiffs and others with a view, as expressed by them at the time, of employing such persons to preach in said house, under said resolution, as would be most satisfactory to said plaintiffs and others who might sympathize with them, to be kept as a distinct fund for that purpose alone, but they have all refused to subscribe, also to pay their annual pew tax ; that said wardens have also applied to the Unitarian Association in Boston for such preachers, but have not been able to obtain them because there were no funds to pay them ; and that said house has not been occupied by said plaintiffs, not because they have been hindered and prevented by the defendants, but simply because the plaintiffs would not occupy it, and would not pay or assist the defendants in paying for preaching of any description.

And the defendants deny, all and singular, the allegations in said bill, except as herein admitted, explained, or modified, as fully and distinctly as if the same were severally repeated.

*Answer of Francis E. Abbott.*

The said Francis E. Abbott, for answer to the plaintiffs' said bill,

says that he does not admit or deny the allegations in the plaintiffs' said bill; that about the first of May, 1868, he made an engagement with Zimri S. Wallingford, Lucius Everett, Josiah B. Folsom, the same who are named as defendants in the plaintiffs' bill, who claimed to represent very many of the other defendants in this proceeding, and some other persons, to preach for them for the term of one year; that his congregation have from Sabbath to Sabbath assembled in said meeting-house, and he has been, by said Wallingford, Everett, and Folsom, directed there to preach; that he has, in fulfilment of his said contract, conducted *public religious worship* in said house in the way and manner which best accorded with his *own convictions of truth and duty,* claiming or exercising no other rights than are by him set forth in this, his answer.

*S. M. Wheeler,* for the defendants.

It appears from the testimony that the society own the church, have the custody and unlimited control of it.    See proceedings organizing the society, deed of the lot to the society, by-laws of the society, and articles and conditions adopted by stockholders.    This is not the case of property donated in trust for the maintenance of a church of a particular character.    Between the two there is a wide distinction, important to be considered in determining this case.    The property is conveyed for a consideration, and not donated.    See deed aforesaid.    There are no trusts or limitations expressed in the conveyance, which are to be executed by trustees, but by the deed the whole management, custody, control, and use of the house is left with the stockholders or proprietors of the meeting-house to be erected thereon, their heirs and assigns.

Previous to this conveyance the society had been formed.    The object of forming the society is stated in the articles of agreement, as follows: " Believing that the *public worship* of GOD has a salutary influence upon society, by awakening and diffusing *moral* and *religious* affections, and considering there are many persons in this place who are unprovided with such means of *religious instructions* and accommodations for *public worship* as are *most congenial with their own convictions of truth and duty,*—Therefore the *subscribers,* for *their mutual* and *better accommodation* in the premises, do hereby unite and form themselves into a *religious* society by the name and style of the First Unitarian Society of Christians in Dover, and do hereby agree to be governed in their associate capacity by such rules and by-laws as said society may from time to time establish.    *Such persons* as are desirous of uniting with them may become members of said society by subscribing this agreement."

What language could possibly be used of broader or more unlimited significance?    It includes everybody who believes in *God,* of whatever religious faith; and all such persons, without further limit or conditions, may become members of said society by subscribing this agreement

and no other,—this *religious*, not *Christian* creed, and no other. It is true, the words " Unitarian Christian " occur in the *name*, but it may well be inquired " What's in a name ?" It is in the power of the society, at any time, to change the name ; and, in this age of improvement and advancement, it is by no means improbable that such a change would transpire. Most Christian names have attached to them a certain meaning, representing certain traits of character ; yet there is no inference that the person bearing a certain name has those traits of character, or that the name was selected with reference to its meaning or significance representing the traits of the individual character. The same may be said in this case. The character, purposes, and traits of the society, what it shall be, and for what it is designed, are fully, .clearly, and broadly set forth in the articles of agreement, and present a strange inconsistency with the idea of fixed limitations in the name. Then we not only say there are no limitations expressed in the deed, but there could have been none implied, even had the property been donated, for the purposes, object, and character of the society were well known at the time the conveyance was made, and are inconsistent with any such limitations. In accordance with this view has been the action of the society, from that time to the present. They have never treated the name as of any consequence, or attached any importance to it as in any way characteristic, or as limiting the character, purposes, or object of the society, or the purposes or uses for which the house was built, dedicated, or to be used. The terms employed in the by-laws, in the articles and conditions adopted by the stockholders, and in all their records, " public worship," " religious worship," and " public and religious worship," are in no way limited by the term Christian, Unitarian Christian, or anything else.

Some testimony has been taken as to who are the pew-owners ; but the owner of a pew is only entitled to the use of his pew during service, and has no voice in the custody and control of the house. *Fisher* v. *Glover*, 4 N. H. 180 ; Art. 1 of Articles and Conditions adopted by the stockholders, and form of deed of pews; *Gray* v. *Baker*, 17 Mass. 435 ; *Daniel* v. *Wood*, 1 Pick. 101. But if they had a voice in the custody and control of the house, the evidence upon this point is with the defendants, for there are 152 pews in the house, and the owners of only 61 are adverse to Mr. Abbott, leaving 91 in his favor. But this point should be left out of the case altogether, as pew-owners are not, as such, members of the society, nor entitled to vote ; and the testimony offered on this point is hearsay, and should be rejected.

The case, then, is this : The house is entirely within the custody and control of the society ; and by this must be meant the majority of the society, for, in the absence of any by-laws or other regulations, the majority must govern in all things properly under the control of the society. *Wiswell* v. *Green*, pamphlet pp. 106, 107, 108, and authorities there cited. By majority is meant a majority of those present and voting at a regular meeting. of the society. *Ib.* 110 ; Redfield on Railways 16 ; 11 Vt. 391 ; 4 Exch. 850 ; Angel and Ames on Cor.

396. Now, by what right do these defendants claim to occupy the house ?

The annual parish meeting was holden March 30, 1868, and adjourned to April 13, and again adjourned to April 27, when was passed, by a vote of 53 yeas to 43 nays, the following preamble and resolution : "Whereas, differences of feeling and sentiment have arisen, and now exist, among the members of the First Unitarian Society of Christians in Dover, so much so that a division of the society seems imminent,— now, therefore, for the purpose of conciliating and harmonizing said differences, *Resolved*, That each of the two divisions of said society be entitled to the use of its meeting-house one half of the time, alternating each forenoon and afternoon ; and that each division may have the use of it at any time when not used by the other ; and, in case both divisions should desire to use it the same evening, that division which the last preceding evening had the use of it shall yield to the other ; and that the pew rents be applied to lighting and heating the house." Here is exercised the magnanimity of the majority, for they grant to the minority the same privileges in the house they take for themselves. Of what, then, can the minority complain ? Is there any such abuse of power as will authorize a court of equity to interfere ? Upon what other ground can it act ? Will it undertake to settle for men their theology ? to dictate religious opinions to men who have associated together for such " public worship as is most congenial with their own convictions of truth and duty?" The majority who voted in favor of that resolution, and most of the former congregation, now have their " public and religious worship " in said house, such " as is most congenial with their own convictions of truth and duty." They are not seceders, but still members of the old society, and as such attend " public and religious worship " in said house. See testimony of Wiggin, York, and Everett.

There is no other society formed. There is merely a subscription paper to raise funds for the support of preaching, and many, if not most, of these defendants have not even subscribed that. There is no evidence that any member of said Unitarian society attends worship there in any other character than as a Unitarian ; but there is direct affirmative evidence that they do attend in that character, and no other. As Unitarians, have they not that right ? Shall not every man decide for himself his own religious faith, his place of worship, its form, manner, and his religious teacher ? Can any man be enjoined by this court from attending worship where it best suits his tastes and his own convictions of duty ? If not as individuals, may this court enjoin majorities from the same exercise of religious freedom, and from the enjoyment of their rights as majorities ? Neither can it be claimed that any religious society should debar all others from the privilege of attending worship with them. Most religious bodies are not free from proselyting and gaining as many to their congregation as can be properly induced to join them. Nor are they bound to reject contributions. A poor society, divided, would reasonably be supposed to be grateful for

help from any quarter, and, though it may be the money of a Jew, it will buy bread for a Christian or a theist; and that theist, whose belief is that " the public worship of God has a salutary influence upon society by awakening and diffusing moral and religious affections," may be devoutly thankful for the benefaction which God may send him to feed himself and family, even from such a source.

The interchange of thoughts and sentiments is most essential to the proper growth and development of religious truths and ideas.    People are differently constituted, and have different tendencies in their thoughts and opinions.    Ever changing, growing, and developing, they read various authors, listen to various preachers, gleaning what seems to each to be truth from every imaginable source.    Congregations do not and cannot remain the same.    Unitarians of one school become Unitarians of another school;—they become Episcopalians, Methodists, Baptists, Congregationalists, and these in turn become Unitarians. Change is seen in every congregation and every where.

In this society, some of its members have become more and more conservative, until their opinions are more Orthodox than Unitarian. Others have taken a different line of thought, and have become radical; but they are still members of this society, all having their rights as members, and their rights to the common property of the society. Now, we ask, who shall sit in judgment upon the religious faith of these men ?    Where shall be the line of division ?    Unitarians have no creed of faith ; but, in the language of Rev. Samuel J. May, in a sermon published and circulated by the American Unitarian Association at Boston in 1867, and fully indorsed by William N. Andrews in his deposition (cross answer 34), they " believe that each and every rational and moral being, male and female, is under the highest obligation to form his or her own opinions about religion."    Mr. May further says,—" Many Unitarians are Arians : that is, they believe that Jesus preëxisted; that he was an archangel, next in dignity to the Most High; that he appeared upon earth in the person of the son of Mary, and led the life and died the death that is narrated in the New Testament. Other Unitarians, probably the larger part of them, believe that he was a man supernaturally born of his mother only, in accordance with the accounts given by Matthew and Luke.    But there are many of our denomination who believe, as I do, that Jesus was the son of Joseph and Mary ; that the accounts prefixed to the gospels of Matthew and Luke, inconsistent with each other, are not genuine, but were taken from the thousand marvellous stories which were invented in the second and third centuries of the Christian era, to magnify, in the eyes of the ignorant and credulous, the founder of the new religion, and do away the reproach of his crucifixion."    See, also, the testimony of Rev. John Parkman and Rev. William J. Potter.

Thus we see that the latitude of Unitarian faith is unlimited.    It is simply a free religion, and we have seen that this society was formed upon the same broad basis.

Now, we repeat, where is the power to limit a man's religious faith ?

There is no ecclesiastical synod to sit in judgment; and if there were, there are no articles of faith, there is no creed, no rule of law to govern. By what standard, by what authority or jurisdiction, shall men be tried? It is simply a house belonging to a society, built for public religious worship of the members of the association, who have no creed, and no limitations in their religious faith. From any evidence in the case, there is no member of the society who voted in the majority on the resolution relating to the use of the house, who is not as much a Unitarian, and has not as much claim to the name of Unitarian, as any member of the society who voted with the minority. Each individual, then, of that majority, has the same voice in the custody, control, and use of the house as any individual of the minority, and his rights would suffer as much by any interference of the court, as would the rights of any individual of the minority by the court not interfering. Aye, and much more, for, as the parties now stand, under the resolution so equitable and just in its provisions, each party has secured to itself all of the rights that equity and good conscience could possibly mete out, and this by the magnanimity of the majority, from whom this court is asked to wrest rights as dear and valuable to each of them as to any individual plaintiff. With the kindest feelings we would suggest, if the plaintiffs manifested to the defendants the same spirit which has been practically demonstrated by the defendants to the plaintiffs, this proceeding would never have troubled the court.

What a man believes is one thing, what he does is quite another. In Jesus we have, at least, the highest type of manhood, the purest precepts, and the purest religion ever revealed to man. It is one thing to believe in those precepts and that religion, and quite another to practice such noble and exalted virtues. If, then, equity and good conscience are implored, let it not only be the precept of the plaintiffs, but the guide of this court, in determining the rights of the parties to this proceeding.

Our position is, that the the religious principles of the defendant, Rev. Francis E. Abbott, are not to decide the rights of these parties. The other defendants are not here as the especial champions of his principles, but they are here as Unitarians, " believing and insisting that each and every rational and moral being, male or female, is under the highest obligations to form his or her opinions about religion, and to worship God according to their own convictions of truth and duty." With this view, with a view to more enlightened " convictions of truth and duty," we listen as Unitarians, as members of the First Unitarian Society of Christians in Dover, from choice, and as anxious inquirers after truth, to the teachings of Mr. Abbott, receiving or rejecting as our conscience and reason may approve or condemn. As members of the First Unitarian Society of Christians in Dover, under the agreement we have subscribed, have we not this right? Who shall answer but we ourselves? In the issues here involved we pin our faith to the sleeve of no man, but claim for ourselves the rights of men and women, the rights of men and women able to think and act

for ourselves. We ask, with due respect, who shall stand between ourselves and our consciences? We are men and women capable of managing our pecuniary interests, and we respectfully submit if we are not to be trusted with our souls' eternal salvation, with the destiny of our future life. In early life some of us were taught that to escape the wrath of a vengeful God and eternal damnation were the principal inducements to good actions and a pure life; that sometime there would be a final judgment, when every one's eternal destiny would be finally, forever fixed; but we have never yet been advised that the supreme judicial court of New Hampshire had any share of that jurisdiction.

But it is objected, that the defendants have been pleased, in the exercise of their "own convictions of truth and duty," to listen to the preaching of one who has placed himself outside of Christianity, and who has declared himself not a Unitarian. What, we most sincerely, reverently, and respectfully ask, is *Unitarianism?* Has it any rule of faith by which men are to be judged—to be condemned, or approved? What is its measure of latitude, what its faith, what its creed? If there is any one thing on which Unitarians are agreed, it is on the opinion that Jesus is not God. See any sermon, address, disquisition, or sentiment of any Unitarian of any age or time, and especially a sermon of Rev. A. P. Peabody, D. D., recently published by the American Unitarian Association at Boston, entitled "Jesus Christ." This opens a somewhat extended field for discussion, upon which we do not propose at this time to enter. But perhaps we may properly enough suggest that it is not claimed probably by any one that Jesus was an angel. If, then, he was not God, and was not an angel, we are left to but one conclusion, and that is, that he was a man. What was his particular mission, how and how far inspired, &c., are questions about which there are all shades of opinion among Unitarians. See testimony of Rev. John Parkman and Rev. William J. Potter, and Unitarian publications generally. Upon this point, Mr. Abbott agrees with other Unitarians belonging to the radical school, and preaches what they preach. Now, shall the defendants, who are every one of them as much Unitarians as any one of the plaintiffs, be enjoined from the exercise of their corporate rights of attending public and religious worship in their own house, and listening there to the same doctrines recognized by the denomination of Unitarians?

One other objection to the theology of Mr. Abbott seems to cover the specific charges in the bill, and that is relating to the infallibility of the scriptures of the Old and New Testaments. And here, again, we say, he does not differ from the radical school of Unitarians. In support of this position, we refer to the quotation already made from the Rev. Samuel J. May, the testimony of Rev. John Parkman, Rev. William J. Potter, the publications of the American Unitarian Association, the testimony of Rev. Francis E. Abbott, and the fact that, having shown, by the most positive affirmative testimony, the wide latitude, the unlimited latitude, of Unitarians on this and all other points of religious faith, no attempt has been made to limit it. And that simply

because there is no limit, because our testimony is known by every one who knows anything about it, to be the truth, the exact truth. ·

But still it is charged that Mr. Abbott has himself said that he is neither a Unitarian nor a Christian. Let us for a moment consider this. Why does he say that he is not a Christian? Simply because of the definition he gives to the word Christian, which is, in substance, that, according to his idea of a Christian, a man must believe in the Messiahship of Jesus, which he (Mr. Abbott) does not. Now, how is it with Unitarians? The testimony clearly shows what everybody knows, that there are many Unitarians who do not believe in the Messiahship of Jesus; and as all Unitarians call themselves Christians, and claim to be Christians, and as Mr. Abbott believes exactly as they do, except in his idea of the word " Christian,"—taking the idea of Unitarians and Christians of the meaning of the word " Christian,"—and judging Mr. Abbott by the same standard they judge themselves by, he is as much a Unitarian and a· Christian as they are. This is certainly righteous judgment, and judgment of which they cannot complain. And this is so, even though the plaintiffs are *conservative* Unitarians; for, while they fellowship *radical* Unitarians, making their corporate agreement broad enough to include all shades of opinion, in no way limiting their religious faith, they are as much bound to accept and acknowledge Mr. Abbott as a Unitarian and a Christian, as they have a right to claim to be such themselves. In other words, we claim that they are morally and legally estopped from asserting that he is not as much a Unitarian and a Christian as themselves and their associates. In the practice of the Christian virtues, in a pure and holy life, in reverence for God and devotion to the eternal principles of truth, it cannot be claimed that Mr. Abbott is excelled by any man now living.

What, then, is the case as it stands upon the testimony? It is this, in brief: About 1828, certain individuals associated together and formed a religious society, under an agreement allowing the broadest latitude of *religious* faith, built a house for their *public and religious worship*, unmanacled by any donated trusts, and placed it in the custody and control of the society. Said society has become divided, one wing representing the conservative and the other the radical view. The majority, no matter whether radical or conservative, have voted a just and equitable division of the use of the house between these two sections, giving to the minority the same privileges they ask for themselves, and all the privilege that either needs or would enjoy, for there has been but one service each Sabbath in said house, with a few exceptions, for full ten years. That minority now ask a court of equity to interfere, and expel the majority from the rightful use of the house, when that use is as legitimate and proper, and as consistent with the purposes for which the house was built, as is the use which the minority would make of it.

We have seen that this property was not donated. There are no express or implied trusts which this court are, or can be, called upon to execute. It is peculiarly an association where the majority are to rule.

Can it be said that there were manifest purposes in the formation of this association which the majority are attempting to thwart, and it is the right of a court of equity to restrain them?

We have failed to find any instance in which any court has exercised such power, and we believe there is no principle which authorizes it. Were courts to assume such power, there is not a society in New England which is not liable to be destroyed, if it has a minority of one conservative fogy who adheres to some obsolete idea of belief which that society has outgrown, as a boy does his coat. It is supposed that fifty years ago most evangelical denominations professed to believe in infant damnation and a personal devil, and it is fair to suppose that societies formed at that period were formed with the view and the purpose of supporting and maintaining those principles of their religious belief. But, thanks to a more enlightened age, such opinions are now generally rejected. If some aged member of one of our good Congregational societies, most sincere and earnest in his religious convictions, should feel that the house he helped erect in his earlier days as a place for his future worship was being desecrated by the majority, by employing a modern divine who either neglected to preach these views or denounced them as relics of a less enlightened age, and should implore the power of this court in restraint, would they feel justified in exercising it? But this case is not so strong even as that; for Mr. Abbott is preaching exactly in accordance with the spirit and purposes of the founders, as expressed in their associate agreement, which is as broad as Theism itself. Should Mr. Abbott and his friends desire to form an association based upon the principles of Theism, they could hardly find language to express themselves more definitely than that employed in this associate agreement. But this is not their purpose. The defendants are a majority of the old society, and as such occupying the house as their place of public worship. We submit, were the case that of a majority of the society voting to open their house to another society, especially, as in this case, only for a part of the time, and that part when they themselves did not wish to occupy it, the court should not interfere to restrain the carrying out of the vote of such majority. In this case, although the vote is not in exact terms for Mr. Abbott to preach in the house, yet the plaintiffs, in their cross examinations, have shown that it was stated and clearly understood at the parish meeting that such was the design and purpose of the resolution.

Some talk has been had that the law can only protect Christians, and that, as Mr. Abbott has declared himself not a Christian, he is a rebel and outlaw, and should be summarily removed by the court outside of Christendom and of all Christian institutions—a position about as tenable in our view as any assumed by the plaintiffs. The question, What is a man's religion? does not, in this state, quite turn him out of court. It may have its influence in that direction, because men are not always free from prejudice. By the statute under which this society was formed, any *religious* sect, as well as any denomination of Christians, may organize, and we suppose each has the same rights

under the law.    At any rate, we hope it will be a long time before our courts will undertake to tie the tongue of a man, or burn him at the stake, on account of his religious faith.

The testimony is, and the fact is, that this house has only been used for one service on each Sabbath for several years.    By the just provisions of the resolution passed at the adjourned meeting, each wing of the society can have their usual and needful use.    What more do the minority want ?    Cannot they be content with their former privileges ?  or, has this controversy awakened in them new zeal ?    We have said they had but one service a day, and it appears, and they were quite zealous to show, that many of them did not even attend that. They will not admit, and the defendants do not wish to claim, that the plaintiffs have any feelings against the defendants to gratify, and that it is upon any such ground that the court are asked to expel the defendants.    If, then, as we have before suggested, this proceeding is awakening in them a new religious interest, perhaps it may rather work good than *irreparable mischief* to withhold the injunction asked for at this time, until the parties may be further and fully heard, and their rights fully settled ; and this gives an opportunity for the reason to have its full and perfect work.

· Here are two parties, divisions of the same society, each claiming the same rights, each enjoying equally those rights, and each fully accommodated.    How, then, is the power of the court to be thus summarily exercised by granting an injunction which can work no practical good to the plaintiffs, and will work great practical injury to the defendants ? Shall not the parties remain as they now are, until a case of such vast magnitude in principle can be fully settled ?    If the plaintiffs choose to have the use of the house, each forenoon or each afternoon, instead of alternating, the defendants will not object.    The defendants only want the house one half day, and, although a majority, they are willing to yield anything the plaintiffs may consistently ask, for their accommodation.    All their rights they cannot yield, and we insist this court will not wrest them from them.

This case is one involving principles of very grave importance.    It is new in its character, most of the questions raised having never been considered, except in the case of *Wiswell* v. *Green*, before cited, the pamphlet of which I herewith submit, believing that it furnishes more light and affords more authority than can be found anywhere else. This case is likely to be an authority in future.    This is an age of progressive thought, and it is being seen and felt in all our religious associations and churches.    It is not confined to Unitarians, or any other denomination, but prevails everywhere ; and it is not unlikely that many other religious societies in New England, and all over our country and the world, may find in themselves minorities and majorities, and what difficulties may arise no prophet or seer can foretell.    But the importance of a right beginning cannot be too greatly magnified.

This brief has been very hastily and imperfectly prepared, because, in

part, of the very limited time, entirely incommensurate with the magnitude of the case. These suggestions, so hastily and imperfectly sketched, are very unwillingly but respectfully submitted.

*J. G. Hall*, for the plaintiffs.

The First Unitarian Society of Christians in Dover, of which the plaintiffs are members, was formed and became a body corporate, as appears by the extracts from the society's records in evidence, and the deposition of Mr. Pidgin, in September, 1827, by virtue of the statute of July 3, 1827, entitled " An act empowering religious associations to assume and exercise corporate powers." The rights and privileges conferred by this statute are confined to Christians : none but members of the Christian faith, of some religious sect or denomination, are qualified to enjoy the benefits conferred by this statute. *The Dublin case*, 38 N. H. 573.

As appears by the extracts from the society's records in evidence, and from the depositions of Benjamin Barnes and William N. Andrews, said society was formed distinctly as a Christian society, and for the purpose, among other things, of maintaining public Christian worship on the Sabbath, and has continued such and had settled Christian ministers down to the time of the defection of the defendant, Abbott, from the Christian faith, a period of forty years.

A society so incorporated cannot, even by major vote of its members, resolve itself into a community of skeptics, and cause their meeting-house to be occupied by a preacher who proclaims his belief to be distinctly anti-Christian, and still enjoy the rights and privileges conferred by the statute of 1827. In such case, the action of the majority would be illegal, and clearly in perversion of the corporate rights and powers of the society, for which they should be restrained from the continuance of such action. Supposing the defendants, in this case, had turned the society's meeting-house into a Mohammedan mosque or a Jewish synagogue, or opened it as a place of public amusement on the Sabbath, we suppose no question could be raised on the propriety of the court's at once enjoining them from the continuance of such proceedings ; and we claim that the evidence shows the belief and preaching of the defendant, Abbott, to be as repugnant and abhorrent to the devout Christian mind, and as completely at variance with the uses to which said house can lawfully be put, according to the letter and spirit of said statute, and in as complete contempt of the rights of the plaintiffs, as if it were devoted to either of the specific anti-Christian or illegal purposes suggested.

The power of corporations is derived only from the act, grant, charter, or patent by which they are created, and they can exercise no authority except what is given them, either expressly or by necessary implication. No vote or act of a corporation can enlarge its chartered authority. *Salem Mill Dam* v. *Ropes*, 6 Pick. 32.

We say that the defendant, Abbott, is not a Christian, but avowedly

anti-Christian in his private belief and public teachings, and hence has no right to occupy the house of worship of said society as a preacher. The printed discourses and articles in evidence, written, preached, and published by said Abbott, and his own deposition, show that he is in no sense a Christian. And we specially call attention to the fact that an examination of his deposition will show that he specifically denies his belief in every one of the points stated in *The Dublin case*, 38 N. H., on pages 571-2, a belief in which, we understand the court to say, entitles a man to be termed a Christian. Said Abbott takes every convenient opportunity to proclaim that he is neither a Unitarian nor a Christian, and makes the great aim and object of his public ministrations an effort to undermine the Christian faith, and reduce his hearers to a belief in a system of natural religion.

The question whether said Abbott is a Christian we understand to be one of law purely. *The Dublin case*, 38 N. H. 459.

We agree with said Abbott, in his statement in the *Liberal Christian* of May 23, 1868, which is in evidence, that a man of his religious belief can be regarded as a Christian " only in a private, esoteric, or transcendental interpretation of the word, and therefore at the expense of perfect sincerity." We claim that the term Christian is to be taken according to its true historical significance; to be taken as it has been uniformly understood since the term has had a meaning, which said Abbott admits to be that of the Christian confession in that " Jesus of Nazareth is the Christ of God." We say that a man, to be considered a Christian, must be, or claim to be, the disciple and follower of Christ. If not, then it seems to us that there is an end of all distinction between Christians and pagans; and the term Christian, as used in our bill of rights and in our statutes, has no meaning.

In said Abbott's answer to Cross Int. 51, he distinctly affirms that he is not the disciple of Christ; and the defendants' witnesses, Parkman and Potter, both admit that modern Jews and said Abbott have substantially the same religious belief, and are equally entitled to the name of Christian, each believing Jesus to have been a weak, sinful man, making from mistaken notions the most preposterous claims ever made by man. Truly, considering the antagonistic position of the Jews to Christ and his early disciples, it seems to us, if the court find Abbott's claim to be termed a Christian good, that eighteen hundred years must be found to have wrought great changes either in Judaism or in Christianity. In said Abbott's answer to Cross Int. 32, he says he considers himself independent, in his religious belief and public religious teachings, of all Bibles, churches, and Messiahs. In what sense is such a man, by any forced construction of language, even to be termed a Christian?

We judge, from certain questions asked the witnesses, Abbott, Potter, and Parkman, that the defendants will ask the court to hold that because certain radical Unitarians hold views similar to said Abbott's, that said Abbott is a Christian Unitarian minister, notwithstanding his disclaimer; and it appears by said Potter's deposition that there are at

least nine persons whose names stood on the Unitarian Year Book of January, 1868, as Unitarian ministers, who believe in some one or all of said Abbott's skeptical notions; but we submit that evidence of skepticism on the part of nine or ninety professed Unitarian ministers has no tendency to prove the belief of said Abbott to be Christian. The question is not whether a portion of the Unitarian clergy have abandoned Christianity, but whether said Abbott has.

As to the Unitarian denomination, it is Congregational in polity, without power to compel uniformity of belief upon penalty of excision; but, as appears by the defendants' evidence, the denomination as a body have endorsed the doctrine of the Messiahship of Christ as a test of membership.

The use of the meeting-house by said Abbott's independent society, as he calls it, is clearly illegal. It is being used by the permission of the wardens by subscribers to said Abbott's preaching, made up of members of said Unitarian society, of Jews, and of persons opposed to Christianity, who may well be called infidels. Abbott distinctly swears that he is not preaching to the Unitarian society, but to an independent society. The defendants are thus putting the house to an unauthorized and illegal use, in perversion of their corporate rights, and in denial of the rights of the plaintiffs.

The votes passed at the parish meeting of April 13 are to the point that said Abbott, and those of like faith, shall not occupy the society's meeting-house as preachers. These votes have never been rescinded, and hence the vote of April 27 cannot override them. It must be construed as it reads. It names Abbott and his independent society in no way. No reference is made to them; and we say that said Abbott's pretence that that vote gives him license to occupy the meeting-house is entirely an afterthought, and made use of by him as a seeming justification of his course in attempting to harass and annoy the plaintiffs by holding their meeting-house as a place in which to preach doctrines which he knows are detested, and considered by a very large portion of the members of the society,—and by far the largest portion of the owners of pews in the meeting-house,—as the rankest blasphemy. We cite, in support of our positions generally, *Miller* v. *Gable,* 2 Denio 492.

*Samuel M. Wheeler,* in reply.

Relying upon the brief we have already presented, and the positions there taken, we propose here to offer some further considerations, and to reply to the positions assumed in the plaintiffs' brief.

The statute, upon which was formed the society which owns and controls the meeting-house in controversy, is not, as claimed by the plaintiffs, in the rights and privileges which it confers, confined to such religionists as are of the Christian faith. The act was passed in 1827, and was then entitled "An act empowering *religious associations* to assume and exercise corporate powers," meaning, clearly, all religious associations, because its language in no way limits its application. If

the act was intended to be limited to associations of the *Christian* religion, its title would be likely to express it. Immediately following the enacting clause, the section reads, " That the members of any religious sect or denomination of Christians," &c. : this can hardly be made to read,—members of any religious sect of Christians, or denomination of Christians. The words " of Christians " do not naturally follow the word sect; and yet the plaintiffs' position claims exactly that. In the Revised, Compiled, and General Statutes, the chapter is entitled " Religious associations," not Christian associations, nor Christian religious associations, but simply religious associations. The first section of the act has been twice changed in its phraseology, each time more simplified, but its meaning unchanged, and now reads,— "Any persons may associate together by written articles, signed by each member, as a *religious society*," &c. If this language means *Christian* religious society, what language would be used if it was desired not to limit its application, but to have it apply to all religious societies ? That part of the sentence in the act of 1827, " or denomination of Christians," should be regarded as one of the superfluities in the section, which have since been left out. The statute, then, clearly authorizes the formation of any religious association ; and those who organized this association, organized a religious association unlimited in its terms, character, and purposes. These are determined by its associate agreement, which is not ambiguous, but definite in its language, clear, distinct, and certain in its meaning.

The plaintiffs have attempted to control the expressed meaning of this associate agreement by other evidence. We object that testimony cannot be received to control what is so well and unambiguously stated in the associate agreement, but that it must speak for itself, uncontradicted and unexplained, for it needs and admits no explanation.

The design and purpose of forming the society is one of the allegations in the bill, and is to be found from the facts which may be disclosed in the testimony, and is not to be settled by the opinions of witnesses. Certain witnesses have stated their opinions as to what were such purposes and design. Those opinions should be rejected. Neither should the court regard who were the men that organized the association, or what was their religious faith, or with what religious society they were connected prior to the organization of this. The associate agreement undertakes to state the design and purposes of the association, and has done so in language which is certain and unambiguous. This associate agreement expresses the theology of the members of this society, and, by subscribing that agreement according to its provisions, they subscribe the only theology that is to bind them. The first, and, really, the only principle of theology there expressed, is a belief in the public worship of God, and that that worship shall be such as is most congenial with each individual member's own convictions of truth and duty. And this is true, not only of those who organized the society, but of all those who have since subscribed and become members. Is the man, who subscribes and joins that society to-day, to inquire what were

the views of the men who organized that society? and is it *their* theology he subscribes, or that which is expressed in the associate agreement? That agreement says, substantially, each individual for himself. The *public worship of God* is the one great, central, controlling idea; the manner of that worship is left to the individual conscience, or, as the society is congregational in its policy, they collectively worship as the majority may decide.

Such is the theology of Unitarians. They believe in God as existing in one person, and that Jesus is not God. They regard God as the only object of their worship: to God alone they pray. Dr. Peabody says all Unitarians are united in believing that Jesus is not the Supreme God; and to the same effect is all of the testimony in this case. All Unitarians, then, are agreed that Jesus is not God, but something less than God. The term Unitarian, in its broadest signification, includes all who are not Trinitarians. This is probably the only thing with reference to Jesus on which Unitarians are agreed, for in the descending scale there is no limit. They do not stop with the Lordship or Messiahship of Jesus, but fellowship those who believe Jesus to have been only a man, and who do not believe him to have been infallible.

In the case of *Wiswell* v. *Green*, page 97, the court say,—"It is clearly in evidence that he [Mr. Conway] insists upon preaching his own views, independent of every denominational creed, and acknowledges no infallible rule of faith and action, apart from his own convictions." Not even the example or teachings of Jesus are to him infallible, as a rule of faith and action. And on page 98, it is said that he, Mr. Conway, in a series of doctrinal sermons, controverted the historical verity of the miracles, assailed the doctrine of the supernatural inspiration of the Bible, and derived proof of the immortality of the soul chiefly from internal or subjective evidences, thereby showing that he neither accepted the life and teachings of Jesus, nor the scriptures, as infallible guides in faith and practice. Still, the same case finds, page 97, that there are thirty-five pastors of Unitarian churches in this country who preach similar doctrines, and particularly Rev. Mr. Furniss of Philadelphia, who *stands high in the Unitarian church*. Mr. Conway, too, at this time, was settled over a Unitarian society, and was sustained in his positions by his society. Thirty-five other Unitarian societies sustained each its own pastor in believing and preaching similar doctrines. Similar doctrine is found in the *Theological Review* for January and February, 1822, pages 18 and 19, and note citing Dr. Lardner, and pages 53 and 54, and number for March and April, pages 118 and 119.

The Rev. William J. Potter, says,—answer to Int. 7, which is, "What are the views of Unitarians with reference to the Messiahship of Jesus?"—" I should say that there were various views, from the opinion that he was the supernatural Redeemer of the world, to the opinion that *he was a natural man*, coming in the providence of God, and revealing in *a natural way* moral and religious truth. I should say that some Unitarians would reject the idea of his Messiahship altogether, and that

some would claim it for him in a spiritual sense—the majority, perhaps." He further says, in answer 8, that he "knows of no limit to the latitude Unitarians are allowed, in respect to the Messiahship of Jesus." He says, with respect to the infallibility of the scriptures of the Old and New Testaments, that he "knows of no Unitarians who would claim infallibility for either; that he knows of no association or body within the denomination, who would limit the latitude in that respect." I wish to call further attention to answers to Int. 14 and 15, and to the article in the *Liberal Christian* referred to in this deposition, in this connection, as Dr. Peabody has denied that the *Liberal Christian* is a Unitarian organ. I refer to the "Year Book," at the top of page 47 and bottom of page 58, which, with the other testimony in the case upon that point, we respectfully submit as at least worthy of consideration, Dr. Peabody to the contrary, notwithstanding. Substantially to the same effect is the testimony of Rev. Mr. Parkman. Without quoting his entire answer to Int. 5, he closes by saying "there has always been a large number of Unitarians who are strictly humanitarians." In the sixth answer, he explains the term humanitarians by saying that he means that Christ was of the same nature as ourselves. I call attention to the eighth answer with reference to the Messiahship of Jesus. Then he says, in the ninth answer, "You may say that there is every variety of opinion held by Unitarians upon every subject." I would also call especial attention to answers 10, 11, 12, 13, 14 and 15, in the direct examination. Then, as Mr. Parkman says in his fifth answer, "there is every shade of opinion. The great distinctive doctrine of Unitarianism, which gives it its name, is the belief in the inferiority of the Son to the Father—that is, that he is not God." In this last sentence is embraced the theology of Unitarians. Such is their theology: simply Theism, with the largest latitude with reference to religion. Religion is defined to be "duty to God, the bond which ties man to Deity, practical piety," which is also Theism.

The only creed ever adopted by Unitarians is found in the "Year Book," page 33, and reads as follows:

"Preamble.—Whereas, the great opportunities and demands for Christian labor and consecration, at this time, increase our sense of the obligations of all disciples of the Lord Jesus Christ to prove their faith by self-denial, and by the devotion of their lives and possessions to the service of God and the building up of the Kingdom of His Son."

This could not be adopted as the sentiment and belief of Unitarians. There were so many who did not believe in Jesus as Christ and Lord, and in his Kingdom, that at the same time they adopted a resolution declaring substantially that this pretended and attempted creed should be regarded as the views of the majority only. See Mr. Potter's deposition, answer 4. Even this resolution was not satisfactory, so determined were the radicals to be unlimited in their theology; and at the last session of the conference they adopted a new article to the constitution, as follows:

"Article 9. To secure the *largest unity of the Spirit*, and the *widest*

*practical* coöperation, it is hereby declared that all expressions in this preamble and constitution are *expressions only of the majority of the conference, committing in no degree those who object to them,* and depending for their effect upon the consent they command, on their own merits, from the churches here represented, or belonging *within the circle of our fellowship.*"

This article was adopted by a vote of 326 to 12, and shows pretty conclusively the broad fellowship of the denomination and of the churches. The debate shows conclusively that it was adopted with reference to the expressions in the preamble which speak of Jesus as Lord and Christ, and "Kingdom of His Son." It shows that there were those reckoned among the denomination, and who receive their fellowship, and whom they are willing and desirous of including in their fellowship, who do not accept Jesus as Lord, as Christ, as the Messiah. It agrees exactly with the testimony of the defendants' witnesses, and contradicts the testimony of the plaintiffs upon this point, unless it be said that their sentiments are too uncertain, indefinite, and mystified to mean anything. Let us look and see who presented and advocated the amendment. The report is found in the most conservative organ of the denomination, and the amendment was presented by the Rev. Dr. James Freeman Clarke, one of the most prominent, eminent, and able clergymen in the denomination. Dr. Clarke says,—"Was it [the preamble] made a condition of fellowship? Certainly not. On the contrary, we passed a resolution saying explicitly that it only represented the opinion of the majority, and that the minority were not bound by it; nevertheless the majority welcomed them to our convention, and rejoiced in them as co-workers. It was not, then, made a condition of fellowship. Was it made a test of Christianity? Far less. There is not a man who has spoken on this preamble who has not taken pains to express his love for the Christian character and nobleness and truthfulness of those who do not subscribe to it. It has never been made a test of Christianity." What does Mr. Abbott make a test of Christianity and Unitarianism? In his answer 16, he says,— " I believe that faith in Jesus, as the Christ and spiritual Messiah, in some sense or other, is essential to Christianity." In answer 6, he says he is not a Unitarian, because he cannot coöperate with that denomination as an organized sect; and in answer 7, he says the reason he cannot coöperate with them is because the denomination has practically avowed its faith in the divine authority of Christ, and this he regards as done in the preamble referred to, answer 8. Mr. Abbott, then, simply does not subscribe to that preamble, because it avows the Messiahship of Jesus, and is one of those for whose " Christian *character* and nobleness and truthfulness" Dr. Clarke says every man who has spoken upon the preamble has taken pains to express his love.

The denomination, then, regard Mr. Abbott, and such as he, Christians, having " Christian characters," and include them within their fellowship. They make Christian character, practical piety, and religion the test, not theology. This is the difference. His noble Christian

virtues will not allow him to subscribe to what, in his honest convictions of truth, he cannot literally accept. They fellowship him and his doctrines; and other men, who think and preach as he does, regard themselves and are regarded by the denomination as of them, are in full fellowship in their conference, members of their churches, pastors of their societies, teachers of their theology and religion. Upon what different ground does the society in Dover stand? Are they holier than any and all other societies in their conference? What distinguishes them from other Unitarian societies? Is it their associate agreement? We have said, and, we submit, shown, that Unitarians, in their theology and religion, are theistical. So is this associate agreement; and so is the society formed under that agreement. The character and purposes of this society are shown, if we are to look beyond the agreement itself, by the character and purposes of other societies of the same denomination.

But, to return to the men who advocated the amendment to the preamble: Dr. Clarke was followed by Rev. Robert Collier, he by Rev. Edward E. Hale, and D. L. Shorey, a layman. Rev. R. L. Collier, Rev. O. B. Frothingham, Rev. J. W. Chadwick, and even Dr. Bellows, —conservative, and second to no man in the denomination,—voted in favor of the amendment. Another circumstance, to show the broad fellowship of this denomination, and to give character and meaning and show the spirit of this convention, and what they mean by the amendment, is the fact which appears in the debate, that Rev. O. B. Frothingham is the president and the representative man of an association, outside of the Unitarian denomination, called the Free Religious Association, "its objects," as stated in its article of association, "being to promote the interests of *pure religion,* to encourage the scientific study of theology, and to increase fellowship in the Spirit; and to this end *all persons* interested in these objects are cordially invited to its membership. Membership in this association shall leave each individual responsible for his own opinions alone," &c. See Rep., May 30, 1867. Yet Mr. Frothingham is pastor of a Unitarian society in New York city, one of the largest in the country. A member of the Unitarian conference, his name appears in the Year Book among the list of ministers, and he is one of the ablest and most influential men in the denomination. When the preamble was adopted, he even put himself outside of Unitarianism; went out from the conference, so radical was he in his views; with others started the Free Religious Association; became and is its president; and, during all this, has remained pastor of his Unitarian and Christian church, been not only tolerated, but the favorite and most popular preacher in a Unitarian meeting-house and a Unitarian pulpit. All this is countenanced, fellowshipped, and approved by the representative body of the denomination, its representative men, his own society, and by Unitarians everywhere. In Dover, N. H., however, we have a baker's dozen of purer men, who raise their hands in holy horror because of a man who has sinned even less,—who is not an officer, but a private soldier, in the Free Religious Association.

So little do Unitarians regard theological opinions, and so entirely do they leave religious character to the individual conscience, that no questions are asked concerning the theology or religion of young men entering as students their theological schools, or graduating and entering upon the ministry.   Even in the ordination of Mr. Abbott over the society in Dover, he refused to be catechized ; and the council assembled, and these plaintiffs accepted him for better or for worse, and consented, agreeably to their associate agreement, that he should become their *religious* teacher ; that he should conduct their *public worship of God according to his own convictions of truth and duty*. This he has done honestly, sincerely, and fearlessly, never abating one jot or tittle of what seemed to him the truth ; and it does not appear from the testimony, and the fact is, that his preaching was not substantially different after the termination of his pastorate from what it had been for several months before.

While pastor, he was supported by a large proportion of his society and by the congregation, a few only staying away and withholding their subscriptions.   In this he was but carrying out the principles of the radical portion of the denomination, preaching the same theology and the same religion that other radicals in the denomination preach, carrying out the resolution of the society making a free pulpit.   He may, in his honest convictions, have dwelt more upon theological questions than accorded with the taste of some of his parishioners ; but the pulpit was a free one, and it was his duty he was doing, of which he alone could be the judge.

Unitarians have not only been liberal in their fellowship, but their pulpit has been free and open for the discussion of every religious, philanthropic, and humane movement.   They have never been able to limit the freedom of their ministers, and they have habitually and everywhere preached upon every subject that they chose, and frankly and boldly expressed their own views upon those subjects.   The subjects of slavery, temperance, politics, and religion have always been freely discussed.   Early in the anti-slavery movement this society resolved that its pulpit was a free pulpit, and that it was open to the discussion of questions of morals and philanthropy, as well as religion.   This was not a unanimous vote, but only a vote of the majority.   The minority undoubtedly felt that their rights were as much outraged by this vote opening the pulpit to such discussions, as do the plaintiffs.   They would undoubtedly say, and swear even, that the society was formed by themselves, or their fathers, for the worship of God ; that the founders were orthodox in their religion, and perhaps democratic in their politics ; and that the purposes and objects of the society were being subverted by allowing anti-slavery and party politics to be preached.   Yet who would have thought that the court would or could put a gag into the mouth of Mr. Parkman, however persistent he might have been in pressing upon his congregation his anti-slavery views !

Now, what is the prayer of the bill, and what do the plaintiffs ask shall be done ?   That the defendants, save said Abbott, shall be

restrained and forbidden to hire, employ, allow, suffer, or permit said Abbott, or any of his associates and fellow disbelievers in Christianity, to preach in said house, or to occupy the same. A man, then, who does not square his faith with these plaintiffs, shall not be permitted to cross the threshold of that sacred temple.

We submit, an injunction cannot be personal, for, if Mr. Abbott's views should change, and he should become, in his religion and theology, what these plaintiffs would approve, then, certainly, unless his sins were unpardonable, he could of right preach there. And how shall this be determined? Must he institute another proceeding, and each of his associates other proceedings, in this court, to have the decree expunged and their sins forgiven? This, we submit, may be done in papal Rome, but hardly in free America. How, then, must be such a decree? It must in some way define the religious doctrines which this court will permit to be preached. It must define what is Unitarianism. It must fix limits—a thing which Unitarians themselves have not yet been able to do. Suppose we take for this purpose the preamble or the constitution of the National Conference, with the amendment to the ninth article to the constitution. If they have any creed, any distinctive theology, this they say it is. We think no one would be in much danger of violating such an injunction. Suppose we take the associate agreement of this society, and enjoin all who do not believe in the public worship of God: it in no way reaches these defendants, or any of them. Suppose we undertake to draw the line of Christianity, define that there the Unitarian denomination is cut in twain, and all of the property of the denomination is given to the conservatives, and the radicals are turned out in the cold,—and that by a decree of the court, against the will of both the conservative and radical elements, who are in favor of a "larger unity of the Spirit and a wider coöperation." ·

In *Wiswell* v. *Green*, page 106, the court say, if indeed it could be made .to appear that it had ceased to be "a house of worship" consecrated to the service of the living God, and had become a temple consecrated to the shrine of deified reason, a minority might wrest it from its votaries; but nothing short of an obvious perversion like that would move a court to interfere.

Now, we submit, where is the testimony which brings this case within this principle? In looking over the sermons of Mr. Abbott, and all of the testimony as to everything he has ever written or said, where is there a single sentence or word that in any way indicates that he is not a sincere, reverent, and humble worshipper of the living God? Where is there any evidence that his services have not always been conducted in the same spirit? On the other hand, the evidence shows that Mr. Abbott's religion is to live more and more "intimately with the Eternal Spirit," God; and this great duty of all mankind all of his ministrations and teachings has aimed to impress. He is only objected to on account of his views of Jesus and of the scriptures, and in these it is clear that he does not differ from a large portion of the radical Unitarians. He accepts Jesus as the greatest religious teacher

of the world, and his life and his teachings the purest of which we have any account; but religion, he believes, "leaves the soul alone with God." "It admits no mediation," not even Jesus, "whose character and spirit he regards as the high-water mark of spiritual excellence;" if not Jesus, certainly not the traitor Judas, and hence neither Jesus nor Judas. He in no way rejects the Christian religion, or any precept or virtue taught or preached by Jesus. He claims, too, that there is good in other religions, and that a good deed done by another in the same spirit is as virtuous as if done by Jesus. It is not objected that he does not himself, in his daily life, practice every Christian virtue, and fully exemplify the highest standard of Christian excellence.

Take out of the case his disclaimer that in theology he is neither a Unitarian nor a Christian, and he becomes, in his religion and theology, exactly like other radical Unitarians. His only reason for not calling himself a Unitarian and a Christian is, that he does not believe in the Messiahship of Jesus. Other Unitarians, and others calling themselves Christians, do not believe in the Messiahship of Jesus. Where, then, is the difference? Who will undertake to write out a decree of this court, which shall go upon its record as a principle of theology to govern all future ages?

Now, of what further do these plaintiffs complain? They say that the defendants, save said Abbott, on April 27, 1868, took, have since held, and now hold possession of said meeting-house. What are the facts? The society have for the last ten years had but one religious service each Sabbath. The resolution, passed by a majority vote, gives the use of the house to each wing of the society one half of each Sabbath. The defendants have never held the plaintiffs out; the bill does not allege it; the evidence nor the facts do not and cannot show it. The plaintiffs then have had the opportunity, under the resolution and under the action of the defendants, to have their accustomed use of the house. They do not allege, nor does the testimony show, that they have any occasion, or desire even, to have more. Do they wish to deprive others of the enjoyment of what does not injure them? Do they say that the defendants so defile and pollute the house as to make it indecent for them? In the exercise of their Christian faith and practice of Christian virtues, would they exorcise their associate brothers and sisters? Or are they pecuniarily and numerically too weak to support themselves, but arbitrary and despotic in their feelings, and seeking to bring others into subjection unto themselves? Why are they still persistent in carrying on this proceeding, when their object has been attained by Mr. Abbott's voluntarily withdrawing from the meeting-house, with the declared purpose of never preaching in it again? When they have been told that the whole difficulty might be ended, and they might have such preaching in the house as the American Unitarian society might approve and send, let the conditions they made answer, which were, Let the wardens resign and give us *loyal* members up the key of the house.

The allegations in relation to the pew taxes are entirely unsupported;

but we claim that the wardens were legally elected, and that they had a right to apply the pew taxes agreeably to the resolution passed at the last adjourned meeting. This, however, they have never done or intended doing. They have never employed Mr. Abbott, appropriated or intended appropriating one cent of the parish money for his support.

As the case now stands, what is there for the court to trouble themselves about ? Mr. Abbott has left the church, never to return. An injunction could certainly compel no more. There is nothing in this respect in the future to provide against, for there is no pretence of any fear that he will ever attempt to preach in the house again. As to his associates and fellow-disbelievers, as they are termed, there is no evidence of any purpose or design on the part of the defendants, or that there ever has been, to employ any one but Mr. Abbott. We submit, then, what is there in the case for the court to consider but the question of costs ?

The plaintiffs in reply.

It is claimed by the defendants, in their brief, that there is, between the case of funds given to be held in trust for the maintenance of a church of a particular character and this case, a wide distinction to be observed by the court in the settlement of the questions raised. We are unable to see what distinction is to be made, so far as the rights of these plaintiffs are concerned, or as to the power of the court sitting in equity to afford relief. It can make no difference as to the power of the court to interfere and prevent a perversion of funds from the purpose they were intended to go to accomplish, whether those funds were given by A to B, C, and others, to be by them held in trust for the maintenance of religious worship after the faith of a particular sect, or whether those funds were contributed by A, B, C, and others, mutually, with which to buy a lot of land and build thereon a church for the use of, and place it under the control of, a religious society of a certain Christian sect that they have formed, and of which they are the members. Many of these plaintiffs were of the original members of this society; their money was contributed to build this meeting-house. They built it for a specific purpose, viz., "for the accommodation of its members," i. e., members of the society "in their public worship." They voted "That the general custody of said house shall be under the control of the First Unitarian Society of Christians in Dover." Pews 1, 6, 2, 88, 13, as the records show, were to be considered as the exclusive property of said society, when and so long as they should maintain public religious worship in said house. Pew taxes were to be paid on the first day of April, annually, to be appropriated for the support of religious worship in said house, under the direction of The First Unitarian Society of Christians in Dover. This society they had just founded on a distinctly Christian basis. It was a religious society of that Christian sect called Unitarian.

They had mutually contributed their money to build the meeting-house, and had put it in the custody of said society for the purpose of accommodating the members,—which members they themselves were,—in their public worship, that is, *Christian* worship, according to the Unitarian faith. If, now, there has been a perversion of these funds, so appropriated, from the use designed by the contributors, then this court will, without hesitation, interfere and restore these plaintiffs to their rights.

Courts have always held that they can inquire into the tenets pro-mulgated in a church in *connection with a right to property*, or a trust to be administered. The limit of the inquiry is this: Was there an *appropriation of property* for the support of a church in which certain religious doctrines should be taught, or a trust created for the promul-gation of such doctrines? * * Then the next inquiry is, Has there been an attempt to withhold the property from the uses to which it was dedicated, or to apply it to others of a repugnant character, and hence, sometimes, whether those who participate in the avails of the property adhere to the doctrines it was given to sustain? *Miller* v. *Gable*, 2 Denio 517 ; *Attorney-General* v. *Pearson*, 3 Merrivale 409.

The suggestions, so freely made, that the plaintiffs are seeking to restrain religious freedom, or that they are asking the court to define, and fix or settle, the theology of the defendants, is entirely uncalled for and foreign to this case. The plaintiffs simply seek their property rights under the constitution and laws of the state, and if, in order to do so, the course of the defendants in abandoning the Christian or Unitarian name, and the usurpation of the church for anti-Christian worship, render it necessary for the plaintiffs to ask the court to ad-minister the law in accordance with the principle approved in *Miller* v. *Gable*, it is not for the defendants to complain. We take it to be the right of the defendants, in common with all other citizens, to worship God according to their own convictions of truth and duty, but not to the disturbance of our vested rights. Was this society established as a Christian society? If so, then we take it the plaintiffs make out their case. The defendants substantially admit this by attempting to show that it was not established on a distinctively Christian basis, because, they say that the language used in the articles of agreement is broad enough to include everybody believing in God, whether Christian, Jew, Mohammedan, or pagan. But if the court will examine the copy of the record of the first two meetings holden by this society, they will find the following: "Notice. Those who are desirous of forming an Unitarian association are requested to meet in the academy, at eight o'clock this evening. Dover, August 28, 1827. Agreeably to the above notice, published in the two papers printed in town, a number of gentlemen met at the time and place requested * * * . It being stated that the object of the meeting was to form an Unitarian association or society, it was voted that there should be a subscription opened for the support of Unitarian preaching in this place for such length of time as may hereafter be agreed upon. *Voted,* That Messrs.

J. B. H. Odiorne, Benjamin Barnes, Jr., and Benjamin T. Tredick be a committee to superintend said subscription. *Voted*, That this meeting be adjourned to September 4th, 1827, at seven o'clock, P. M." " September 4th, 1827, met according to adjournment, J. B. H. Odiorne in the chair. On the committees reporting the following subscription paper as the result of their labors, viz.: ' We, the subscribers, agree to pay the several sums affixed to our names for the purpose of hiring a preacher of the Unitarian faith to preach in this town, at a place to be designated by us at a regular meeting. Dover, August 28, 1827.' [Here follow the names and sums subscribed.] *Voted*, That Daniel M. Durell, Cyrus Goss, Benj. Barnes, Jr., Benj. T. Tredick, and J. C. Sewall be a committee to draft the preamble and resolutions for the formation of a society. After retiring, said committee reported the following [here follow the preamble and resolutions forming the society], to wit: ' Believing that the public worship of God has a salutary influence upon society, by awaking and diffusing moral and religious affections, and considering there are many persons in this place who are unprovided with such means of religious instructions and accommodations for public worship as are most congenial with their own convictions of truth and duty, therefore, the subscribers, for their mutual and better accommodations in the premises, do hereby unite and form themselves into a religious society, by the name and style of The First Unitarian Society of Christians in Dover, and do hereby agree to be governed in their said associate capacity by such rules and by-laws as said society shall from time to time establish. Such persons as are desirous of uniting with them, may become members of said society by subscribing this agreement. Dover, Sept. 4th, 1827.' "

One thing is certain and clear, from an examination of the proceedings of these two meetings, as words can make it,—that is, that the design was to found a Christian society of the Unitarian faith. Their avowed and repeatedly expressed object, and the name which they adopted, show this, and the only fair construction to be put upon the words in the preamble,—" and considering there are many persons in this place who are unprovided with such means of religious instructions and accommodations for public worship as are most congenial with their own convictions of truth and duty,"—is, that reference was made to residents of Dover and vicinity who believed in the theological views then entertained by that sect of Christians called Unitarians, and perhaps, in addition, those who were understood to be dissatisfied with the doctrines preached in the other pulpits in town, and who would be likely to come over to the Unitarian faith upon hearing it expounded by ministers of that denomination. We submit that this is the only reasonable view to be taken, taking into account the object in forming this society and the name assumed.

This preamble expresses just what it was intended to express, viz., the reasons for forming a Christian society of the Unitarian denomination. Having done this, the founders formed themselves into a religious society, by the name and style of The First Unitarian Society of Christians in Dover.

The defendants' view is, that the founders of this society, like the defendant Abbott, placed no special value on Christianity above other religions, only providing one God were worshipped; that they were ready to invite Jews, Mohammedans, deists, and pagans, indiscriminately, to their fellowship, and to go on under the banner of any of these forms of religion as the majority of the society for the time being might happen to dictate. Probably the court will find some difficulty in believing that such a state of mind as this prevailed in any society in New Hampshire forty years ago, when it appears that despite the great advances that the defendants claim have been made within that time in liberality of religious belief and in disbelief in Christianity, this defendant, Abbott, the farthest advanced picket in religious knowledge and attainments, amid great tribulation, and with no great show of success as yet, is just now attempting to set on foot this same Utopian scheme of obliterating Christianity as a religion of any special Divine power or value.

If it was not designed to form a Christian society, why was the Christian name adopted? It is said the name is not of any significance. We beg leave to say that it is of the utmost significance. These men either called themselves by their own proper name, religiously considered, or they practised a deliberate fraud. We submit that the instance cannot be shown where a religious society has organized under a name indicating principles antagonistic to those held by the members. The court are to hold the society to have held the belief indicated by the name chosen for the society, unless it be shown that a contrary belief was entertained by the society. Again: this society was formed just two months after the Act of July 3, 1827. That act, in the powers, privileges, and rights it conferred, was confined to " members of any sect or denomination of Christians " forming religious societies. *Dublin case*, 38 N. H. 573.

This society, as the records in evidence show, took the exact steps required by said statute to become an incorporated body under that statute. Second on the list of original members of this society is the name of Daniel M. Durell, an eminent lawyer of that day, and a former judge in our courts, and probably the legal adviser in the formation of this society. Now why, if these men did not understand that they were establishing and incorporating a Unitarian society on a distinctively Christian basis, did they take all these steps to become incorporated under a statute, clearly,—not only to a man like Judge DURELL, but to any reader of plain English,—by its terms, restricted to Christians? Manifestly there is no reason, unless they designed to perpetrate a fraud upon the state, and to act under false colors. But is there any evidence of such fraudulent intent? So far from this, the testimony from Mr. Barnes, William N. Andrews, Edmund C. Andrews, and Rev. Samuel K. Lothrop, D. D., the first pastor of the society, is most conclusive that the society was founded, and has always been maintained, upon distinctively Christian ground ; that it was formed as a Christian Unitarian Society, and the belief of all its original mem-

bers that of the Unitarian denomination of that day; and the evidence is equally conclusive, that the pastors of this society, down to the defendant Abbott, have been Christians of the Unitarian sect. No other doctrines have been inculcated in their public teachings. In further support of the distinctively Christian character of this enterprise, we cite the records of the church connected with this society in evidence. We doubt whether, in any church records, more distinct or more frequent affirmations of a fervent belief in Christianity, or more distinct avowals of determination to walk as the disciples of Christ, can be found. This church was made up of members of this society, living in harmony with it, and as the outgrowth and result of the doctrines from Sabbath to Sabbath preached from its pulpit.

The position of the defendants and the drift of their defence, if we understand it, is, that they are a majority, and as such have the right to govern in all things properly under the control of the society. To this statement of the right of the majority we make no objection, but it is for doing those very things not properly under the control of the majority of the society that we complain. This society, we say, was founded as a Christian society, for the dissemination of Christian doctrine as held at the time by the Unitarian denomination. Money was contributed to that end. It was incorporated as such under a law limited to Christian sects. Now, the law will not suffer a majority of the successors of these original members to enjoy this property and all the corporate rights granted by the statute of 1827, when they have distinctly abandoned the doctrines of Unitarians as they were held in 1827, and employ ministers whose chief delight seems to be a proclamation of disbelief in Christianity. How can this anti-Christian majority any more enjoy these corporate rights as successors to Christian founders, than they, as anti-Christian men, could have become incorporated as a religious society in 1827? And it is pointedly settled in the *Dublin case* that none but Christians could form a religious society, under the statutes of 1819 and 1827. If none but Christians can form a religious society, can others maintain one so founded?

Perhaps by a unanimous vote a religious society, incorporated as this was, may change its name and faith to that of another Christian sect, but most clearly they cannot, by a unanimous vote, even, abandon Christianity and go over to Theism; much less can the majority do this, no matter what opportunity for partnership in the occupancy of the meeting-house they, in their so called magnanimity, may give to the minority who stand firm in their loyalty to the principles under which the society was founded and incorporated. It is simply an attempt on the part of the majority to revolutionize, to effect a complete change of the principles on which the society was founded, and to deprive the minority of their chartered rights and privileges to " worship God in the manner and season " most agreeable to the dictates of their own consciences, at all times, without being disturbed in their Christian worship.

But the defendants may say they have not abandoned Christianity

or Unitarianism. They do so, with the exception of Abbott. He says he has, and that the other defendants agreed to, and did as far as men could do morally. See the sermon of said Abbott in the *Dover Gazette* of October 9, 1868, attached to his second deposition. But, at any rate, the defendants admit that they have chosen to hear said Abbott preach to them, and have accordingly installed him preacher in their house. Now, no matter what the professions of these defendants may be, they have refused to join with the plaintiffs in settling a pastor of the Unitarian Christian faith, and employ and listen, from choice, not to the preaching of a Christian minister, but of one who openly avows himself to be not a Christian, but a Theist. This, for the purposes of this case, is a clear abandonment of Christianity, a complete perversion of the chartered rights of the plaintiffs. The defendants claim that they have employed Abbott, and have been listening to his preaching simply and purely as a majority of the members of the First Unitarian Society of Christians. Aside from the improbability that a company of Christian believers would from choice be sitting under the teachings of a professed disbeliever in the Christian scheme, do not the facts in evidence show most conclusively that the defendants have been, by the permission of the defendant wardens, occupying the meeting-house in question as an independent religious society? The sermon of Abbott, published in the *Dover Gazette* of October 9, 1868, shows that this independent society was formed just prior to the parish meeting of April 27; that immediately after that meeting the wardens of the old society, probably conceiving that they had that right under the resolution of April 27, let the independent society, with their preacher, Abbott, go into the meeting-house of the old society, which they have since occupied down to the time when Abbott discovered that his parishoners were still claiming to be good Unitarians while sustaining him as their preacher,—when he denounces their attempt at deception for the sake of gaining this suit; tells them what they know to be the truth as matter of fact, that they have left the Unitarian denomination with him, and organized the new society; that it was the new society, and not members of the old society, as such, to whom the house was let by the wardens of the old society; that it is to the new society alone that he has been preaching. Mr. R. B. Wiggin, in his answer to cross-int. 28, says that he understood, from Mr. Abbott's remarks in the pulpit, soon after April 1, that he was preaching to the independent society. Dr. York, one of the defendant wardens, in answer to direct int. 12, says there was an independent society formed; gives the articles of agreement and the names of the subscribers, himself one of the number. And, in answer to direct int. 8 of his deposition, wherein he is asked if he or his associate wardens have appropriated any of the pew taxes to the support of Mr. Abbott, or whether they design to, he answers, Not a dollar, and do not design to do so. Now, why did Dr. York make this answer, if he and his associates were occupying the church as the Unitarian society? Further: it appears by Mr. Abbott's sermon, above referred to, and by the testimony of Mr. Cressey, another

of the defendants, that on the 9th day of June last a meeting of this independent society was held at the house of Zimri S. Wallingford, at which the society was permanently organized by the choice of wardens and clerk, and a record made of the same. The wardens there chosen,— Zimri S. Wallingford, Lucius Everett, and Josiah B. Folsom,—are the gentlemen with whom Mr. Abbott, according to his testimony, made his contract to preach for the independent society. The same gentlemen obtained the subscription for Mr. Abbott's preaching. See Mr. Everett's deposition, direct int. 4. These defendants, on the 9th of June last, had done everything necessary to constitute this independent society a body corporate,—if, under the existing statute taken in connection with our constitution, a society carrying on its face such an implied ignoring of Christianity can become incorporated,—except to publish a notice.

The real reason why the process of incorporation stopped here is doubtless found in the fact that this suit was commenced a few days after June 9,—as we find Mr. Abbott saying, in his sermon above referred to, that his counsel finds it necessary to ignore and deny the legal existence of the independent society, to ensure success in this suit. But we say it makes no difference, for the purposes of this case, that the defendants failed to comply with the statute in one particular. They actually organized themselves into an association distinct from, and antagonistic to, The First Unitarian Society of Christians in Dover. As such, they raised money and hired a Theistic preacher. They, as such body, and not as members of the old society, occupied the latter's meeting-house by permission from the defendant wardens. Their acts make them seceders from the Unitarian society, and entitle the plaintiffs to possession of the meeting-house to their exclusion. It is said that the latitude of Unitarian faith is unlimited ; that it is simply a free religion ;—hence, this being a Unitarian society, the plaintiffs must submit to hear any doctrines preached in the society's church that may please the majority for the time being, whether it be the belief of Channing, or of Hume, Voltaire, Paine, or Abbott, or of Mohammed, or the Jews.

Now, so far is this from being the fact, the testimony of Abbott and his sermons in evidence show that he abandoned the Unitarian denomination because it did not believe in a free religion, and that he and the other defendants might set up an independent society "for the purpose of maintaining free religious principles in Dover." We admit that the Unitarian denomination of Christians has never had any fixed creed of belief. Yet the testimony of Rev. Dr. Peabody and Rev. Dr. Lothrop shows, what everybody acquainted with the history of the denomination ought to know, that it has always had its denominational limits practically, and a certain degree of uniformity on the part of its members in religious belief. The testimony of these gentlemen shows that the Unitarian denomination, starting out as one branch of the Congregational denomination in Massachusetts, claimed to be and was a Christian sect, believing in the inspiration of the scriptures,

taking them as the rule of their faith and their guide in life, believing in the divine mission and the authority of Jesus Christ to teach;—in short, placing the same estimate on the Christian religion, compared with all other religions, that the Trinitarian Congregationalists, and all other Christian sects, had done. Such always has been, and now is, the belief of the denomination. See the twenty-eighth report of the American Unitarian Association, with the addresses at the anniversary, May 24, 1853, and discourses and discussions in explanation and defence of Unitarianism, by Orville Dewey. Like all other denominations, the Unitarian denomination has here and there a heretic in its ranks. The defendants have, we believe, counted up nine preachers similar in belief to Abbott, who, lacking the honesty and manliness to openly avow their belief in simple Theism, as Abbott has done, still claim, in some "private or esoteric" meaning of the term, to be called Christians. These men, as appears by the testimony, are distrusted, and are not received into the pulpits or fellowship of the denomination with any degree of cordiality.

Such being the facts, and taking into account the circumstance that the denomination is Congregational in polity, without power of excinding these parties from the denomination by vote of any ecclesiastical tribunal, is the denominational standard of the great body of devout Christians, who make up and give form and consistence to this denomination, to be lowered to comport with the notions of these few apostates who attempt to shelter themselves under the cover and enjoy the prestige of the Unitarian body? It is truly a novel doctrine that, when here and there a man in a denomination proclaims his disbelief in the views always entertained by the great body of the denomination, the whole denomination is estopped to disown him because he persists in claiming for himself the denominational name.

The defendants may undertake to claim that the action of the national conference of Unitarian churches, at their recent session, is favorable to their case in some aspects; but, from the cross-examination of Rev. Dr. Lothrop, it clearly appears that the action of the conference was hasty, and does not express the real sentiment of the denomination. Again: this society is Congregational in its polity, no matter how many deists or theists there may be in other Unitarian societies. This society has always been a Christian society, down to the meeting of April 27, 1868. Then certain persons joined it, as their acts since show, as members of an independent society, anti-Christian in its character, for the purpose of retaining the defendant Abbott as a preacher, and to enable him and his independent society to take possession of the Unitarian society's meeting-house. By their acts they have gone out from the Christian ranks, and the plaintiffs and their friends are the only members of the society who remain true to the Great Head of the church, and who are competent to enjoy the privileges and powers belonging to the society under the constitution and the statute of 1827.

As to the ownership of pews in the society's meeting-house, the

proof is that at the time of the commencement of this suit more than sixty pews belonged to the opponents of Abbott, and not above five to the defendants, many of the other pews being owned by the heirs of persons deceased, who reside in or out of Dover and take no interest in the society, and some twenty-six having always been held by the Cochecho Manufacturing Company (who have never taken any part in the affairs of the society) up to a short time after the commencement of this suit, when said twenty-six pews were sold to the society for $14.

The testimony of Mr. Abbott, together with his printed sermons and articles in evidence, clearly establishes his anti-Christian character, and the exclusively anti-Christian character of his public teachings. We are astonished at the defendants' assertion that Mr. Abbott was not ordained over this society and installed by a council of Unitarian ministers, when the records in evidence show that he was so ordained, and that one of the members of this court, present as a lay delegate, was moderator of the council.

SARGENT, J.* This society in Dover was formed and organized on the 28th day of August, 1827, and has continued to the present time under the same organization. The purpose and design of forming the society are set forth in the articles of agreement, as. follows: " Believing that the public worship of God has a salutary influence upon society, by awakening and diffusing moral and religious affections, and considering there are many persons in the place who are unprovided with such means of religious instructions and accommodations for public worship as are most congenial with their own convictions of truth and duty,—therefore, the subscribers, for their mutual and better accommodation in the premises, do hereby unite and form themselves into a religious society by the name and style of The First Unitarian Society of Christians in Dover, and do hereby agree to be governed, in their associate capacity, by such rules and by-laws as said society may from time to time establish. Such persons as are desirous of uniting with them may become members of said society by subscribing this agreement."

This discloses a design to form not an agricultural, a mechanical, a philosophical, or a literary organization, but a religious society. Its name was adopted for the double purpose of having a legal style and name by which to act and be recognized in law, and also of indicating and defining the religious opinions and sentiments of its members, of expressing their sectarian and denominational preferences and peculiarities. Every word in the name assumed was not only important as a part of its legal cognomen, but also as expressing some truth which formed an important part in the description of the society, referring either to its location and rank, or to the peculiar religious sentiments of its members. It was the " First " society of its kind, and not the third or the fifth. It was a society " in Dover," not in Exeter or

---

* SMITH, J., did not sit.

Portsmouth. So it was a "Unitarian," and not a trinitarian society; and it was also a society of "Christians," and not of Jews, Mohammedans, pagans, or infidels.

This society thus constituted, and having voluntarily assumed this name, the leading and most important words in which were, and were designed to be, so expressive of the most fundamental doctrines of the sect of which, and of which alone, its members were to be composed, on the 6th day of November, 1827, met and voted,—"that, in the views of the society, it is expedient that there should be a house built for the accommodation of its members, in their public worship; that there be a committee formed for raising by subscription the sum of $10,000, for the purpose of purchasing a lot of land, and thereon building a house for the above purpose; and that that sum be divided into 100 shares of $100 each;"—and a committee was at the same time appointed to superintend said subscription.

The required amount was thus raised by subscription, and a lot of land was bargained for; and during the year 1828 a meeting-house was commenced thereon, said house fronting on Locust street, in said Dover, the land and house all being paid for by the money thus subscribed. After the house was commenced, the land, including the house, was conveyed, by the Dover Manufacturing Company, June 10, 1828, to five persons,—H., C., A., P., and O.,—all of Dover, and their successors, as "trustees of said society," to be held by them "in trust for the use of the stockholders or proprietors of the meeting-house to be erected thereon, their heirs and assigns, and under such regulations, conditions, and restrictions for the sale and occupancy of the pews in said house, and for the use, care, custody, and control of said house as may be prescribed by a majority of the votes of said stockholders, at any time previous to the sale or disposal of the pews in said house."

A meeting of said stockholders or subscribers was duly called and holden at said Dover, on the 6th day of March, 1829, prior to the sale of any of the pews in said house; and among other things it was voted, 1st, "That the general custody of said house shall be under the control of The First Unitarian Society of Christians in Dover." Then, after various other regulations, they provided that a pew tax shall be paid on the 1st day of April annually, "to be appropriated for the support of religious worship in said house, *under the direction of* the First Unitarian Society of Christians in Dover," and, also, that the pews be sold subject to these conditions.

A public sale of the pews in said house was holden March 17, 1829, when said pews were sold and conveyed, with all the privileges and appurtenances incident to the pews in said house, and subject to all their liabilities, agreeably to the regulations and conditions as adopted by said stockholders for the sale of said pews.

It appears that such vacancies as have occurred in the board of trustees of said society have been duly filled by new elections, and that Eri Perkins and others are the present trustees, and the proper successors of the original grantees of the land, who now hold it, with the

meeting-house thereon, subject to the same trusts as contained in the original deed.

It will be observed that the meeting-house is described in the bill and in the decree as the meeting-house of said society. This is not literally true, but it is apparent what was intended by this expression. The house was not the absolute property of the society. Perhaps the society, properly speaking, had nothing of legal title. It was not conveyed to the society, not to the trustees of the society in trust for the use of the society as such, but to said trustees and their successors in office, " in trust for the use of the stockholders or proprietors of said meeting-house,  *  *  *  their heirs and assigns," subject to such regulations, conditions, and restrictions " for the occupancy of the pews in said house, and for the use, care, custody, and control of said house," as should be prescribed by the stockholders (subscribers) before the sale of the pews ; and the conditions prescribed by the stockholders were that " the custody of said house shall be under the control of," and that the annual pew tax is " to be appropriated for the support of religious worship in said house, under the direction of" "The First Unitarian Society of Christians in Dover." While, therefore, the house was not owned by the society, nor held in trust for the use of the society as such, the legal title was held by the trustees of said society, but in trust for the use of the stockholders or proprietors of said meeting-house, but not for their general or unrestricted use. But their use, both in the occupancy of the pews, and in the general use, care, and custody of the house, was to be under the absolute and unlimited control of " The First Unitarian Society of Christians in Dover," and the annual pew tax was to be appropriated for the support of religious worship, under the same unlimited control of the same society.

It was, therefore, the meeting-house which the society controlled, both in regard to the occupancy of the pews and the general custody and use of the house, and is thus spoken of as the house of the society, though the society did not hold the legal title. No question is raised here in regard to this trust, or in regard to the right of this society to control the house and the use of it in the way specified in the deed, and as regulated and restricted by the subscribers to the stock before the sale of the pews. This meeting-house was thus held by certain persons, being trustees of the society for the time being, *in trust* for the use of certain other persons, said use being always subject to the control and general custody of " The First Unitarian Society of Christians in Dover."

This society was formed under and by virtue of an act of the legislature of this state, entitled " An act empowering religious associations to assume corporate powers." Approved July 3, 1827, N. H. Laws (1830) 462. This was substantially a reënactment of the act of 1819, 2 N. H. Laws (1824) 44 ; and this act of 1819 was in amendment of the law of 1791, entitled "An act for regulating towns and the choice of town officers "—N. H. Laws (1815) 243 ; and this law of 1791 was passed under and in conformity with the provisions in

our state constitution of 1783, which provisions remained unchanged in the constitution of 1792, which is still in force.

Let us then examine such parts of our constitution as bear upon this subject, and we shall find it convenient to select and group together several articles of part first of the bill of rights, and also of part second of the constitution, each of which we may need to examine by itself and in connection with the others, as throwing light upon the questions involved in this case.

These articles in the constitution of 1783 were not changed in the revision of 1792, but remain the same in both, and continue unchanged to the present time.   They are as follows:

## "PART FIRST.

### " BILL OF RIGHTS.

"ART. I. All men are born equally free and independent; therefore, all government of right originates from the people, is founded in consent, and instituted for the general good.

"ART. II. All men have certain natural, essential, and inherent rights,—among which are the enjoying and defending life and liberty, acquiring, possessing, and protecting property, and, in a word, of seeking and obtaining happiness.

"ART. III. When men enter into a state of society, they surrender up some of their natural rights to that society in order to insure the protection of others; and without such an equivalent the surrender is void.

"ART. IV. Among the natural rights, some are in their very nature unalienable, because no equivalent can be given or received for them. Of this kind are the RIGHTS OF CONSCIENCE.

"ART. V. Every individual has a natural and unalienable right to worship God according to the dictates of his own conscience and reason; and no subject shall be hurt, molested, or restrained in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession, sentiments, or persuasion, provided he doth not disturb the public peace, or disturb others in their religious worship.

"ART. VI. As morality and piety, rightly grounded on evangelical principles, will give the best and greatest security to government, and will lay in the hearts of men the strongest obligations to due subjection; and as the knowledge of these is most likely to be propagated through a society by the institution of the public worship of the DEITY, and of public instruction in morality and religion;—therefore, to promote these important purposes, the people of this state have a right to empower, and do hereby fully empower, the legislature to authorize from time to time the several towns, parishes, bodies corporate, or religious societies within this state to make adequate provision, at their own expense, for the support and maintenance of public Protestant teachers of piety, religion, and morality.

"*Provided, notwithstanding*, That the several towns, parishes, bodies

corporate, or religious societies shall at all times have the exclusive right of electing their own public teachers, and of contracting with them for their support and maintenance; and no person of any one particular religious sect or denomination shall ever be compelled to pay toward the support of the teacher or teachers of another persuasion, sect, or denomination.

"And every denomination of Christians, demeaning themselves quietly, and as good subjects of the state, shall be equally under the protection of the law; and no subordination of any one sect or denomination to another shall ever be established by law."

The other provisions of the constitution, that need to be considered in connection with the above, are the following:

## "PART SECOND.
### " FORM OF GOVERNMENT.

"ART. V. And, further, full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions, and instructions, either with penalties or without, so as that the same be not repugnant or contrary to this constitution, as they may judge for the benefit and welfare of this state, and for the governing and ordering thereof, and of the subjects of the same.

"ART. XIV. Every member of the house of representatives * * * shall be of the Protestant religion, and shall cease to represent such town, parish, or place, immediately on his ceasing to be qualified as aforesaid.

"ART. XXIX. *Provided, nevertheless*, That no person shall be capable of being elected a senator who is not of the Protestant religion * * *.

"ART. XLII. The governor shall be chosen annually, in the month of March * * *. And no person shall be eligible to this office * * * unless he shall be of the Protestant religion.

"ART. LXI. * * * and the qualifications for councillor shall be the same as for senator."

It is sufficiently plain that, by these last four provisions, a religious test is instituted as a qualification for holding certain civil offices. Every member of the house of representatives " shall be of the Protestant religion." No person shall be capable of being elected a senator or councillor " who is not of the Protestant religion." And no person shall be eligible to the office of governor "unless he shall be of the Protestant religion." Something more is evidently intended by these expressions than that a man should simply not be a Roman Catholic in order to hold these offices. The requirement is not negative, but positive and affirmative. It is not that these offices may be filled with those who are *not* Roman Catholics, or who are *not* pagans, or Jews, or Mohammedans, but only by those who *are* of the Protestant religion. This is so in every case; each provision requires a positive and affirmative qualification in order to hold the office. A Mohammedan is not a

Roman Catholic; but he cannot hold these offices, or either of them, because he is not of the Protestant religion, as the law requires he should be. So of the Jew; so of the pagan. The same would be true of an infidel; he is not a Roman Catholic, but he is not of the Protestant religion, because, to be a Protestant he must be a Christian; to be of the Protestant religion, he must be of the Christian religion. The term Christian embraces and includes both Roman Catholic and Protestant alike; and, to be of the Catholic or Protestant religion, a person must first be of the Christian religion.

In Robbins's Religions of All Nations, page 6, it is said,—" The religious world is divided into four grand systems, viz., Christianity, Judaism, Mohammedanism, and paganism. *Christianity* is the religion of those who believe that Jesus Christ is the true Messiah and the Saviour of men, and who receive the Holy Scriptures of the Old and New Testaments as the word of God [page 11]. *Judaism*—of all those who still expect and look for a promised Messiah. *Mohammedanism*—of all those who acknowledge Mohammed a true prophet. *Paganism*— of all those who have not the knowledge of the true God, but worship idols."

The author, adds, "The only people who may not be classed under one or the other of these four divisions are the *Deists* and the *Atheists*, the latter differing from them all, in owning no religion, and the former in owning no divine revelation as the foundation of their religion."

The grand subdivisions among Christians are,—

" 1. The Greek or Eastern church.

" 2. The Roman Catholics, who acknowledge the authority of the pope.

" 3. The Protestant or Reformed churches or sects, who reject the authority of the pope." *Id.*, p. 7.

In consequence of the protest against the decree of the Diet of Spires (or Spire or Speiers), holden within and for the empire of Germany, under the Emperor Charles V, in the year 1529, the followers of Luther were denominated Protestants,—a general term, which was applied alike to all who adopted the principles of the Reformation in opposition to the Catholic church, and which has continued to the present time. *Id.*, 109, 110. Dowling's History of Romanism 471 and note; 1 Felt's Ecclesiastical History of N. Eng. 5, 6; 4 D'Aubigne's History of the Reformation, book 13.

Now the principles of the Reformation, thus adopted by Luther of Saxony and his fellow laborers,—among whom were Zuinglius in Switzerland, Melanchthon in Germany, Calvin in France, Cranmer in England, and Knox in Scotland, preceded first by the Waldenses among the Alps, and later by Wickliffe of England, and after him by Huss and Jerome of Bohemia,—were founded upon the Bible alone, received as the revelation of God's will, and held to be the supreme and only rule of faith and practice. In this they all agreed, though they differed widely in many of their views of doctrine and of church polity.

These views and principles were incorporated into a general confession by the Diet held at Augsburg in Bavaria, in the year 1530, which has since been known as the "Augsburg Confession." This event marked the culmination of the German reformation; and this confession was for a time the established Protestant creed. 1 Chambers's Encyclopædia 548, 549; 6 Chambers's Encyclopædia 222. This confession consisted of two parts,—first, the positive or affirmative part, consisting of twenty-one articles, which embraced their views of Christian doctrines as taught in the Bible; while the second part consisted of seven articles, stating the points of difference between themselves and the Roman Catholics. Mosheim, in speaking of the Augsburg Confession, says,—"That confession was adopted by the whole body of the Protestants as the rule of their faith." 4 Mosheim's Ecclesiastical History, ch. 3, p. 89. In a note on page 90, it is said that twenty-one chapters were devoted to stating the positive and affirmative principles and opinions which they entertained as Protestants, and only the remaining seven to pointing out the errors of popery. 1 Chambers's Encyclopædia, "Augsburg Confession"; 4 D'Aubigne's History of the Reformation, book 14. From this we learn that it was thus early considered that what they believed was of vastly more consequence than what they did not believe; that it was far more important to be right themselves, than to differ from somebody else who was, or was supposed to be, wrong; of far greater moment to be Christians, than not to be Romanists. They were all Christians; believers in Christianity first, and secondly, though Christians, they did not admit the authority of the pope of Rome; and though the number of religious sects has since been multiplied, yet the term Protestant has never been applied, and cannot properly be applied, to any but those who are first Christians, and afterwards anti-Catholic.

An infidel,—one who does not believe the Bible, or that Jesus Christ was the true Messiah, "the Christ of God,"—can no more be a Protestant than he can a Roman Catholic, because he lacks the first and chief qualification of either, viz., a belief in Christianity; for while he, with the Protestant, denies the authority of the pope, he differs from both in not believing the Bible, or in Jesus Christ and his religion. The infidel and the pagan stand alike; they are both anti-Catholic, and equally anti-Protestant. They each lack the first element necessary to make them either Catholic or Protestant, and that element is Christianity. Jews believed in the Old Testament, and not in the New. Mohammedans receive the whole Bible in a sense, but receive and acknowledge the Alcoran as of higher authority, and accept Mohammed as a greater prophet than Jesus. Neither believes the system of Christianity, as taught in the New Testament. They are both, alike, anti-Catholic and anti-Protestant, for the reason that they are both anti-Christian. A Roman Catholic is a Christian who admits the authority of the pope; a Protestant is a Christian who denies that authority; and no one not a Christian can be either a Catholic or a Protestant, any more than a man can be a Jew (religiously) who does not believe in

Moses or the Pentateuch, or than he could be a Mohammedan who did not believe in Mohammed or the Alcoran. Since the days of Luther, Romanists and Protestants have constituted, and still constitute, the two great divisions of Christianity in western Europe and America.

This question becomes of little importance in this case, in the view we take of Art. VI of the bill of rights. But, still, as it is argued and held by one member of the court that the word Protestant in that article, as well as in all other places where that word is used in the constitution, means simply anti-Roman Catholic and nothing more; and, also, that the word Christian in said article is used in a sense having no reference to Christianity as a system of religious doctrines, but in some indefinite sense which would include all good men who behave well without regard to their religious belief, we, for a moment, in passing, advert to these positions, in order to state the views of the majority of the court upon those subjects. We have already cited some authority upon the word Protestant. There are numerous others. Felt, in his Eccl. Hist. of New Eng., p. 6, says, that the term Protestant since the Diet of Spire has been " applied to Christians who have withdrawn from communion with the Roman See." Chambers, in his encyclopædia, traces the meaning of the word Protestant from the protest of Spire down, and concludes that the essence of Protestantism consists " in the source from which and the way in which it proposes to seek for the truth in all matters of faith and practice," that source being the Bible, whose authority is held to be supreme; and that the same is not to be interpreted by tradition, but to be explained by itself, its own language, and connection; which doctrine was the foundation stone of the Reformation. According to this definition, no one of course could be of the Protestant religion who was not also and first of the Christian religion.

The New American Cyclopædia, Vol. 13, has the following: " PROTESTANT, a collective name for a large class of Christian denominations," and embracing all such denominations, " except the Roman Catholic and Eastern churches. * * * The name Protestant came early into use as the collective name for all the Christian denominations in Switzerland, France, England, Scotland, Holland, and other countries which proclaimed the Bible to be the only rule of faith." So in the Penny Cyclopædia, Vol. 10, is the following: " PROTESTANT, a general term comprehending all those who, professing Christianity, yet are not in the communion " of the church of Rome. So the government of England, when under Protestant rulers, passed laws against Jews, pagans, Turks, and infidels; and also against non-conforming Christians, of which they enumerated two classes,—Papists and Protestant dissenters—4 Black. Com. 52, 57, 58; while the Catholics, when in power, punished in the same way Jews, infidels, pagans, and Protestants. The church of England was never *the* Protestant church, but only *a* Protestant church—*one* among *many* branches of the great Protestant division of Christianity. Although the church of England was Protestant, being first Christian and then anti-Roman

Catholic, yet they forgot to a great extent that the rule of private, independent judgment in matters of religion should apply alike to all; and they tried by legal enactments to make all others conform to their views, just as the church of Rome had done before, and very much as the Puritans on a small scale did afterwards in this country, when they persecuted Roger Williams and Wheelwright, the Baptists and the Quakers.

There was the same reason in all these cases. The church in each case constituted a part of the state. Each had their government or state religious establishment; and, in all such cases, whoever denies the state religion, must be, to a certain extent at least, an enemy of the state.

Nicholson's Encyclopædia says,—" PROTESTANT, a term now applied to all Christians who, in any country or of any sect, dissent from the principles and discipline of the church of Rome." To the same effect is the New Edinburgh Encyclopædia, title, "Ecclesiastical History," chap. 4, and the London Encyclopædia, title, " Protestantism." And the Encyclopædia of Religious Knowledge says,—" PROTESTANT, * * * has now of a long time been applied generally to the Christian sects of whatever denomination and in whatever country they may be found, which have separated from the see of Rome." The same work quotes Mr. Chillingworth as saying,—" The Bible, I say, the Bible only, is the religion of Protestants ;" and the Encyclopædia Americana says,— " PROTESTANTISM : the numberless sects *. * * of Protestants all agree * * * in rejecting human authority in matters of religion, taking the Holy Scriptures as the sole rule of their faith and life, and adhering to particular creeds only as expressing the conviction in which all their members agree ;" and see Neal's History of the Puritans, vol. 5, p. 149 and seq.

But let us look to the authority most in use,—the dictionary. Webster's Unabridged gives, *first,* the original meaning, " one who protests," and mentions those who protested at Spires, &c.; *second,* especially, " A Christian who protests against the doctrines and practices of the Roman Catholic church; one who adheres to the doctrines of the Reformation." See, also, Worcester's Unabridged Dictionary : " Protestant,"—no exceptional instances are noticed in which the word was or is ever used to designate any one but a Christian. If such cases existed, where the term has been or might properly be used to denote those who were or are simply anti-Catholic without regard to whether they were Christian, or pagan, or infidel, such enlarged or exceptional cases would have been given, as they are in all other cases. If the word had, at the time of our revolution, or when our state constitutions were adopted, received any enlarged or peculiar signification ; if it was used at that time, or had ever been, to designate or include all who united in opposition to the church of Rome, whether Christian, Jew, or pagan, such peculiar use would have been referred to in the dictionary, and some sentence given in which it had somewhere, or at some time, been used in that sense, or with that significance. But no

such meaning of the word is given, no allusion made to any such use of it, no instance or sentence mentioned in which it was ever applied to, or used to denote, any religious sect or denomination, or any sect or party whatever, except they were Christians. To be Protestant they must first be Christian.

But what is Mr. Abbott's view on this subject? What does he understand by the word Protestant? His own admissions are certainly good evidence against himself in this case, and probably the other defendants will not complain if we quote his opinion as authority on this subject, since they all (except himself) recommend him in their answer as being "honest, sincere, truthful, and clear in his expression;" and all admit his power of intellect and learning. In his sermon of March 15, as reported in the *Dover Gazette* of March 20, 1868, which has been proved and introduced as evidence in this case, he states that *Christianity is only one among many religions into which the human race is divided*, and says,—"Precisely as Methodism or Episcopacy * * * is only one division of Protestantism, precisely as Protestantism is only one division of Christianity, so Christianity is only one division of religion." And in another sermon, preached November 15, and reported in the *Dover Gazette* of November 20, 1868, he says,—"If questioned whether I regard myself as a Protestant, in the plain meaning of the article, I should certainly say, No! If the word Protestant means all who protest against the authority of the Romish church, then I am, of course, a Protestant; and so is every Jew, Mohammedan, Parsee, or even atheist. But that is not the common meaning of the word, nor the meaning of Art. VI in the bill of rights. Fairly interpreted, the word Protestant covers only those Christians who reject the Romish church, and in that sense I am not a Protestant. In fact, I am a Protestant in no sense in which a Jew is not a Protestant."

"Protestants * * * are one division of the Christian religion, and all who are of the Protestant religion are of the Christian religion. Under our constitution none but Protestants can hold certain offices. * * * unless Unitarians are to be reckoned as of the Christian religion, no Unitarian is eligible to the office of governor, senator, or representative." *The Dublin case*, 38 N. H. 459, 573.

Thus we see that the requirements of our constitution, in relation to these officers, demand something more than that they should be simply anti-Roman Catholic. It is no negative qualification that is required, but a positive, an affirmative one. They must be of the Protestant religion. To be of the Protestant religion they must necessarily be of the Christian religion, because a man cannot be a Protestant without first being a Christian. We do not understand by this that such officers must be members of any Christian church, but that they must assent to the truth of Christianity, and thus be nominally Christian. The Encyclopædia of Religious Knowledge says the term "Christian," when used in its more strict, scriptural, and theological sense, denotes "one who really believes the gospel, imbibes the spirit, is influenced by

the grace, and obedient to the will of Christ;" and this it calls the "sacred and proper" use of the word. It mentions another use of the word, which it calls the "political or conventional" use, which denotes one who assents to the doctrines of the religion of Christ, and who, being born of Christian parents, or in a Christian country, does not profess any other religion, or belong to any other of the divisions of men, "such as Jews, Mohammedans, deists, pagans, and atheists;" or, as is said in another part of the article, "Christians may be considered as nominal, and real."

It may be proper to remark, that in this opinion we use the term Christian in its "political and conventional sense," as above stated, that being the sense in which it is ordinarily used in constitutions, and statutes, and legal documents; in other words, "nominal Christians." Mr. Webster thus defines the word "Christian:" 1. One who professes to believe, or is assumed to believe, in the religion of Christ; especially, one whose inward and outward life is conformed to the doctrines of Christ. 2. One who is born in a Christian country, or of Christian parents. This first definition recognizes the same distinction above stated. First, he gives the political or conventional use,—"one who professes to believe, or is assumed to believe, in the religion of Christ;" then the special, scriptural, and theological use above mentioned. His second definition is substantially covered by the first part of the first, for those born in Christian countries or of Christian parents are always reckoned and counted as Christians nominally, "are assumed to believe in the religion of Christ" so long as they do not profess anything else. This is always assumed until the contrary appears. But when such citizen or child openly renounces and abandons the religion of his country or his parents, and embraces some other, such as paganism or infidelity, he is not and cannot be any longer assumed to be a Christian. So the children of Protestants are generally reckoned and assumed to be Protestants, and the children of Roman Catholics are assumed to be Catholics, until they profess or claim to be something else. But when the child of Protestant parents professes to believe the doctrines of the church of Rome, and claims to be a Romanist, he cannot any longer be reckoned or assumed to be a Protestant. So, when the child of Roman Catholic parents renounces the religion of his parents and embraces the faith of some Protestant sect, he is no longer counted or assumed to be a Romanist, because he has made an election or choice for himself, and is thenceforth a Protestant or Catholic, a Christian, a pagan, or an infidel, according to that election and choice, and according to his belief, whatever it may be.

It follows that no man can properly be reckoned, counted, or assumed to be a Christian, who does not believe or assent to the doctrines of that religion. But one who has embraced some other system of religious doctrines; who has elected and chosen not to be, and not to be called, a Christian; who has renounced Christianity and openly professed some other faith,—such a man, not being of the Christian religion, could not be of the Protestant religion.

The question next arises whether in Art. VI, in the bill of rights, which authorizes " the support and maintenance of public Protestant teachers of piety, religion, and morality," there is anything which was intended to be, or can properly be held, directly or by any implication, to forbid the support and maintenance of any other teachers of religion who may not be Protestants ? It will be seen at once, by an examination of this article, that there is nothing in it which directly forbids the employment of any person as a religious teacher by those who choose to employ and pay him. So far as any direct provision or statement in that article is concerned, we are clear that no person is prohibited from teaching any religious doctrine he may choose, whether it be Jewish, pagan, or infidel; nor is any person directly prohibited from supporting and maintaining such religious teacher, provided they do it at their own expense, and in a proper way, so as not to disturb the public, or any private citizens, in the similar enjoyment and exercise of their religious rights and privileges.

But, is there anything in this article, or any kindred article, which by any implication can be held to forbid the employment of any religious teacher by any person or persons, or by any town, parish, or religious society whatsover ? It may be important, in considering this question, to consider, first, what natural right is declared in Art. VI of the bill of rights. It declares that " the people of this state have a right to empower, and do hereby fully empower, the legislature to authorize from time to time the several towns, parishes, bodies corporate, or religious societies within this state, to make adequate provision, at their own expense, for the support and maintenance of public Protestant teachers of piety, religion, and morality." This right is not conferred by this article, but only declared, stated, asserted, as something inherent in the people—a right they had before this declaration of rights, as much as after. It is one of the " natural, essential, and inherent rights " that belong to all men, as declared in Art. II, some of which they may " surrender up to society in order to secure the protection of others," as is declared and set forth in Art. III. But it is also one of those *rights of conscience* which is declared in Art. IV to be not only a natural right, but an " unalienable " right; in its very nature, one which cannot be surrendered to government or to society, because no equivalent can be received for it, and one which neither the government nor society can take away, because they can give no equivalent ; one of the " natural, essential, and inherent rights " which belong to all men,—and not only that, but an inalienable right which a man cannot surrender, and which government or society cannot take from him, as declared in Art. V. " Every individual has a *natural* and *unalienable* right to worship God, according to the dictates of his own conscience and reason ; " and it is also his " natural and unalienable right " not to be " hurt, molested, or restrained in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession, sentiments, or persuasion," provided he does not disturb others.

The right of the people to employ one kind of religious teachers in their towns and religious societies is declared in Art. VI, but does the declaring or stating of one natural and inalienable right take away any others rights which are just as inalienable as the one here declared? The rights of conscience of a Roman Catholic are just as inalienable as those of a Protestant, and the rights of conscience of a Jew just as inalienable as those of a Christian, whether Catholic or Protestant. Neither society nor government can take away either, because in each case the right is declared to be "unalienable." Can it be claimed, then, that the asserting, the stating, the declaring of the existence of one inalienable right, can, by implication, take away from the people another right just as inalienable as the one declared? That were absurd, impossible. In Art. V there is a broad, a general, a universal statement and declaration of the "natural and unalienable right" of "every individual," of every human being, in the state, to make such religious profession, to entertain such religious sentiments, or to belong to such religious persuasion as he chooses, and to worship God privately and publicly in the manner and season most agreeable to the dictates of his own conscience and reason. And if he do it in a way not to disturb others, that right is without exception and without qualification. And can the assertion of the right of the people to support Protestant teachers of religion, as declared in Art. VI, a right which existed before that declaration was made as much as after, and which would not have been stated or declared unless it had been understood to have existed independent of that declaration, as a natural, essential, and inherent right in every man, be held by implication to take away the rights of the same people to support any other religious teachers they may choose, when their right to do so under Art. V is stated, declared, and asserted, not only as a " natural," but as an " unalienable right ?"

The framers of the constitution were very careful to state and declare the distinction between mere civil or political rights, although they were " natural, essential, and inherent " rights belonging to " all men " (Art. II), and the " rights of conscience," which had the additional quality and excellence of being " unalienable." These merely civil or political rights could be surrendered to the government or to society (Art. III) in order to secure the protection of other rights, but the rights of conscience could not be thus surrendered; nor could society or government have any claim or right to assume to take them away, or to interfere or intermeddle with them, except so far as to protect society against any acts or demonstrations of one sect or persuasion which might tend to disturb the public peace, or affect the rights of others. Hence the political right of holding or being eligible to the office of governor, councillor, senator, or representative might be surrendered to the government or to society for the better security and protection of the rights of the whole people, and government or society might insist upon this surrender when deemed necessary for the public good, as was the case in Articles XIV, XXIX, XLII, and LXI, in part second of our constitution.

But when the rights of conscience come in question, the right of worshipping God, either privately or publicly; the right of making "profession" of any religion, privately or publicly; the entertaining of any religious " sentiments," and the proper expression, maintenance, and vindication of them, whether in private or in public; the right of belonging to any " persuasion," which word, in the sense in which it is here used, means " a creed or belief, or a sect or party adhering to a creed or system of opinions " (Webster's Dict.); the belonging to any sect or denomination, entertaining and professing, and in a proper way striving to maintain and to teach, both privately and publicly, any religious creed or belief whatsoever,—these rights are all held to be " unalienable," and are forever secured and guaranteed to " every individual " in the state by Art. V in the bill of rights.

Now, it is only in connection with the exercise of some of these rights of conscience that religious teachers are desired or needed, or are supported or maintained. They are to assist the people or some portions of the people in their public worship of God; to teach and instruct them in the " sentiments " and doctrines of their " persuasion," or sect or denomination, and the duties connected with and growing out of those doctrines and sentiments. Each religious sect, whether Christian, Jew, Mohammedan, or deist, wishes its own religious teacher to assist in the public worship of God, or publicly to teach the doctrines of its creed; and so long as they confine themselves to the requirements of Art. V as to disturbing others, and do not violate any other provision of law, they have an inalienable right to employ and support them, provided they do it at their own expense. The right of the people, which is declared in Art. VI, to support, and to empower the legislature to authorize towns and religious societies to support, teachers of the Protestant religion, is, in substance, only the same right which it is declared in Art. V that " every individual has a natural and unalienable right " to do, in regard to the teachers of any and all other religions or systems of religious doctrine. People of the Protestant faith would have had just the same religious rights and been entitled to the same religious privileges by virtue of the general provisions of Art. V, that they are declared to be entitled to in Art. VI. There is nothing, then, in Art. VI that can be construed as forbidding, by any implication, the exercise or enjoyment of any right which is declared and asserted as belonging to all men equally in Art. V.

Again: the proviso annexed to Art. VI shows the same fact: "*Provided, notwithstanding,* That the several towns, parishes, bodies corporate, or religious societies, shall at all times have the exclusive right of electing their own public teachers, and of contracting with them for their support and maintenance. And no person of any one particular religious sect or denomination shall ever be compelled to pay toward the support of the teacher or teachers of another persuasion, sect, or denomination." It might at first seem that the right which towns, &c., and religious societies are here declared to have, exclusively, of electing their own teachers, &c., is to be taken to mean, by

reference to the former part of the article, *Protestant* teachers ; still, any other religious sect or denomination are not obliged to pay for their support, and such other religious sect or denomination may, as a voluntary association, by virtue of the rights guaranteed to each one of them individually by Art. V, select their own teacher and pay him ; and this expression, " any religious sect," &c., is clearly not to be confined to Protestants, or even to Christians.   The expression is, " any one particular religious sect or denomination ; " it is *not* any sect or denomination of Christians, or of Protestants, but any religious sect or denomination, or any sect or denomination of any religion.

Again : the additional or third paragraph in Art. VI, known as the "free toleration clause," shows that no exclusive privileges were intended to be granted to Protestants, in the matter of the rights of conscience or religious freedom, for it is there expressly provided that "every denomination of Christians, demeaning themselves  quietly and as good subjects of the state, shall be equally under the protection of the law ; and no subordination of any one sect or denomination to another shall ever be established by law."   By the first clause in this paragraph all denominations of Christians are made to stand equal before the law, which places Roman Catholics on the same footing with Protestants, both being alike Christians, the Roman Catholics being a denomination of Christians ; and, finally, it is provided that no subordination of " any one sect or denomination to another " shall ever be established by law. Notice the three separate expressions in this article : " Any   *   *   religious sect or denomination," including sects of all possible religions ; next, " every denomination of Christians," are made equal ; then, no subordination of " any one sect or denomination to another" is to be allowed,—the last clause evidently being intended to include and cover both the other clauses, and including all " denominations of Christians," whether Catholic or Protestant, and all " religious sects," whatever might be their religion.   Observe the distinction here made between " religious sects," or " religious sects or denominations," and " denominations of Christians ; " for we shall find the same distinction kept up in the statutes that we shall have occasion to examine.

It will also be seen that there is equal power conferred upon the legislature in relation to any and all other " religious sects " which they may think it best to favor by their legislation, in Art. V of part second of our constitution, as is conferred by Art. VI of the bill of rights in favor of Protestants.   " Full power and authority are   *   *   given and granted to the said general court, from time to time to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions, and instructions, either with penalties or without, so as that the same be not repugnant or contrary to this constitution, as they may judge for the benefit and welfare of this state, and for the governing and ordering thereof, and of the subjects of the same."   We have already seen that it would not be repugnant or contrary to the constitution for the legislature to give to towns, parishes, bodies corporate, and religious societies, the same powers in regard to

any or all " religious sects," as well as to any or all " denominations of
Christians," that are conferred, in regard to Protestants, by Art. VI
in the bill of rights.   The legislature may, therefore, grant to " any
religious sect," or to " any denomination of Christians," whether Prot-
estant or Catholic, the same rights that are granted to Protestants; or,
rather, the legislature may grant to towns, parishes, bodies corporate,
or religious societies, the power, the right, and the privilege of making
" adequate provision, at their own expense, for the support and main-
tenance " of public teachers of any " denomination of Christians,"
whether Romanist or Protestant, and not only so, but of any " relig-
ious sect," whether of the Christian religion or of any other.   *Com-
pany* v. *Fernald*, 47 N. H. 444, 448 ; *Concord R. R.* v. *Greely*, 17 N.
H. 47, 54 ; *East Kingston* v. *Towle*, 48 N. H. 59, 60.

Under these provisions of the constitution of 1783, the law of 1791
was passed, entitled " An act for regulating towns and the choice of
town officers."   Section 10 of this act provided " that the inhabitants
of each town in this state, qualified to vote as aforesaid,   *   *   *
may   *   *   *   grant and vote such sum or sums of money as they
shall judge necessary for the settlement, maintenance, and support of
the ministry, schools, meeting-houses, school-houses, the maintenance
of the poor," &c.   Such towns had the exclusive right of electing their
own teacher or minister (such as the majority might choose), and
then they could assess a tax for his payment, just as any other town
tax was assessed, and such tax might be collected as other taxes were,
of all the inhabitants of the town, unless there were some who were of
some " particular religious sect or denomination," differing from the
public teacher or minister of the town ; and when that fact was ascer-
tained, such persons were to be excused from paying such minister tax,
by the provisions of the constitution.

At the time of the adoption of the constitution of 1783, there were
but few persons of any particular religious sect or denomination except
the Puritans or Congregationalists.   There were a few of the Church
of England, or Episcopalians, a few Quakers and Baptists, and perhaps
a few of the Scotch Church, or Presbyterians ; so that for a time the
taxes voted and assessed by the towns for the support of the ministry
were collected of the inhabitants generally, with the few exceptions
above stated, just as the taxes for the support of schools and other
public purposes were collected.   And these circumstances remained,
with very little change, down to the time of the adoption of the consti-
tution of 1792, which was the same as that of 1783, so far as all its
provisions relating to the rights of conscience were concerned, and all
the other provisions we have been considering.

But soon after this many new religious doctrines were broached, and
new opinions disseminated, and every new doctrine and opinion
had its advocates and its followers, few and scattered at first, but gradu-
ally increasing in numbers and influence.   The believers in these new
doctrines assumed names as new in some cases as the doctrines which
they believed, and they were not for a time recognized as numerous

enough, or of sufficient importance, to be considered as particular religious sects or denominations, and the majority for a while successfully refused them such recognition as religious denominations. But in 1804 the Freewill Baptists obtained an act of the legislature as follows :

" *Resolved,* That the people of this state, commonly known by the name of the Freewill Anti-Pedobaptists' Church and Society, shall be considered as a distinct religious sect or denomination, with all the privileges as such, agreeable to the constitution." N. H. Laws (1815) 46.

This had the desired effect. They then had a legal name and a legal existence, as a particular religious sect or denomination, which compelled recognition, and excused them from the payment of taxes for the support of the preaching of any other denomination.

In 1805 the Universalists obtained a similar act, constituting " all the people of this state known by the name of Universalists " " a distinct religious sect or denomination from any other ; " and in 1807 the Methodists obtained a similar act, and in both these cases with similar results. *Id.* 46.

These men had been taxed before to support the religious teachers or preachers which the several towns had elected and employed, not because they were understood to be Congregationalists or anti-Congregationalists, but simply as citizens of the town, all of whom were made liable to support the preacher chosen by the town, unless they could excuse themselves under the article in the bill of rights on the ground that they belonged to some " particular religious sect or denomination " different from that of the town preacher. It will be observed, that to be a distinct religious sect or denomination, it was not necessary that they should be Protestants, or even Christians. If they were " a religious sect," that was enough to excuse them from paying the religious teacher of the town ; and then they might voluntarily unite and support any religious teacher they chose, at their own expense, and might meet for public religious worship, preaching, or religious teaching, without regard to the doctrines taught, provided they did it conformably to the laws. They must not be guilty of blasphemy ; they must not teach or countenance any infraction of the laws ; they must not disturb the public peace, or disturb others in their worship. Within these limits, Art. V in our bill of rights secures to every man in the state entire freedom in his " religious profession, sentiments, or persuasion," and the right to worship God, privately and publicly, " according to the dictates of his own conscience and reason."

In 1819 an act was passed in amendment of the law of 1791,—2 N. H. Laws (of 1824) 44,—by which so much of that act was repealed as authorized towns to elect or support religious teachers of any kind, Protestant as well as others ; and it was provided " that each religious sect, or denomination of Christians in this state, may associate and form societies, may admit members, may establish rules and by-laws for their regulation and government, and shall have all the corporate

powers which may be necessary to assess and raise money by taxes, * * * and to collect and appropriate the same for the purpose of building and repairing houses of public worship and for the support of the ministry," &c. No person could be compelled to join or support, be classed with or associated to, any congregation, church, or religious society, without his express consent first had and obtained ; and it was provided that any person might cease to be a member of such society or association by leaving a written notice with the clerk, &c. It will be observed that the legislators of 1819 were careful to adopt the precise language of the constitution into their act. Not only " each denomination of Christians," including Roman Catholics as well as Protestants, but also " each religious sect," may associate and form religious societies, with power to assess and collect taxes, and to appropriate the same for religious purposes.

So the act of 1827, entitled " An act empowering religious associations to assume and exercise corporate powers "—N. H. Laws (1830) 462—provided " that the members of any religious sect, or denomination of Christians in this state, may associate together and form a society," with the various powers therein stated, among which was the power to hold real and personal estate " for the purpose of erecting and repairing a house of public worship, * * * and for supporting the ministry in such society." Here is a very slight variation in the use of words, but evidently without any intent to change the sense. The language is a little more general. " The members of any religious sect," instead of " each religious sect; " or, the members of any " denomination of Christians," instead of each " denomination of Christians." But in the revision of 1842 it was thought useless to keep up these old constitutional formulas any longer, and so they were all abandoned, and instead of so much circumlocution, a simple formula was adopted, which covers, and was intended to cover, at least, all the ground which was covered by the former expressions, and perhaps more. " Any persons " may associate themselves together, form a religious society, and become a body politic and corporate; may build and repair churches, and support the ministry in such society. Rev. Stats., chap. 144, sec. 1. The same expression is used in the General Statutes of 1867. ' " Any persons may associate together * * * as a religious society," &c. Gen. Stats., chap. 139, sec. 1.

Perhaps the laws of 1842 and of 1867 may, if the question ever arises, be held to go further than the laws of 1819 and of 1827, in this, that the religious societies formed under them may perhaps be held to be divested of their sectarian or denominational character, and to stand solely upon the ground of bodies politic and corporate, while societies, organized under the laws of 1819 and of 1827, were recognized as sectarian or denominational societies, notwithstanding such organization, these acts only authorizing religious societies to be formed of such sects or denominations ; and, instead of losing their identity in the body corporate, their peculiar identity as sectarian and denominational societies is carefully retained, while they are only au-

thorized to exercise or assume certain special and limited corporate powers. While the acts of 1819 and of 1827 thus recognize and carefully retain the sectarian or denominational qualities and characteristics of all religious societies formed under those acts, the act of 1819 provides that " each religious sect, or denomination of Christians * * * may associate and form societies, * * * and shall have all the corporate powers which may be necessary " to assess and collect taxes, and appropriate the same to the building of meeting-houses and the support of the ministry; while the act of 1827 is entitled " An act empowering religious associations to assume and exercise corporate powers,"—showing a design to leave the religious societies with all their sectarian and denominational features, but to engraft upon them such powers, simply, as were necessary to enable them to support religious teachers, while the laws of 1842 and of 1867, in terms, at least, ignore any such distinction.

Under these provisions of the laws of 1842 and of 1867, there can be no doubt that " any persons," of any religious creed or sect, may form a religious society, and may elect such religious teachers as they choose, and support them at their own expense, so long as they keep within the restrictions of the constitution in regard to disturbing others. What is said·in the opinion in the *Dublin case*, 38 N. H. 573, that unless Unitarians are Christians they could not form a religious society under the statute, was evidently an error, and it is apparent upon examining the authority on which it is based. No reference is made there to the law of 1842, but the authority quoted purports to be from the acts ·of 1819 and 1827, which are there said to authorize " members of any sect or denomination of Christians " to form religious societies. The conclusion there reached would undoubtedly be correct, if the authority of the acts had been such as the quotation would imply. But the authority of those acts is nowhere limited to " members of any sect or denomination of Christians." The scope of those acts is much broader than that, and includes all " religious sects" as well as all " denominations of Christians." The conclusion is wrong, simply because it is based upon wrong premises; while the conclusion that, under our constitution, none but Christians can hold the office of governor, senator, or representative is right, because the words of the constitution make everybody ineligible to those offices except Protestants, or those who are " of the Protestant religion ;" and to be of the Protestant religion they must be of the Christian religion.

So much of the argument of the plaintiff's counsel as is based upon the assumption that none but " members of any sect or denomination of Christians " can unite and form a religious society, under the acts of 1819 and of 1827, is not well founded, since those acts, as we have seen, authorize the members of any religious sect, or denomination of Christians, thus to unite and form societies, and not the members of any sect or denomination of Christians only.

But even suppose it had been so, that none but Christians could form such a society, under the laws of 1819 and of 1827, that would include

Roman Catholics as well as Protestants, so that, under either construc-
tion, it would show conclusively that the legislatures of both those
years understood that they were not restricted exclusively to authoriz-
ing the support of Protestant religious teachers only, but that they might
as well make provision for Roman Catholic teachers of religion as any
other.   It would show that they understood the constitution as empow-
ering them to authorize Roman Catholics to form religious societies,
and elect and support their own religious teachers, as well as Protes-
tants, if they thought it best to do so.   But they understood, as the
fact was, that the constitution had declared these rights of conscience
to be inalienable; that they could neither be surrendered, nor taken
away, nor impaired, and therefore they authorized any religious sect, as
well as any denomination of Christians, to form religious societies.

When the Freewill Baptists, the Universalists, and the Methodists
wished to get relieved from that part of the town taxes which went to
pay the town preacher, and when the town authorities would not ex-
cuse them on the ground that they were a distinct religious sect,
because they were not of any sect or denomination which had been
hitherto recognized as such, but were what were then sometimes termed
" new lights," all they had to do was to get the legislature to enact
or resolve that they constituted " a distinct religious sect or denomina-
tion," and they could shield themselves under the provisions of the
constitution.   They did not need to be Protestants or Christians, or to
be declared to be such, in order to be entitled to that protection.   It
was enough if they were simply a " distinct religious sect."   No one had
any right to ask the question what their religion was.   That was one
of their rights of conscience, to believe and to profess, and properly to
maintain and teach, any religion, any sentiments, any belief, any per-
suasion, which their conscience and reason might dictate to them; and
this right was not only a natural, but an inalienable right.

A comparison of our constitution of 1783 with the Massachusetts
constitution of 1780 will tend to show that the framers of ours did
not intend, by Art. VI in the bill of rights, by any implication, to
forbid the legislature from authorizing towns or religious societies to
support other teachers beside Protestant, if they chose to do so at their
own expense.   It is a matter of history, that one constitution was sub-
mitted to the people of New Hampshire in 1779, which failed to be
adopted.   Another was submitted in 1781, which was also rejected; but
the same convention continued its sessions, and remodelled it very
materially, and sent it out again, and this amended constitution was the
one which was finally adopted in 1783.   Belknap says that this con-
vention had more advantage than the former, " the neighboring state of
Massachusetts having digested and adopted a constitution which was
supposed to be an improvement upon all which had been framed in
America."   Farmer's Belknap's Hist. of N. H. 383, 384, 389.   The
Massachusetts constitution, in Art. III of the bill of rights—Gen. Stats.
Mass. 14—asserted and declared " the right of the people to invest
their legislature with power to authorize, and the legislature shall from

time to time authorize and require, the several towns, parishes, precincts    *    *    *    or religious societies to make suitable provision at their own expense for the institution of the public worship of God, and for the support and maintenance of public Protestant teachers of piety, religion, and morality, in all cases where such provision shall not be made voluntarily. And the people    *    *    *    have also a right to and do invest their legislature with authority to enjoin upon all the subjects an attendance upon the instructions of the public teachers aforesaid, at stated times and seasons, if there be any on whose instructions they can conscientiously and conveniently attend." Their legislature must not only authorize, but require, the towns, &c., and religious societies, to make provision for public worship and the support of Protestant teachers, that is, to enforce its performance when not done voluntarily; and the legislature might enjoin, and did enjoin, all subjects to attend upon the instructions of said Protestant teachers.

But the framers of our constitution, although they had before them this model constitution, inserted all the religious tests they thought necessary in connection with the civil rights of holding certain offices; but when they came to the rights of conscience, they boldly declared their inalienability, and only simply authorized the support of Protestant teachers of religion. They did not require it, or require that any religious worship be sustained or supported; nor did they require anybody to attend upon the instructions of these teachers or any others, and provided that no person of any different sect or denomination should be compelled to pay for their support. They evidently needed and desired to say something in favor of the Christian religion and the Protestant religion, in order to meet the expectations of the people in those times, but they said as little as they well could about it, so far as it was connected with the rights of conscience, and religious toleration and freedom. They did not intend, in Art. VI of the bill of rights, to confer, or grant, or assert, any rights that should in any way conflict with the broad and just declaration of the natural, the universal, and inalienable rights of conscience, as enunciated and set forth in Art. V.

We have before alluded to the fact that this society in Dover, in selecting its name, had in view two separate and distinct objects: one, to adopt a name as a corporate body under the statute,—a name in which it could sue and be sued, and transact business as a body corporate; another object was, to select a name which should be descriptive of the " particular sect or denomination " of which its members were to consist, which should indicate the particular religious creed or belief of its members, and thus designate them as a " particular sect," which had been recognized in the constitution, and upon which certain rights had been conferred in Art. VI in the bill of rights. A name was selected which accomplished this purpose,—one which indicates and was designed to indicate the fundamental doctrines and tenets of the sect, as well as to furnish a corporate name.

This would probably be sufficiently indicated by the name itself. The people commonly known as " Freewill Anti-Pedo Baptists," and

the people known by the name of "Universalists," and the people known by the name of "Methodists," had each been declared distinct religious sects under the constitution, and were sufficiently described by those names to distinguish them as religious sects, not only from each other, but from all other religious sects or denominations then existing or known, each of which was equally well known by a name which of itself was a perfect and· sufficient description of the fundamental doctrines of the sect thus named, so as to distinguish it from any and all other religious sects or denominations, so that it might assert its rights under the constitution to all the privileges of a distinct religious sect. This practice of designating religious sects by a name that should so describe their creed or association as at once to distinguish them from all other sects, was kept up after the act of 1819 took effect, the same as before; so that often, perhaps generally, the name assumed by religious societies, as in this case, was selected with reference not only to obtaining a corporate name, but also with reference to describing the sect, or of indicating to what sect or denomination the society belonged, by the use of a name which should describe the fundamental doctrines and peculiarities of such sect or denomination. Such was the fact in the case before us, and we think the name itself is a sufficient indication of that fact. But whether this be so or not is immaterial, since the evidence in this case makes it entirely conclusive that such was the intent of the founders of this society, which intent and purpose were well known to the proprietors who put the meeting-house in this case into the hands of trustees, to be forever under the absolute control of said society. By assuming that name, the society and its original members understood, and designed and intended that everybody else should understand, that they were and were to be a society of Unitarians and not of Trinitarians, of Christians and not of infidels; and this trust was established, and the use, custody, and control of the house were placed under the direction of this society, with special reference to the belief, the sentiments, and the doctrines of the society, as belonging to a distinct religious sect or denomination as indicated by its name. All this is abundantly shown by the evidence in the case, if such evidence were necessary.

In numerous English cases the questions have been discussed as to religious charities and trusts, and what doctrines were fundamental in religion, and as to whether the private religious opinions of the founder of a charity or trust were competent to be proved in evidence in order to aid in giving construction to the words of a will or deed by which a charity or trust is created. Some of these are *Attorney-General* v. *Pearson,* 3 Meriv. 353 ; S. C. 7 Sim. 290 ; *Attorney-General* v. *Drummond,* 1 Con. & Law 264 ; *Drummond* v. *Attorney-General,* 2 Eng. L. & Eq. 15 ; *Glasgow College* v. *Attorney-General,* 1 House of Lords' cases 800 ; *Attorney-General* v. *Wilson,* 16 Sim. 210 ; *Attorney-General* v. *Gardner,* 2 DeGex & Smale 102 ; *Attorney-General* v. *Munroe,* 2 DeGex & Smale 122 ; *Attorney-General* v. *Murdock,* 7 Hare 445 ; S. C. 12 Eng. L. & Eq. 83 ; *Attorney-General* v. *Hutton,* 7 Irish Eq. 612 ; *At-*

*torney-General* v. *Shore*, 7 Sim. 309, note ; S. C. 11 Sim. 592 ; S. C. 16 Sim. 210. This last case, known as the Lady Hewley's charity, was finally carried to the House of Lords—see 9 Clark & Finn. 355.   In this case the former cases are reviewed, and the results and conclusions are stated in 1 Greenl. Ev. (4 ed.), sec. 295, note 3.   The principles involved in that case and the earlier English cases cited have been incorporated into and made a part of our American decisions, as far as they are material in this case, as we shall see from an examination of the American authorities.

It was early held in New York, by NELSON, J., in *Field* v. *Field*, 9 Wend. 395, 400, 401, that a fund created by a religious society, for the instruction and education of children in the faith and doctrine of the society, as professed at the time of the creation of the fund, cannot be diverted from its original object and destination ; and that if a diversion be made or attempted, a court of equity will interpose and correct the procedure, but that a court of equity will not attempt to enforce the peculiar faith or doctrines of either party, where there is a schism in a religious society, though their existence and nature may be incidentally involved in an inquiry relative to the rights of property belonging to such society ; all that the court does is to enforce the observance and execution of an ascertained trust.   To the same effect are *Lawyer* v. *Cipperly*, 7 Paige 281 ; *Gable* v. *Miller*, 10 Paige 627 ; *Miller* v. *Gable*, 2 Denio 492 ; *People* v. *Steele*, 2 Barb. 397.

In *Gable* v. *Miller*, 10 Paige 627, it is held that the court of chancery has jurisdiction to prevent a diversion of the temporalities of a church from the purposes for which they were devoted by the donors, and to require them to be appropriated to the support of that form of worship and to the teaching of those doctrines for which they were originally intended.   WALWORTH, Chancellor, in the opinion, p. 647, says,—" The exercise of jurisdiction by this court, in cases of this kind, is not without its difficulties.   And I felt them pressing upon me in the case of *The Baptist Church* v. *Witherell*, 3 Paige 276, so as to induce me to doubt whether civil courts could interfere.   Since that time, however, several cases have arisen and been decided, in this country and in England, which appear to settle the question in favor of such jurisdiction."

And in *Miller* v. *Gable*, 2 Denio 492, 548, which was an appeal from the court of chancery to the court of errors, it is held that when property is conveyed to a religious corporation to promote the teaching of particular religious doctrines, and the funds are attempted to be diverted to the support of different doctrines, it is the duty of a court of chancery, under its general jurisdiction over trusts, to interpose for the purpose of carrying the trust into execution according to the intention of the donors ; and that it was no reason why the court should not thus interfere to enforce such a trust, that a majority of such society, or the trustees elected by such majority, are in favor of such diversion of the trust from its original purpose ; but the court would in such case be bound to interfere upon the complaint of a minority of said society

against the majority. It was also held, that in ascertaining the purposes for which property conveyed to a church was intended to be devoted, the language of the conveyance, if clear and unequivocal, is conclusive. If the language is indefinite, extrinsic evidence, such as the tenets held by the donor, or the faith then actually taught by the donees, and the circumstances under which the gift was made, and that the *denominational name* of a religious corporation or society to which a donation is made, and *the doctrines actually taught* therein at the time of the gift, may be resorted to, in order to limit and define the trust in respect to doctrines usually considered fundamental, such as those in dispute between Trinitarians and Unitarians, but not as to lesser shades or points of doctrine not deemed fundamental. GARDINER, Prest., says he does not sympathize with the doubt expressed by the chancellor in *The Baptist Church* v. *Witherell* (which he has ceased to entertain), as to whether the trustees of a religious society are not independent of all control in reference to doctrine and modes of worship.

In *The People* v. *Steele*, 2 Barb. 397, it was held that the intention of the donors is the criterion by which to determine the purposes to which the property of a church has been dedicated; that if the grant expresses that intention clearly and unequivocally, that must govern. But where the conveyance is merely to the religious corporation by name, with no other designation of its purposes or trusts, the corporate or denominational name, in connection with the contemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust, and that it is no excuse for the trustees of religious corporations, for any aberration from the line of their duty, for such officers to say that they have been directed to it, or are sustained in it, by a majority of those to whom they owe their appointment. And see *Lawyer* v. *Cipperly*, 7 Paige 281; *Bowden* v. *McLeod*, 1 Edw. Ch. 588; *Kniskern* v. *Lutheran Churches*, 1 Sandf. Ch. 439; *Gibson* v. *Armstrong*, 7 B. Mon. 481; *Trustees, &c.,* v. *Johnson*, 1 Watts & Serg. 1, where it is held that, where there was no express condition to that effect, it might be a breach of the compact of association for the majority of a congregation to go over to a sect of a different denomination, though it were different only in name. See *Scott* v. *Carle*, 9 B. Mon. 17; *Inhabitants of Princeton* v. *Adams*, 10 Cush. 129, 132; 2 Story's Eq. Juris., sec. 1191, *a* and note; Hill on Trustees, *467 and note.

In *Robertson* v. *Bullions*, 9 Barb. 64, 132, 133, after a very careful review of all the authorities, both English and American, the court came to the conclusion that a court of equity had power, upon the application of a portion of the corporators in a religious society, to restrain the trustees from applying the temporalities of the corporation to the support of a person as minister who has been deposed from the ministry by the proper ecclesiastical tribunal, and has not been restored. That the support of particular doctrines, or systems of worship or government, or a connection with some particular church judicatory, may be made a condition in a grant or donation to a religious

society; but if no such condition be expressed, none will be implied, except as to cardinal points; but that the corporate or denominational name may indicate the nature of the trust, so far as it respects doctrines deemed fundamental; and that, if a society of one denomination become incorporated, it may be considered as designed and constituted for the purpose of advancing the vital doctrines of the Christian faith, professed by that denomination; and that the trustees may be restrained from applying the property or the use of it to the promotion of tenets or doctrines clearly opposed and adverse to the fundamental principles of the faith and doctrine professed by the church or society at the time the trust was created.

This last case was carried to the court of appeals, and it was there held that religious societies, incorporated under the statute of that state, were to be regarded merely as civil corporations; and that when, in a conveyance in trust for religious purposes, the use is expressed in general terms, it cannot be inferred from the religious faith of the grantor that it was intended to limit the use to the support of the particular doctrines in which he believed, but that, where the language creating the trust is ambiguous, evidence of the faith of the donor, like that of surrounding circumstances, may be received to aid in the construction; and that, in a religious society, the majority of the corporators, without regard to their religious tenets, are vested with the entire control over the revenues of the corporation. 11 N. York (1 Kernan) 243, 267. In the *Parish of Bellport* v. *Tooker*, 29 Barb. 256, 265, the same doctrine is maintained. One fact, however, appears, which it may be well to note, and that is (p. 264), that the religious society in that case was incorporated without any mention, or assumption, of any denominational name or preference.' The name of the society was simply " The Parish of Bellport." This case was carried to the court of appeals, and is reported as *Petty* v. *Tooker*, 21 N. York (7 Smith) 267, where it is held that corporations, formed under section 3 of their act for the incorporation of religious societies, have no denominational character, and none can be engrafted upon them; and that persons otherwise qualified do not lose their right as corporators to vote at elections, by reason of their having individually or collectively renounced the doctrine and ecclesiastical government professed and recognized by the religious body in whose worship and services the corporate property had always been employed, and that the title of trustees to office and to the control of the corporate property is not impaired by any aberration in doctrine or church government on their part, or on that of those by whom they are elected; and that the grant of corporate property must be made upon some express condition, in order that its use may be restricted to the propagation of any particular form of religious belief or ecclesiastical organization; — and see *Burrill* v. *A. R. Church*, 44 Barb. 282, in which the same view is taken as in *Petty* v. *Tooker*.

So far as the case of *Petty* v. *Tooker* is concerned, we see no particular fault to find with the decision, as based upon the facts stated. The

parish was incorporated without assuming any denominational name, without the mention of any such name in connection with the act of incorporation, and there was no trust created in that case except the legal duty which trustees, as officers of the corporation, owed to the corporation.   Here, so far as appeared, was an unsectarian society, which had chosen officers as any other legal society might do, who had simply their duty to do to the society which had elected them.   But in the case we are considering, the deed is to the trustees of this society, not for the use of the society, but for the use of the proprietors of the meeting-house; and said use of the house and its general custody were to be under the control of this Unitarian society of Christians.   The deed might just as well have been given to the trustees of the first savings bank of Dover, and if subject to the same use, and that use had been made subject to the same control, the society would have just as much interest in the meeting-house as it now has.   The society takes nothing under this deed, except that they are to have the control of the use of the house; and that might have been given to them just as well, and just as effectually, if the deed had been given to the trustees of the bank instead of the trustees of this society.   The duty of the trustees, as such, to the society that elected them, has nothing to do, and no connection, with their duty as trustees under this deed. They must hold the meeting-house just as anybody else would under a similar deed, and that had nothing to do with the discharge of their duty to the society as trustees.

We have seen that the decisions in *Robertson* v. *Bullions*, in the court of appeals, and *Bellport* v. *Tooker*, in the supreme court, and the same case as *Petty* v. *Tooker*, in the court of appeals, and the other cases which follow those authorities, are all based upon the peculiar provisions of the statute of New York in relation to corporations.   It is held that under that statute a religious corporation cannot be sectarian or denominational.   But not so the statute under which this society was formed.   The law of this state, passed in 1827, under which this society was formed, authorized "the members of any religious sect, or denomination of Christians" in this state, to associate together and form a society.   So, by the act of 1819, "each religious sect, or denomination of Christians" in this state, may associate.   Was it understood that "the members of any religious sect," or that "each religious sect," when thus associated together, were at once to lose their sectarian and denominational characteristics?   Were not the societies thus formed for the very and sole purpose of enabling the sect or denomination the more successfully to prosecute its peculiar sectarian work? No one was authorized in those statutes, in terms, to associate and form erligious societies, but the different religious sects, and denominations of Christians; and if they were at once by such association, under a general law, to lose their sectarianism and denominationalism, and no longer to be the sects or denominations they were before, then the effect of forming religious societies was certainly very different from what anybody supposed or intended.   But that was not the design.

The sects were to remain sects after such association, the same as before. The different denominations of Christians were to retain all their denominational peculiarities. They were not to lose their identity by such association, but were to be different sects and denominations still. When they associated themselves together to form a religious society, they might keep their old denominational name if they chose, and it would not lose any of its meaning, or any of its force, as descriptive of the tenets of the sect; or, they might adopt a name that had no reference to the sectarian doctrines or creeds, as in the case of " The Parish of Bellport." By the force of our statute, these religious sects, by associating together as religious societies, acquired the powers and rights of a corporation, so far as they were necessary to enable them to raise money to support a religious teacher and to build a meeting-house, without losing any of their rights or powers as a religious sect. All these they retained, the same as before. So that our statute had no such effect as the act in New York had upon which those decisions in *Bellport* v. *Tooker* and *Petty* v. *Tooker*, and others of the same kind, were founded. Those decisions can, therefore, be of no weight as authorities in this case.

Under the constitution, religious sects or denominations were recognized, which were then only distinguished by their names, the names being sufficiently indicative of the doctrines of the sect: " Roman Catholics " was the name of one sect, " Presbyterians " of another, " Quakers " of another. A society which should take for its name " The First Society of Roman Catholics in C," or " The First Society of Presbyterians in C," or " The First Society of Quakers in C," would be understood as made up of persons of the sect which the name of the society indicated; and if a donation of a church had been made to certain persons in trust for a certain use, which use was to be forever subject to the control of The First Society of Roman Catholics in C, or of The First Society of Quakers in C, the trust would have been held to be subject to the control of such of the society, and such only, as adhered to the fundamental doctrines of the society as indicated by the name, even though they might be a minority of those who at first were numbered among its members; that a majority of the original society, if they had abandoned the principles and doctrines of the sect, would not be known as a society of Romanists or Quakers, for the purpose of administering such trust. So of the Methodists, after, by special statute, they were recognized and declared to be a distinct religious sect. The name indicated the belief of the sect. The name in that case would also indicate that the church polity, or plan of church government, was different from that of the Congregationalists, just as the term Episcopalian or Presbyterian would indicate, in each, a different polity from the Congregational; and after the acts of 1819 and 1827, which took away from towns all power to act as parishes or to support religious teachers, and gave to the different religious sects, and denominations of Christians, and to them alone, the right to form religious societies, they retained all the powers and rights which they had.

before as sects, and acquired the additional powers of a corporation for certain limited purposes.

While the authority was granted to towns by the legislature to raise money to support the ministry and to build meeting-houses, these towns, being simply municipal corporations, could not be made sectarian or denominational; while under the acts of 1819 and 1827, as we have seen, all religious societies were, and were to be assumed to be, sectarian and denominational; and they might adopt a sectarian and denominational name, which should describe and declare their faith, and at the same time answer as its corporate name; or they might adopt a general corporate name merely, having no reference to the faith or doctrines of the sect to which they belonged, and then they would, of course, make a declaration of their doctrines, or creed, or confession, in their articles of association. It is not material in this connection to inquire whether religious societies, under our Revised or General Statutes, retain their sectarian and denominational character, which they had, and were presumed to have, under the acts of 1819 and 1827.

Under this condition of things, this society was formed by a distinct religious sect, by a particular denomination of Christians, and, instead of assuming a name which should merely answer as a corporate name in which to transact business, but which should not have any reference to the peculiar sect that had formed the society, they assumed a name which, while it answered for a legal corporate appellative, should also express, as definitely as language could be made to do, the peculiar creed or doctrines of the sect or denomination which formed the society. It was to be a "Unitarian society of Christians." Both these words in the name are as strongly expressive of the fundamental doctrines of the sect as words could be; and it would be assumed in such a case, without any evidence, that the name was adopted for the purpose of expressing the peculiar and fundamental doctrines of the sect that formed the society; and that this would be so understood by everybody.

Therefore, when a trust was created in certain persons, for the benefit or use of this society, or for the use of others, to be under the control of this society by its denominational name, by its distinctive sectarian appellative, it must be understood that the donor or founder of the trust had in view that fact; and that when he constituted his trust or use, and made it subject to the control of this society, he had in view, and referred more particularly to, its sectarian and denominational qualities than to any other. It was only as a Unitarian society of Christians that the control of the use of this house was placed in their hands. This trust was reposed in them simply because they were Unitarian Christians, and not because they were an incorporated society. It was in them in the character of a distinct religious sect, a particular denomination of Christians, that the confidence was placed, and not in them merely as members of a civil corporation. Now, suppose such a society should, in the course of time, become equally divided;

just half its members should secede from the faith and doctrines of the sect which formed the society, and the other half should adhere to such faith and doctrines, and each half should separately undertake to control the use of the house according to its own religious views, and the views of the two divisions were antagonistic, and the court were called on to enforce the trust: can there be a doubt that equity would require that the control of the house should be given to the division which adhered to the original faith? Would not that be carrying out the wishes and intentions of the original founders of the trust? But, suppose that the party which had seceded from the faith of the denomination should outnumber the other by one or more, could that change the reason of the case or its controlling equities? Would it not be the duty of a court of equity to look beyond the mere form of the thing to its material substance, and to say, in such a case, that the portion of the religious society, who adhered to the faith of the sect that founded the society, were entitled to control the use of the house, rather than the portion who, being still members of the society in form, had renounced the faith of the sect which formed, and whose fundamental doctrines had given name to, the society?

We do not deny the right of individuals to change their religious faith, nor the right of members of religious societies to do the same, nor the right of whole societies as a body to apostatize from their original faith, and adopt a new one antagonistic to the first. This is but exercising those very rights of conscience which are asserted in Art. V of the bill of rights as the inalienable birthright of every inhabitant of the state. Nor is it the province of the court to decide or to inquire which faith is most consistent, or what doctrines are true or what are false; and it seldom becomes necessary for the court to turn its attention to theological studies in order to decide questions of law, except in cases like the present, where they are called upon to see that a trust is administered according to the intention of the original founders of such trust. If a trust is created or a charity given for the benefit or use of a sectarian society by its sectarian and denominational name, it is to be presumed that it was intended to be used to advance the peculiar doctrines of that sect; and if a meeting-house is conveyed in trust for certain persons, to be under the control of a society of Christians, it would be the duty of the court, upon proper application and proofs, to see that the house was controlled by a society of Christians, and not by Mohammedans, pagans, or infidels, even though a majority of the original society have apostatized from the faith of the sect which formed the society.

We find in this case, upon the evidence, that the defendants, who claim to be a majority of the society, had in fact, most of them, seceded from the doctrines and faith of the original sect which founded this society, and were no longer, in any proper sense of the term, " Unitarian Christians." Whether they had not seceded from the society altogether, by uniting with an opposition society and acting in hostility to the sect and denomination which at first instituted the religious soci-

ety to which they claimed to belong, and by other acts, may be a question, but one not now material to be considered in this particular connection.

We have seen that the decisions in *Robertson* v. *Bullions*, 11 N. Y., and *Petty* v. *Tooker*, 21 N. Y., are not authorities here, because they are based upon the special provisions of the statute of that state, which provisions are not like those of the statute of this state. In fact, we do not find that these decisions in New York have been followed in other states, except in cases where there was a statute like that in New York. The case in 11 N. Y. was decided in 1854, and that in 21 N. Y. in 1860. In 1862, *Winebrenner* v. *Colder*, 43 Penn. State 244, was decided, where the church by its charter was declared to be independent, and its polity was Congregational; but the constitution of the denomination provided that no person should be accepted as a minister without a regular license, which was to be annually renewed by the eldership of which he was a member. Upon a bill in equity by the minority (who were willing to submit to the eldership and receive the minister sent them. by it, and to conform to the discipline of the denomination) against the majority, for an injunction to restrain them and their minister from preaching or teaching in, or in any manner using, the church edifice,—*Held*, That the church property was held in trust for the use of such of the congregation as adhered and were willing to submit to the regular order and discipline of the denomination; also, that a majority of the congregation, who had made use of the regular corporate forms to institute an organized resistance to the legitimate authority of their ecclesiastical superiors, and had instituted a minister as their pastor who had been expelled by the denomination, was not the true congregation.

In *Ferraria* v. *Vasconcellos*, 31 Ill. 25, decided in 1863, the court were unanimous in opinion; but opinions were delivered by several members. CATON, C. J., said,—" As a matter of law, as I understand the decisions, the rule is, that, where a church is erected for the use of a particular denomination or religious persuasion, a majority of the members of the church cannot abandon the tenets and doctrines of the denomination, and retain the right to the use of the property; but such secessionists forfeit all right to the property, even if but a single member adheres to the original faith and doctrine of the church. This rule is founded in reason and justice, and is not departed from in this case. Church property is rarely paid for by those alone who there worship, and those who contribute to its purchase or erection are presumed to do so with reference to a particular form of worship, or to promote the promulgation or teaching of particular doctrines or tenets of religion, * * * and to pervert the property to another purpose is an injustice of the same character as the application of other trust property to purposes other than those designed by the donor. Hence it is, that those who adhere to the original tenets and doctrines, for the promulgation of which a church has been erected, are the sole beneficiaries designed by the owners; and those who depart from and abandon these tenets and doc-

trines cease to be beneficiaries, and forfeit all claim to the title and use of such property. These are the principles on which all these doctrines are founded." The same views are expressed in *Brunnenmeyer* v. *Buhre*, 32 Ill. 183.

In *Attorney-General* v. *Moore's Executors*, 19 N. J. Eq. (4 C. E. Green), decided June, 1868, a distinction is made between a religious charity and an educational or eleemosynary charity, and though in the latter cases they held the name of the society to be immaterial by a divided court of seven against six, yet they all admit and claim that in the former case,—that of a religious trust,—the doctrines of *Miller* v. *Gable*, 2 Denio 492, and *The People* v. *Steele*, 2 Barb. 398, were correct, and should be carried out; and that the remark of the court there made, that, in a grant to a religious corporation, " its distinctive denominational name, as descriptive of its ecclesiastical connection, was indicative of the particular religious tenets designed to be propagated, is applicable to societies established for religious purposes." BEDLE, J., in the dissenting opinion of the minority, says,—" Names, like titles to acts of the legislature, may denote character and quality, or they may indicate but little.   *   *   Churches are often named after saints, and no denominational character can be deduced from it. But when, in addition to that, a peculiar denominational name is added, as, for instance, St. James's *Roman Catholic* Church, no one could hesitate to believe that it meant what it said ; that it showed, as plainly as words could make it, that the church which bore that name was a Roman Catholic church ; and so of all other churches of any sect or creed. The name, whether Baptist, Episcopalian, Methodist, Presbyterian, or whatever religious sect it may be, is always considered as showing the denominational character of the church ; and no one could reasonably think otherwise. Denominational names, so far as common observation goes, are only used to denote character, or some quality, when applied to church organizations."

We see very little evidence of any disposition to follow the decisions made by the New York court in *Petty* v. *Tooker*, 21 N. Y., and similar cases in that state, in the courts of any other states, unless it may be in some that have statutes similar to that of New York ; and we think those decisions are not to be considered authorities here.* By our statutes of 1819 and 1827, religious societies have all the powers, rights, and privileges of religious sects or denominations under the

---

* In *Calkins* v. *Cheney*, in the circuit court of Cook county, Illinois, decided in 1872, and reported in the *Chicago Legal News*, August 3, 1872, WILLIAMS, C. J., in speaking of the decisions in *Robertson* v. *Bullions*, 11 N. Y., and *Petty* v. *Tooker*, 21 N. Y., says,—"These cases cannot be regarded as authority, except in states which have essentially the same statutes, and then only in instances where religious societies have organized themselves under such state laws."

constitution, all the rights and powers of religious societies at common law,—the statutes only conferring limited corporate powers, in addition to those held before, while none of the privileges, rights, or powers of religious sects, or of religious societies, at common law, are taken away or in any way abridged.

There is a class of cases, like *Wiswell* v. *First Congregational Church*, 14 Ohio St. 32, where it is held that, in case of a division of a religious corporation, where both parties still adhere to the tenets and doctrines and discipline of the organization, the property should be divided between them, in proportion to their numbers at the time of the separation. See *Niccolls* v. *Rugg*, 47 Ill. 47. No one can find any fault with that arrangement of the property in such cases; but the principle of those cases has no application here, for here both parties do not adhere to the tenets, doctrines, or discipline of the original organization. *Smith* v. *Swormstedt*, 16 How. 288.

It is well settled, that members who secede from a church organization or a religious society, thereby forfeit all right to any part of the church property; and whether there has been a secession or not, within this rule, "is a mixed question of law and fact, to be decided upon the evidence with a view to all the circumstances, including the acts of the parties and the motives which have prompted such acts." *Wiswell* v. *First Cong. Church*, 14 Ohio St. 32. In *Baptist Church* v. *Rouse*, 21 Conn. 160, it was held to be a question of fact for the jury whether there was a secession. See *Stebbins* v. *Jennings*, 10 Pick. 172, and cases cited; *The Dublin case*, 38 N. H. 459.

We find that, in this state—in *The Dublin case*, 38 N. H. 459—it is settled, that the individual religious opinions of the donor cannot be received to enlarge or contract the meaning of general terms used in the instrument by which he established the charity.

But it is also held that "courts will resort to the original and long-continued application of a religious charity by the trustees, for aid in giving construction to doubtful terms in the instrument which establishes the charity," and that "where the original trustees, appointed by the founder of a religious charity, applied the fund to the support of certain religious doctrines, and that application has been long continued and acquiesced in, a court of equity will not interfere with the application," unless such interference was called for by the plainly expressed intention of the donor.

It would seem, then, that the proper principles to be applied in this case upon the weight of authority (not taking into consideration those authorities which are based upon the peculiar provisions of the statute of New York, and which can, therefore, have no application here) are, in substance, as follows: That the denominational name of a religious society to which or to whose use a donation or grant is made, and the doctrines actually taught therein at the time of the gift or grant and immediately after, and the length of time they continue to be thus taught without interruption, may be resorted to, to limit and define the trust in respect to doctrines deemed fundamental; that where the conveyance is merely

to the religious corporation by name, with no other designation of its purposes or trusts (as in this case), the denominational name, in connection with the contemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust; that where there is no specific designation in the deed as to the particular religious tenets or doctrines which it is to be used to advance or support, the denominational name may indicate the nature of the trust, so far as respects doctrines admitted to be fundamental; and that, if a society of one religious sect or denomination becomes incorporated with a strict denominational name, descriptive of the fundamental doctrines of the sect to which it belongs, it will be presumed that it was constituted for the purpose of advancing the vital doctrines of such sect or denomination, and that the society, or those having control of property held in trust for the benefit of such religious society, should be restrained from applying the property or the use of it to the promotion of tenets or doctrines clearly opposed and adverse to the fundamental principles of the faith and doctrines of such sect or denomination at the time and immediately after the trust was created.

Now, that the terms Unitarian and Christian, when assumed as a denominational name, are both expressive of the most fundamental and essential doctrines and tenets, will not probably be questioned.  It was settled, in *Inhabitants of Princeton* v. *Adams*, 10 Cush. 129, 132, that the two systems of belief (Unitarian and Trinitarian) are essentially different in their doctrines and principles of faith; and METCALF, J., in the opinion, says,— " We know of no school, either of theology or of jurisprudence, in which these two systems of faith were ever considered essentially the same.  From the early days of Christianity they have always been deemed, as they have been in our day, antagonistic systems; and courts have decided that funds given to support the teaching of one of them, are misemployed and perverted when applied to support the teaching of the other, and have redressed such misemployment,"— citing *Attorney-General* v. *Pearson*, 3 Meriv. 353, and 7 Simons 290; *Shore* v. *Wilson*, 9 Clark & Fin. 355; *Attorney-General* v. *Shore*, 11 Simons 592, and 16 Simons 210; *Attorney-General* v. *Drummond*, 1 Con. & Lawson 210, and 1 Dru. & Warren 353; *Attorney-General* v. *Hutton*, 7 Irish Eq. 612, 614; *Miller* v. *Gable*, 2 Denio 492, 548; *Kniskern* v. *Lutheran Churches*, &c., 1 Sandf. Ch. 439; 2 Story on Eq., sec. 1191, a.

And if the term Unitarian be thus expressive of a doctrine so fundamental and essential, what shall be said of the term Christian ?  If the distinction is so great between two sects, both of which are admitted to be only different denominations of the same religion, what must the difference be between whole systems of religion,—between Christianity and other systems of religion, as the Mohammedan or pagan, or between Christianity and infidelity; a disbelief in and denial of all the fundamental and essential doctrines of the whole system ?

Difference in creed or belief of the Christian doctrines makes the different Christian sects; difference in name makes the different denom-

inations, and the name in some way usually indicates or describes the sect;— so it is the belief in the Christian religion, and in Jesus Christ as its author and as the true Messiah, that makes a Christian; and belief in the religion of Mohammed, and in Mohammed as a true prophet, makes a Mohammedan. It is a man's belief, his creed, that decides what religion and what sect he belongs to. The idea that any man, however good, can properly be called a Christian, who does not believe or assent to the truths and doctrines of Christianity, and, first and foremost of all, to the doctrine that Jesus was the Christ, the true Messiah, "the Christ of God," is simply preposterous. A man's belief alone decides his religion and his sect. A man may be a Christian, in the political or conventional sense in which we use the word, if he assents to the truths of the Christian system. If he lives an upright life, it makes him a good, or, as might be said, a consistent Christian. So a man believing the Mohammedan faith may be a good man. If his life is pure and correct, it makes him a good Mohammedan; but any amount of good living will not make a pagan a Christian, until he believes the Christian faith. An infidel may be a good citizen and a good man; a good infidel, but not a good Christian; because, while an infidel he cannot be a Christian at all. There is and can be no doubt as to what the word Christian means, in its common use and acceptation, and as it is generally understood. All Christians believe in Jesus Christ as the true Messiah and the Saviour of men; in other words, that Jesus Christ was just what he claimed to be,— "the Christ of God." It is to be presumed that the framers of our constitution, when they used the word in Art. VI in the bill of rights, and also that the founders of this society in Dover, when they applied this name to their religious society as descriptive of the faith of the sect which formed it, used this word in its common and ordinary sense: such is the ordinary and universal rule, unless something appears to restrict or qualify such ordinary meaning. "We are not at liberty to presume that the framers of the constitution, or the people who adopted it, did not understand the force of language." They must "be intended to mean what they have plainly expressed, and no room is left for construction." *People* v. *Prudy*, 2 Hill 35; S. C. 4 Hill 384; *United States* v. *Fisher*, 2 Cranch 399; Cooley's Const. Lim. 55; *Robinson* v. *Tuttle*, 37 N. H. 248; *Barnstead* v. *Alton*, 32 N. H. 250; *Mailard* v. *Lawrence*, 16 How. 261.

Let us, then, examine the records of this society in Dover, and the other evidence in the case, and see whether this society was, or was not, in fact, all that its name indicated, to wit, "A Unitarian society of Christians." They must be first Christian, and next Unitarian. We shall also see, in that way, how the trust in this case has been administered. In Congregational organizations there is' presumed to be a church, which is a constituent part of the congregation. Unitarians are Congregationalists, at least in this country. *The Dublin case*, 38 N. H. The society embraces the church, and all those who worship with the church. "Churches  *  *  * in the call of a minister to be their

pastor   *   *   *   act separately from and generally prior to the soci-
ety or parish, which embraces both the church and those who worship
with them.  The call of the church, however, is not valid, unless the
parish assents to it.   The contract of settlement is made wholly be-
tween the parish and minister, and is obligatory on them only."   En-
cyclopædia of Reigious Knowledge, " Congregationalist ; " *Dublin case,*
38 N. H. 507, 508, & seq. ; *Baker* v. *Fales,* 16 Mass. 520 ; Baird's Re-
ligion in America 453, 454.

To find what are the religious opinions of any Congregational soci-
ety, you must look to the creed or doctrines of the church which con-
stitutes its centre and basis.  A Congregational society is generally
made up first of the church, and next of those who worship with the
church and favor the same views, and who assist in supporting the
preaching and public worship of that church.  The society, as such,
often, perhaps generally, has no creed or published religious opinions
distinct from the church ; the church is the basis or foundation of the
whole.  This is true in the Congregational societies in this country
generally, whether orthodox or Unitarian.  The ministers are gener-
ally settled by the society, as in this case, but they become pastors of
the church as well as of the society ; and the creed or belief of the soci-
ety is not to be sought in its constitution or by-laws, but in the creed
or belief of the church with which said society is connected.

In this case, we find that all the ministers who were present at the ordi-
nation of Mr. Abbott are spoken of and described as pastors of the several
*churches* from which they came ; but they were all settled, no doubt, by
their respective societies.   " A church can subsist and perpetuate itself
only by an organic connection with a society.   The society is the soil
for the roots of a Christian vine, supplying the new material to repair
waste by death.  A church not connected with a society would die out."
Ellis's Half Century of the Unitarian Controversy 424, 425, 429–431 ;
*Stebbins* v. *Jennings,* 10 Pick. 172.   A Congregational church is de-
scribed by SHAW, C. J., as an " aggregate body or association—not a
corporation or *quasi* corporation—formed within the religious society
or parish ; set apart from the rest of the society for peculiar religious
observances, for the celebration of the Lord's supper, and for mutual
edification."    *Weld* v. *May,* 9 Cush. 181 ; Buck's Eccl. Law 67.

This society in Dover, being formed as we have seen, and having
erected their meeting-house and sold their pews subject to conditions
above specified, made arrangements to dedicate their house to the wor-
ship of God.  This was done by Christian ministers of Unitarian Congre-
gational churches, in the usual form.  Their first minister was ordained
by the same council of ministers that dedicated the house of worship.

But before the house was dedicated or any minister ordained, it was
thought proper, and perhaps necessary, that a Christian church should
first be formed and organized, as the body which was especially to oc-
cupy the house and direct in its public worship, and to which the pas-
tor was to minister, by virtue of his connection with the society as its
pastor and minister.

Therefore a church was formed, which was made up of members of the society who expressed " their earnest desire and solemn intention of forming themselves into a Christian church, for the purpose of observing Christian ordinances, obeying the precepts of Jesus Christ, and aiding each others' advancement in a holy life," and who, having solemnly declared their belief " in the gospel of Jesus Christ," &c., were declared and pronounced to be " a regular Christian church." And, " now that their house was about to be dedicated, a minister of Jesus Christ to be ordained among them, they themselves formed into a Christian church about to enjoy the satisfaction and benefit of Christian ordinances," they were exhorted to let their hearts be full of gratitude and praise.     See Church Records.

This church was thus formed the 17th day of February, 1829, and the next day (the 18th) their house was dedicated and their first minister ordained.     Let us find what were the doctrines of this church, and they will indicate what kind of a religious society was connected with it.     On the 26th day of April, 1829, at a meeting of this church and its pastor, " the following preamble and covenant drawn up by the pastor, having previously had the individual approbation of the members of the church, was adopted as the covenant of this church."     See Church Records, and B. Barnes's 2d deposition.

" As it seems to be the duty of every Christian church cautiously to obey the injunction of the apostle, ' that all things be done decently and in order,' while at the same time it avoids imposing anything by way of covenant or articles of faith, which may not be conscientiously complied with by all who profess faith in our Lord Jesus Christ, and thereby deprive many of the benefit of Christian ordinances who have a right and privilege to enjoy them ;—therefore,—

"*Resolved,* That the following acknowledgment shall be the covenant of this church, to be assented to by all who may hereafter wish to unite themselves with us for the benefit of Christian ordinances: ' Do you believe in Jesus Christ as the Messiah, and accept his religion as a revelation from God, the true guide of your faith and rule of your duty? With a deep sense of your imperfection and weakness, and a humble and grateful reliance upon God for the pardon of sin and assistance in duty, will you solemnly and earnestly endeavor, by attendance upon the services of religion, and by the offices of Christian charity and piety, to become a sincere disciple of Jesus Christ? that, being faithful to yourself, your fellow men, and to God, you may not be found wanting in that day when he shall judge the world in righteousness by that Man whom he hath appointed.'

"*Resolved, further,* That any person wishing to unite with us in the celebration of the Lord's supper, his desire having been previously signified by the pastor to the church, he shall, unless some serious objection be made,     *    *    *    be received, on the acknowledgment of the above covenant, or any other form of words he may prefer expressing a belief in Christianity, to the full communion of this church and to the enjoyment of all its benefits.

"*Resolved, further*, That baptism shall be administered to all who desire it, to themselves or their children, upon their assenting to the following declaration, which shall be put to them by the pastor before administering the ordinance : ' Do you believe in Jesus Christ as the Messiah, and regard his religion as a revelation from God ? ' " ·

A service of plate had been procured, and the Lord's supper was administered to this church for the first time on said April 26, 1829.

The several pastors or ministers have uniformly been ordained by a council of pastors and delegates called from the neighboring Unitarian Congregational churches for that purpose.

Therefore, judging this society, as all religious societies must be judged, by the doctrines and ordinances of the church whose principles and preaching and public teachings the society sustains and supports, we find it to be not only Christian in name, but in its principles, doctrines, and ordinances.

We also find that the following allegations in the bill are true : " That the main purpose and design of forming said society was the promotion of religious knowledge and Christian virtues by the maintenance of public worship, and the erection of a meeting-house for that purpose, where the doctrines of the Christian religion should be publicly taught and inculcated, as cherished by the sect of Christians known as Unitarians; that said society, from the date of its formation in September, 1827, down to the time of the dedication of the meeting-house, regularly maintained public Christian worship in said Dover on the Sabbath, and had preaching by regularly ordained ministers of the Unitarian denomination of Christians, who there at such meetings preached and taught the doctrines of Christianity, as holden by the sect of Christians called Unitarian ; that, from the time of the dedication of said meeting-house down to the 31st day of August, 1864, said society regularly maintained Christian worship on the Sabbath in said meeting-house, and during nearly all that time had preaching in said house by ministers of said Unitarian denomination of Christians, regularly ordained and installed over said society as its pastors by other clergymen of said denomination, and that, during that portion of the time, between the dedication of said house and said 31st day of August, 1864, when said society have been without settled ministers, they have uniformly had preaching on the Sabbath in said house from ministers of said denomination, and both said last named ministers, and all the settled ministers of said society, have, up to that date, preached and inculcated in said house on the Sabbath, and at all other times have publicly and privately taught and inculcated, the doctrines of Christianity, as believed and taught by the denomination of Christians called and known as Unitarians."

Let us next examine Mr. Abbott's religious opinions and theological views at the time he was settled as pastor over this society, and also at the time when this bill was filed, and see whether any, and, if so, what changes of views and of religious opinions have occurred in his case, and whether he was a Unitarian and a Christian at the time when they first employed him, and whether he continues so at the present time.

It appears from the copies from the records of this society and from the evidence, that Mr. Abbott was ordained as pastor of The First Unitarian Society of Christians in Dover on the 31st day of August, 1864. That he then understood that he was to act as pastor of the church as well as of the society, appears from the following extract from his letter of acceptance, as found in the records of said society : " Unless our *church* shall be a united, earnest, and working one, no amount of outward prosperity or social enjoyment can make it anything but a wreck and failure, and I interpret your invitation as implying, on your part, a pledge of hearty support in all right works and ways." And at the time of his ordination he had his two children baptized, one about two years old, and the other an infant. They were baptized in the name of the Father and of the Son and of the Holy Ghost, as a consecration of them to the service of God. See Barnes's and Abbott's depositions. And we have no doubt that Mr. Abbott at that time assented to the declaration required by the church covenant, previous to the baptism of his children, viz., that he " believed in Jesus Christ as the Messiah, and regarded his religion as a revelation from God."

The council for his ordination was composed of ministers and delegates from several neighboring Congregational (Unitarian) churches, and the record of their proceedings is as follows: " On Wednesday, August 31, 1864, at 10½ o'clock A. M., at a meeting of pastors and delegates, present by invitation, for the ordination of Mr. Francis E. Abbott as minister of The First Unitarian Society of Christians in Dover, Judge H. A. Bellows was chosen moderator, and Rev. H. W. Foote, scribe. Mr. Hale read the record of the action of the society, and. their correspondence with Mr. Abbott. Rev. E. E. Hale moved that the council is satisfied with the proceedings, and is prepared to proceed to the ordination of Mr. Abbott. Rev. Dr. Clark moved that the scribe be instructed to furnish copies of this record, to be entered on the records of this society. The meeting then adjourned." The exercises at the ordination consisted of the usual introductory prayer, reading of the Scriptures, ordination hymn, sermon, ordaining prayer, charge, right-hand of fellowship, address to the people, concluding prayer, and benediction. He was, then, it would seem, a believer in Christianity, and was, therefore, either a Roman Catholic or a Protestant ; and there is no claim that he was a Catholic.

We will next examine the main charge in the bill, viz., that Mr. Abbott has apostatized from the Christian faith and become a disbeliever in Christianity, and also in Unitarianism ; and that he is now occupying said church, not as a public teacher of Christianity, but as an open opposer of Christianity,—as an avowed deist or theist, disowning Jesus Christ as the Messiah, and his religion as the only true religion; and charging that said Abbott is now neither a Unitarian nor a Christian.

Mr. Abbott remained with this society, as pastor or religious teacher, till April 1, 1868, when, by his resignation, that relation terminated. Towards the latter part of his preaching, he made statements that " Jesus Christ was like other men, with no more authority," and

compared Christ with Garrison and other good men; that he doubted whether there was more than one pulpit in Boston that he (Abbott) would be allowed to occupy; stated that he was looked upon as a "rebel" in his theology (Barnes's 1st deposition); that he considered Christ as a mere man, and fallible like other men; that Christ was not the Messiah, and that if he (Christ) believed himself to be the Messiah, he was mistaken (Andrews's deposition); that the New Testament showed that Christ did claim to be the Messiah, but that he (Abbott) believed the Messiah had not come, and would not come (Bell's deposition).

He went on in this way, step by step, until he openly declared himself not a Christian, nor a Unitarian, so far as Unitarianism was based upon Christianity. or the recognition of Christ as the Messiah; proclaimed himself a theist, and preached his theistical doctrines to such an extent as to give great dissatisfaction to the members of the church and society,—in consequence of which his subscription list fell off until he was advised by his friends to resign, which he at once did; and by arrangement, his term of service terminated April 1, 1868.

On Sunday, the 15th day of March, 1868, said Abbott, in his public discourse, stated his belief in the following propositions: "1st, That Christianity is merely one among many religions; 2d, That each religion is partly true and partly false; and 3d, That pure theism, which is the common element, the universal essence of all religion, is by itself greater and truer than all." The following are also extracts from said sermon: "Whoever has been so fired in his own spirit by the overwhelming thought of the Divine Being as to kindle the flames of faith in the hearts of his fellow men, whether Confucias, or Zoroaster, or Moses, or Jesus, or Mohammed, has thereby proved himself to be a true prophet of the living God; and thus every great historic religion dates from a genuine inspiration by the Eternal Spirit." Speaking of the teachings of Jesus Christ, he said,—"Love to God and to man is the epitome of his instruction, and this is simply faith in the Divine in its two-fold aspect. Hence I deem it right to say that Jesus was himself not a Christian, but a simple theist, and that simple theism is the entire burthen of his life and doctrine." Speaking of the Messiah, he said,—"I regard the doctrine of the Messiahship as, in any sense, a superstition of the times. The pretence that any man has been singled out to be a permanent Christ, Messiah, or Mediator to his fellow beings, is, to me, monstrous. Henceforth I claim to be neither a Unitarian nor a Christian, but simply a theist. * * * Jesus I believe to have been a theist, and Christianity I believe to be a perversion of theism. In resigning the names Unitarian and Christian, I do so with full knowledge of the grave, practical consequences that must ensue; but, wishing ever to be docile to the teachings of life, this step seems to me the plain lesson of recent circumstances."

In preaching his farewell sermon, March 29th, 1868, he commenced as follows: "My text this morning is taken from no Hebrew Scriptures, whether of the Old or New Testaments. America is every whit

as sacred as Judea. God is as near to you and to me, as ever he was to Moses, to Jesus, or to Paul. Wherever a human soul is born into the love of truth and high virtue, there is the 'Holy Land.' Wherever a human soul has uttered its sincere and brave faith in the Divine, and thus bequeathed to us the legacy of inspired words, there is the 'Holy Bible.' To find my text, therefore, for the last morning of my ministry in Dover, I cannot travel across the Atlantic and the Mediterranean to ransack the Orient for a prophet, nor leap the gulf of eighteen centuries to find a word that shall fit this occasion, to me so earnest and full of moment. I am impelled to turn to some American scripture, instinct with the deep religion of the day. I am impelled to listen to some American prophet, whose soul is fired with the Divine suggestions and fathomless significance of all human life. This shall be my text, taken from a seer as truly and as highly inspired as any that ever prophesied in days of yore. I mean, Ralph Waldo Emerson."

In the course of this sermon, he alluded to the charge that he came among them as a " conservative," when his real views, when he came to express them, were most " radical." He said that in one of his earliest sermons he had taken the position that " Christ is a mere man," and that all his wonderful power is the simple product of character; that this doctrine is not a reproach to Jesus, but rather praise and exaltation. He then adds,—" In these statements you have the germ of everything that is radical in theology. The moment a man gives up the absolute Deity of Jesus, he cannot stop till he accepts his mere humanity, that is, *if he can think*. Unitarians, I confess, often succeed in stopping half way, but do it by ceasing to think. Begin to doubt the 'Deity of Christ,' and, if your mind is active and strong, you cannot stop doubting till you have doubted yourself out of Christianity into pure theism. That is where I am to-day—outside the warm shelter of the Christian church, in the vast expanse of God's boundless universe, yet still at home."

He assigns, as a reason for leaving the Unitarian denomination, the fact that, at their conventions in 1865 and 1866, holden at New York and at Syracuse, they adopted a platform distinctively Christian. He says,—" I feel convinced that henceforth the Unitarians, as a sect, will maintain their stand on what is called ' distinctively Christian ground,' which, in plain English, means the Lordship or Messiahship of Jesus." In his deposition, taken in this case, Mr. Abbott says,—" Christianity, in my opinion, is religion, as taught in the New Testament, and more especially in the gospels, and based upon faith in Jesus of Nazareth as the Christ of God;" that the distinction between religion and Christianity " is substantially one of the bases on which the two rest. Religion rests on universal humanity. Christianity rests on the individual Jesus;" that he cannot longer coöperate with the Unitarian denomination, because it " has practically avowed its faith in the Divine authority of Christ;" and, in stating the reason why he is not a Christian, he says,—" I believe that faith in Jesus as the Christ or Spiritual Messiah, in some sense or other, is essential to Christianity, and I do not entertain that faith in any sense."

The 1st of April, 1868, Mr. Abbott commenced preaching for and to an independent society, in a hall in Dover, and, after preaching there a few Sabbaths, he returned to the church of the Unitarian society, and preached there alternate Sundays for a few months. While thus engaged, he wrote to the editor of the *Liberal Christian*, a newspaper published in New York city, which communication, dated May 11, was printed in the number of that paper dated May 23, 1868, of which the following are extracts:

" The true historic significance of the Christian name is that of the ' Christian confession,' namely, that Jesus of Nazareth is the Christ of God. On this confession Jesus himself founded his church, and on this confession alone can Christianity, as a distinct religion, continue to stand. Etymology, history, and philosophy prove equally that Christianity has no basis, except in the Messianic mission of Jesus as spiritual leader of humanity and Saviour of the world.

" Whoever is unable to regard him as, in some sense or other, the Hebrew Messiah, can call himself a Christian only in a private, esoteric, or transcendental interpretation of the word, and therefore, it seems to me, at the expense of perfect sincerity.

" Wisely, or unwisely, I have come to the conclusion that in no sense is Jesus the Messiah or Christ of God. The soul is its own Christ. Humanity is its own Messiah. I reject Christianity that I may still cleave to religion, which admits of no mediator because it is immediate. There is no room in religion for the intervention of a third person. What distinguishes Christianity from religion is its error and limitation alone. What is universal in it belongs to religion, and not to itself. In discarding the Christian name, therefore, I discard nothing but error and limitation, and because the step involves complete disconnection from all organizations calling themselves Christian. It is infinitely more than a mere matter of words. * * * The Unitarian conference have taken their stand upon the Christian confession, and all Christian bodies *must* take the same stand. Christianity *must* say something or other about Jesus, *must*, in some way, confess his moral leadership, *must* take him as a perfect exemplar and perfect teacher, *must* connect itself indissolubly with his historic personality.

" But religion has no more to do with Jesus than it has with Judas. It leaves the soul alone with God. It acknowledges no leader; is loyal to no master; imitates no exemplar; looks to no redeemer; needs no saviour; knows no Christ. The very heart of Christianity, as taught by Jesus himself, is the Christian confession that ' Jesus is the Christ of God.' I cannot, in any sense, literal or metaphorical, make this confession."

It will thus be seen that the charges against the defendant Abbott, as set forth in the bill, are substantially proved. I have also given much that he said and wrote in connection with the words charged in the bill, for the purpose of showing that these words were spoken and written understandingly and deliberately, and expressed his sincere belief and honest sentiments.

In May, 1868, two protests were made in writing to the acting wardens of this society, one signed by over forty, and the other by eighty-five names, which were similar in purport, one of which was as follows :

" *Whereas*, A ' theist .is neither a Unitarian nor a Christian,' and *whereas*, Christ and anti-Christ, being in nature and spirit antagonistical, cannot with propriety be preached from the same pulpit, and would necessarily tend to subvert the foundation on which this society is built,—

" Therefore, the undersigned, members of the ' First Unitarian Society of Christians ' in Dover, N. H., do hereby protest against the use of the church of said society, in whole or in part, for theistical preach ing or lectures, or for any purpose whatever, not in harmony with the avowed objects of said society, which are, the building up and sustaining a Christian society in Dover, under the protection of the constitution and laws of the state of New Hampshire."

In his deposition taken in this case, Mr. Abbott states that, at the time of his said ordination in Dover (August 31, 1864), he regarded himself as " a minister of the gospel of Jesus," but that now he claims " to be a minister, not of the gospel of Jesus Christ, but of the gospel of humanity," which he believes to be " the only gospel in harmony with the religious wants of the age ;" that his views in matters of theology have changed since his said ordination, " in the sense of a natural growth and development;" that he was educated as a " conservative Unitarian Christian," but now finds himself obliged by his convictions " to stand outside of organized Unitarianism and of Christianity ;" that his views in relation to the ordinances of the gospel have also changed since his ordination ; that at that time he had his two children baptized ; that it was done simply in recognition of his " grave responsibility for their wise training and religious education," but that he now regards " baptism as the symbol of admission into the Christian church;" that at the time of his ordination he " regarded baptism as a spiritual symbol of consecration to the service of God," but that he now " believes all symbolical acts in religion to belong to an immature state of religious development," and that, as minister of the independent society to which he was then preaching, he would not administer either the ordinance of baptism or the Lord's supper ; and that he now considers himself as independent, in his religious belief and public religious teachings, of all bibles, churches, and Messiahs ; and that, as he understands the term " Christian," no man, who agrees with him in his belief in these respects, can fairly and truthfully be called a Christian ; and that he has formally withdrawn from the Unitarian denomination, and requested his name dropped from the roll of Unitarian ministers just prior to April 1, 1868.

We thus see that the charge made in the answer of the defendants (except Abbott), that said Abbott was a progressive man and that he changed his opinions from time to time, is true. Very radical changes had taken place in his views upon fundamental questions and doctrines in theology after coming to Dover, and before the filing of this bill.

·We are also satisfied that the further charge in the answer of all the defendants (except Abbott), that said Abbott " is free in his thought and free in his speech," is also true; and that he may properly be styled a " freethinker," in the technical sense of that term. We are also satisfied that he is " honest, sincere, truthful, and clear in his expression," as charged in the answer.

But the charge that the quotations in the bill, purporting to be from his sermons, " are garbled extracts, and taken alone are deceptive, tending, if not designed, to misrepresent the sentiment, tone, and spirit of his ministrations, seems to be wholly unfounded, as we have already seen. Indeed, Mr. Abbott for himself makes no such claim. He is too " honest, sincere, and truthful " to do so. In fact, he has done everything that a man can well do to put himself, or, as he expresses it, " to take his stand," outside of Christianity. 1. He does not believe in the facts, the doctrines, or the ordinances of Christianity. He does not admit that Jesus Christ was a leader, a master, or even an exemplar. He denies that he was or is a mediator, a redeemer, or a saviour of men. He does not receive him or believe in him as the Christ of God,—the true Messiah. He does not believe that Christ was a prophet even, any more than Confucius, Zoroaster, or Mohammed was. He does not receive the Bible as a revelation from God, or as of any higher authority than the writings of Garrison and of Emerson. 2. He has taken particular pains to publish his disbelief of Christianity, by preaching and writing and printing his views, so that no one need be deceived, or mistaken, or misinformed in relation to them.

The charge in the answer that Mr. Abbott's views, when fully and fairly expressed, are " not peculiar to him, but are substantially held by many clergymen and others who call themselves Unitarians," is simply a charge that this class of Unitarians are not Christians; in other words, that a portion of the denomination known as Unitarian is not Christian, but purely infidel, simple deists. This charge to a certain extent may be true, for we find evidence in this case tending to show, that some who call themselves Unitarians claim to believe in the existence of a·Supreme Ruler of the universe, and really believe nothing else, but are infidels or deists, and are not entitled to the Christian name any more than the pagans are. They may, *in one sense*, be Unitarians, just as all Jews and Mohammedans are, but they are not Unitarian *Christians*, because they do not believe in the fundamental doctrines of Christianity. And that those men who call themselves Unitarians while they are simply deists, and who only assume the name of Unitarians as a cloak to cover their bald infidelity, " are fellowshipped by Unitarians " as the answer charges, if true to any extent, is simply owing to the fact that the denomination has undertaken to go along without any particular creed or established articles of faith by which such men would be excluded; and they are thus of necessity endured in the society and companionship of those who have no sympathy, nor any bond of Christian fellowship or communion, with them. (See Dr. Peabody's deposition.) So far as this part of the answer is

true, it is simply saying that some who call themselves Unitarians are not Unitarian Christians, but Unitarian infidels. But the term "Unitarian," as descriptive of a religious sect, or denomination, is generally and properly used to denote a denomination of Christians, and of that great division of Christians known as Protestants. *Dublin case,* 38 N. H., before cited ; Baird's Religion in America, ch. 3.

The answer also alleges that "Unitarians have no rule of faith or creed of doctrines." In a certain sense, this is true. Unitarian Christians profess to take the Bible as their creed, and allow every person to read, and interpret, and understand the Bible for himself, according to such light as he has, using his reason and other powers of mind, as best he may, in aiding him to arrive at correct conclusions. But in another sense they do and must have a creed. The church in Dublin had a formal creed, or confession, or articles of faith, and the decision in that case only settles that Unitarians, who believe in such a creed or church covenant as that, are Christians. That decision is not an authority that all who call themselves Unitarians are Christians, without regard to their faith or belief in the doctrines of Christianity. *Dublin case,* 38 N. H. 459, 460, 466, 468, 571, 572. So the church in Dover had a "covenant," which was to be assented to by all who would unite with them for the benefit of Christian ordinances. This covenant was a creed. They must "believe in Jesus Christ as the Messiah, and accept his religion as a revelation from God, the true guide of · * * faith and rule of * * duty." Now, a man's creed is what he believes. Trinitarians believe in the trinity or the tri-unity of God. That, so far, is their creed. Unitarians believe in the unity of God. That, so far, is their creed. Each has a creed which necessarily excludes the other. Different creeds constitute the different "sects." Each sect has a particular name, and that makes it a "denomination." A creed may have one article of belief, or many. What makes it a creed is the fact that it is the common belief of a sect,—not its length, or its brevity. It would be impossible to have a sect, or denomination, unless there were at least some one ground on which they agreed ; and, so far as there was a common belief, just so far they would have a creed, or a covenant. And the case is not changed, whether the creed contains one article of faith, or thirty-nine.

In the Encyclopædia of Religious Knowledge, *Unitarians* are designated as "a class of religionists, who hold to the personal unity of God in opposition to the doctrine of the trinity. * * * Unitarians profess to derive their views from Scripture, and to make it the arbiter in all religious questions. * * * In America, Unitarian opinions are much divided upon the point of Christ's preëxistence, while, on the other hand, the rejection of the tenet of his vicarious suffering (or suffering as men's substitute), along with that of his supreme deity, appears to be universally characteristic of the sect." See, also, Prof. Palfrey's article on *Unitarians,* in the American Encyclopædia ; also, in the Encyclopædia of Religious Knowledge.

A belief in the unity of God, in the Bible as a divine revelation, the

ultimate arbiter in all religious questions, and a rejection of the doctrine of the vicarious sufferings of Christ and of his supreme divinity, would seem to be leading articles in their belief or creed, from these authorities.   See Dr. Channing's sermon on Unitarian Christianity, 3 Channing's Works 59 ; Ellis's Half Century of the Unitarian Controversy 48.

If there is any such Unitarianism as the defendants claim, and describe in their answer as having " never been exclusive, sectarian, or limited to Christian worship," it must be a kind of Unitarianism that stands " outside of Christianity," where Mr. Abbott stands.   It is not Christian Unitarianism, nor is it Unitarian in the sense in which this word is ordinarily and properly used, denoting a sect or denomination of Christians.

It was not until about the year 1867 that Mr. Abbott's anti-Christian views and doctrines began to be made prominent in his preaching and public teachings.  Up to that time he had been preaching in a way to satisfy the church as well as the society, he being the pastor of both, in the same way that all the preachers before him, to that society, had been. They had been preaching the doctrines of the church, which were those of the society, as a matter of course, which they were assisting the church to promulgate ; distinctively Christian doctrines, such as that Jesus Christ was the true Messiah, and that his religion was a revelation from God, which was the true guide of faith and rule of duty. The distinctively Christian ordinances of baptism and the Lord's supper had been administered to the church by all of these pastors, so far as appears, from the time when they formed the church, and each " solemnly declared their belief in the gospel of Jesus Christ," and when it was duly pronounced to be " a regular Christian church," down to the time when Mr. Abbott baptized his two children " in the name of the Father, and of the Son, and of the Holy Ghost," and assented to the declaration " I believe in Jesus Christ as the Messiah, and regard his religion as a revelation from God."   During all this time, a period of full forty years, this meeting-house had been used regularly and statedly, by regularly ordained ministers of the sect known as Unitarian Christians, in preaching and teaching distinctively Christian doctrines, and in administering the distinctively Christian ordinances of baptism and the Lord's supper ; such teaching and preaching, and such an administration of Christian ordinances there, as the church desired in order to help them to become what they so much desired in the commencement, to wit, " sincere disciples of Jesus Christ."

To such uses has this church or meeting-house been set apart, and appropriated and consecrated, from its very origin and inception, through the long period of forty years, down to 1867, under the special and particular direction and control of this society of Unitarian Christians. For forty years,—as long as the children of Israel wandered in the wilderness, seeking the land of promise,—has this trust been administered, and applied to the support and maintenance of the doctrines and ordinances of Christianity, without any variation or cessation, and going

back to the erection of the meeting-house, and also to the foundation of the trust, when the founders could see for themselves how the trust was applied and executed, and were satisfied, it would seem, with the way the whole thing was managed, under the direction and control of this society of Christians, to whom the founders of the trust had committed the custody and control of the house.

And, surely, if " courts will resort to the original and long continued application of a religious charity by the trustees" in order to aid them in giving construction to the instrument which established the charity (see *Dublin case*) ; or, if it be true that, " where the original trustees, appointed by the founder of a religious charity or trust, applied the fund to the support of certain religious doctrines, and that application has been long continued and acquiesced in " *(id.)*, a court of equity will not allow such application to be interfered with or changed unless such change is clearly required by the plainly expressed intention of the donor, then it follows that the court should not allow or suffer this charity or trust now to be diverted, and misapplied to uses directly antagonistic to all those uses and purposes to which it has heretofore been uniformly applied ; will not and should not allow this house to be used for the teaching and preaching of doctrines directly subversive of all the fundamental principles of Christianity and of Christianity itself, to whose use it has always heretofore been devoted.

If the *Dublin case* is to be sustained as an authority, if it is not to be overruled and set aside as of no weight or consequence, it would seem that the questions at issue in this case must be decided in favor of these complainants, on the ground of a long continued and uninterrupted application of this charity or trust, in a particular way, and for the use and support of the doctrines of Christianity, from the very foundation of the trust, and so down for full forty years, with the full knowledge, assent, and approval of the original founders of the trust, and of everybody interested in the same. We might properly stop here, and order a decree in favor of the complainants ; but there are a few other aspects in which it may be well to look at the case.

If we hold, as the weight of authority seems to be, " that the denominational name of a religious society to which or to whose use a donation is made, and the doctrines actually taught therein at the time of the gift and immediately after, and the length of time they continue to be so taught without interruption, may be resorted to to limit and •define the trust in respect to doctrines deemed fundamental," then we should come to the same result, to wit, that these defendants ought to be restrained from using the house for the preaching and promulgating doctrines opposed to Christianity; or, if it be the law that " when the conveyance is merely to the religious corporation by name, with no other designation of its purposes or trusts, the denominational name, in connection with the contemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust," then we must inevitably reach the same conclusion in favor of the complainants. So, also, upon the ground that "where there is no specific designation in the deed

as to the particular tenets or doctrines which it is to be used to advance or support, the denominational name may indicate the nature of the trust, so far as respects doctrines admitted to be fundamental," the same conclusions must be reached; and, finally, if, " when a society of one religious sect, or denomination, becomes incorporated, with a strict denominational name descriptive of the fundamental doctrines of the sect to which it belongs, it will be presumed that it was constituted for the purpose of advancing the vital doctrines of such sect or denomination;" and if in such case it follows " that the society, or those having control of property held in trust for the benefit of such religious society, should be restrained from applying the property or the use of it to the promotion of tenets or doctrines clearly opposed and adverse to the fundamental principles of the faith and doctrine of the denomination, at the time and immediately after the trust was created," then the injunction prayed for in this case would be granted, as a matter of course, upon the facts proved in evidence, even upon the ground that said Abbott had been employed by said wardens of said Unitarian society, and that by authority of a majority of the members of said Unitarian society, for the time being, acting in good faith, but under a mistaken notion of their powers and duties.

But in this case we find that this Unitarian society had not in any sense elected, or contracted with, or employed said Abbott, as their minister or religious teacher, after the first of April, 1868. After that date, when the matter was suggested to him by the wardens or others, Mr. Abbott utterly declined and refused to be employed by said society, or to preach to that society, or to be connected or associated with the society as a society of Unitarian Christians, in the capacity of religious teacher, directly or indirectly, in any manner whatever.

He insisted that, as the society had originally assumed a name, expressing and intended to express and represent the religious sentiments of its members and the system of theology which the society was formed to promulgate and inculcate, they should now, if they had changed their religious sentiments and wished to advocate and disseminate such doctrines as he was preaching, which were antagonistic to all the doctrines and sentiments expressed and represented by the name they had assumed,—antagonistic to all the doctrines of Christianity generally and of that particular sect of Christians called Unitarian,—that they should change their name and assume one that would be consistent with their present position—one, at least, that should in some respect represent and express the new doctrines they had embraced and proposed to promulgate; that they were bound, in good faith and common honesty, not to sail under false colors; that they should not seek to teach and disseminate anti-Christian sentiments and doctrines under the name of Christianity; that, like honest men, they should call things by their true names, and not seek, by fraud and false pretences and false names, to advance and inculcate any system of doctrines, however good in themselves Mr. Abbott might think them to be; and in this we think Mr. Abbott was clearly right.

But, as a society of Unitarian Christians, Mr. Abbott utterly declined and refused to have any connection or association with them as their pastor or religious teacher. Now, the election of a religious teacher, contemplated by the constitution, was one that was to be accompanied by a contract for his support and maintenance. He was to be elected and contracted with. An election of one that could not be had, or of one that would not serve, would amount to nothing. The privilege which the constitution secured to religious societies was the privilege of electing and contracting with ; of hiring such religious teacher as they chose to support, for themselves and in their own way. But this society has not elected, contracted with, or employed Mr. Abbott as their preacher or religious teacher in any way since his resignation was tendered and accepted, taking effect April 1, 1868.

The charge in this bill is against all the defendants (except Abbott, and the wardens of the Unitarian society) as claiming to be members of said "First Unitarian Society of Christians in Dover," but as being, in fact, members of an independent religious society of which said Francis E. Abbott is the preacher, and against said Abbott as such preacher, and against said York, Folsom, and Horsch, as wardens of the said Unitarian society of Christians. The plaintiffs charge in substance that the defendants have united and formed an independent society entirely outside and independent of said Unitarian society, and, in fact, antagonistic and hostile to it; and that, as such, they have employed Mr. Abbott as their preacher ; and that the wardens of said Unitarian society have, in violation of their duty to said Unitarian society, allowed and encouraged said Abbott and his associates, and fellow-disbelievers in Christianity, as such independent society, to occupy the meeting-house of said Unitarian society since said 27th day of April ; and that said wardens have allowed said Abbott in the pulpit of said house to preach, not to said Unitarian society, but to said independent society ; and that said preaching was not according to the views of the denomination of Christians known as Unitarians, but in opposition thereto and to Christianity generally ; that the plaintiffs do not know who compose said independent society to which said Abbott claims to be preaching, but believe the same to be made up of said defendants (save said Abbott) and others ; and that said wardens of the Unitarian society have assessed the pews in said house, and are proceeding to collect the taxes so assessed of the plaintiffs, and apply the same towards paying for the preaching of said Abbott in said house, not to said Unitarian society, but to another society, whose views and doctrines are hostile to Christianity generally, and to the views and doctrines of Unitarians particularly,—all which, it is alleged, is in violation of the duties of said wardens of said Unitarian society, and in violation and disregard of the rights of these plaintiffs.

In the answer the defendants (except Abbott) deny that they are members of any independent society, but claim that they are members of said Unitarian society, and that they are Unitarians, and that they employ Mr. Abbott to preach to them in their house, under and by

authority of the vote therein set forth concerning the two divisions of said society and their occupancy of the house.

Mr. Abbott's answer is evidently drawn with great care, so as to say nothing in regard to this independent society. Had he been allowed to say anything about it, he would no doubt have told, as in other cases, the plain and simple truth. But this may not have been thought desirable by the other defendants, and so, in his answer, Abbott is put upon safe ground. He admits nothing and denies nothing, but says that for the year 1868 his engagement was made (not with York, Folsom, and Horsch, as the wardens of the Unitarian society, or with anybody who claimed to act for said society, but) with Wallingford, Everett, and Folsom, three of the defendants, "who claimed to represent very many of the other defendants in this proceeding, and some other persons, to preach for them for the term of one year ; that his congregation have from Sabbath to Sabbath assembled in said meeting-house, and he has been, by said Wallingford, Everett, and Folsom, directed there to preach ; and that he has, in fulfilment of his said contract, conducted public religious worship in said house, &c., *claiming or exercising no other rights than are by him set forth in this his answer.*"

From this it will be seen that he does not claim to have been employed by the Unitarian society or its wardens, or by anybody acting in its behalf, or that he was preaching to said society, or that he had any authority from said society to preach in their house. He does not deny that his employers and the other defendants, whom they claimed to represent with others, were acting as an independent society in open hostility to said Unitarian society. The non-committalism of this answer is by no means characteristic of Mr. Abbott.

But what are the facts as disclosed in the evidence. It will be borne in mind that Mr. Abbott, on account of the change in his views while at Dover, and finding that his present views were distasteful to the Unitarian society, had resigned his place as pastor of said society, which resignation had been accepted to take effect April 1, 1868, and that he had withdrawn from and terminated his connection with the American Unitarian society just before that time, and had publicly announced that he was neither a Unitarian nor a Christian, and had preached his farewell sermon to said society March 29, 1868. After this he was engaged and employed by an independent society, to which he preached until the 1st of October of the same year, when he preached his farewell address to said independent society of Dover, which was printed in the *Dover Gazette* of Oct. 9, 1868, and which has been introduced as evidence in this case, and is not substantially contradicted.

In this address, he says,—" When, therefore, I deliberately discarded the Unitarian and Christian names, this step was by no means a matter of words ; it meant the standing aloof, albeit in utter solitude, from all Unitarian and distinctively Christian organizations. * *. * I resolved, after the expiration of my Unitarian pastorate, to refuse to connect myself again, whether directly or indirectly, with any Unitarian or Christian society. * * * Immediately after the delivery of my

farewell sermon, however, a movement started at the church door to retain me as a preacher in Dover, notwithstanding the public position I had taken. The next day, March 30th, my friends in the old society, wholly without my knowledge, went to the parish meeting and elected radical wardens, with authority to supply the Unitarian pulpit as they should think proper. The plan was to invite me to preach to the Unitarian society, not as its settled minister, but simply as its preacher for the present year, it being supposed that this course would leave me perfectly free to occupy my own ground *uncommitted to the Unitarian denomination.* The new wardens, therefore, invited me to preach in my old pulpit the very next Sunday ; but I declined doing so until I knew precisely what relation I should thereby occupy towards my former society, and what would be its action at the adjourned parish meeting. During this interval, between the first and second parish meetings, I became convinced of two things,—first, that my friends, having got control of the church, were strongly disinclined to form a new society ; and secondly, that the proposed plan would conflict with my determination to stand wholly aloof from the Unitarian sect. At a meeting of my friends, therefore, held at the house of Mr. Wallingford, the evening before the second parish meeting (April 12), I said plainly and emphatically that I could not again become their preacher, unless they should either *change the name of the Unitarian society*, or else *form a new, independent society.*

" After a full discussion, my friends concluded, as I was distinctly informed, to accept the second condition I had named, and to form a new and wholly independent society. At the parish meeting next day, after much wrangling, the following resolution was passed : '*Resolved*, That the wardens shall employ none other than Unitarian Christians to supply the desk in this house.' * * * The radical wardens at once resigned, conservative wardens were nominated who refused to serve as such, and the meeting was adjourned a fortnight, for the purpose of then electing wardens who would serve. Thus at the second parish meeting the church passed into the control of the conservatives, and I believe there was, at that time, but one purpose among my friends, namely, to go into a hall, and start outside as an independent society. Meanwhile, a subscription paper had been carried round, with the following heading : ' We, the undersigned, hereby constitute ourselves an " independent society," for the purpose of maintaining free religious principles in Dover ; and, in order to carry out this purpose, we agree to pay the sums set opposite our names, for the support of the Rev. Francis Ellingwood Abbott, as our preacher, for the ensuing year.' "

There is proof, from the records of the Unitarian society, that the votes which he refers to were passed by that society on the 30th of March and 13th of April, as stated by him. We also have a copy of this subscription paper of the independent society, duly authenticated, attached to a deposition in the case, with the names of the signers. The total subscription amounted to $1,061, which was subscribed by

some forty-four different persons, many of whom were not members of
the Unitarian society, and some of whom were Jews. (See York's
deposition.)

Mr. Abbott continues : " Enough money was pledged on this paper
to sustain the movement, and, having made a definite agreement with
the leading men concerned in it, I held the first public services of the
new society in American hall, Sunday evening, April 26th, and then
and there announced the fact of my engagement as preacher to the in-
dependent society for the year. The next day, April 27th, the third
parish meeting was held in the church, the former radical wardens were
reëlected,   *   *   *   and resolutions   *   *   *   were passed, assign-
ing the use of the church to ' each of the two divisions of said society
for one half the time.' In consequence of verbal explanations, made
at the time,   *   *   *   it was universally understood, both by radicals
and conservatives, that it was intended to give *to the independent society*
the use of the church for half the time. It has been, in virtue of this
vote alone, thus understood, that I have conceived myself justified
hitherto in preaching in the Unitarian church. If I had for a moment
supposed that the audience to which I preached regarded itself not as a
*bona fide* independent society, but only as the radical portion of the
Unitarian society, I never should have consented to stand again in my
former pulpit.

" About six weeks after our first services in American hall, I felt con-
vinced that the independent society must either complete its legal or-
ganization, or else come under the suspicion of being a nonentity, a
mere blind for deceiving the public in regard to the real nature of our
movement. Accordingly, early in June, I requested you to take such
steps as were necessary to complete the legal organization of our soci-
ety. You promptly voted to do so, and appointed a committee of three
to report on this subject at an adjourned meeting."

The following is the official record of this adjourned meeting :

"DOVER, June 9, 1868.

" At a meeting of ' The First Independent Religious Society' of the
city of Dover, for the promotion of free religious principles, Zimri S.
Wallingford was chosen moderator, and Thaddeus P. Cressey secretary
*pro tempore.* Jasper H. York, from the committee on permanent organ-
ization, reported the names of Zimri S. Wallingford, Lucias Everett,
Josiah B. Folsom, for wardens, and Thaddeus P. Cressey, clerk.

" On motion of Mr. Everett to proceed to the choice of officers, Zimri
S. Wallingford, Lucias Everett, and Josiah B. Folsom were chosen
wardens, and Thaddeus P. Cressey, clerk, for the ensuing year. The
oath of office was then duly administered to the wardens and clerk.

"On motion of Dr. York, Jasper H. York, Russell B. Wiggin, John
Bell, Mrs. Z. S. Wallingford, and Mrs. J. B. Folsom, were chosen a com-
mittee to draft by-laws, and report at the next adjourned meeting. The
meeting was then adjourned to Tuesday evening, June 16, at 8 o'clock.

"(Signed)      T. P. CRESSEY, Clerk."

(See deposition of Cressey.)

"After these proceedings," says Mr. Abbott, "I think we all believed that we had complied with all the conditions of forming a legal organization. Notice of the election of these officers was published in the *Dover Gazette,* and I, at least, thought we had done everything required by straightforward dealing in the matter of organization. Of your *intention* to organize legally and completely, I think there could be no doubt at that time.

"In June, however, a complaint was made to the supreme court by the conservative members of the Unitarian society, asking that an injunction should be issued restraining us from occupying the Unitarian church.  *  *  *  Your council in the case denies the existence of any independent society, declares that you occupy the church as Unitarians and nothing else, and hence makes it appear that, contrary to all my public statements, I am still the preacher of a Unitarian society. Such is his argument, as contained in his printed brief, and published to the community. He holds the opinion that your success in the pending law-suit depends on the validity of this argument, and that you cannot occupy the church except as a Unitarian society, or the majority of it. By this argument, therefore, he has placed you in a very awkward predicament. If you go on and complete immediately your legal organization, (some trifling details of which, as it turns out, are still wanting), he says you will lose the church; but if you wait and win the case by means of his argument, I believe you will lose what is worth infinitely more than the church, namely, the *principle for which we contend.*

"We have taken the ground, publicly and privately, that we are an independent society : can we afford to win our suit on the ground that we are not? The case will not be decided till late in December. You have ample time to set this matter right. In my opinion, honor and integrity are at stake. Only one course seems to me just and right,—to organize at once, in accordance with the letter of the law, and then run the risk of losing the church. To postpone all action on the matter, and to hold the church until after December as a majority of the Unitarian society, notwithstanding our public profession of being an independent· society, this is a course I cannot adopt myself, or be a party to; either directly or indirectly. I remained with you solely on condition of your forming an independent society, having a perfect right to say on what terms I could or could not conscientiously remain. I understood you to agree to comply with this condition. You and I both thought that it had been fully complied with.  *  *  *  I told you at the start I could not preach to a Unitarian society. You respected my scruples,  *  *  *  and consented to form an independent society."

Jasper H. York, in his deposition, states that he is one of the wardens of The First Unitarian Society of Christians in Dover, for 1868; that it was several weeks after Abbott's pastoral relations to the society ceased, on the 1st of April, before he preached again in the meeting-house; that it was not till after his meeting in American hall; says that he

(York) never gave permission to said Abbott to return to said church to preach, but that he did give such permission *to the executive committee of the independent society.* He is asked,—"Who are the executive committee of said independent society?  When and where were they chosen?" He answers,—" Z. S. Wallingford is one, and I think J. B. Folsom and Lucias Everett are the other two.  I don't recollect when they were chosen; they were chosen between the two adjourned meetings of the Unitarian society, or immediately after the last adjourned meeting. They were chosen before Mr. Abbott began to preach in the house, in May, at the house of Mr. Wallingford."  Again, he says,—" I never was chosen one of the executive committee of the independent society; I think I was appointed one of a committee of three to nominate an executive committee."

Immediately after Mr. Abbott had preached his farewell to the independent society, the plaintiffs proceeded at once and took the deposition of Cressey, in order to find, if possible, the records of this society, which until then nobody had been able to find.  In his deposition, taken October 15th, he discloses the facts stated by Mr. Abbott.  He finds and produces the records of the society, and annexes them to his deposition, confirming Mr. Abbott in every particular.  On cross examination, he is asked by Mr. Wheeler, his counsel, as follows: " About the time of commencing taking testimony in this case in June last, did not the defendants' counsel call upon you for information respecting the formation of an independent society, and for any records thereof?  If so, what was the result?"  *Ans.*—" He did.  I told him there had been none formed,  *  *  *  and I did not think enough of these minutes to mention them to him."

Mr. Cressey also says that Mr. Abbott, in September, 1868, " *sent in his resignation,* and that some of his friends met *at Mr. Wallingford's,* and *as signers of a subscription paper,* to raise money to pay him for preaching, *accepted his resignation.*"

It thus appears that this subscription paper, designed to constitute an independent society, was got up and signed between the two adjourned meetings of the Unitarian society, holden the 13th and 27th of April; that the independent society itself was organized about the same time, or immediately after the second adjourned meeting, April 27, and that these men,—Wallingford, Everett, and Folsom — the men with whom, Mr. Abbott says, in his answer, he made the contract to preach that year,—were at this time acting as executive committee temporarily of said independent society, which had had probably several meetings before that of June 9, which appears from the records to have been an adjourned meeting, at which Dr. York, as a member of a committee chosen at a former meeting, upon the subject of permanent organization, then made a report, recommending a set of permanent officers of the society, who were then chosen " for the ensuing year," and who took the oath of office as wardens and clerk.  After April 1, 1868, Mr. Abbott was employed by an independent society as its teacher and preacher.  His subscription was raised by the members of such inde-

pendent society, as such, distinctively and specially. He was employed
to preach to such independent society, and did preach to it, and when
he closed he tendered his resignation to the same independent society,
which met, and accepted it, and discharged him, and closed up the con-
tract, though for certain reasons of policy it was then thought best to
ignore the name of the independent society. The Unitarian society
had nothing to do with electing, or contracting with, or employing, or
paying, or consulting with, or dismissing Mr. Abbott; in fact, that so-
ciety had nothing to do with him, except that he was allowed by the
wardens of said Unitarian society to occupy their house and preach his
anti-Christian doctrines there, as the plaintiffs claim, in well known
disregard and violation of their duty as such wardens.

What the defect in their organization was that prevented this inde-
pendent society from becoming a legal society for all purposes, we are
not informed. Whether in fact there was any such defect is not made
certain, and we are led to doubt it. But if there was, it does not alter
the case at all. That there was for a time such a society *in fact*, of
which these defendants were acting members, many or all of them,
there is no doubt; and that its purposes and objects were directly hos-
tile to the purposes and objects of the Unitarian society is equally ap-
parent, and must have been equally well known to its members; and so
far as it affects the good faith of its members, it is entirely immaterial
whether the independent society became fully organized as a legal so-
ciety or not. If there was any defect in completing its organization, it
was, no doubt, as Mr. Abbott says, owing to the notice which was served
upon defendants of the commencement of legal proceedings, for we find
that the next day after the independent society had chosen its officers
" for the ensuing year," the plaintiffs served a notice (June 10) upon
them, describing them as being in fact members of the independent
society, citing them to appear before the supreme court at its law term,
to be held June 16, at Exeter, when all at once, " in the twinkling of
an eye," this independent society, which had been in existence as it
would seem for about two months, raising large sums of money by
subscription among its members for the promotion of its objects, which
had contracted for a preacher for the year, had organized as a corpo-
rate body, assumed a corporate name, had elected its permanent an-
nual officers, and kept and preserved a record of its doings, and had
published a notice of its proceedings and doings in the public news-
paper, is ignored and abandoned, and its very existence is denied by
the defendants, except Mr. Abbott, who alone, of all this independent
society, as it would seem, is willing to admit the whole truth and abide
the consequence. For a time the defendants seemed disposed to de-
ceive Mr. Abbott by pretending to be independents, when their secret
design was to continue with the Unitarians, and not form any indepen-
dent society in fact; and this seems to have been their view up to the
time of the third parish meeting of the Unitarian society, April 27, the
next day after the first meeting of the independent society in Ameri-
can hall. But some six weeks after this, as Mr. Abbott says, or early

in June, he became convinced "that the independent society must either complete its legal organization, or else come under the suspicion of being a nonentity, a mere blind for deceiving the public in regard to the real nature of our movement." Perhaps he became convinced that such had been the real purpose and object of the defendants (except himself) thus to deceive the public; but such was not his purpose, nor could he be long deceived or blinded in regard to their true objects. He, therefore, early in June, insists that the proper steps be taken to organize the independent society. They comply with his wishes, and vote to complete their organization as an independent society, and go on, and, in fact, organize, adopt a name, choose their permanent officers for the year, choose a committee to draft by-laws to be submitted at an adjourned meeting which was appointed for June 16, and adjourned, all believing that their organization was complete and legal, and all intending that it should be so.

The defendants intended at that time to form the independent organization, and intended to leave and abandon the Unitarian society; and when they completed, as they supposed, the organization of the independent society, they left, withdrew from, abandoned, and seceded from, the old Unitarian society of Christians forever. Though they had been long hesitating, and though they might never have come to that point, except for the influence which Mr. Abbott exerted over them, yet they did finally come to the point of abandoning the old society and forming a new one, whose creed or sentiments, so far as it had any, were antagonistic to those of the old society. At that time (June 9), at the close of their meeting of that day, most of these defendants had not the most remote idea of ever going near the old Unitarian society of Christians again. They had seceded from that society, and formed a new and entirely different society, in which their future home was to be,— a society so hostile, in all its views and doctrines and aims and purposes, to the old society, that no man could consistently belong to both at the same time. This was thoroughly understood by Mr. Abbott, and was thoroughly explained by him to these defendants, and they were made to understand it as he did, so that they all intended, when the independent society was fully formed and organized, as they all supposed, and they had become active members of the same, to abandon and secede from, and did, in fact, abandon and secede from, the Unitarian society of Christians forever. This we find to be the fact upon all the testimony in the case. Had it not been for the facts disclosed in Mr. Abbott's farewell discourse to this independent society, we might never have found the evidence of its organization by these defendants. If Mr. Cressey's statement in his deposition can be credited, he had concealed, even from his own counsel, all knowledge of the existence of such society and of its records. Whatever we may think in relation to the truth of that statement, it is certain that from the moment there was any notice of the commencement of legal proceedings, these facts were attempted to be concealed from everybody else, and especially from these plaintiffs and their counsel. Whoever drew Mr. Abbott's

answer for him evidently had the same object in view, as will be seen by an examination of its terms; but when Mr. Abbott is finally forced in self-defence to disclose all these facts in October, then the plaintiffs find who was the sworn clerk of this independent society, and where its records are, and what they are, and show up the whole thing.

The only evidence which the defendants introduce to meet or answer this is, that an interview took place one Sunday between Mr. Wheeler, the defendants' counsel, and Samuel Hale, one of the plaintiffs, in presence of York, at Wheeler's house, about the 11th of October, 1868, after the suit was commenced, and after Mr. Abbott's farewell address to the independent society had been delivered and published, where York says that Wheeler made to Hale this proposition,—" To enter the action ' Neither party,' the effect of which is, the suit stops, and each party pays its own cost; each person, who will, subscribe what he pleases for preaching; the wardens to apply to the àssociation for preachers, and the desk to be supplied in that way." York says that Wheeler stated at the time that he made this proposition on his own responsibility, but he thought the defendants would assent to it. But York says that he (himself) objected to it, and it does not appear that besides Wheeler and York, this proposition ever came to the knowledge of any of the defendants until York's deposition was taken, or that any of them ever assented to it. York says that Hale never accepted the proposition; but he does not say that he ever refused to accept it, or that the subject was ever again alluded to by anybody.

Now, if Mr. Wheeler had had full authority to make this proposition, it would have been clearly incompetent as evidence upon any ground. 1. Plaintiffs could not have introduced it against the defendant, because it was simply an offer to compromise an existing suit, which is never admissible. 2. The defendants could put in their own sayings, their own statements, in their own favor, to make out their own case. This is too well settled and too plain for argument. 3. But Wheeler had no authority to make the proposition, and he so explains it at the time, so that nobody would be bound by it if it were accepted; and there is no evidence that the defendants ever ratified or assented to the proposition. 4. And, even if made by authority of the defendants, and if it were competent, it bound the defendants to do nothing. The effect of it would simply be to release the defendants from the pending lawsuit, without any consideration, either present, past, or future. Defendants did not agree to subscribe a dollar. The contemplated subscription was to be entirely voluntary, and the defendants would not one of them, probably, have troubled themselves about the old Unitarian society, after they were well out of the lawsuit; but they could go along with their independent society then without fear and without hindrance. They might well consent that the pulpit of the plaintiffs' meeting-house should be supplied by the Unitarian society, when they themselves were not to be responsible for any of the pay for the preaching. We think the defendants might as well have omitted this last effort on their part towards making out their defence. We fail to see

any evidence here that the defendants had not, most of them, joined the independent society, and had not seceded from and abandoned the old society.

Mr. Abbott says,—" We have taken the ground, publicly and privately, that we are an independent society," and of course, as he would have us infer, not the Unitarian society, or any portion of it; and such was the fact. These defendants, in the early part of June, 1868, were claiming to be an independent society, both publicly and privately, and were claiming to act as such in hiring Mr. Abbott, and were not claiming to act as any part or portion of the Unitarian society. They saw the inconsistency and impropriety of attempting or claiming to act in both these capacities at the same time. Mr. Abbott refused to be the preacher to the Unitarian society, or to any part or faction of said society, and the defendants had finally come, though late, to adopt his views, and had now formed the independent society in order to be able to retain his services, which they could not do as any part or portion of the Unitarian Society of Christians.

" We have taken the ground, publicly and privately, that we are an independent society," and not any part or portion of the old Unitarian Society of Christians, says Mr. Abbott, in substance; and no one denied the charge at the time, or does deny it in the evidence, though all the defendants (except Abbott) stoutly deny it in their answer; but the evidence establishes the fact beyond all question, notwithstanding the denial of the answer. The necessity of forming the independent society was, to accomplish an object which could not be accomplished by the defendants as a part or portion of the Unitarian society. Mr. Abbott was not employed by the old society of Unitarian Christians, or by anybody in their behalf, nor by any part or faction of said old society as such, for the simple reason that he would not be employed by them, and would not preach to them, or any part of them, as Unitarians or as Christians, or as members of a society that was called by that name. These defendants must not only form an independent society, but they must cease to be members of the Unitarian society of Christians in Dover, in order that they might be able to treat with Mr. Abbott, and secure his permanent services as their religious teacher and preacher.

To be sure, our acts of 1819 and of 1827 provided a way by which any member of a religious society might withdraw and cease to be a member of the same, simply by leaving a notice in writing to that effect with the clerk of such society. 2 N. H. Laws (1824) 45; N. H. Laws (1830) 463. This furnished an easy method by which any member might withdraw from any religious society at pleasure, and terminate all liability as such member; but it does not follow by any means that this was the only way that a person could cease to be a member of a religious society. He might cease to be a member without giving the notice in writing, as was expressly held in *Baptist Church* v. *Rouse*, 21 Conn. 164, where it was held that though no such notice was given, yet that all the circumstances of the case might properly be submitted

to the jury, to find, as a question of fact, whether there had been a secession from the old society or not; and in settling that fact, not only all the acts of the parties, but more particularly their intentions, were material. The acts and motives, which were held to be material, were evidences of intention, and the fact of secession is to be found or not upon all the evidence in the case, including acts with the motives that influenced them, and the circumstances under which they were performed, and more particularly the intentions with which they were done. The real intentions of the parties at the time would be of great and generally of controlling weight in the settlement of such questions of fact. *Wiswell* v. *First Congregational Church*, 14 Ohio St. 32; *Dublin case*, 38 N. H. 459.

Having found as matter of fact in this case that these defendants had, on or before the 9th day of June, 1868, not only as they supposed formed a new and an independent society "for the promotion of free religious principles," but had abandoned and intentionally seceded from The First Unitarian Society of Christians in Dover, it follows that they forfeited all right to that society's property or any part thereof, or to the use of any property which belonged, or the use of which belonged, to the old society, and hence have no further claim to the use of the meeting-house in question for any purpose whatever. Hence it follows that the injunction asked for in this case should be granted, as well upon the facts of the case as upon the law.

We find that any claim that was made, if any was made, after the meeting of April 27, 1868, by most of these defendants to be members of the old society, and especially after they had fully determined to form and organize their new independent society, was simply a pretence, and without any foundation in fact; but as soon as the legal proceedings are commenced, and it is found that their success in the lawsuit may depend upon the fact as to whether they are members of the one society or the other, and when it is supposed that in order to succeed in this suit the existence of the independent society must be denied, and that they must still claim to be members of the Unitarian society of Christians, we find the defendants ready to take both positions, that they are still members of the Unitarian society of Christians, and that they are not and have never been members of any independent society, and are willing to deny the existence of any independent society altogether. Their claims to be still members of the Unitarian society of Christians have just the same foundation that their denial of the existence of the independent society rests upon, which is simple assertion, unsupported by facts. The facts are all found to be the other way.

When Mr. Abbott saw how ready most of these defendants (except himself) were to abandon the independent society, and even to deny its very existence, after all that had been done by said society, and how ready they were to assume any new position that might seem necessary; when he saw how ready they were even to desert and betray him, and to compromise their own consistency and integrity, for the sake of success in a paltry suit at law, it is not strange that he left them

when his year, for which he had engaged, was but half completed.  His last prayer in Dover was, most probably, that he might be saved from his friends.

He seems to have understood their true position, when he suggested that, after having taken the ground, publicly and privately, as they had done, that they were an independent society, and were acting as such, they could not afford to win their suit on the ground that they were not, and when he boldly suggested to them that their honor and integrity were at stake, and could only be preserved by moving forward as an independent society, and abandoning the false position (in which they seemed willing to put themselves, in the hope of a temporary advantage in their suit) of claiming to be members of the old society, which they had abandoned and seceded from.  Fortunate would it have been for these defendants had they listened to this last admonition of their religious teacher, and followed his friendly advice and timely counsel in this matter of worldly concern, as they had long been doing in all matters that related to their religious and spiritual interests; for, although by that course they might not have won their cause in the suit, yet they would have gained what would have been infinitely better.

Since preparing the foregoing opinion, I have read the first draft of the able and ingenious dissenting opinion in this case, and wish to make a few additional suggestions, partly in reply to that opinion, and partly in illustration of the grounds upon which the foregoing opinion is based, and I prefer to make them in this connection rather than by way of a separate reply to the dissenting opinion.  It is claimed, and many arguments are used to convince us, that the word Protestant, as used in the constitution of this state, has the sole meaning of anti-Roman Catholic, and that the word as there used was intended to cover and include all other classes, sects, and denominations, whether of Christians or of any other religion.  Let us, in addition to the authorities already cited in this opinion, look a moment to see how the word had been used in the province of New Hampshire before the constitution, and how the same word had been used in England during the same period.

The political organizations of the colonies were classed and known as provincial, proprietary, and charter governments.  New Hampshire, with others, belonged to the first of these classes,—provincial governments.  " These had no other written constitutions or fundamental laws than the commissions issued to the governors appointed by the crown, explained by the instructions which accompanied them.  The governor, by his commission, was made the representative or deputy of the king, and was obliged to act in conformity with the royal instructions.  He was assisted by a council, the members of which, besides participating to a certain extent in the executive functions of the government, constituted the upper house of the provincial legislature; and he was also authorized to summon a general assembly of the representatives of the freeholders of the province.  The three branches thus convened, con-

sisting of the governor, council, and representatives, constituted the provincial assemblies, having the power of local legislation, subject to the ratification and disapproval of the crown." 1 Curtis's Hist. of Const. U. S. 4; 1 Story on Const., sec. 159.

The only written constitution which New Hampshire had, from the year 1679, when she was separated from Massachusetts and erected into a separate provincial government, was the commissions of her several governors or presidents, beginning with that of President John Cutt, in 1679; and this commission was printed at the commencement of the volumes of the N. H. Provincial Laws, just as the constitution now is. The commissions of the other presidents and governors, from Cutt down to the last Governor Wentworth, were, in the main, substantial copies of that of Cutt. N. H. Laws (of 1771) 1; 8 N. H. Historical Collections 1, 455, 456; 1 Story on Const., sec. 80; 1 Robertson's Hist. U. S. 398, and seq.; Hutchinson's Collections 522; Barber's Hist. of N. Eng. 41; Belknap's (Farmer's) Hist. of N. H. 88; 1 Provincial Papers N. H. 373, 433.

"Governor Wentworth, in his last message to the assembly of the province, referred to the commission appointing President Cutt and a council as having 'laid the foundation of the constitution by which the province has since been governed,' and said 'the laws of the province rest upon this foundation.'" State v. Rollins, 8 N. H. 562.

In this commission to President Cutt, is this language: "And above all things we do, by these presents, will, require, and command our said council to take all possible care for the discountenancing of vice, and encouraging of virtue and good living, and that by such examples the infidel may be invited and desire to partake of the Christian religion; and, for the greater ease and satisfaction of the said loving subjects in matters of religion, we do hereby require and command that liberty of conscience shall be allowed to all Protestants; that such especially as shall be conformable to the rites of the church of England shall be particularly countenanced and encouraged." 8 N. H. Hist. Collections 5; 1 Provincial Papers N. H. 373, 378.

Under this commission to Cutt, the councillors were qualified, and a general assembly elected; and, at a meeting of the governor, council, and assembly, at Portsmouth, in March, 1680, the first code of laws was passed in the province of New Hampshire. 8 N. H. Hist. Coll. 10, and seq.; 1 Prov. Papers of N. H. 383, and seq. Among the capital laws, the first that was passed was against idolatry. If they had understood that the term Protestant, in their constitution, to all of whom liberty of conscience was allowed, embraced all but Roman Catholics, then it of course embraced pagans, and they would hardly have provided first of all for punishing them all with death for exercising the liberty of conscience which was specially guaranteed to them in the constitution. Their second capital enactment was against blasphemy. Among their criminal laws were acts against profane swearing, profaning the Lord's day, and contempt of God's word and ministers. Neither their Christianity nor their Protestantism included Jews, Mohammedans, pagans, or infidels.

A similar commission issued to Edward Cranfield as Lieutenant-Governor, in 1682; and at a meeting of the governor and assembly, Nov. 14, 1682, various other laws were passed, and some of the former acts were modified; but the act against idolatry was not changed, though the same liberty of conscience is allowed to all Protestants in that commission as in the one to President Cutt. 8 N. H. Hist. Coll. 85; 1 Provincial Papers N. H. 433, 439, 444, and seq. Thus, the only constitution which the province of New Hampshire had, from 1680 to 1783, viz., the commissions to the presidents and governors, had made provision that all possible care should be taken for the discountenancing of vice, and the encouraging of virtue and good living, so that by such examples the infidel might be invited and desire to partake of the Christian religion, and for the liberty of conscience to all Protestants.

Soon after the commission to President Cutt containing the Protestant clause above quoted, a new charter was issued to Massachusetts containing provisions similar to those contained in Cutts's commission, and in that charter, granted in 1691 to Massachusetts, it was provided that there should be " a liberty of conscience allowed in the worship of God to all Christians except papists;" and under this charter the province of Massachusetts was governed until the revolution. Colony and Province Laws of Massachusetts (1814); 1 Holmes's Annals 436; 1 Hutchinson's History 415, 416; 1 Story on Const., sec. 71.

The commission to President Cutt, which was substantially the constitution of New Hampshire from 1679 until the revolution, provided for "liberty of conscience to all Protestants," while the Massachusetts charter, granted a few years later (1691) and continuing in force until after the revolution, provided for "liberty of conscience * * * to all Christians except papists." These two forms of expression were, and were intended to be, synonymous. The term " Protestant " was then and has ever since been used to include and describe " all Christians except papists." If the charter of Massachusetts had allowed liberty of conscience to all subjects, or to all men, or to men of all religions except papists, it might be an argument for the position that the term " Protestant," when used in a similar instrument, in connection with the same subject-matter, a short time before, was intended to include and describe the same class of persons, though it had never been used in that sense before.

But here we find the same government granting charters to two adjoining provinces with similar interests, inhabited by people of the same lineage, language, customs, and religion, at about the same time,—said charters containing similar general provisions and designed for the same general object. There certainly is no apparent reason why the liberty of conscience granted by each should not be the same, and granted to the same class in each. Such was no doubt the intention; and, if the government of England had been asked what they meant by the expression " all Protestants " in the first, they could not have answered the question with greater technical exactness and truth than they did

by the expression in the second, of " all Christians except papists." But that is not all.   This same charter of Massachusetts, immediately after granting liberty of conscience, &c., provides that all *subjects* inhabiting in the province, and their children, shall have all the liberties and immunities of free and natural subjects, as if born within the realm of England.   1 Story on Const., sec. 71.

Here certain rights and immunities are expressly granted to all *subjects*, certain other rights to *all Christians* except papists; that is, to all Protestants,—the term Christian being understood and used by them to include all who believed in or gave their assent to the *Christian* religion, including papists and Protestants.   But " all Christians except papists," in the one case, or " all Protestants" in the other, did not include all *subjects* except papists, or anybody besides Christians, and especially did not include " the infidel," whose conversion to the *Christian religion* it was considered by them important "above all things" to secure.

Let us also examine for a moment the constitution which was proposed to the people of New Hampshire in 1779, and which was by them rejected.   4 N. H. Hist. Coll. 154.   In the bill of rights of that constitution, Art. 5, it was provided, among other things, that the future legislature of the state shall make no laws " contrary to the laws of God, or against the Protestant religion."   *Id.* 155.   Here Protestantism is recognized as *a religion*, which it could not be if it was merely a negative.   To be anti-papist does not constitute a religion.   But that constitution went further than this.   In the plan of government, Art. 8, was this provision : " all the male inhabitants of the state, of lawful age, paying taxes and professing the Protestant religion, shall be deemed legal voters in choosing councillors and representatives," and having in addition to the above certain property qualifications, " shall be capable of being elected."   *Id.* 157.   By that constitution, if adopted, there would have been a Protestant test, not only in regard to councillors and representatives, but in order to be a legal voter, a man must be one " professing the Protestant religion."   But a man need not profess any religion to be anti-Roman Catholic.   If all that was intended had been to require that such person should not be a Roman Catholic in order to entitle him to vote, it would have said so in plain words, and then the door would have been open for all others —Jews, pagans, and infidels—to have asserted their rights.   But something more than that was intended.   To be a voter a man must *profess a religion*, " the Protestant religion," the religion of Protestants, which was the Christian religion as embraced by all Christians except papists.

The pilgrims and other early settlers of this country, and particularly of this state, did not come here to escape Roman Catholic persecution, but the persecutions of the Church of England, one branch of the Protestant church, and their design in coming here was not so much to found a state that should be anti-Catholic, as one that should be particularly Christian; founded less, in fact, upon the constitution

or laws of England, than upon the Bible as the law of God; and opposed to the Church of England, not so much in matters of doctrine, as in their views of church government, of ecclesiastical polity, discipline, and worship. But they were Protestants, whose religion did not so much consist in opposition to papacy or the Church of England, as it did in being Christians. They were Protestants because they were Christians, first and primarily; and next, because they did not subscribe to the papacy. It was not a Protestantism which contented itself with simply differing from Rome, and had no system of faith of its own,—a Protestantism that would include pagans and infidels, as well as Christians.

Bancroft says,—" The settlement of New England was a result of the reformation, not of the contest between the new opinions and the authority of Rome, but of implacable differences between Protestant dissenters and the established Anglican church." 1 Bancroft's Hist. U. S. 266, 278; 1 Neal's Hist. of Puritans 121; 1 Hallam's Hist. England 140; 3 Turner's Hist. England 140 and *seq*. He further says that the system of religion revealed in Judea " was professed in every part of our widely extended country, and cradled our freedom "—2 Bancroft's Hist. U. S. 454; and he adds,—" Our fathers were not only Christians; they were, even in Maryland by a vast majority, elsewhere almost unanimously, Protestants"—2 *Id*. 456; and their Protestantism was a protest against the supposed errors of the Church of England as well as those of the Church of Rome, and their object was to found a church and a government according to the word of God, Christianity being its great foundation stone, and freedom its main pillar of support. Belknap's Hist. N. H. 42, 43. Robertson's Hist. U. S. 408; Lowell Institute Lectures (1869) 383 and *seq.*; 403 and *seq*. (lecture of Judge Parker); Baird's Religion in America 578; 1 Story on Const. U. S. 42, 43, 49, 54, 65.

And at the time of the formation of the constitution, the great mass of our people, as we have already seen, were Congregationalists, who were first Christians, and next Protestants, and then Congregationalists, opposed alike to popes and hierarchies and councils, and who insisted, first and last and altogether, upon the Bible as the direct and only revealed will and law of God, as a perfect rule of faith and practice, as the only sure guide in ecclesiastical polity, discipline, and worship. To them the Bible was the fountain of all religious truth, the standard by which to judge of all systems of faith and doctrine, all forms of church government and modes of worship, the test by which everything that claimed to be true in religion was to be tried. They believed in Jesus Christ as the true Messiah, the Christ of God, and that all which he taught in the New Testament concerning himself and his system of religion was true; that all the doctrines which he taught were true; that Christ was himself " the way, the truth, and the life." Such was their Christianity and their Protestantism, as was that of most of the New England states,—while in the Southern states, the worship of the Church of England had been received with more favor; and

they were satisfied with being first Christian and then Protestant, without adding to these the feature of independency. It is not strange that in their constitutions they should in some way show their preferences for Christianity, and for their particular form of Christianity, Protestantism, and also for their particular feature or type of Protestantism. Hence we are informed that, as the colonial period drew to a close, " there were only two colonies in which the civil power did not employ its influence in supporting one or other of the two communions · or churches. In New England it gave its support to Congregationalism, or, as it is called in Britain, independency, that being established in all the colonies of that province, with the single but small exception of Rhode Island. In the colonies to the south of these, from New York to Georgia, with the exception of Pennsylvania, episcopacy was the favored doctrine." Baird's Religion in America 184; also, Book 2, chaps. 16, 17, 18.

But let us look a moment at the constitutions of the other states in the Union, formed about the same time that ours was,—for this may throw light upon the terms we are considering, and show the meaning attached to them at that time. Mr. Bancroft says,—" Had the Americans been skeptics, had they wanted faith, they could have formed nothing. Let not the philosopher hear with scorn that their constitutions were so completely the offspring of the past, and not the phantoms of theories; that at least seven of them required some sort of religious test as a qualification for office. In Maryland and Massachusetts, it was enough to declare belief " in the Christian religion;" in South Carolina and Georgia, in " the Protestant religion, and the divine authority of the Old and of the New Testaments;" in North Carolina, " in God, the Protestant religion, and the divine authority of the Old and New Testaments." In Pennsylvania, the test was " a belief in God, the Creator and Governor of the universe, the rewarder of the good and the punisher of the wicked," with a further acknowledgment that " the Scriptures of the Old and New Testaments were given by divine inspiration." Besides this last acknowledgment, Delaware required the officer to " profess faith in God the Father, Jesus Christ his only son, and the Holy Ghost—one God, blessed forevermore." 9 Bancroft's Hist. U. S. 274, 275. He omits to mention New Hampshire, and some other states that had a religious test. He then adds,— " These restrictions were incidental reminiscences of ancient usages and dearly cherished creeds, * * * and for a season, in the states where they were established, they created discussions chiefly on the full enfranchisement of the Catholic and the Jew, and they were eliminated almost as soon as their inconvenience arrested attention. At first, the Jew was eligible to office only in Rhode Island, New York, New Jersey, and Virginia; the Catholic in these states, and in Massachusetts, Pennsylvania, Delaware, Maryland, and perhaps Connecticut. But the great result was accomplished from the beginning; * * * nowhere was persecution for religious opinion so nearly at an end as in America; and nowhere was there so religious a people." *Id.* 276.

In the four states in which the Jew was at first eligible to office, according to Mr. Bancroft, no test, either Christian or Protestant, was required. Wherever either of those tests was required, the Jew was excluded. The Christian test admitted the Catholic and the Protestant, while the Protestant test excluded both the Catholic and the Jew. No claim here that the word Protestant, in any constitution of any state, was broad enough to include all but Catholics. No question probably arose concerning pagans, Mohammedans, or infidels, from the fact that none openly claiming to be such were elected to office in any of the states where either of these tests was required; or if so, the test was not insisted on, for some special reason. It is very apparent that if Jews could not properly be classed as Protestants, as they were not, neither could pagans or infidels.

Dr. Baird, in his Religion in America, ch. 8, gives a more full and detailed account of the forms of the constitutions of the several states. He states that Virginia is silent upon the subject of Christianity and Protestantism. Rhode Island and Connecticut had adopted no constitutions. They were of Puritan origin, and the charters of both were based on religious principles, and remain as their present constitutions. New York had no test. New Jersey's constitution provided that "all persons professing a belief in the faith of any Protestant sect  *  *  *  should be capable of being members of either branch of the legislature, and should  *  *  *  enjoy every privilege and immunity enjoyed by others, their fellow citizens." Baird's Rel. in Am. 248. But there was no disfranchisement of those not "of any Protestant sect," and no test was actually required of any one. 9 Bancroft's Hist. U. S. 279, note. Dr. Baird then speaks of the requirements of the several states of New Hampshire, Massachusetts, Maryland, and others that we have noticed, and adds,—" Such was the character of the state constitutions in the opening scenes of our national existence. Of the thirteen original states, the organic laws of all but one expressly enjoined the Christian religion, and, almost without exception, *the Protestant form of Christianity.*  *  *  *  I repeat, in few words, that the state governments were founded on Christianity, and, almost without exception, on *Protestant Christianity.*  *  *  *  This is the present position of the governments of the several states of the American Union. Their legislation, while it avoids oppressing the conscience of any sect of religionists, is still decidedly favorable in general to the interests of Christianity." Baird's Religion in America 252; 1 Story on Const., Book 1. "All the new states, when they cut loose from the mother country, had a favored form of religion which they had adopted as a state religion, or one which they were patronizing, and in their new constitutions they to a great extent endeavored to preserve the same favorite system; but, failing in this, as many of them did, they fell back upon the Christian religion generally, or, when they could, upon the Protestant religion, which included all the Christian sects, or denominations, except Catholics; and these tests were continued in the constitutions of a majority of the original states."

There is no doubt that the same words in the constitutions of the different states meant the same thing, and the same was true concerning the laws that were passed under the different constitutions about the same time. It is said to have been through the influence of Mr. Jefferson that the word Christian or Christianity was not contained in the constitution of Virginia; and in his famous act for establishing religious freedom, adopted by the legislature of Virginia in 1785, which did not contain the word Christian or Christianity at all, but left every one free to believe and worship, or to disbelieve and refuse to worship, as he pleased, it is said to have given him great satisfaction because it was made to " comprehend within the mantle of its protection, the Jew and the Gentile, the Christian and the Mohammedan, the Hindoo and the infidel, of every denomination." Baird's Religion in America, Book 3, ch. 3. He evidently understood that a Christian test would exclude the infidel just as much as it would the Mohammedan and the Hindoo. So a Protestant test would exclude all not Christians on one side, and Roman Catholics, who were Christians, on the other side. If Protestantism would include Mr. Abbott in this case, it would of course include Thomas Jefferson, and by the same rule also Thomas Paine, whom Gov. Plumer of New Hampshire called " that outrageous blasphemer," that "infamous blasphemer," " that miscreant Paine," whose " Age of Reason" Plumer had read " with unqualified disapprobation of its tone and temper, its coarse vulgarity, and its unfair appeals to the passions and prejudices of his readers." Life of Wm. Plumer 242, 243. But if Protestantism includes all but Roman Catholics, then Thomas Paine, in writing his Age of Reason, was preaching Protestantism, as truly as Whitefield or Wesley or Edwards while preaching the gospel of the Messiah, the Christ of God; for Thomas Paine and all other atheists, deists, theists, and infidels, of every stamp, and all pagans, were no more Roman Catholics than were Whitefield, Wesley, or Edwards. Mr. Abbott denies that he is a Christian, and so did Jefferson and Paine, and that was honest in all of them, and was the simple truth; and because they were not Christians, they were not and could not be Protestants, as Mr. Abbott truly declares, Protestantism being only one branch of Christianity. Thomas Paine and his followers were neither Christians nor Protestants; neither were the Mohammedans, Hindoos, and infidels of Jefferson's time; neither are the theists, the free religionists, and infidels of the present day.

It seems unnecessary to examine much further the provisions in the constitutions of the other states. Virginia and New York had no tests; anybody who could get elected, might, so far as religious opinions or professions were concerned, hold any office. Some of the states had simply a Christian test, as Maryland, and there all Christians, whether Catholic or Protestant, were eligible to office. In others, and by far the larger number, there was at first a Protestant test, which only admitted one of the great divisions of Christianity to the exclusion of the other from certain offices. Under neither the Christian nor the Protestant test could a Jew hold any office in this country or in England until the

constitutions were amended here, and special acts of parliament passed in their favor in England.  9 Bancroft's Hist. U. S. 275 ; 1 Black. Com. 375, 449 ; 4 Black. Com. 52, 57, 58, 59, 272.

In England there was the national church which was Protestant, and besides that there were papists and Jews and Mohammedans and infidels and Protestant dissenters.  These were all dissenters from the Church of England, and all anti-Catholic, and if the term Protestant included all who were not Romanists, then they were all Protestant dissenters.  But such was not the meaning of the word Protestant in England at that time, or at any time since.  Protestant dissenters included only such Christian sects as dissented from the Church of England, and also from the Roman church.  The edicts of the government were against Jews, pagans, Turks, infidels, papists, and Protestant dissenters, showing that the term Protestant did not include infidels, any more than it did Turks and pagans.

In England, formerly, Unitarians were not recognized as a sect of Christians, because their faith was prohibited by law.  They were then classed as a kind of infidels, and so long as they were not reckoned as Christians, they could not properly be reckoned as Protestants.  *Drummond* v. *Attorney-General*, 2 English Law & Eq. 15, was a case decided in the House of Lords in 1849 or 1850, where one question was, whether Unitarians were Protestant dissenters or not.  It was admitted that they were and always had been dissenters from the Church of England, and that they were not and never had been Catholics.  But it was expressly held, that while they were not recognized as Christians, they could not be Protestants ; that to be Protestant dissenters, they must be first Christian dissenters ; and, second, that they must not only be Christians, but anti-Catholic.  To be Protestant dissenters, they must be Christian as well as anti-Catholic dissenters from the English church.  This case covers the ground from 1710 to 1850, and shows that such and such only was the meaning of the word Protestant in England during all that time.

In 1835 the state of North Carolina amended her constitution.  Before that time, she had a Protestant test similar to that in our constitution, under which none but Protestants could hold certain offices in the state.  The people wished to enlarge this test so as not to exclude Roman Catholics, but they did not therefore propose to abolish the test altogether, so as to allow Jews, or pagans, or infidels, to hold these offices ; so they substituted the term Christian instead of the word Protestant.  By this amendment all Christians are admitted to these offices, whether papists or Protestants, whereas under the old, only Protestants could thus be admitted ; but neither admits, nor was intended to admit, anybody but Christians.

But it is claimed that soon after the formation of our constitution of 1783, William Plumer was elected representative from the town of Epping, and was afterwards elected as senator and governor of the state, all which positions he was allowed to hold without objection on account of his religious views, while it is claimed that he was a deist, a dis-

believer in Christianity, and because he was allowed to hold his seat, and was not forcibly ejected because of his religious belief, or want of religious belief, that therefore he must have been a Protestant within the meaning of the constitution, and therefore that the term Protestant as there used must have been intended to include all others except papists.

It would seem to be a sufficient answer to this position to state, what everybody knows, that many Roman Catholics have been elected as members of the house of representatives and to other offices within the limit of this test, and have always been allowed to hold their seats without objection. Now it is claimed that the Protestant test was introduced to prevent Roman Catholics from holding these offices, and we have no doubt it was intended to prevent them, with all who did not give their general assent to the doctrines of Christianity, from holding office; that is what we claim, and if the fact that many Roman Catholics have been allowed to hold seats in our legislature without objection does not prove that the term Protestant in the constitution does not mean anti-Catholic, which no one claims, then why should the fact that one deist was allowed to hold his seat there be held to prove that the same term in the same instrument does not mean anti-deistical? If many exceptions on one side are admitted, as they are to prove nothing as against this rule, why should it be claimed that a single exception on the other side overthrows the rule itself, and that this single exceptional case must be taken to establish the rule in its favor for all time?

We have no doubt that William Plumer himself understood the term Protestant, in the constitution, to mean just what the majority of the court hold that it means, and that everybody in his time understood it in the same way. We form these conclusions from an examination of the life of Governor Plumer, as written by his son, who was well known to many of us personally, and whose ample means of knowledge in relation to the facts stated cannot be questioned.

In speaking of the proposed constitution of 1779 (Life of Wm. Plumer 49), the author mentions the fact that that constitution made the "professing the Protestant religion" a necessary qualification of a voter, as well as a test for holding office in the state. This religious test for voting was then first introduced in that constitution, and was not included in any of the subsequent ones; and the reason of this is stated in the life of Mr. Plumer: "It is worthy of remark that this religious test, then first proposed, was nearly contemporaneous with the alliance with France, which, however beneficial in other respects, was thought by many likely to favor the introduction of popery among us." But, as we have before seen, this constitution of 1779 was not adopted.

"Another convention was called in 1781, and the constitution proposed by it, after various alterations and amendments, went finally into operation in 1784.    *    *    *.    It was provided that no person should hold the office of governor, councillor, senator, delegate,    *    *    *    unless he were of the Protestant religion.    It was in opposition to these intoler-

ant restrictions, and in defence of religious liberty," that Governor Plumer's first essay was written. " In it the broad principle is laid down that all men are equally entitled to the protection of the laws, who demean themselves peaceably as good members of civil society, without reference to their religious opinions; and that any man should be eligible to office who possesses the ability necessary to the discharge of its duties." " This communication, which went the full length not of toleration merely, but of religious freedom, as now understood by its most liberal advocates, was far in advance of the times." " The printer," my father writes, " thinking the religion of the country required such a provision as I opposed, refused to publish what I had written until I paid him three dollars for it." Life of William Plumer 50, 51.

He adds,—" The articles of the constitution thus opposed were adopted by the people, and still remain a part of that instrument. Such however was the justice of his strictures, and such the advance of public sentiment on this subject, that these provisions soon became practically obsolete. Men not Protestants, nor even Christians, have been repeatedly chosen to offices which, under these provisions, they were not entitled to hold, and no attempt was ever made to exclude them on the ground of their religious disqualifications." *Id.* 51.

In 1785, William Plumer was elected representative to the legislature from Epping, and was frequently reëlected to the same body between the years 1778 and 1801, and for two years was its speaker. He was a member of the constitutional convention of 1791, which framed our present constitution. In 1810 and 1811, he was a member and president of the state senate. In 1812 he was elected governor, and again reëlected in 1816, 1817, and 1818. *Id.* 337, 338. On his first election, in March, 1785, "his religious opinions had been urged against him in the canvass, and he was told that his seat would be contested on the ground that he was not of the Protestant religion. But no such objection was made to him, and he held his seat during the three sessions the legislature held that year." *Id.* 59. It is not suggested that Mr. Plumer ever contended or claimed, at any time or anywhere, that the fact that he was a deist (if such was the fact) would not be a disqualification for the office, under the provisions of the constitution, if insisted on. He did not understand that he could be a deist and at the same time be " of the Protestant religion," within the meaning of the constitution. He admitted that a knowledge of theology and a belief of the truth might be necessary for a religious teacher, but not for the civil ruler or the magistrate, who needed much more to know something of the principles of government and of political science; and that the error in the constitutional requirement was, that it required a *religious* qualification for a *civil* office.

He did not understand that he, as a deist, or that any deist, would be included within the words Protestant or Christian, as used in the constitution; but he seems frankly to admit that he is neither of these. There is no doubt that his son had special reference to his

father, where he says, as above, that *men not Protestants* or *even Christians*, have been repeatedly chosen to offices which, under the provisions of the constitution, they were *not entitled to hold*. But why not entitled to hold? Simply because they were not Protestants, as the constitution required they should be. He evidently was not referring to Catholics, because they were Christians, though not Protestants; but he is speaking of those who *were not Protestants, nor even Christians*. We cannot doubt that the author of the Life of William Plumer, being at the same time his favorite son and most intimate friend, understood fully and perfectly his father's views upon these subjects, and that he has, in these expressions, fairly and truthfully represented them.

But let us see whether there was any good reason why there was no objection made to Mr. Plumer in 1785, even though he was constitutionally disqualified for the office to which he was then elected. When about twenty years of age, in May, 1779, after some weeks of the most intense religious excitement, he became a convert to the doctrines of the Calvinist Baptists, under the preaching of Dr. Samuel Shepherd, the third Baptist preacher ever ordained in the state. From a convert, he became at once an exhorter, and then a preacher. In one year from the time of his supposed conversion he started on a preaching tour through the state, in which he spent some six weeks, and he continued preaching some six months in all. But by the autumn of 1780 a thorough reaction had begun in all his religious feelings;—from unlimited faith, he went to the opposite extreme of almost universal skepticism, which ended in deism. By the commencement of the year 1781 he was a confirmed skeptic, and for a short time seemed disposed to advocate these new opinions publicly, as he had the old, before. But, as before, he soon tired of this new excitement, and concluded that the best way was to let every man look after his own religious opinions and religious faith, and that, as for himself, he had better devote himself to his farm, and the study of the law, and the practice of politics; and this he did.

His son says of him,—" The strength of his earnest and confiding faith filled, while it lasted, all his thoughts, and directed the whole energy of his mind to the inculcation of his religious opinions, and with them, as he believed, to the promotion of the highest happiness of his fellow men. But this confiding faith, and more than missionary zeal, were not destined long to continue. A new train of thought and feeling had now arisen, which mastered him as effectually as his former mood, with results more lasting, and, in some respects, less fortunate. * * * The revulsion of thought and feeling was as far, or farther, on the other and the wrong side of a just balance of opinion and sentiment. Driven into the extreme of fanatical belief, under the excitement of fear and the contagion of example, he was carried by a natural but unfortunate reaction into the opposite extreme." *Id.* 34.

" In the first ardor of his change, he sought for a time to make converts to his new opinions. He was, as Mackintosh says of himself, ' probably the boldest heretic in the county.' But he soon relinquished the vain ambition of settling the opinions of others, while his own were

in a state of so much uncertainty. His feelings were those of an inquirer, in doubt as to truth, and anxious chiefly for the solution of that doubt. When he spoke upon the subject, it was therefore not with levity or sarcasm, but with the respect due to long established opinions, and in the tone of inquiry rather than of dogmatic defiance and disbelief." *Id.* 40.

It seems that though at first an open and pronounced deist, his ardor soon cooled down, and he came into the condition of an *inquirer after truth*, speaking *not with levity or sarcasm*, such as would be likely to offend any one, but *he showed respect for long-established opinions*, and his tone was that of *inquiry*, and *not of defiance or disbelief*. He had learned to conciliate the good will and the good opinions of those about him, and the course he pursued was calculated to make him friends in all circles and denominations, and to disarm and conciliate those who had otherwise been enemies. Again : we must recollect that the country had just passed through the period of the revolutionary war, and that young Plumer had all along been an ardent patriot and a preacher of liberty (Life of Plumer 44), and had only been restrained from enlisting in the army and marching to Boston at the battle of Bunker Hill in 1776, then only in his seventeenth year, by his father's direct prohibition (*Id.* 45) ; that he had ever been ready to suffer chains and imprisonment as a martyr to the cause of his country, if such should be his lot (*Id.* 44, 45) ; and that in these views he agreed with or led almost the entire community in the state (*Id.* 45). Such a young man could not fail to be popular among his associates ; and though in 1785, when he was about twenty-six years of age, some five years after his fiery zeal as a Baptist had burned and cooled, and some four years after his like fiery zeal as a deist had blazed and then gone out, and some three years after he had assumed the tone of *inquiry* alone, had dropped his sarcasm and had become accustomed to speak of the religious views of others with that respect due to long-established opinions ; though at that time there were some who threatened to object to him on the ground of religious belief, or want of religious belief, yet by the course described above, he had disarmed nearly all opposition, and even these faint threats were never carried into execution.

Another reason why no objection was made to Mr. Plumer was, that no political parties had at that time been formed, and the rancor and bitterness of political parties were then, to a great extent, unknown in this state. The only parties then known in the state or country were whigs and tories, but in New Hampshire nearly all were whigs; "there was no considerable tory party here." Life of Plumer 45. So that while young Plumer had been for some years pursuing a course calculated to conciliate all parties in religious matters, he belonged to a political party which embraced nearly all the citizens of the state, and the question was not then so much upon religious subjects as upon subjects of civil government. He had been a true friend to his state and country during the revolutionary war, and was now ready to aid in the making of laws in conformity to the new constitution which

had gone into operation the year before, in which the Protestant cause had received such encouragement as its friends thought proper and desirable.   Under these circumstances it is not strange that a young man of promise and known patriotism should be suffered to hold his seat in a body of men nearly all of whom agreed with him in political sentiment, so far as any political sentiment had been developed in the state.

But, let us look a little further at the acts of Mr. Plumer.   As we have seen, he was a member of the constitutional convention that sat in 1791, which formed the constitution of 1792, which is still in force. There is but little reported in the journal of the proceedings of that convention, and that little has not been published.   But, in the Life of Governor Plumer, his son has been able, as he says, partly from the journal and other papers of the convention, and partly from his father's papers, to give some account of these proceedings, and of his father's connection with them.   " On the subject of religion, he proposed, instead of the former provisions," an article considered by him much more liberal.   " This amendment," he adds, evidently expressing the views and opinions of his father as well as his own upon that subject, " was wide enough to embrace the Roman Catholic on the one hand, and the deist on the other."   *Id.* 116.

That would be, as he understood it, enlarging or extending the existing Protestant platform, as contained in the constitution of 1783, and which remains unchanged to this time, by putting an addition upon each side of it.   On the one side, it would be extended so as to admit the papist, so that it might embrace all the Christian sects, Catholic and Protestant ; and upon the other side, the platform was to be enlarged so as to admit the deist, the disbeliever in the whole system of Christianity, and the advocates of all other systems opposed to Christianity. Governor Plumer evidently understood that a Protestant platform would no more hold a deist than it would a Roman Catholic ; that, to hold either, it must be enlarged or changed, so that it could no longer be a Protestant platform.   He evidently understood that deists were not included in the meaning of the word Protestant in the constitution, any more than papists were.   But this amendment was defeated in the convention, and the constitution in that regard remained unchanged.

The same writer adds,—" A motion made by my father to abolish the religious test for office-holders, who were required by the constitution to be ' of the Protestant religion,' though at first rejected, was finally adopted by the convention.   It failed however with the people, receiving a majority of the votes in its favor, but not the two thirds necessary for its adoption.   This test still forms a part of the constitution.   The convention of 1850 twice proposed, almost unanimously, its repeal ; but the people refused, by very large majorities, to make the proposed alteration."   *Id.* 117, 118.

In the convention of 1850, Judge Woodbury made a speech in favor of removing the test in the constitution, in which he spoke of it as having been inserted in the constitution of 1783 in consequence of some fears or taunts that, after the French alliance, there was also to be an

alliance with the French religion—the Catholic. He only speaks of it, however, as the traditionary cause, and thinks the tradition may have come to him from Governor Plumer. 1 Woodbury's Writings 486.

But this tradition had reference to the provisions of the proposed constitution of 1779, instead of that of 1783 as has been already stated in the quotation from Mr. Plumer. The French alliance was formed early in the spring of 1778; Franklin and the other commissioners from this country were presented to the king of France, March 20, 1778; and the alliance was soon completed, so that in April of the same year the news of the treaty between France and the United States had spread throughout Europe, and of course through this country. 9 Bancroft's Hist. U. S. 489, 497. And in the summer of 1778, in July, a French fleet appeared on our coast to aid us in the contest with Britain. Whiton's Hist. N. H. 140; Belknap's Hist. N. H. 376. At that time and immediately after, these fears of French Catholicism prevailed, as Mr. Plumer states; and this is evidently the only tradition of that kind that ever came to the ears of Judge Woodbury from Governor Plumer or anybody else, for long before 1783 everybody had learned, as the history of the times fully proves, that the fear to our religion was not from French Catholicism, but from French infidelity. "The only real danger from the French alliance to the religion of the country was not from the primate of Rome, but from the philosopher of Ferney, whose disciples in the French army were much more numerous and more zealous than the priests." Life of Wm. Plumer 50. We are also assured, upon the best of authority, that whatever the fears may have been in 1778 and 1779, when the French alliance was first formed, its real effect was very powerful in diminishing the prejudices against Catholicism that had existed before. 3 Hildreth's Hist. of U. S. 385. Hence we see that these fears may have induced the convention that framed the proposed constitution of 1779 to insert the article requiring all legal voters to be Protestants, but before 1783 such fears were all dispelled, and instead of fears of Catholics, the fear of French infidelity had taken its place, which was the great thing to be guarded against; and especially if that provision in the constitution of 1783 had crept into it from any such cause as fear of Catholicism, it would have been omitted in the constitution of 1792, when that cause and all similar causes had ceased to operate: but this was not the case. In fact, it is by no means certain that had Governor Plumer, in the convention of 1791, proposed to substitute a *Christian* test for the *Protestant*, instead of abolishing all tests, he might have obtained not only the assent of the convention, but the two-thirds vote from the people, which was necessary to adopt it. For there is no doubt that at that time, as well as in 1783, the people of this state had much greater fears of infidelity than of popery. The people would probably have been more unwilling to have consented to the proposed enlargement of the Protestant platform on the side of deism than on the side of Romanism.

A short extract from an article that was printed in the *N. H. Gazette* of April 20, 1786, in relation to Major-General Sullivan, will, perhaps,

as well as anything, indicate the true state of feeling in this state at that time. The article is signed "A friend to justice." General Sullivan had been accused, it seems, of being one of a party of three, who had, at a Mr. Brewster's, at Portsmouth, treated with contempt and ridicule the Christian religion and the sacred Scriptures. In justification of General Sullivan, the writer says,—"To suppose him to be one of those who joined in reviling the sacred writings, is most unjust and ungenerous. It is a fact, well known to all who have the pleasure of an acquaintance with that gentleman, that he has ever been a zealous and able advocate in favor of the divinity of the Scriptures, and particularly of the truth of the Christian system. It is well known to a number of worthy officers who served under him, that, while the army which he commanded in 1779 lay at Wyoming, he wrote a most learned and ingenious treatise against the deists, which was highly applauded by all the chaplains in that army, among whom was the Rev. Dr. Evans, then chaplain to the New Hampshire troops. And even those who professed to be deists acknowledged that it contained the most powerful and conclusive arguments in favor of divine revelation and the system of Christianity they had ever seen. This piece, though many copies of it were given out, he would not consent to have published, lest it should be said he was acting out of his sphere. I remember sometime the last fall to have heard a number of persons, among whom was Mr. James McGregore, son of the late Rev. Mr. McGregore, say that, in a dispute with some gentlemen who professed deism, he argued with such clearness of reason upon the Scriptures as at once silenced his adversaries, * * * and I heard the Hon. Judge Calfe since observe, that he (Sullivan) was the most powerful antagonist, and used the most convincing arguments against the deists, he ever heard. How malicious then and cruel must it be for persons to whisper that he was one of the impious club who so daringly blasphemed the sacred Scriptures and the Redeemer of mankind." The writer then states that the above facts in relation to General Sullivan are within his own knowledge, and that they are stated so as to open the door to inquiry, so that any person may satisfy himself of their truth.

It would seem that there would be no great difficulty in ascertaining the truth of the above statements, since the individuals mentioned were all well known in that portion of the state at that time. But it is evident that at that time, if any false slanders were to be *whispered* against any one, designed to his injury, it would be that he was a deist, and not that he was a Catholic, so much stronger was the prejudice against the former than the latter. It also tends to show that the religious discussions in the army, in 1779 and after, were not upon the subject of the papacy, but upon French infidelity. General Sullivan was vindicated against all such false charges, or *whisperings*, by being elected president of the state in 1786, and also in 1787, and again in 1789. Whiton's Hist. N. H. 155, 160; Jenks's N. H. Political Manual for 1868, 34, 35. General Sullivan was also chosen president of the New Hampshire convention which ratified the Federal constitution in 1788, and Hon. John Calfe

(the Judge Calfe mentioned in the above article) was chosen its secretary, and he was also secretary of the state constitutional convention of 1791.  Whiton's Hist. N. H. 158, 163, 164.

It is evident, we think, that the Protestant test was not introduced into the constitution of New Hampshire on account of any particular fear of the Catholics, for there was no occasion to fear them at that time, or probably at any time since then, in this state ; but, more particularly at that time, they were not numerous enough to cause any alarm.  For two hundred years after New Hampshire was settled,—from 1623 to 1823,—there were no Catholics in the state, or next to none. For forty years after the constitution of 1783 was adopted, there was no church or society of Catholics in the state, so far as we have been able to learn ; for in 1822, "*for the first time*, an attempt was made to introduce into New Hampshire the principles of the Roman Catholic church.  The Rev. Mr. Barber, who had passed some time at Rome, was ordained at the Catholic chapel, in Boston, as a Catholic missionary to this state ;" and between that time and 1833 he had succeeded in collecting " a small society at Claremont," and " another  *  *  * at Dover."  Whiton's Hist. of N. H. 193.

The only man of whom we find any account, who ever had or pretended to have any suspicions of danger from the Romanists in those days, was Edward Gove, of Hampton, who, in 1682, excited a rebellion against the government of Edward Cranfield, and, among many other things equally absurd, he charged upon the governor a design to " bring popery in amongst them."  But upon being arrested, he was indicted and tried for high treason before Richard Waldron and others as judges, was convicted and sentenced to death, but was finally sent to England and imprisoned in the tower of London.  Belknap says,—" Gove, in his petitions to the king, pleaded ' a distemper of mind' as the cause of his actions for which he was prosecuted.  He also speaks in some of his private letters of a drinking match at his house, and that he had not slept for twelve days and nights about that time.  When these things are considered, it is not hard to account for his conduct.  From a letter which he wrote to the court while in prison [at Portsmouth, and before trial], one would suppose him to have been disordered in his mind."  Belknap's Hist. N. H. 99, 100, and note ; Appendix to same, No. 33, p. 465 ; 8 N. H. Hist. Coll. 168, 171.  Probably no man, who was not either insane, or drunk, or both, as Gove seems to have been, ever had any great fears of the Romanists in New Hampshire, until 1778, when some fears arose from the French alliance, which fears had their effect, as we have seen, upon the convention, which framed the proposed constitution of 1779.  But these fears were soon dissipated, and the real cause of fear was soon discovered to be in the opposite direction, as Mr. Plumer says,—from French infidelity ; and this was well understood when the constitution of 1783 was formed, and continued so until 1792, when our present constitution was adopted.  Thus we see that in 1779, when there were vague fears of Romanism, the Protestant tests were retained because Protestantism was known, on the one-

hand, to be anti-Catholic; and when there were real and well-grounded fears of French infidelity in 1783 and afterwards, the same Protestant test was still preserved unchanged, because Protestantism, upon the other hand, was equally well known and understood to be anti-infidel,— being first Christian, and then anti-Catholic. Prior to the formation of the constitution of 1783, there had been far more fear of a hierarchy of some other kind than there was of the Catholics, and at the time of its formation there was far more fear of French infidelity than of all the rest.

When the constitution of the United States was adopted, in 1788, no religious test was incorporated into it, and the first amendment that was adopted was, that congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. 2 Curtis's Hist. of Const. 629; 1 Story on Const., sec. 278; 2 Story on Const., secs. 1870, 1871. "Thus," says Judge Story, "the whole power over the subject of religion is left exclusively to the state governments, to be acted upon according to their own sense of justice and the state constitutions; and the Catholic and the Protestant, the Calvinist and the Arminian, the Jew and the infidel, may sit down at the common table of the national councils without any inquisition into their faith or modes of worship." 2 Kent's Com. 35–37; Rawle .on Const., ch. 10; 2 Story on Const., sec. 1879.

"The real object of the amendment was," says Judge Story, "not to countenance, much less to advance, Mohammedanism or Judaism or infidelity by prostrating Christianity, but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment .which should give to a hierarchy the exclusive patronage of the national government. It thus cut off the means of religious persecution (the vice and pest of former ages), and of the subversion of the rights of conscience in matters of religion, which had been trampled upon almost from the days of the apostles to the present age." And again he says,—"Probably at the time of the adoption of the constitution, and of the amendment to it now under consideration, the general if not the universal sentiment in America was, that Christianity ought to receive encouragement from the state, so far as was not incompatible with the private rights of conscience and the freedom of religious wor- .ship. An attempt to level all religions, and to make it a matter of .state policy to hold all in utter indifference, would have created univer- :sal disapprobation, if not universal indignation." 2 Story on Const., :secs. 1874, 1877.

We think it will be evident to any one who will read Judge Story's ' Commentaries on the Constitution, from sec. 1870 to sec. 1880, that he understood the term "Christian," as used in the state constitution, .and at the time of their adoption, to mean simply those who believed .in or assented to the truth of the religion of Jesus Christ, as taught in the New Testament; that he understood the terms "Catholic and Protestant" as designating the two great subdivisions of Christianity, and .that a man could no more be a Protestant unless he assented to the

truths of the Christian system, than he could be a Roman Catholic without such assent. Montesquieu says,—"When the Christian religion, two centuries ago, became unhappily divided into Catholic and Protestant, the people of the north embraced the Protestant, and those of the south still adhered to the Catholic." Montesq. Spirit of Laws, Book 24, ch. 5.

The framers of the constitution have stated plainly and fully the reasons for placing that test in the constitution; they have not left these reasons to be ascertained by conjecture, or to be supplied by the imaginations of their descendants; and not only the framers of the constitution, but all the people of the state, in adopting the constitution, have adopted the reasons for this Protestant test, which are stated at length in the constitution. Judge Story says that at that time " the general if not the universal sentiment in America was, that Christianity ought to receive encouragement from the state." And most of the states, among which was New Hampshire, considering Protestantism to be the best form of Christianity,—considering Protestantism to be, in the language of the constitution, " evangelical " Christianity, they chose that form of the Christian religion instead of Christianity generally, which would have included both the Protestant and Catholic forms. Such was evidently the nearly universal sentiment in New Hampshire when the constitution of 1783 was adopted. The printer of the *N. H. Gazette* only echoed the general public sentiment, when he refused to print Mr. Plumer's first essay without pay because he thought " the religion of the country required such a provision " as the religious test; and the same was true in 1791, when Mr. Plumer proposed his amendment, which was designed, not to help the papists merely, by striking out the word Protestant and inserting the word Christian as they did in North Carolina, but by striking out the word Protestant and not substituting anything in its stead, so as thereby to admit deists and other anti-Christians, as well as papists. But the people were by no means ready to give up the idea that what they believed to be the true " evangelical" religion, Protestant Christianity, should receive encouragement from the state.

There is no doubt that the language of the constitution is to be understood in the sense in which it was used at the time when it was adopted. Opinion of Justices 41 N. H. 551 ; Opinion of Justices 44 N. H. 635; Cooley's Constitutional Limitations 66. And in interpreting clauses, whether of constitutions or of statutes, we must presume that words have been employed in their natural and ordinary meaning. Cooley's Const. Lim. 58 ; 1 Story on Const., sec. 453. In written constitutions, " the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated." Cooley's Const. Lim. 58, 79. " The framers of the constitution," says MARSHALL, C. J., " and the people who adopted it, must be understood to have employed words in their natural sense, and to have understood what they meant." *Gibbens v. Ogden,* 9 Wheat. 188.

And Mr. Cooley, speaking of the provisions in the state constitutions on the subject of religious liberty, marks their wide differences,—" some of them being confined to declarations and prohibitions designed to secure the most perfect equality before the law of all shades of religious belief; while some exhibit a jealousy of ecclesiastical authority by making the persons who exercise the functions of a clergyman, priest, or teacher of any religious persuasion, society, or sect, ineligible to civil office; and still others show some traces of the old notion, that truth and a sense of duty are inconsistent with skepticism in religion." Cooley's Const. Lim. 468.    He cites as instances where this " old notion " prevailed, the constitutions of Pennsylvania, North Carolina, Mississippi, &c., and might have cited Massachusetts and New Hampshire.    Blackstone notices this " old notion," when he says that " all moral evidence, therefore, all confidence in human veracity, must be weakened by apostasy, and overthrown by total infidelity."    4 Black. Com. 44.

It seems that this " old notion " was very prevalent in New Hampshire and Massachusetts, and the other New England states, namely,— " that truth and a sense of duty were inconsistent with skepticism in religion," and, therefore, they required that their civil officers, at least in New Hampshire, should be of the Protestant religion, not so much that it was anti-Roman Catholic, as because it was Christian, and that particular form of Christianity that they believed to be true, pure, and evangelical.

Another principle of construction should be here stated.    In ascertaining the meaning of any provision of a constitution or law, the general object of it, and the danger which was apprehended, and against which the constitutional or legal provision is intended as a guard or barrier, are to be considered.    Cooley's Const. Lim. 65 ; *Concord Railroad* v. *Greeley*, 17 N. H. 63 ; *Moore* v. *Taylor*, 44 N. H. 374–5 ; *Underhill* v. *Manchester*, 44 N. H. 220–21, and cases; *Barker* v. *Warren*, 46 N. H. 124 ; *Dartmouth College* v. *Woodward*, 4 Wheaton 628–9.

It is evident that the evil to be guarded against in the minds of the framers of the constitution was not Romanism, else they would have said so plainly.    There was no cause to fear that at that time.    But what they then feared was *immorality* and *impiety*, and for the reason that these would destroy the security of government by destroying in the hearts of men, in the hearts of the subjects of that government, the obligations to due subjection.    Here is the " old notion " plainly visible, as stated by Blackstone, that " all confidence in human veracity must be weakened by apostasy, and overthrown by total infidelity ;" or, as stated by Cooley, namely, that " truth and a sense of duty were inconsistent with skepticism in religion."    In other words, that a person who did not believe in the Christian religion—a skeptic, an infidel— could have no proper regard for truth, no proper views of the sacred obligations imposed by an oath, no proper sense of duty, or of obligation to the civil government, any more than he would be likely to have of his duty and obligations to God, in whom he did not believe ; and

hence, in their view, the necessity of encouraging the Christian religion, and requiring that all their important and most responsible officers of state should be of the Christian religion, as in Massachusetts, or of the Protestant religion, as in New Hampshire, and for the reason, as stated in the New Hampshire constitution, that Protestantism was, in their view, evangelical Christianity.

The danger to be avoided or guarded against, then, is *immorality* and *impiety;* the objects to be secured are " *morality* and *piety*, rightly grounded on evangelical principles " (Art. VI, Bill of Rights) ; that is, a morality and piety grounded upon the principles of the gospel of Christ. They believed that such morality and such piety would " give the best and greatest security to government," and would " lay in the hearts of men the strongest obligations to due subjection ;" " and as the knowledge of these [that is, morality and piety, rightly grounded on evangelical principles] is most likely to be propagated through a society by the institution of the public worship of the Deity, and of public instruction in morality and religion," *therefore* the legislature is empowered to authorize towns and religious societies to support public Protestant teachers of piety, religion, and morality.

Here is, first, a plain statement of the objects desired to be gained ; second, the reasons stated why those objects are desirable ; and, third, the way and manner in which these objects are likely to be attained ; and then follows the provision that such means may be provided for, under this constitution, as will be most likely to secure the desired object, to accomplish the end in view. For the reasons therein stated, they desired to secure a system of morality and piety for the people of this state; but that was not all. They wished for a system of morality and piety " rightly grounded upon evangelical principles,"—upon the principles of the gospel of Jesus Christ, which must be Christian ; and to secure that result, as the means most likely to accomplish that object and best adapted to that end, the support of Protestant teachers of piety, religion, and morality was authorized, and the Protestant tests were introduced in regard to office-holders. The reason why the framers of our constitution, and the people who adopted it, preferred Protestantism as the favored religion of the state, was, that they believed it to be not only Christian, but that it was most purely and intensely and exclusively Christian, the most *evangelical* of all the known subdivisions and forms of Christianity. They chose Protestantism, not so much because it was anti-Roman Catholic, as because they believed it to be *true in itself,* founded upon the gospel of Christ alone, *evangelical,* —a pure Christianity, stripped, as they supposed, of all the traditions of men and of every human device and invention, founded alone upon the Bible as the word of God ; and because they believed Protestantism to be that system of morality and piety founded upon evangelical principles, which gave the best and greatest security to government, and laid in the hearts of men the strongest obligations to due subjection. This was what they wanted, and all they wanted, and these were the reasons why they wanted it, and this was the way in which they proposed to

secure it, all fully and plainly stated in this article in the bill of rights. Not a word about Catholics or Romanism.

And here another principle of construction comes in with authoritative force, which would seem conclusive on this subject, viz., "When we once know the reason which alone determined the will of the law-makers, we ought to interpret and apply the words used in a manner suitable and consonant to that reason, and as will be best calculated to effectuate the intent. Great caution should always be observed in the application of this rule to particular given cases; that is, we ought always to be certain that we do know and have actually ascertained the true and only reason which induced the act. It is never allowable to indulge in vague and uncertain conjectures, or in supposed reasons and views of the framers of an act, where there are none known with any degree of certainty." Cooley's Const. Lim. 65; Smith on Stat. and Const. Construction 634.

In the case before us we know the reason why the framers of the constitution made provision for Protestant teachers of religion, and why they prescribed the Protestant test for office-holders, because they themselves have informed us fully on that subject. There is no room for doubt or for cavil. It was not solely because Protestantism was anti-Catholic. If that had been the reason, it would have been fully and plainly stated. But it was that they might secure to the state and its inhabitants "morality and piety, founded upon evangelical principles," the principles of the gospel of Jesus Christ, the principles of true Christianity. This was what they sought, as they have fully and plainly stated, and also given us fully the reasons why they desired it, and the manner in which they expected and intended to secure it.

There is no occasion here for the great caution spoken of in the rule, for that is to be exercised only when the reasons are not known. And if it is never allowable to indulge in vague and uncertain conjecture, or in supposed reasons and views of the framers of an act, *when there are none known with any degree of certainty,* what ought to be said of the impropriety of indulging in vague conjecture, and in supposing reasons to exist which are not only not the ones given by the framers of the act themselves, but which are directly in conflict with those that are given? What shall be said of the injustice of an utter perversion of all rules of construction, when we are called upon to ignore all the reasons which the framers of the constitution have given as the grounds of their action, and to substitute other supposed and conjectural reasons, which the framers did not give or in any way allude to, and which are utterly inconsistent with those that are given? This can never be allowed until we are prepared to convict the framers of the constitution, and the people who adopted it, either of not knowing the reasons upon which they did act, or of not having sufficient intelligence to state them fairly, or of having intentionally stated them falsely.

The remarks of BRONSON, J., in *The People* v. *Purdy,* 2 Hill. 36, 37, are in point here. He says,—" In this way a solemn instrument,—for so I think the constitution should be considered,—is made to mean one

thing by one man, and something else by another, until in the end it is in danger of being rendered a mere dead letter, and that, too, where the language is so plain and explicit that it is impossible to make it mean more than one thing, unless we first lose sight of the instrument itself, and allow ourselves to run at large in the boundless field of speculation. For one, I dare not venture upon such a course. Written constitutions of government will soon come to be regarded as of little value if their injunctions may be thus lightly overlooked, and the experiment of setting a boundary to power will prove a failure. We are not at liberty to presume that the framers of the constitution, or the people who adopted it, did not understand the force of language. * * * We have here not only the unequivocal language of the constitution itself, but the declared will of the framers of that instrument in another form, * * * and this fundamental law has not yet been repealed, unless it has been brought about without the consent of the people who adopted it. I will not inquire whether the provision be a good one or a bad one: whatever may be my views on that subject, I am not at liberty to set up my opinion against the declared will of the people, as manifested in the supreme law of the land."

To whatever source we look for authority, as to the meaning of the word " Protestant" in our state constitution, we find but one response. All the authorities teach us that it means, first, Christian, and, second, anti-Catholic; that no man can be a Protestant, unless he first assents to the truth of Christianity; that Christianity has become divided into two great subdivisions in western Europe and America,—the Catholic and the Protestant; that a man can be neither a Catholic nor a Protestant, unless he is first a Christian; that the term Roman Catholic means, first, a Christian, and, second, a papist; while the term Protestant means, first, a Christian, and second, an anti-papist; that no man, unless he assents to the truth of the Christian religion, as taught in the New Testament, can properly be called either a Catholic or a Protestant; and that the term Protestant, as used in our constitution, does not include the believer in Judaism, the Mohammedan, the pagan, the atheist, deist, theist, free religionist, or any other class of infidels, who deny the truth of the Christian system as taught in the New Testament. 1 Hallam's Const. Hist. of England, ch. 2 (Reformation); 2 May's Const. Hist. England, ch. 12 (Religious Liberty); 7 Lingard's Hist. England 384; 1 Motley's Rise of Dutch Republic 484; 2 id. 490; 1 Froude's Hist. England 130, 174; 2 id. 32, 34, 36, 71; 6 id., ch. 33; 7 id. 23, 24, 73, 74; 10 id. 4; 2 Macaulay's Hist. England 168, 172, 180; 3 id. 39, 113, 153, 154, 166, 488, 489; 4 id. 305, 306, 307; 3 Hume's Hist. England 132, 233, 370; 4 id. 10, 11, 29, 147, 148, 157; Smiles's History of the Huguenots 71, 78, 110, 113; Mackintosh's History of England 319, 334; D'Aubigné's History of Protestant Church in Hungary, passim; Marsh's History of Protestant Reformation in France, passim; 1 Bancroft's History of U. S. 276, 277, 281; 2 id. 456; 4 id. 277, 279, 280; 5 id. 1; 9 id. 272, 274, 276, 278; 2 Story on Const. U. S., secs. 1871, 1872, 1873, 1876, 1877, 1878; 2 Tytler's Universal History, ch. 20.

I have thus, perhaps, at too great length, adduced authorities and arguments to sustain the views of the majority of the court as to the meaning of the words Protestant and Christian, as used in our state constitution ; not so much that the decision of this cause depends upon this particular view, for the decision of the cause must be the same, as will readily be seen upon the facts found in this case, whatever. meaning we may attach to these words in the constitution ;—but it is rather to meet some of the arguments of the dissenting opinion in this case, the result in which, as will be seen, can only be reached and the conclusions in which can only be sustained, by holding that the term Protestant in the constitution means simply anti-Catholic, and hence that it will include deists, theists, and infidels, and Turks and pagans as well ; and that the term Christian, as used in the constitution, has no particular reference to Christianity as a system of religion, but was intended to embrace all men who were moral and upright in their lives, as well Mohammedans, pagans, and infidels, as those who assented to the truth of the doctrines of Christianity. The majority of the court are clearly of opinion that these views, however ingeniously or forcibly stated, are, in the main, erroneous and radically wrong, and have stated a few of the reasons and grounds upon which our conclusions are based.

We rejoice that our constitution has not made the rights of conscience to depend upon differences of religious opinion, but has established those rights upon a firm, a broad, a just, and an enduring basis ; and although the Protestant test was introduced as a qualification for some civil officers, yet no case has yet arisen, and there is probably little fear that a case ever will arise, where this religious test has been or will be applied, to exclude any person from an office to which he is duly elected, and for which he is in other respects qualified. These tests have always been, in fact, a dead letter, and the only regret is that they have not been long ago removed by amendment, so as to free our constitution from this just objection ; so that it should require only the qualifications of talent and integrity, of honesty and ability, for any civil office, and leave it for churches and other religious organizations to decide upon questions of religious faith and the doctrines of theology.

In the dissenting opinion, the old question in relation to original sin and to the future punishment of infants is sought to be again revived, after a comparative rest of forty years or more. These questions seem to us to have very little to do with the questions at issue in this case. It is said in the opinion that " the Calvinistic doctrine of predestination, whatever it originally was in general principle, and however it was applied to infants or adults, has been rejected or transformed in Calvinistic churches since the time of Calvin." To a certain extent we may assent to that proposition. It has been denied that Calvin or St. Augustine, whom Calvin seems to have followed in his form of statement of the doctrines of " original sin " and of " predestination," either of them, absolutely taught the doctrine of " infant damnation," yet that they carried the doctrine of " original sin," at least in its statement, much further than the Calvinists of the present day, or any for the last

hundred years have done, is not questioned.   See Dr. Lyman Beecher's letters, published, in 1828, Spirit of the Pilgrims, vol. 1, pp. 42, 78, 149. In the first letter, he claims that the "future punishment of infants is not a doctrine of Calvinism;" in the second, that this doctrine was "never a doctrine of the Calvinistic churches;" and, in the third, that "this doctrine is neither believed nor taught by the Calvinists, as a body, at the present day." In the first and second letters, he takes up the passages substantially as quoted in the dissenting opinion in this case, from St. Augustine, from Calvin, from Edwards and Bellamy, and from Dr. Twiss, "the prolocutor of the Westminster assembly," and Dr. Gill and others. He also examines the different confessions of Protestant churches, synods, assemblies, &c., from the confession of Augsburg down to that of the synod of Cambridge (1648), and of Seybrook still later, and including the English confession of the thirty-nine articles, and asserts that the doctrine of the future punishment of infants "has never been avowed in a Calvinistic confession of faith, or implied in anything taught in one, from the reformation to this day."

But he admits that the "mode of stating the doctrine of original sin, adopted by the reformers," had been such as to give some seeming countenance to the charge that Calvinists believed in the doctrine of infant damnation; but he calls attention to the fact that these modes of stating the doctrine of original sin "have been exchanged in New England, for many years, for views and language which utterly preclude even the appearance   *   *   *   of ground for such an inference." He adds,—"The mode of stating and explaining the doctrine of original sin, and other kindred doctrines, which I have adopted, and which some affect to consider as new,   *   *   *   is a mode of explaining and vindicating the doctrines of the reformation, which was adopted in New England more than seventy years ago.   Some of the most approved writers on this subject are Hopkins, the younger Edwards, West, Smalley, Spring, Strong, Dwight; and in England, Andrew Fuller, one of the greatest a    ost of men." He concludes by the assertion that "the charge so lo.    ulated against Calvinists, that they believe in the damnation of infants, is utterly false; and, knowing it to be so, I publicly deny it.   *   *   *   The Calvinists of New England, and of the United States, do not hold that infants are damned."

"From Luther to Calvin there was progress; from Geneva to New England there was more." 2 Bancroft's Hist. U. S. 464. Belknap says, "In the doctrinal points of religion, they (the puritans) were of the same mind with their brethren of the church of England, as expressed in their articles." But their peculiar system of polity, the Congregational system of church government, was the result of the studies of the renowned John Robinson, who was the pastor of the puritans in Holland, "who seems to have had more of the genuine spirit of the reformation and of freedom from bigotry than any others in his day. His farewell charge to those of his flock, who were embarking in Holland for America, deserves to be had in perpetual remembrance." He then gives the substance of this farewell charge, in which Robinson

adverted to the advance in truth which had been made by Luther, and the still greater advance made by Calvin, and lamented the disposition in their followers to stop with their favorite teachers, and go no further in search of truth than they went, and adds,—"For though they [Luther and Calvin] were burning and shining lights in their times, yet they penetrated not into the whole council of God; but, were they now living, would be as willing to embrace farther light as that which they at first received. I beseech you to remember it as an article of your church covenant, *that you be ready to receive whatever truth shall be made known to you from the written word of God.* Remember that, and every other article in your sacred covenant. But I must herewith exhort you to take heed what you receive as truth. Examine, consider, and compare it with other scriptures of truth before you receive it; for it is not possible the Christian world should come so lately out of such thick anti-Christian darkness, and that perfection of knowledge should break forth at once." Belknap's Hist. N. H. 38, 39.

The reformation has in fact gone far beyond Luther and Calvin, as the articles of faith, and more particularly the doctrinal preaching of the Lutheran and Calvinistic churches of the present day, will show. But, while they have changed and modified the old formulas of doctrine and introduced new ones, they still uniformly adhere to the doctrine of John Robinson,—that all religious truth is to be made known and received " from the written word of God." That is the source of all religious light and truth. If new developments of truth are to be looked for, they are to be expected to be made known from that source alone. By this standard all new truth is to be tried; it is to be examined, considered, and compared with other scriptures of truth, and must be proved to be founded upon, and emanate from, *the written word of God,* before it is received. Upon this point all denominations of Christians, now termed evangelical, are agreed. This in fact was the doctrine of the reformation,—the great doctrine which was the foundation and chief corner-stone of the reformation,—that the Bible alone was, and was to be, the only source of all true religious light, and of all revealed religious truth; and that every doctrine in theology, as well as every course of life, is to be tried by this test and judged by this standard; in fact, Lutherism and Calvinism are only excellent so far as they embody the real teachings and doctrines of the Bible.

That was the faith of the puritans; that is generally the faith of their descendants. A few only have apostatized, and believe with Mr. Abbott and some of his associates and followers, in a religion " that acknowledges no leader, is loyal to no master, imitates no exemplar, looks to no redeemer, needs no saviour, knows no Christ."

A decree may be entered, in substance, that the prayer of the bill be granted with costs; that said York, Folsom, and Horsch, wardens of said First Unitarian Society of Christians in Dover, and all other wardens of said society, be strictly enjoined and forbidden to hire, employ, allow, suffer, or permit, said Francis E. Abbott, or any other person, to

preach and inculcate, in the meeting-house of said society, doctrines subversive of the fundamental principles of Christianity, as generally received and holden by the denomination of Christians known as Unitarians ; or to employ, suffer, or permit to preach in said meeting-house, said Abbott, or any other person who rejects, and teaches a rejection, of Christianity and its fundamental doctrines, or who preaches and inculcates a disbelief in the doctrine of the Lordship and Messiahship of Jesus Christ, as taught by him in the New Testament Scriptures, or a disbelief in Jesus Christ as the great head of the church, or of his divine mission and authority as a religious teacher, as thus taught by himself; or who preaches or inculcates a denial of the doctrine that the Scriptures of the Old and New Testaments contain a divine revelation, given by inspiration of God, and containing a sufficient and perfect rule of faith and practice; and that said Abbott and his associates and fellow-disbelievers in Christianity be strictly enjoined and forbidden to occupy said meeting-house of said society, for the purpose of preaching or inculcating said disbeliefs, denials, and doctrines, herein before prohibited to be taught therein, and any and all other doctrine or doctrines subversive of the fundamental principles of Christianity, as generally received and holden by the denomination of Christians known as Unitarians.

PERLEY, C. J., and BELLOWS and NESMITH, J. J., concurred in the general conclusions and result of the foregoing opinion.

DOE, J., dissenting :—

The plaintiffs and the defendants, except Rev. Francis E. Abbott, are members of an incorporated parish. Mr. Abbott has never been a member, but was pastor of the corporation from August, 1864, to the spring of 1868, at which time two parties arose in the corporation, one party desiring and the other party opposing the employment of Mr. Abbott for another year. After various meetings and votes, the contest terminated in the triumph of the former party, April 27th, 1868, by the election of the wardens who were the candidates of that party, that election being the final test vote. The plaintiffs are certain individuals of the minority; the defendants, except Abbott, are the majority.

The plaintiffs, in their bill, ask the court to restrain the use of the "meeting-house of said society." And, by the decree* of the court now

---

*The following is a copy of the decree :

SUPREME JUDICIAL COURT.

STRAFFORD SS.                                         DECEMBER LAW TERM, 1868.

SAMUEL HALE & ALS. v. CHARLES E. EVERETT & ALS.

Upon hearing the parties and their proofs,—

*It is ordered*, That the prayer of said bill be granted, with costs taxed at one hundred and fifty-three dollars and sixty-one cents;

made, all "wardens and members" of the corporation are "jointly and severally strictly enjoined and forbidden to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person, to preach and inculcate in the meeting-house of said society, doctrines subversive of the fundamental principles of Christianity, as generally received and holden by the denomination of Christians known as Unitarians;" and "said Francis E. Abbott, and all and every other person or persons," are "forever strictly enjoined and forbidden to occupy said meeting-house of said society for the purpose of preaching and inculcating * * any * * doctrine or doctrines subversive of the fundamental principles of Christianity, as generally received and holden by the denomination of Christians known as Unitarians." The decree carefully distinguishes "the fundamental doctrines of Christianity, as generally received and holden by the denomination of Christians known as Unitarians," from the fundamental doctrines of Christianity, as generally received and holden by other denominations of Christians. And this distinction is universally recognized as vast and vital.

Unitarianism and Trinitarianism are everywhere acknowledged to be "antagonistic systems." *Princeton* v. *Adams*, 10 Cush. 129, 132. Trinitarians have always, theoretically and practically, denied that Unitarians are Christians in the theological, Trinitarian sense. The orthodox denominations regard the doctrine of the vicarious atonement as the fundamental, central, and supreme principle of Christian-

---

And that said Jasper H. York, George L. Folsom, and Carl H. Horsch, wardens of said First Unitarian Society of Christians in Dover, and all other wardens and members of said society, be jointly and severally strictly enjoined and forbidden to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person, to preach and inculcate in the meeting-house of said society doctrines subversive of the fundamental principles of Christianity, as generally received and holden by the denomination of Christians known as Unitarians;—or to employ, suffer, or permit to preach in said meeting-house any person who rejects Christianity altogether; or who teaches that, as a system of religion, Christianity is partly true and partly false; or who preaches and inculcates a disbelief in the doctrine of the Lordship and Messiahship of Jesus Christ, as taught by him in the New Testament Scriptures, or a disbelief in Jesus Christ as the great head of the church, or of his divine mission and authority as a religious teacher, as thus taught by him; or who preaches and inculcates a denial of the doctrine that the Scriptures of the Old and New Testaments do contain a divine revelation given by inspiration of God, and containing a sufficient and perfect rule of faith and practice;

And that said Francis E. Abbott, and all and every other person or persons, be forever strictly enjoined and forbidden to occupy said meeting-house of said society for the purpose of preaching and inculcating said disbeliefs, denials, and doctrines hereinbefore specially prohibited to be taught therein; and any and all other doctrine or doctrines subversive of the fundamental principles of Christianity, as generally received and holden by the denomination of Christians known as Unitarians.

A true copy of the original decree on file in the clerk's office.

        Attest:          DANIEL HALL, *Clerk.*

ity; Unitarians regard it as "hideously heathenish." Ellis's Half Century of the Unitarian Controversy XV; 5 Christian Examiner 512. Dr. Worcester, in his first letter to Dr. Channing, said,—"The doctrines of atonement by his death, and justification through faith in his blood, * * together with all the truths and sentiments, all the powerful motives to repentance, faith, and holiness, depending on those cardinal doctrines, at once fall to the ground before you! * * If you hold to atonement, yet unquestionably not in the sense of a proper propitiatory sacrifice. Upon this denial of atonement must follow of course the denial of pardon procured by the blood of Christ, of justification solely through faith in him, of redemption from eternal death unto everlasting life by him. * * The God whom you worship is different from ours." In 1830, Professor Stuart, of Andover, quoted, and evidently assented to the truth of, the remark of Belsham, the English Unitarian, that "we do not worship the same God,"—and stated that the Unitarians made against the orthodox charges "of worshipping a God who is a tyrant, of propagating horrible and blasphemous ideas of the Divinity, of worshipping a God who is no better than a devil." So liberal a Trinitarian as Dr. Arnold, of Rugby, held the tenets of the Unitarians to be irreconcilable with the essentials of Christianity. Stanley's Life of Arnold (8th Am. ed.) 231.

In 1826, Dr. Channing said of Trinitarianism,—"Its leading feature is the doctrine of a God clothed with a body—of the Infinite Divinity dying on a cross; a doctrine which in earthliness reminds us of the mythology of the rudest pagans. * * Suppose, then, that a teacher should come among you, and should tell you that the Creator, in order to pardon his own children, had erected a gallows in the centre of the universe, and had publicly executed upon it, in room of the offenders, an infinite being, the partaker of his own supreme divinity; suppose him to declare that this execution was appointed as a most conspicuous and terrible manifestation of God's justice, and of the infinite woe denounced by his law; and suppose him to add, that all beings in heaven and earth are required to fix their eyes on this fearful sight, as the most powerful enforcement of obedience and virtue: would you not tell him that he calumniated his Maker?" 3 Channing's Works 173, 197. In a sermon on the atonement, published in 1844, Dr. Peabody, quoting the "terrific language" of one of Dr. Watts's hymns, which represents the Deity as pacified by "Jesus' blood," says,—"When I have heard these words read or sung, * * they have * * placed before me the semblance of a blood-thirsty fiend, at first ravening for his prey, and to be approached with safety only when satiated with carnage."

The decree is a perpetual injunction upon all the members of this corporation and the whole world. It forever prohibits the preaching and inculcating of doctrines subversive of Unitarianism in "the meeting-house of said society." The doctrines of the Trinity and the vicarious atonement are peculiarly and entirely subversive of the fundamental principles of Unitarianism. Any Trinitarian minister, missionary, agent, or other person, who should on a single occasion, on any

day of the week, occupy this house for the purpose of preaching and inculcating either of those doctrines; and every member of the corporation who should "allow, suffer, or permit" any person, at any time, or in any form or manner, to preach and inculcate either of those doctrines in this house, would be liable to fine and imprisonment for the criminal offence of violating this decree. If Mr. Abbott should become a Methodist or Baptist, he could not, in this house, endeavor to convert his former parishioners, even upon their own unanimous invitation, without incurring the same penalty. And if all the members of this corporation should become orthodox, and should, "in the meeting-house of said society," listen to an orthodox sermon on the vicarous atonement, every one of them would be guilty of a flagrant breach of the injunction. Banishment from their own meeting-house is to be the punishment of their conversion. It may be a serious question whether the choir or congregation can safely sing the Trinitarian doxology. If a Trinitarian minister (contrary to usage) should exchange pulpits for a Sunday with a minister of this parish, the former will need to prepare himself with extreme caution for a perilous service. It would be strange if another temple could be found in any country more thoroughly fortified against orthodox doctrines than is "the meeting-house of said society" by the decree made in this case.

The carefully chosen language of the decree seems to vouch for the theological soundness of Unitarians as Christians, and to elevate them to a certain ecclesiastical position among other sects, which they have not been able to acquire by their own unaided exertions. Undoubtedly they are, in law, the peers of any other sect; but whether they are Christians, in the technical, ecclesiastical, Trinitarian sense, entitled, as theological equals, and by virtue of the genuineness of their Christianity, to the Christian fellowship of other sects, is a question upon which it is not our official duty to intimate an opinion.

The decree forbids this parish ever to "permit" any person to preach in its meeting-house "who preaches and inculcates a disbelief in the doctrine of the Lordship and Messiahship of Jesus Christ, as taught by him in the New Testament Scriptures, or a disbelief in Jesus Christ as the great head of the church, or of his divine mission and authority as a religious teacher, as thus taught by him." This prohibition is a clear assumption of ecclesiastical jurisdiction. It is a decision that the doctrines mentioned were taught by Christ: we cannot enforce the decree without deciding what doctrines were "taught by him" on those subjects; and the power of deciding what he taught on those subjects, is the power of deciding what he taught on all subjects. If we can authoritatively establish what are the doctrines of the Lordship of Christ, his Messiahship, his headship of the church, and his divine mission and authority as a religious teacher, "as taught by him,"—if it is our duty to settle theology to that extent, it is our duty to settle the whole body of theology for every parish in the state. It is supreme ecclesiastical authority, maintained by the civil power, that is asserted.

In the meeting-house of this parish, the decree establishes the Lordship of Christ, "as taught by him," and prohibits the preaching of any

doctrines subversive of the fundamental principles of Unitarian Christianity. The doctrine that Christ was not God, nor a partaker of the supreme divinity, being one of those fundamental principles, is thus adjudged to be a doctrine of the Lordship of Christ, " taught by him." It is Unitarianism that is established as the religion taught by Christ.

I. Has this parish the corporate power " to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person, to preach and inculcate, in the meeting-house of said society, doctrines subversive of the fundamental principles of" Unitarianism ? Laying aside, for the present, all question of a use of property confined within any narrower limits than the powers of this parochial corporation; supposing " the meeting-house of said society " to be under no other restrictions than those it derives from the corporation; and considering the subject of corporate power alone,—would the parish, in permitting Abbott or any other person to preach Trinitarianism or theism in its house, exercise its corporate power ? What theological restrictions are imposed upon parochial corporations by the constitution and laws of the land ? Is it the right of all such corporations to decide for themselves what theology shall be preached in their pulpits, or is it the duty of this court to decide that question for them ?

It is necessary to remember that this society is a New Hampshire lay corporation, and not an English ecclesiastical one ; that the peculiarities of the latter, and the ecclesiastical courts, ancient clerical prerogatives and religious abuses of amalgamated church and state, are not here ; and that the idea of ecclesiastical immutability, generated by or embodied in foreign political institutions, has no place in our law. " Ecclesiastical corporations are where the members that compose it are entirely spiritual persons,—such as bishops ; certain deans and prebendaries ; all arch-deacons, parsons, and vicars, which are sole corporations : deans and chapters at present, and formerly prior and convent, abbot and monks, and the like bodies aggregate." 1 Bl. Com. 470. Our " incorporated societies are not to be regarded as ecclesiastical corporations in the sense of the English law, which were composed entirely of ecclesiastical persons and subject to the ecclesiastical judicatories, but as belonging to the class of civil corporations, to be controlled and managed according to the principles of the common law, as administered by the ordinary tribunals of justice." *Robertson* v. *Bullions*, 11 N. Y. 243, 251. " Public teachers of religion and morality, chosen by a corporate body, are to every purpose civil officers of the state, as much so as schoolmasters and magistrates. * * Public instruction in religion and morality, within the meaning of our constitution and laws, is, to every purpose, a civil and not a spiritual institution. * * The minority must submit to the judgment of the majority." *Muzzy* v. *Wilkins*, in the county of Hillsborough, May, 1803 ; 4 Chief Justice Smith's MSS. Reports 65.

Congregationalism, in its broad and general meaning, is a form of church polity, a system of ecclesiastical organization, the essential peculiarity of which is, that it maintains the independence of each

congregation or society, in all matters of ecclesiastical government, discipline, doctrine, and practice, including the right of the majority to change its religion, to choose its ministers, and to inaugurate them, or employ them without any inaugural ceremonies, as it sees fit. It may be connected with any form of doctrine and any mode of worship. Baptists, Universalists, Unitarians, and Trinitarian Congregationalists are different divisions of the Congregational denomination, or different denominations of Congregationalists. *The Dublin case*, 38 N. H. 459, 516–548; *Muzzy* v. *Wilkins*, p. 35; *Henderson & a.* v. *Erskine*, in Cheshire, October, 1802; 5 New American Cyclopedia 606; Baird's Religion in America 555–564; Lawrence's N. H. Churches 11; Wayland's Baptists 14; Hutch. Coll. 482, 500. " This constitution of church government was adapted to the constitution of civil government, both as popular as can well be conceived." 1 Hutch. Hist. Mass. 371, 372.

The definition of Congregationalism was forcibly illustrated in *Henderson & a.* v. *Erskine* and in other cases, more than sixty years ago, when towns were parishes, and, as such, had power to elect public teachers of piety, religion, and morality, and to support them by taxation. The constitution provides that no person of one sect or denomination shall be compelled to pay toward the support of the religious teacher or teachers of another persuasion, sect, or denomination. Towns, in which the majorities were Trinitarian Congregationalists, elected Trinitarian Congregational religious teachers, and taxed Universalists as well as others to support them; and the courts held that Universalists were Congregationalists, and must pay the ministerial taxes. Those decisions were manifestly wrong in this: they were based solely on the indisputable proposition that Universalists are Congregationalists, in disregard of the two other propositions equally indisputable and equally important, that Universalists are one of several Congregational sects, and that religious liberty is the object of the constitutional provision. In 1804 the Freewill Baptists, in 1805 the Universalists, and in 1807 the Methodists, applied to the legislature for relief from the tax-paying consequences of being held not to be religious sects distinct from the puritans, and procured the passage of resolutions declaring them to be religious sects entitled to the constitutional privilege. Whether they were religious sects, within the meaning of the constitution, or not, was a judicial and not a legislative question; but, by the unconstitutional and void resolutions of the legislature, the erroneous decisions of courts, juries, towns, and town officers were practically reversed. In holding Universalists, whom they regarded as infidels, to be liable, as Congregationalists, to Congregational taxation, the puritans illustrated the broad idea of Congregationalism as a system of ecclesiastical government without any theological limitations.

This court held, in *The Dublin case*, that the right of each church to choose and change its ministers and doctrines is the distinguishing principle of Congregationalism; that it is too clear for dispute that, in the origin and outset of Congregationalism, each church had the right to

choose and change its ministers and its standards of religious doctrine; that this principle always has been and still is the fundamental theory of the Congregational system, and that Unitarians are Congregationalists. That case was very thoroughly considered; the decision was unanimous; and no suggestion comes from any quarter that there can be any doubt as to its correctness on those points.

The Congregational or independent theory was the New Hampshire theory, from the first settlements at Portsmouth and Dover in 1623. It was not only the ecclesiastical polity of voluntary organizations; it was established by general custom and law as a principle of municipal administration. The New Hampshire provincial act of 1714, entitled "An act for maintenance and supply of the ministry within this province," provided that it should be lawful for the freeholders of every town, convened in public town-meeting, as often as they should see occasion, to make choice of a minister or ministers, and to agree with such minister or ministers what salary should be paid,—salaries and expenses of meeting-houses to be defrayed by taxation, like other town charges. N. H. Province Laws, ed. 1771, pp. 55, 138. This act confirmed and sanctioned the legal custom that had previously prevailed, and it is an authentic declaration of the adoption, by the provincial government, of an ecclesiastical system of parochial independence. The majority of the voters, in town-meeting, chose their minister or ministers as often as they saw occasion. They could at any time choose several ministers of different denominations, Trinitarian and Unitarian, to preach, every Sunday, conflicting and contrary doctrines utterly subversive of each other on the most essential and vital subjects. They could, at different times, choose ministers of different beliefs, and change the town religion every year, and oftener. They were no more restricted by denominational tests in the choice of their ministers, than in the choice of their representatives or selectmen. They had as good a right to elect a layman for minister as to elect a clergyman for town clerk, and no more ceremony was necessary in the former case than in the latter. All systems of ecclesiastical tests, sacerdotal domination, hierarchical government, and superior judicature were rejected. The fundamental principle of parochial independence, established as the general law of the land, confirmed the natural right of each society to govern itself, and to choose and change its minister and its religion, —the right of the majority of each parish to rule the parish in all ecclesiastical affairs. It was an ecclesiastical institution of the government; but that institution was the independence and freedom of each society, when each town was a society. It was religion established by law; but it was such religion as the majority of each town or other parish might choose and change every day in the year. It was, among other things, the right of apostasy, to be exercised by each parish in its corporate capacity, by major vote, directly or indirectly.

The independent system continued through the provincial period and the revolution, and, on the organization of the present form of government, was incorporated in the constitution, where it remains to this

day, after an uninterrupted duration of nearly two hundred and fifty years, as a fundamental principle of New Hampshire law. A religious establishment coëval with New Hampshire history, it is as firmly settled, as fully developed, as clearly defined, as prominent and conspicuous, as any other New Hampshire institution. It has been constantly and universally enjoyed, and regarded as an indispensable part of a free government. The religious establishment of England seems to have been adopted to some extent in the Episcopalian colony of Virginia—*Terrett* v. *Taylor*, 9 Cranch 43, 46; but in this province, the English Church, though " particularly countenanced and encouraged " by the crown and by Episcopalian governors,—*Pawlet* v. *Clark*, 9 Cranch 292, 333, 334,—did not flourish, and its polity did not become a part of the organic structure of the state. At the close of the war of independence, when the people framed the first permanent state government, and embodied in the constitution the free institutions they were establishing, it is not strange that they inserted therein the parochial independence which had been one of their cherished institutions for more than a century and a half. Article VI of Part I of the constitution, which was adopted in 1783 and took effect in 1784, provides that the legislature may authorize " the several towns, parishes, bodies corporate, or religious societies, within this state, to make adequate provision, at their own expense, for the support and maintenance of public Protestant teachers of piety, religion, and morality.

" *Provided, notwithstanding*, That the several towns, parishes, bodies corporate, or religious societies, shall at all times have the exclusive right of electing their own public teachers, and of contracting with them for their support and maintenance."

And this article was retained in the constitution of 1792. It does not confer any power that the legislature would not have if this article had been omitted. The legislature could authorize towns or other parishes to support ministers, under those general grants of legislative power by which it passes acts of incorporation, and a great variety of other statutes. *Concord R. R.* v. *Greely*, 17 N. H. 47, 54; *Company* v. *Fernald*, 47 N. H. 444, 458. But the provision, that all parishes shall at all times have the exclusive right of electing their own public teachers, is the provincial system of parochial freedom, incorporated in the organic law of the state beyond the reach of legislative action. Whatever sectarian ties of advisory councils, ecclesiastical fellowship, or theological harmony, or other limitations of parochial autonomy, were associated with the idea of Congregationalism in the minds of theologians, no such limitations were inserted in the constitution. So far as Congregationalism was a system of independent parochial government, the ecclesiastical supremacy of the majority of each parish, and an embodiment of the fundamental principle of free institutions, it was adopted as the ecclesiastical system of the state. So far as it was a system of theology, it could not be adopted without establishing a state religion;—a state religion, in any other sense than a religion of parochial independence, was not established, but was prohibited.

The next preceding article of the constitution, Article V, declares the natural and unalienable right of every individual to worship God according to the dictates of his own conscience and reason. Under that article, and without it, if the members of this Dover corporation are Unitarians, they have a constitutional right to apostatize from Unitarianism to Trinitarianism. And whether any of them exercise that right or not, a majority of them have the constitutional right, under Article VI, to elect a Trinitarian teacher. If the converted majority of a company of heathen idolaters should elect an orthodox missionary to preach in their temple, they would but practice one of the natural and unalienable rights of men. And the preaching and inculcating, in that temple, of doctrines subversive of the fundamental principles of heathenism, could be illegal only in a land in which religious freedom and parochial independence are prohibited, instead of being established, by law. Our Saxon ancestors exercised this right, at an early period in the history of the common law, more than a thousand years ago, when they turned their pagan temples into Catholic churches.

" *Provided, notwithstanding*, That the several towns, parishes, bodies corporate, or religious societies, shall at all times have the exclusive right of electing their own public teachers." This plain grant or guaranty of elective power establishes parochial independence. It establishes the constitutional right of every parish, at all times,—at at one time, and at different times—at the time of its organization, forty years afterwards, and at all other times,—to elect public teachers of one religion or of different religions. The decree amends the constitution, by inserting this additional proviso : " *Provided, notwithstanding, furthermore*, That every parish, the first members of which were Unitarians, shall at all times be deprived of the right of electing a public teacher of any other than the Unitarian denomination, and shall at all times be deprived of the right to allow, suffer, or permit any person to preach and inculcate in the meeting-house any doctrine subversive of Unitarianism, and no person shall there preach and inculcate any such subversive doctrine."

Our constitutional provision, establishing the independent parochial system, was copied almost literally from the third article of the declaration of rights in the Massachusetts constitution of 1780 ; and it has never been doubted in Massachusetts that the proviso secures to every society the right of corporate apostasy, although the occasions for raising a doubt have been very numerous and very urgent.

The Episcopalian Society of King's Chapel, in Boston, had been in existence ninety-nine years, when, in 1785, having become Unitarian, it altered the Episcopal liturgy. Its members asserted their constitutional congregational power by electing a Unitarian pastor, and by ordaining him themselves in 1787 ; and they have continued to the present time to exercise that power in the same manner, and, as a Unitarian society, to occupy the meeting-house erected for the use of the society when it was Episcopalian. They not only asserted their

congregational power, but they expressly and publicly asserted it as a constitutional power, and in the very words of the constitution. In a vote of the society, read and formally reaffirmed at the public ordination of their first Unitarian pastor as a part of that ceremony, they declared that

" We, the wardens, vestry, proprietors, and congregation of King's Chapel, or First Episcopal Church in Boston, do, by virtue of the third article in the declaration of rights, hereby solemnly elect, ordain, constitute, and appoint the Rev. James Freeman, of said Boston, to be our * * public teacher." Greenwood's History of King's Chapel 193. The terms of this vote show that it was drawn by some person or persons who comprehended the legal nature of the business. It is said, in Belsham's Memoirs of Lindsey, that the ceremony of ordination was performed " according to a form suggested by Governor Bowdoin;" and this occurred within eight years of the time when the declaration of rights was framed by the constitutional convention of which Bowdoin was president. One of the majority of the parish who effected this transformation was John Gardiner, who had studied law at the Inner Temple, London, and had been admitted to practise in the courts at Westminster Hall, where his abilities attracted the notice of Lord Mansfield. " Here," says Greenwood, " was a most conspicuous, and, as we must regard it, a most happy revolution. * * *The First Episcopal Church in New England became The First Unitarian Church in America.*" *Id.* 139. The Episcopal minority of the society vigorously protested against all the proceedings, denouncing the altered liturgy and the new " articles of faith" as " unscriptural and heretical," affirming that the ordination was " unprecedented, irregular, and contrary to apostolic and primitive usage," and might " be attended with fatal consequences to the interests of religion in general and that of the Episcopal church in particular," and declaring their "utter abhorrence of measures so contrary to the doctrine, discipline, and worship of an Episcopal church, and which will include a total alienation of the property of said house from the use intended by the original donors or founders." *Id.* 184. The protest was answered by the majority. *Id.* 185. " The validity of this ordination was furiously assailed in the newspapers of the day, as might have been expected. *. * The newspaper abuse was sufficiently and pleasantly answered in a short piece attributed to the Rev. Dr. Belknap,"—the Dover pastor and New Hampshire historian,—who had recently been elected minister of the Federal Street Church of Boston, which passed from Presbyterianism to independency in 1786. *Id.* 142. In the piece attributed to Belknap, and published in the *Centinel*, the writer says,—

" On Sunday, the 18th instant, was exhibited, at the house formerly called the King's Chapel, an instance of the public exercise of a long dormant right which every society, civil and religious, has to elect and *ordain* their own officers. * * Invested with this right by the God of nature, secured in the exercise of it by the civil constitution, * * the independent congregation * * publicly invested with the min-

isterial office a sensible, honest man, \* \* without any mysterious, unintelligible ceremonies, without any assumption of apostolic powers, without any pretended superiority of office, without any affected communication of sacerdotal effluviæ." *Id.* 195. " A sort of repudiation or excommunication of Mr. Freeman and his church" was issued by the Episcopal ministers of Boston, Newburyport, and Portsmouth, which at Mr. Freeman's request was published in the *Centinel. Id.* 142. The substance of this document was, " Whereas, a certain congregation in Boston, calling themselves the First *Episcopal* Church in that town, have in an irregular, unconstitutional manner" changed the liturgy of the Episcopal church, " and have also assumed to themselves a power unprecedented in said church of separating to the work of the ministry Mr. James Freeman, \* \* we \* \* do hereby declare the proceedings of said congregation \* \* to be irregular, unconstitutional, diametrically opposite to every principle adopted in any Episcopal church, subversive of all order and regularity, and pregnant with consequences fatal to the interests of religion ; and we do hereby, and in this public manner, protest against the aforesaid proceedings, to the end that all" Episcopalians " may be cautioned" to regard " Mr. James Freeman " and " his congregation " as apostates. *Id.* 197. · The complaint of these ministers and of the Episcopal party was, that the revolution in the society was a violation of the constitution and laws of the Episcopal church ; but no one thought of denying that it was expressly authorized by the constitution of Massachusetts. It was debated whether the ordination was valid in a scriptural, ecclesiastical, and sacerdotal sense ; but it was not claimed that any ordination was necessary in law. The controversy was animated, and the affair attracted much attention. The society, by the form of their vote, particularly invited an examination of the specified constitutional grant of power upon which they professed to act ; and if the most careful scrutiny could have raised a doubt as to the legality of their apostasy, that doubt would not have been suppressed. In 1813, PARSONS being Chief Justice, the court held that parishes have secured to them, by the declaration of rights, the election and appointment of their ministers or public instructors, and that Mr. Freeman was the minister of King's Chapel, elected by the only competent authority. *King's Chapel* v. *Pelham,* 9 Mass. 501. And certainly no one ever supposed that, if the name of the parish had been Trinity Chapel, or the First Episcopalian Society of Christians in Boston, instead of King's Chapel, the constitution of Massachusetts would thereby have been so far abolished as not to apply to that particular parish. In 1864, the constitutional power of that parish to change its faith was not impugned in a contested case in which there was a strong interest and a pressing occasion to oppose it. *Attorney-General* v. *Trinity Church and King's Chapel,* 9 Allen 422, 433, 436.

In the early part of the present century, large numbers of Trinitarian societies became Unitarian, in Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut. There were more than one hun-

dred cases of this apostasy in Massachusetts. The defection occurred in all the old orthodox Congregational societies in Boston except one, and probably in half the towns in eastern Massachusetts. Buck's Ecclesiastical Law 54; Baird's Religion in America 556, 557; list of Unitarian societies in The Unitarian Year Book for 1868. It naturally produced a bitter and prolonged controversy. A vast amount of time and thought and zeal was spent upon it. A mass of literature in newspapers, pamphlets, and volumes accumulated, presenting both sides of the controversy, in all its details, in every possible light. Ellis's Half Century of the Unitarian Controversy 3; *The Dublin case*, 38 N. H. 537. The most eminent legal talent that this country has produced was employed by the Trinitarians to maintain their rights of property. Suits were brought and judgments rendered; but it seems that no one, in court or out of court, ever questioned the constitutional right of apostasy, or the right of an apostate society to retain and use its meeting-house and all its corporate property for preaching and inculcating doctrines subversive of its former faith.

In 1818, the majority of an old Trinitarian society in Dedham elected a Unitarian minister. The church, an unincorporated body connected with the society, held funds separate from the property of the incorporated society. A majority of the church remained Trinitarian, and, in a suit involving the control of the church funds, Webster was counsel for the Trinitarians. *Baker* v. *Fales*, 16 Mass. 147, 488; Buck's Ecc. Law 50. The Unitarian minority of the church brought the suit and claimed the church funds on the ground that they adhered to the apostate society. The decision shows that Mr. Webster, in resisting that claim (two years after his argument in *The Dartmouth College case*), did not dispute the constitutional power of corporate apostasy asserted by the plaintiffs, although he did contend that the power had not been properly exercised in that particular case because of the non-concurrence of a majority of the church. He could not have failed to argue against the power itself, if he had deemed such an argument fit to be made. The court had no occasion to consider an argument that was not advanced; but, in the course of a unanimous and elaborate opinion delivered by Chief Justice PARKER, the court said,—

"That the proceedings of the parish and the council were not conformable to the general usage of the country cannot be denied. But the parish allege, in vindication of their departure from this usage, their constitutional right to elect and contract with their minister, exclusively of any concurrence or control of the church. * * That the parish have the constitutional right contended for cannot be questioned by those who will peruse the clause of the third article of the declaration of rights upon which this claim is asserted. It is there provided 'that the several towns, parishes, precints, and other bodies politic, or religious societies, shall at all times have the exclusive right of electing their public teachers, and of contracting with them for their support and maintenance.' This is too explicit to admit of cavilling or to require explanation, as every constitutional provision for the security

of civil or religious liberty ought to be.   All preëxisting laws or usages
must bow before this fundamental expression of the public will, and
however convenient or useful it might be to continue the old form of
electing or settling a minister whenever a parish determines to assert
its constitutional authority, there is no power in the state to oppose
their claim.   *   *   The people having the constitutional right to
choose, they must have the right to have the minister of their choice
set over them, or the former right would be, in many important respects,
useless.   *   *   This doctrine is as old as the history of the New Eng-
land churches, for the first minister of Salem was set apart by the lay
brethren.   *   *   And the Cambridge platform recognizes the principle.
*   *   Constitutional privileges can never be lost by mere non-user.   *   *
We consider, then, the non-concurrence of the church in the choice of
the minister and in the invitation to the ordaining council as in no
degree impairing the constitutional right of the parish."   And judg-
ment was rendered for the plaintiffs.

When the circumstances under which Mr. Webster's argument was
made are considered,—the number of other cases involved, the eccle-
siastical, denominational, and pecuniary interests at stake, and the
ardor of the whole Trinitarian party, defendants in interest; when he
discussed the manner in which the society had exercised the constitu-
tional right set up by the plaintiffs; when the nature of his defence,
the necessities of his argument, the interests of his clients (the govern-
ing party of New England), and his professional duty required him to
deny the right itself, if it could be denied; and when he did not call it
in question,—the constitutional right will be regarded by many as
settled, so far as anything can be settled by human authority.

The Trinitarian party of the country severely reprobated the decision
in that case, not because it recognized the constitutional right of the ma-
jority of the incorporated society to change the religion and retain the
property of the society, but because, on the question of the identity of
the unincorporated church, it recognized as the church the minority
who adhered to the society.   The decision was formally challenged by
an orthodox ecclesiastical council; it was characterized as "unright-
eous;" the court were loudly called upon to revoke it; the successful
Unitarian minority-church were summoned to restore their "plunder;"
but the constitutional right of the majority of the apostate society to
appropriate its old orthodox property to the uses of apostasy was
universally admitted, and remains admitted to this day.   Ellis's Half
Century U. C. 415, 424.

In 1830, when but one of the judges who decided that case remained,
the same questions, in another case, were brought before the court, and
again fully and ably argued by other counsel on the Trinitarian side; but
the constitutional right was left undisputed as Webster left it.  Stebbins v.
Jennings, 10 Pick. 172.   The next year, the same significant silence
was observed on the same side, in Sawyer v. Baldwin, 11 Pick. 492.
And in a litigation that lasted from 1833 to 1838 between a Trinitarian
minister and a parish over which he had been settled thirty-seven years,

and which became Unitarian by the action of a majority, neither the Trinitarian minister, nor the Trinitarian minority of the parish, nor the Trinitarian parishes of the country, nor the bar, nor the court, manifested the least suspicion that the majority of the parish could not legally elect a Unitarian minister "to preach to them in the pulpit which he (the Trinitarian pastor) had long occupied." *Stearns* v. *F. P. Bedford*, 21 Pick. 114, 118, 119, 121.

In 1735, a meeting-house lot was conveyed in trust for the sole use of a society described as "the congregation belonging to the Presbyterian meeting-house in Long Lane," whose members had purchased the lot, and caused the conveyance to be made in that form. The society continued to be Presbyterian for fifty years, and then became orthodox Congregational, and elected Dr. Belknap their minister; and, in course of time, they became the Unitarian society of Dr. Channing and Dr. Gannett. In 1854, Chief Justice SHAW declared that the reason that the society did not forfeit its right to the property by "becoming Congregational in 1786, or Unitarian afterwards," was, that every religious society, "by the general law, were at liberty to change their denomination." *Atty.-Gen.* v. *Fed. St. M.*, 3 Gray 1, 56, 57. In an article understood to be the work of the same judge, the writer says that it is manifest that under "the constitution of 1780, the fundamental law, not to be changed by the legislature," the legal voters of the parish have the exclusive right and power of electing their public teachers, and that, in case of an appeal to law, the court "must decide these questions of right according to the express provision of the constitution * * without regard to sect or denomination." Ellis's Half Century U. C. 429.

When a Unitarian society became Trinitarian, no one imagined that Unitarianism was specially guaranteed against apostasy, or excepted from the general principle of parochial independence. *Princeton* v. *Adams*, 10 Cush. 129, 132.

In New Hampshire, at least six Trinitarian societies became Unitarian,—in the towns of Charlestown, Dublin, Peterborough, Portsmouth, Walpole, and Wilton. Lawrence's Hist. N. H. Churches 240, 244, 255, 299, 425; Peabody's Hist. South Parish of Portsmouth; Unitarian Year Book for 1868. *The Dublin case* grew out of the apostasy of the Dublin society, and in that case, in 1859, this court used the following language: "The history of the denomination shows * * that the original and distinguishing principles of the Congregational denomination allowed differences and diversities of doctrine within the pale of the denomination; that each church had the right to choose and change her articles of faith; * * that ministers and churches, for a long time before 1817, had used this Congregational liberty, and a considerable number of them had departed from the faith of the fathers and become Unitarian. * * There was no new organization of churches and societies; the new opinions were engrafted on the old system." 38 N. H. 533.

The Unitarian apostasy is one of the most striking series of events

in the ecclesiastical history of New England. It has been universally accounted a theological revolution, an alteration of the substance of doctrine, an overthrow of cardinal points of orthodoxy, a material change in fundamental and essential doctrines of religion. If the religion of Channing is, for substance of doctrine, the religion of Calvin and Edwards, the whole country has been and still is laboring under a strange delusion. If everybody has been mistaken on so important a subject, it would be well for some one to set about correcting the mistake.

When this Dover corporation was formed and its house built, very few parishes in America had been organized by Unitarians; they were essentially a denomination of apostate parishes, who, by their apostasy, in substance of doctrine, had lost their ecclesiastical standing and fellowship without losing their corporate property or any of their corporate rights; and the amount of such property was very large. According to the history of this sect, culminating in the decree in the present case, while the law upholds apostasy in carrying property from other religions to Unitarianism, it does not allow apostasy to carry property from Unitarianism to other religions. The theory, that the constitution and the parochial unsectarian independence guaranteed by the constitution can be abolished by the sectarianism of the members of a parish, is a novel and startling one. It did not occur to such a constitutional lawyer as Webster (sorely pressed as he was for arguments against that independence, and losing the memorable Dedham case for want of such arguments), but was left to be invented by the thrifty ingenuity of these plaintiffs, as the peculiar privilege and exclusive protection of Unitarians against loss from parochial apostasy, after their sect had gained all it seemed likely to gain, and before it restored what it had won, by that practice. The constitutional law, settled by the case of King's Chapel, the Dedham case, and a hundred other cases (decided on this very point by the unanimous judgment of all lawyers and judges who considered it, and of all parties interested), invariably held, publicly announced, uniformly acted upon, and undisturbed for eighty years, authorizes parishes of other sects (so called) to become Unitarian; the decree in this case forbids a Unitarian parish (so called) to go over to any other sect. The result is a Unitarian monopoly of parochial apostasy. The plaintiffs are not barred, in law, from setting up this claim, by the doctrine of estoppel: whether they and their sect are morally estopped is a religious question, of which this court has no jurisdiction. A Baptist society, comprising a minority of the town of Wilton, endeavored by suit to obtain a share of the interest of an ancient ministerial town fund which the members of another society wholly appropriated to support the minister of their choice. In the decision delivered by Chief Justice Richardson, the court expressed these views: "If the town apply the fund to the hiring of a minister whom a majority approve, can we say that the fund is misapplied?   *   *   It is the misfortune of these plaintiffs that they are a minority in the town of Wilton. But should the time ever arrive when the members of this

society shall constitute a majority of the town of Wilton, this fund will
be unquestionably at their disposal, and they may apply it in such
manner as they may think best." *Baptist Society* v. *Wilton*, 2 N. H. 508,
512. About the time of that decision, a Trinitarian minority seceded
from the dominant society without contesting its right to become
Unitarian. Lawrence's History N. H. Churches 246. In *Candia* v.
*French*, 8 N. H. 133, Judge PARKER said that when towns were par-
ishes "it would probably not have been contended that towns had not
power to distribute real estate, or funds held for religious purposes,
among the religious societies within their limits." It is settled by these
two cases that town parishes were not sectarian in their legal character ;
their parochial powers were not limited by sectarian conditions.

Many corporate changes of ecclesiastical government and doctrine
are collected in Lawrence's Hist. N. H. Churches. Societies of orthodox
Congregationalists and societies of Presbyterians, who were held, in
*Muzzy* v. *Wilkins*, to be of different denominations, have frequently
passed from one to the other. Alterations of church covenants have
been very numerous, and modifications of doctrinal preaching very
common. New doctrines have been introduced in regard to slavery and
intoxicating liquor. The systems of belief, as intended to be set forth
in creeds and confessions, and as formerly understood, have been gen-
erally, if not universally, qualified by liberal construction. The half-
way covenant, which expelled Jonathan Edwards from his parish, has
been adopted and abolished. Lawrence's Hist. N. H. Churches ; 3 Pal-
frey's Hist. N. E. 85–88. Calvinism and Arminianism have often
supplanted each other. The latter has sometimes prevailed extensively.
"Into this scheme of belief a vast number of the churches sank after
the revolutionary war, which had so blighting an effect upon vital
religion throughout the country. Many went over from this to Unita-
rianism. * * The ministers called Arminian opposed the revivals
of that day. The distinctive doctrines of Calvinism dropped out of
their preaching." Lawrence's Hist. 309.

In Newmarket " the ' tables were turned,' and the Methodists be-
came the ' standing order.' The town employed their preachers, voted
them the use of their parsonage, the meeting-house, and more or less
salary year by year. And they lived in the Congregational parsonage,
occupied their meeting-house, and used their church service for some
twenty years." *Id.* 137.

In Langdon, " April 20, 1803, the town voted to ' raise $100 for
preaching, and that one half be laid out for the Congregational order,
and the other half for the Universalist order.' In 1803, October 25,
' voted to hire Mr. Kneeland to preach in this town two Sundays
in a month for one year, and give him five dollars a day.' * *
August 27, * * 1804, at a regular town-meeting, ' voted to
settle Mr. Kneeland in the ministry.' * * He had changed his
sentiments, and assumed the title of a ' practical preacher.' * * The
evangelical portion of the church was in the minority. * * He was
settled Oct. 30, 1805. The town voted in 1806 to raise $300. * *

The town voted in 1807 to raise $280 for preaching, and each denomi-
nation to have their equal share.   1810, Mr. Kneeland being chosen
representative to the General Court, the town voted 'not to raise money
to hire preaching this year.   Voted to raise $40 to support the conven-
tion (Universalist) to be held in September next, and that it be raised
in the same way that Mr. Kneeland's tax is raised.'   At a town-meet-
ing in 1811, 'voted to dismiss Mr. Kneeland from the public ministry
in this town the last week in September, agreeably to his request and
that of the First Universalist Society in Charlestown, Mass.'"   Id. 499,
450.

Before 1819, towns, in many instances, divided ministerial funds
among different denominations, and, before and after 1819, towns often
divided the use of their meeting-houses in the same manner.   This was
an exercise of their parochial independence.  Candia v. French, 8 N. H.
133.  And since 1819, societies have been known to exhibit a like liberal
and tolerant spirit.  The Second Parish in Exeter, originally Trinitarian,
became Unitarian, and afterwards Trinitarian again.  And during its
Unitarian period, Chief Justice SMITH, as an active and leading mem-
ber, practically and unequivocally manifested his opinion that the
corporate apostasy was not unlawful ; and if there could have been any
question on that point in his day, his authority would have been con-
clusive.  In Muzzy v. Wilkins, he took it for granted that a parish may
elect a minister of any denomination.   P. 73.

In 1812, the Panoplist lamented the want of ecclesiastical tribunals
for these reasons: in case of any moral delinquency "there is no
tribunal in our churches competent to try an offending minister with-
out his consent.   *   *   But the defect is still more apparent in the
case of heresy.  Here a minister is absolutely invulnerable."  In 1815,
a committee of the general association of Massachusetts deplored "the
present state of things," because " a church as well as an individual
member may apostatize from the common faith, and fall into disorders
wholly incompatible with the Christian character.   *   *   Churches
*   *   may go to the greatest length of apostasy without any inspec-
tion."   Dublin case, 38 N. H. 528, 529 ; Buck's Ecc. Law 238.   If the
evils thus complained of had been contrary to law, the divines who
made these complaints would not have deplored the want of ecclesias-
tical tribunals with powers of inspection and correction, for they would
have found abundant remedies in courts of law.

Great numbers of dissatisfied persons, who, since 1784, have seceded
from parishes or remained in them without appealing to the law, under
circumstances calculated to produce litigation, are witnesses of the
universal understanding that it is the legal right of the majority to
introduce innovations.   Somebody would have contested that right if
it had been considered a doubtful one.   Especially, in the wide-spread
Unitarian apostasy, would the orthodox denomination, who lost so
much, have made some attempt, by legal proceedings, to prevent the
Unitarian parochial majorities from diverting corporate property to uses
which the orthodox regarded as sacrilegious, or at least have expressed

a doubt as to the legality of the desecration, if any such doubt had been entertained. And now, when the Episcopalian, Presbyterian, and puritan churches, and the legal intellect, of the country for eighty years past, have been unable, though often specially requested, to detect the unlawfulness of those apostate transactions, it would require no little audacity for the sect who gained so much to claim that they have discovered the illegality for which the losing parties searched in vain, and to propose not to make restitution of King's Chapel, and the Presbyterian property of Channing's church, and the ancient puritan property and corporations of nearly all the leading Unitarian parishes in New England. It would be a bold position for a legal or a religious body to take. And it is due to the Unitarian denomination to say, that the evidence in this case does not show that they have abandoned the constitutional ground taken by the parish of King's Chapel in 1787.

If the meaning of the general grant of elective power to parishes is to be ascertained from contemporaneous practical construction,— *Concord R. R.* v. *Greely,* 17 N. H. 47, 62, 63 ; *Co.* v. *Fernald,* 47 N. H. 444, 458, 459, 460,—the parochial history of New Hampshire and Massachusetts is decisive. But there is no occasion to resort to that method of interpretation, or to judicial authorities: the constitutional parochial power " cannot be questioned ;" it " is too explicit to admit of cavilling or to require explanation, as every constitutional provision for the security of civil or religious liberty ought to be." *Baker* v. *Fales,* 16 Mass. 488, 508.

" The several towns, parishes, bodies corporate, or religious societies shall at all times have the exclusive right of electing their own public teacher." The ninth article of Part II of the constitution provides that " every town, parish, or place entitled to town privileges, having one hundred and fifty ratable male polls of twenty-one years of age and upward, may elect one representative." The corporate power of electing a minister is declared more fully and emphatically than the corporate power of electing a representative. The constitutional power of a town to elect a representative, is the power of a majority to elect a representative of their political faith ; and the constitutional power of a parish to elect a minister, is the power of the majority to elect a minister of their religious faith. The right of a town to elect a representative of one political faith this year, is its right to elect a representative of an opposite political faith next year ; and the right of a parish to elect a minister of one religious faith this year, is its right to elect a minister of an opposite religious faith next year. The former is the constitutional power of corporate political apostasy ; the latter is the constitutional power of corporate religious apostasy. One is as indisputable as the other ; they are mere examples of civil and religious freedom, in which the right to abandon an opinion is as sacred as the right to adhere to it. So it was when towns were parishes ; and the constitutional nature of parochial power has never been altered. If the people think their liberties perniciously extensive, it will be for them to apply remedies by constitutional amendments ;—

whether the constitution ought to be so amended as to enable this court, on theological grounds, to set aside and nullify parochial ministerial elections, is a political and not a judicial question. But until parochial independence is struck out of the constitution, the court may as well dictate the character of political speeches to be delivered in the town-house of a town under a vote of the town, as to dictate the character of sermons to be preached in the meeting-house of a parish under a vote of the parish. To require parishes to keep fixed standards of theology as towns keep weights and measures, and compel ministers in their sermons and exchanges, and parishes in their ministerial elections and in their weekly control of their own pulpits, to conform to those standards, would be a judicial usurpation of ecclesiastical jurisdiction, an utter subversion of the genius of our government, and a plain violation of the letter and spirit of the constitution.

The power of apostasy, established by the constitution as a paramount article of the charter of every parish, whether incorporated by special or general law, cannot be repealed by any legislature or parish, nor nullified by common law, or statute law, or by-law, or prescription, or parochial name. Nothing less than an amendment of the constitution can, in the slightest degree, affect it. And for that reason the only decisions adverse to the parochial power, that could be of any importance here, would be those made under constitutional provisions like ours. And no such decisions have been cited in this case.

But it has been held in other states that the same parochial power exists, in the absence of express constitutional stipulations, by virtue of the general principles of religious freedom and democratic government. *Keyser* v. *Stanisfer*, 6 Ohio 363; *Wiswell* v. *F. C. Church*, 14 Ohio St. 31, 44, 45; *Trustees* v. *Seaford*, 1 Dev. Eq. 453; *Whitney* v. *Society*, 5 Conn. 405. *Smith* v. *Nelson*, 18 Vt. 511, 547, a very carefully considered case, was decided on that ground. The Chief Justice, in delivering the opinion, said,—" However strange it may sound to the ears of an Englishman, as was observed by the Lord Chancellor in the case of *Leslie* v. *Birnie*, 2 Russ. 114, that a minister is to be elected by ' the elders, members, and seat-holders,' yet I apprehend that the very spirit of our institutions does explicitly recognize this right of electing or employing a minister as vested in the corporate body or the majority of the individual members.   *   *   *   *Baker* v. *Fales*, 16 Mass. 488; *Baptist Church* v. *Witherell*, 3 Paige 296. In this latter case, the learned Chancellor very ably and fully expresses my views of the . *   * rights of a majority of the members."

In *Baptist Church* v. *Witherell*, Chancellor WALWORTH held that the defendants, although excluded from the communion and fellowship of the Baptist church on account of anti-Sabbatarianism or some other heresy, were still legal voters as members of the society, and might be elected trustees and have the management of the temporal concerns of the society, and that an ecclesiastical judicatory had no right to remove a minister without the consent of a majority of the members of the society. After referring to the decision of Lord ELDON, in *Atty.-Gen.*

v. *Pearson*, 3 Meriv. 264, Chancellor WALWORTH said,—" I presume the original founders of the Baptist church in Hartford, in conformity with the generally received opinion among Calvinistic Baptists, believed the holy Sabbath was of divine institution, and that they intended such doctrines should be taught in that church and congregation. Upon that supposition, if Elder Witherell is permitted by the trustees to inculcate a different doctrine in his public discourses in this church, I presume Lord ELDON would consider it such a departure from the original establishment as to justify his interference.   *   *   I confess I have always entertained serious. doubts whether any civil tribunal in this state could interfere to prevent the majority of the corporators in a religious society from introducing such changes in the doctrines or modes of worship in their churches as they might deem expedient.   *   *   Neither am I prepared to say that it would be right or expedient to adopt the principle of Lord ELDON here, where all religions are not only tolerated, but are entitled to equal protection by the principles of the constitution.   Upon Lord ELDON's principle, a society of infidels, who had erected a temple to the goddess of Reason, could not, upon the conversion of nine tenths of the society to Christianity, be permitted to hear the word of life in that place where infidelity and error had once been taught.   And upon the same principle, the   *   *   equity jurisdiction in a neighboring state might find itself constrained to order some of the parishes within its limits to employ religious teachers who should inculcate the doctrine of witchcraft, as it was taught in their churches at the time of their first organization."   Lord ELDON's principle, with which Chancellor WALWORTH was dissatisfied, required an English trust-deed to be so interpreted as to carry out the presumed intent of the grantor not to promote a religion that was unlawful when the deed was executed, and had no reference to a constitutional provision of theological independence, in the charter of a parish in a country where all religions are equally lawful.

In New York, religious societies seem generally to be incorporated under sec. 3, ch. 60, Laws of 1813, which is much less explicit on this subject than our constitution.   Under that statute, certain officers called trustees, elected by the society, have charge of the property belonging thereto, and transact all affairs relative to the temporalities thereof, and the corporate property. is held in trust for the use of the society. Tyler's Ecc. Law 85 ; *Wheaton* v. *Gates*, 18 N. Y. 395.   In *Robertson* v. *Bullions*, 11 N. Y. 243, 263, 264, it was held that the majority in a particular congregation, without regard to their religious sentiments, can change entirely their form of worship.   And in *Petty* v. *Tooker*, 29 Barb. 256, 264, 272, 273—21 N. Y. 267—it was decided that corporations formed under said section 3 have no denominational character, and that none can be engrafted upon them ; that the legal character of the corporation is not affected by the doctrines, rites, or modes of government of a church formed by the corporators ; that the corporation and its officers do not lose any rights or the use of the corporate property by any change of doctrine or church government ; and that

" the act for the incorporation of religious societies was obviously framed with a view to and in accordance with that just and sound principle which lies at the basis of all our civic institutions, viz., that in every organized society the controlling power should be in the hands of the majority," who may " change its religious character and modes of worship against the will of its original founders and chief contributors." This is the settled doctrine in New York. *Burrel* v. *A. R. Church*, 44 Barb. 282; *Gram* v. *Society*, 36 N. Y. 161. And it is so settled there, not because the New York statute differs from our constitution, but because it is like our constitution in not making parishes sectarian in their legal character.

" This corporation is essentially and exclusively *lay* in its constitution; * * it has no jurisdiction of spiritual things, being incorporated exclusively for purposes of civil administration. It is not even mixed; for although three of the trustees are clerks, it is not so much the character of the *corporators* as the nature of the *objects* to be accomplished which determines the character of the corporation. * * The truth is, there must be a discretionary power somewhere to vary the application of the fund according to the ever varying exigencies of times and circumstances. * * The congregation was incorporated, not in its ecclesiastical but in its lay aspect. That it should continue to hold the tenets or be subject to the discipline of the Church of *Rome* was no condition of the charter, express or implied. A congregation of any other sect could have had a charter as readily as this. Stipulations for forms of doctrine or points of faith were matters to which the legislature was not a party, and with which it had nothing to do. This congregation was incorporated, like every other, to enable it to manage its temporal concerns to the best advantage. The establishing of a particular set of religious opinions by law is contrary to the genius not only of our government, but of the age in which we live." *Case of St. Mary's Church*, 7 S. & R. 536, 545, 548, 549.

There is a strong intrinsic improbability that the founders of our institutions overlooked the practical necessity of allowing for some variations in all ecclesiastical affairs. · The Catholic church, more stable in doctrine than the Protestant bodies that have withdrawn from it or from others in that line of secession, and exhibiting a constancy nearly equal to that of its Jewish predecessor, or of Mohammedanism or other steadfast religions, now teaches, in its schools, astronomical principles which it formerly condemned as fatal theological heresies, to be extirpated by fire. Draper's Intellectual Development of Europe 443, 514, 520. " What is theologically true in religion, it is agreed on all hands that the court are not competent to decide; nor have they power to determine what is really and intrinsically substantial and essential in matters of doctrine." *The Dublin case*, 38 N. H. 509. But in the cases of Bruno and Galileo, and throughout Christendom, astronomical doctrines now admitted to be erroneous were held by the church to be essential. And the doctrines of the sovereignty of the church over the state, and of the unlawfulness of receiving compensa-

tion for the use of money loaned, once maintained, are now practically abandoned by the same church. "A large proportion, perhaps the majority of the members of the Lutheran church, believe no more in the doctrines of Luther than in the doctrines of Confucius. * * I do not believe that any denomination of Christians exists, which, for so long a period as the Baptists, have maintained so invariably the truth of their early confessions. * * It is difficult at the present day to conceive to what extent the doctrine of the limited atonement, and the views of election which accompanied it, were carried" among the Baptists. "Within the last fifty years a change has gradually taken place in the views of a large portion of our brethren. At the commencement of that period, Gill's Divinity was a sort of standard, and Baptists imbibing his opinions were what is called almost hyper-Calvinistic. A change commenced upon the publication of the writings of Andrew Fuller, * * which, in the Northern and Eastern states, has become almost universal." Wayland's Baptists 15, 18, 19. "In a late edition of Neal's History of the Puritans, it is stated that in almost all the Presbyterian congregations there has taken place a change of opinions, and that they have swerved from the doctrines of their forefathers, and have now become advocates of very different tenets." *Attorney-Gen.* v. *Pearson,* 7 Sim. 290. Portions of the Common Prayer of the English Church are not now generally accepted in the original sense by the learned laity or clergy of England or America. 4 Hume's Hist. Eng. 503; 1 Works of John Adams 40; Stanley's Life and Correspondence of Dr. Arnold of Rugby, Letter No. CCXI. The constructions lately introduced by the supreme ecclesiastical tribunal of that church in England are sufficiently liberal to admit some who are substantially Catholics, some who are really Unitarians, and an infinite variety of others. Universalism changes with the rest. Greeley's Recollections 74. Among some sects the old formularies remain, with an understanding that each individual enjoys a large liberty in putting his own interpretation upon them. Within the strictest nominal uniformity there is immense diversity. The most rigid standards of orthodoxy have an undefined and uncertain degree of flexibility. Explicit creeds, upheld by acts of parliament, conform themselves to the apostasies of the people.

On the subject of predestination there has been a general change of opinion among Calvinists. "Whosoever shall tell us that infants shall be quickened in Christ, who die without partaking in his sacrament, does contradict the apostle's teaching, and condemn the whole church. * * And he that is not quickened in Christ must remain in that condemnation of which the apostle speaks,—'by the offence of one, judgment came upon all men to condemnation.' To which condemnation infants are born liable, as all the church believes. St. Augustine's Epist. 166," as quoted in 1 Lecky's Hist. European Morals 220.

"For neither does Paul teach that the ruin of the wicked was foreseen by God, but that it was decreed of his counsel and will in the manner that Solomon teaches, not only that the destruction of the

wicked was foreknown, but that the wicked were created designedly that they should perish." Calvin " *(in Rom.* cap. 9, verse 19). As to infants, the language of Beza, one of the most celebrated followers of Calvin, is this : ' The same happens in baptism, which many thousand infants receive, who, nevertheless, are never regenerated, but perish eternally.' (1613. *Acta Colloquii Montisbell. Quoted in Lawrence's Bampton Lectures,* p. 443.) Dr. Lawrence thus states Calvin's doctrine : that, though all children are outwardly incorporated into Christ's church, some only are inwardly regenerated by the Spirit. *(Bampton Lectures. See Institutes,* cap. 16, sec. 17.)" *Miller* v. *Gable,* 2 Denio 529.

" I ask again, How has it come to pass that the fall of Adam has involved so many nations with their infant children in eternal death without remedy, but because such was the will of God ?" Calvin's Inst., Lib. iii, c. 23, sec. 7. " And so even infants, as they bring their damnation with them from their mother's womb." *Id.* Lib. iv, c. 15, sec. 10. And again, indignant at being supposed to think differently, he says,—" As if I denied that the whole race of Adam was by nature under a curse, so that even infants before being born to light are liable to eternal death." App. Lib. de Vera Eccles. Reform. Ratione. Replying to Castalio, and controverting his doctrine that all laws, human and divine, condemn a man after and because of transgressions, Calvin explains,—" Put forth now your virulence against God, who precipitates into eternal death harmless infants torn from their mothers' breasts." And arguing that Adam's sin is sufficient for the damnation of Adam's posterity, he asks, in regard to infants snatched out of this life before they were able, on account of their age, to give any proof of wickedness,—" Why will Christ, at the last day, separate some of them to his left hand, from others standing at his right ?"

Dr. Twiss, prolocutor of the Westminster Assembly, says,—" The condemnation of many infants to eternal death is the consequence of Adam's transgression solely." *Twissi Vindiciæ,* Lib. i, p. 46. " His (Adam's) sin is made ours by the imputation of God ; so that it has exposed innumerable infants to divine wrath, who were guilty of this sin and of no other." *Id.* Lib. iii, p. 21.

" III. By the decree of God, for the manifestation of his glory, some men and angels are predestinated unto everlasting life, and others foreordained to everlasting death. IV. These angels and men, thus predestinated and foreordained, are particularly and unchangeably designed." *Westminster Confession,* ch. iii. " III. Elect infants, dying in infancy, are regenerated and saved by Christ through the Spirit, who worketh when and where and how he pleaseth. So also are all other elect persons, who are incapable of being outwardly called by the ministry of the word. IV. Others not elected, although they may be called by the ministry of the word, and may have some common operations of the Spirit, yet they never truly come to Christ, and therefore cannot be saved." *Id.* ch. 10.

" The Calvinists carry the matter much farther [than the schoolmen],

asserting that original sin deserves the punishment of damnation ; and therefore they conclude that such infants as die unbaptized, and are not of the number of the elect, are, for the transgression of our first parents, condemned to the eternal torments of hell-fire.  It must be confessed that the doctrine of the Church of England makes too near approaches to this opinion, when it tells us that ' in every person born into the world, original sin deserves God's wrath and damnation.'  For the words seem to be too strong and express to admit of those mollifying constructions which some by way of apology have thought proper to put upon them."  Stackhouse's Body of Divinity .292, 293.

Jonathan Edwards's work on Original Sin was published in 1758, the author having brought it to the press the year before his death ; and among the subscribers for it were fifty-nine clergymen of New Hampshire, Massachusetts, and Connecticut.  In that book, under the title " The Death of Infants proves Original Sin," the author, refuting the argument of Dr. Taylor that " The Lord of all being can never want time and place and power to compensate abundantly any sufferings infants now. undergo," says,—" There are no bounds to such a license in evading evidences from fact.  *  *  This gentleman might as well go further still, and say that God may cast guiltless persons into hell-fire, to remain there in the most unutterable torments for ages of ages (which bear no greater proportion to eternity than a quarter of an hour), and if he does so, it is no evidence of God's displeasure ; because he can never want time, place, and power abundantly to compensate their sufferings afterwards.  *  *  We may well argue from these things that infants are not looked upon by God as sinless, but that they are by nature children of wrath.  *  *  There are some particular cases of the death of infants, which the Scripture sets before us, that are attended with circumstances in a peculiar manner giving evidences of the sinfulness of such, and their just exposedness to divine wrath ; as, particularly, the destroying the infants in *Sodom* and the neighboring cities.  *  *  We see what great care God took that *Lot* should not be involved in that destruction.  *  *  The whole affair, both the destruction and the rescue of them that escaped, was miraculous ; and God could as easily have delivered the infants which were in those cities.  *  *  To say here that God could make it up to those infants in another world, must be an insufficient reply.  For so he could as easily have made it up to *Lot*.  *  *  Since God declared that if there had been found but ten righteous in *Sodom* he would have spared the whole city for their sake, may we not well suppose, if infants are perfectly innocent, that he would have spared the old *world*, in which there were without doubt many hundred thousand infants ?  *  *  especially when such vast care was taken to save Noah and his family (some of whom, one at least, seem to have been none of the best).  *  *  *Who ever perished, being innocent? or where were the righteous cut off?*  *  *  And when God executed vengeance on the ancient inhabitants of *Canaan*, not only did he not spare their *cities* and families for the sake of the infants,  *  .*  but often with

particular care repeated his express commands that their infants should not be spared, but should be utterly destroyed without any pity.   *   * And when God executed his wrath on the *Egyptians* by slaying their first-born,   *   * a miracle was wro't to kill them.  Here, not to stay to be particular concerning  *.  *  the destruction of the infants of the *Midianites*  *  * all the infants of the *Amalekites*  *  * and what is said concerning *Edom*.    Psal. cxxxvii, 4.  *Happy shall he be that shall take thy little ones, and dash them against the stones.*  I proceed to  *   * the destruction of *Jerusalem*, represented in Ezek. ix, where   *   * the infants were not marked, nor a word said of sparing them.  On the contrary, the infants were expressly mentioned as those that should be utterly destroyed without pity.   *   *  And if any should suspect that such instances as these were peculiar to a more severe dispensation under the Old Testament, let us consider a remarkable instance in the days of the glorious gospel and grace of God, even the last destruction of *Jerusalem*.  *.  *  At that time particular care was taken to distinguish and deliver God's people, as was foretold.  Dan. xii, 1.  And we have in the New Testament a particular account of the care Christ took for the preservation of his followers.   *   *   * Yet no care was taken to preserve the infants of the city in general; but, according to the predictions, of that event, they were involved with others in that great destruction.  *  *  These very destructions of that city and land are spoken of, in those places forementioned, as clear evidences of God's wrath to all nations which shall behold them.  And if so, they were evidences of God's wrath towards *infants*, who equally with the rest were the subjects of the destruction."  Pp. 132–138.  In another place the author shows that the passage in Eph. xi, 3,—" and were by nature children of wrath,"—refers to natural birth, and is to be understood in its most literal, and not in any metaphorical, sense.  Pp. 230–236.

Dr. Bellamy said,—" Those who die in infancy may as justly be held under the law in the next world as those that live may be in this." The edition of his collected works containing this sentiment, published in 1811, was accompanied by a strong recommendation, signed by six distinguished doctors of divinity, three professors of Andover Theological Seminary, and two other clergymen, testifying, among other things, that the writings of Dr. Bellamy have been held in high estimation by the churches in New England.  In 1856, Dr. Baird stated one of the doctrines of the puritans thus: " Some may be regenerated in infancy, which it is lawful for us to hope is the case with all who die before they are old enough to profit by the external means of grace." Baird's Religion in Am. 547.  He was careful not to say it is lawful for us to believe in infantile irresponsibility; and the early Calvinistic authorities do not recognize the distinction between the lawfulness of hope and the lawfulness of faith on this point.

In a discussion between Dr. Lyman Beecher and a writer in *The Christian Examiner*, in 1827 and 1828,—1 Spirit of the Pilgrims 42, 78, 149; 4 *Christian Examiner* 431; 5 *id.* 229, 316, 506; Ellis's Half-

Century of the Un. Controversy 82–84,—Calvinistic authorities enough were collected to settle this disagreeable historical subject beyond any further question. Those authorities merely made a logical and unavoidable application of general and fundamental principles that did not except infants from their operation. The doctrines of predestination and its appurtenant dogmas were a consistent system. Calvinism was logical. When the Westminster Confession asserted that elect infants and other elect persons are saved, and that others not elected cannot be saved, it gave no more intimation that all infants are elect than that all adults are elect; it left the fate of non-elect infants in no more doubt than the fate of non-elect adults. When the children in our common schools were taught, in the first illustrated reading lesson of the New England Primer, that "in Adam's fall we sinned all," they were not taught, either in that lesson or any other, nor was anybody anywhere taught by Calvinism, that infants are exempt from the punishment of that original sin of Adam. Endless suffering is the punishment of guilt, not of innocence. Original guilt, for which the whole human race is punished, is the guilt of Adam, imputed to and inherited by his posterity. In that system, the personal innocence of an infant is as immaterial as the personal innocence of an adult pagan, who never heard of and never was conscious of his liability for, or his duty to repent of, a sin committed many thousand years before he was born.

The fact of doctrinal change is generally if not universally conceded. One of the complaints made against Unitarians has been, that they falsely accused modern Calvinists of nominally professing an unqualified allegiance to old Calvinistic formulas. Dr. Ellis says,—"The first point on which Unitarian sentiment is found to be in positive and entire antagonism with *the standards of orthodoxy* is that which concerns the nature and the state of men as responsible creatures of God. * * * Unitarians do deny positively, and with all the earnestness of a sincere and solemn conviction, that the original Calvinistic doctrine (or any subsequent modification of that doctrine, which has the authority of an accredited formula with the party) concerning the nature and the state of man, is either a Scriptural or a Christian doctrine. * * * The Unitarians understood and avowed that they were assailing, not the undefined and modified semblance now called *orthodoxy*, but *Calvinism*, which had expressed itself in *positive formulas*, and to which the orthodox party professed an unqualified and unequivocal allegiance. Since the controversy opened, orthodoxy, being restless under each and all of the dogmatic statements in the creed of the three doctrines to which it committed itself, has exhibited its uneasiness in continual efforts to modify and qualify its formulas. Some of its disciples, feeling, precisely as our first Unitarians felt, a shrinking reluctance against the plain literal meaning of the creed, and knowing that they could not accept it as ' the fathers ' held it, and yet, fearing to commit themselves to our theology, have tried in various ways, with an amazing exercise of ingenuity, to soften and dilute the creed. Especially, on this one doctrine of the complete original depravity of

human nature, have there been endless variations and shadings of opinion.   \*   \*   \*   At the opening of the controversy, it was the real Calvinistic doctrine which was assailed,—the doctrine of the Westminster Assembly's Catechism, which our fathers had accepted,—the doctrine of the New England Confession of Faith, which our churches sent forth in 1680.   Fifty years ago the orthodox began to complain, and they have ever since complained, that Unitarians misrepresented them in charging upon them ' in this neighborhood ' a shape of orthodoxy which had been held by Calvinists of a former age, and which survived only in other parts of this country.   And here we must be pardoned for giving frank expression to a disagreeable truth.   There seems to Unitarians to be something evasive and very unworthy in the pleas with which the orthodox have met our exposures of what we regard as the errors of their system.   They censure us and deny us the Christian name because we reject their creed ; and when, with the best faculties we possess for analyzing that creed, we attempt to state the reasons why we reject it, they proceed to tell us that they themselves do not hold the creed in what is to us its plain signification.   We have endeavored to state fairly its essential doctrines, and the honest, unexaggerated inferences which logically flow from them.   But no statement which we can make of the system is ever allowed by the orthodox to be fair : some private qualifications, which they attach to it in their own minds, and of which we have no means of knowing or judging, justify them, as they think, in charging us with misrepresentation.   \*   \*   \*   Unitarianism opposed and still opposes the Calvinistic doctrine of the entailed corruption of human nature in all our race as the punishment of Adam's guilt.   Nor did the Unitarians err in addressing their arguments against that authoritative statement of Calvinism which is given in the orthodox creeds.   The orthodox wished to have the praise, they claimed the honorable and grateful repute, of ' adhering to the faith of the fathers of New England.'   They claimed also the exclusive inheritance of the old piety, on the score of holding its doctrinal standards.   Was not the assertion repeated by them even to weariness,—too often, certainly, to be regarded as a mere empty boast,—' We hold the doctrines of the reformation, the doctrines of the fathers of New England ' ?   Now, the Calvinistic doctrines were held heartily and firmly, and without subterfuges of metaphysics, by the fathers of New England.   Their professed successors cannot enjoy at the same time the honor of holding their opinions, and the privilege of changing them.

" Here, then, is the doctrine which Unitarians understood they were opposing.   We quote from the sixth chapter of the Confession of Faith of the New England churches:

God having made a covenant of works and life thereupon, with our first parents, and all their posterity in them, they, being seduced by the subtelty and temptation of Satan, did wilfully transgress the law of their creation, and break the covenant in eating the forbidden fruit.   By this sin they, and we in them, fell from original righteousness and communion with God, and so became dead in sin, and wholly defiled in all the faculties and parts of soul and body.   They being the root, and by God's appointment standing in the room and stead of all mankind,

the guilt of this sin was imputed and corrupted nature conveyed to all their posterity, descending from them by ordinary generation.   From this original corruption, whereby we are utterly indisposed, disabled, and made opposite to all good, and wholly inclined to all evil, do proceed all actual transgressions.   This corruption of nature during this life doth remain in those that are regenerated; and although it be through Christ pardoned and mortified, yet both itself and all the motions thereof are truly and properly sin.   Every sin, both original and actual, being a transgression of the righteous law of God, and contrary thereunto, doth in its own nature bring guilt upon the sinner, whereby he is bound over to the wrath of God and curse of the law, and so made subject to death, with all miseries, spiritual, temporal, and eternal.

"The shorter catechism of the assembly, which also had been formally recognized by our churches, and was taught to all our children, advances the same doctrine on the same grounds, and tells us that 'all mankind, by the fall [of Adam], lost communion with God, are under his wrath and curse, and so made liable to all the miseries of this life, to death itself, and to the pains of hell forever.'   We purposely abstain from adding to these authoritative statements of doctrine any quotations from approved Calvinistic writers, which follow it out into its revolting and blasphemous details.   We think that the hideous and yet perfectly consistent speculations and representations made by Edwards, to set forth the horrors of hell-torments, the anguish of the reprobate who suffer them, and the exquisite happiness which the 'righteous' derive from contemplating them, have done their service in controversy.   It only aggravates our opponents if we renew those fearful delineations.   We are content to follow the doctrine as nakedly presented in the formula.   This is the doctrine which, by profession one hundred years ago, and in sober sincerity two hundred years ago, underlaid the theology—the Calvinistic, the orthodox theology—of New England.   It was made the starting-point of the Christian system.   It decided the terms of relation and duty, of accountability, judgment, and doom, in which men stood to God.   It was made to establish the necessity and the method of redemption by an infinite sacrifice to God, designed to serve as a substitute with God for the sufferings of men.
*   *   The moment a decided opposition was raised by Unitarians to this Calvinistic doctrine, those who came forward to vindicate it began to evade its full force.   They shrank from facing it; they shrink from it now; they try to soften it.   *   *   The doctrine still stands, however, unchanged in word, unrelaxed in authority, in the formulas of orthodox churches.   Still is the repute of holding the faith of the fathers claimed by those who are called orthodox.   *   *   And this is the doctrine which Unitarianism rejected, positively, and without qualification, concession, or tolerance."   Ellis's Half-Century of the Un. Controversy 54, 55, 56, 60, 61, 62, 63, 65, 66.

The orthodox reply to Dr. Ellis, in the *Puritan Recorder*, by a writer understood to be of the highest authority, is as follows: "They (the Unitarians) well knew, and we know, that the current orthodoxy of New England, in the year 1815, when the Unitarian controversy properly opened, was not precisely that of old Calvinistic formulas.   To these formulas the orthodox of that day did not 'profess an unquali-

fied allegiance.' They were willing to accept them, and they did, ' for substance of doctrine,' as the phrase was ; but this implies that they were not accepted *ad literam.* Nor were the modifications of statement, which they wished to make, unknown to the public or to Unitarians. They had long been exhibited in sermons and in books. They were paraded with some exaggerations in Ely's Contract, as early as 1811, and of this work an elaborate review had been published in Norton's Repository. All this took place some years before the opening of the Unitarian controversy. And yet, at the commencement of the controversy, the attempt was made, and is still persisted in, to hold the orthodox to the letter of the old formulas ; and, what is worse, to all the ' *logical deductions,*' amounting in some instances to the grossest distortions, which their adversaries have been pleased to draw out from them. It was vain for Doctors Woods and Worcester and Beecher to say ' we do not accept your logical deductions, or the old formulas themselves, without explanation.' It was vain for them to state, as they often did, and had a perfect right to do (and their opponents should have believed them and met them accordingly), what their explanations and modifications were. They were brought back and reined up to the ' old formulas,' with the appended ' logical deductions,' and must fight for these, or abandon the contest."

To this Dr. Ellis replies,—" There was one privilege demanded by the orthodox, which the Unitarians had no idea of granting them, namely, the privilege of professing to be Calvinists without believing Calvinism. Still less would Unitarians permit any ingenious trickery, under the phrase of ' substance of doctrine,' to metamorphose Calvinism into something wholly different from Calvinism.  *  *  As my critic says, ' Unitarians well knew that the current orthodoxy of New England, in the year 1815, when the Unitarian controversy properly opened, was not precisely that of the old Calvinistic formulas.' Why, then, did it pretend to be *substantially* what it was not precisely? Why did it insist, in all sorts of persistent phrases, that it held the faith of the reformers and the New England fathers, and of their catechism and their confession ? ' The modifications of statement which the orthodox wished to make' were known to the Unitarians. These modifications would either affect the *substance* of Calvinism, or they would not. If they did affect its substance, then Unitarians denied the orthodox the right to make these modifications and still claim to be Calvinists. If, on the contrary, the modifications did not reach to the substance of Calvinism, then the Unitarians did no wrong in holding the orthodox to the Calvinistic formulas. It was fair that they should ' fight for those, or abandon the contest.' " Ellis's Half-Century 450, 451.

The Calvinistic doctrine of predestination, whatever it originally was in general principle, and however it was applied to infants or adults, has been rejected or essentially modified in Calvinistic churches since the time of Calvin. 1 Lecky's Hist. Rationalism, ch. iv, part 1 ; 10 Works of John Adams 67.  It has been greatly changed since the

organization of the old puritan parishes of New Hampshire. Not one of them would now endure the doctrine of its founders. The preaching that first mustered them, would now disband them. Calvin and Edwards are the two great Calvinists of history;—their religion was Calvinism. The New England Calvinism of to-day is a very different religion. There are many parishes in this state that once held the faith of Calvin and Edwards: let them be decreed to return to it, and they would be extinguished, or the decree would be reversed. The length of the process of doctrinal elimination or transformation is immaterial. It was going on in 1783, as it is now; and it was a striking illustration of the necessity of parochial liberty brought to the knowledge of the authors of the constitution by study, tradition, and observation. They did not intend, in establishing parochial independence, to authorize the court to disperse the old Calvinistic parishes by requiring them to adhere to their original doctrine in regard to infants or adults.

The Westminster Confession has been accepted by orthodox Congregationalists and Presbyterians for substance of doctrine, but its meaning has undergone great mutations. The Westminster Shorter Catechism has been used in those denominations and in our common schools, and it constituted about one half of the contents of a common edition of the New England Primer. But the doctrine of election as therein set forth,—" God, having out of his mere good pleasure from all eternity elected some to everlasting life,"—is not now held by any denomination in this state, in the sense, and with the comprehensive corollaries, attached to that language by the Westminster Assembly, and by the early puritan and Presbyterian churches of New England. Adherence to the letter of ancient formulas has not been easy; adherence to their original signification has been impossible. An ancient creed, retained " for substance of doctrine," is an open profession of looseness and progress that leaves room for an indefinite latitude of interpretation, by which, for instance, non-elect infants at one period lost, at another period are saved. Nothing that the human mind is capable of understanding can be more material, or more a " substance of doctrine," than the Calvinistic difference between the eternal ineffable felicity of the elect, and the eternal excruciating agony of the non-elect. The difference between the old doctrine of putting a person to death, by the temporary torture of fire, for witchcraft, Unitarianism, or other heresy, and the new doctrine of allowing him to live unmolested, is something material and a matter of substance. And the difference between the Calvinistic doctrine of putting a person, infant or adult, to the eternal torture, so terrifically represented and so much dwelt upon in times past, and the anti-Calvinistic doctrine of many Calvinists of the present day,—is this something immaterial and of no consequence? On this subject, of transcendent interest and importance, involving the endless doom of millions of beings irresponsible and innocent, according to human tests, by reason of immaturity and want of development, the Calvinistic creed, " for substance of doctrine," is to-day the opposite of what it once was. Whether this apostasy is a

progress toward truth, or a progress toward error, it is a constitutional right. And if the change should extend to the fate of other millions, partially or wholly irresponsible and innocent, according to human tests, by reason of the immature, undeveloped, and unenlightened hereditary state of heathenism, the case would be provided for by parochial independence.

"The remarkable and often quoted passage from John Robinson's discourse, preached to the Plymouth colonists on their embarkation for the New World, may be supposed to set forth what was then the leading principle of the denomination, and shows that they did not then regard their religious opinions as fixed and unchangeable." *The Dublin case*, 38 N. H. 517; Belknap's Hist. N. H., ch. 3. In 1670, when New Hampshire was under the jurisdiction of Massachusetts, a committee appointed by the house of deputies in Massachusetts to inquire into prevailing evils, reported, among other things, a "declension from the primitive foundation work; innovation in doctrine and worship, opinion and practice." "Many of the Congregational ministers and churches, under the names of moderate Calvinists and Arminians, had, before the middle of the eighteenth century, lapsed from the strictness of the ancient faith, and held opinions diverging more or less widely from the standard of orthodoxy in earlier times." *The Dublin case*, 38 N. H. 526. In 1815, the *Panoplist* recited the familiar fact that generation after generation had been relaxing the ancient strictness, and admitting innovations in a general and growing departure from the first principles of the fathers of New England. *Id.* 529. In regard to Genesis, evil spirits, special providences, the resurrection of the fleshly body, the localities and methods of future reward and punishment, and all Scriptural points touching science, the deviation has been marked. There is much historical evidence going to show that within the best preserved sectarian lines, since the revolt of Luther, the general average tendency has been to rely more and more on what is called reason, and less and less on what is called authority; and that the result has been a partial and increasing merger of what is called a supernatural in what is called a natural type of doctrine. But, if the tendency has been in the opposite direction, it has the same bearing upon this case. It is the fact of general motion, and not the direction of it, that is pertinent to the present inquiry; and no candid and diligent student of ecclesiastical and doctrinal history will reckon a motionless theology among the characteristics of a free and intelligent people.

When Edwards preached,—"The God who holds you over the pit of hell, much as one holds a spider or some loathsome insect over the fire, abhors you, and is dreadfully provoked;"—and "The sight of hell-torments will exalt the happiness of the saints for ever. It will not only make them more sensible of the greatness and fulness of the grace of God in their happiness, but it will really make their happiness the greater, as it will make them more sensible of their own happiness: it will give them a more lively relish of it; it will make them prize it more when they see others who were of the same nature, and born

under the same circumstances, plunged in such misery, and they so distinguished. Oh! it will make them sensible how happy they are!"— he inculcated ideas of the divine government that were prevalent in and before his time, but have since been generally modified. Whether any particular or general changes in theological or ecclesiastical affairs are for the better or for the worse, are questions which the court, being by law incapable of officially entertaining their private religious opinions, are not authorized to consider; but perpetual change establishes a probability that change was contemplated and provided for in the constitutional grant of parochial power.

Every sect has a legal right, while nominally retaining an ancient creed "for substance of doctrine," to change it in everything that is legally, logically, or practically the substance of it. But to say that such changes as have occurred in Calvinism do not affect it "for substance of doctrine," is to indulge in a style too hyperbolical for the practical purposes of the law, however useful it may be for other purposes. They who resist the changes of the present, may be tempted to deny the changes of the past; to yield to the temptation would weaken their cause; so far as the success of their resistance is concerned, it would be worse for them to be convicted of gross and inexcusable ignorance or insincerity, than to confess themselves guilty of progress. Every reading and thinking person, gathering information, and exercising his faculties without bigotry or prejudice, believes that the tendency is, and for a long time has been, to a religion more humane and rational (according to human tests) than that of former times. Whether the movement is towards truth or towards error, and whether it is the duty of religious teachers to accelerate the current, or to float along with it, or to stem it, it is not the duty of the court to deny a notorious fact of history, or to construe the constitution in defiance of the fact, in full view of which, and in conformity to which, the constitution established parochial independence.

"There have been, times when toleration was reckoned among the number of the deadly and mortal sins. He who believed that he had the command of God to extirpate heresy, would not suffer the execution of the divine will to be retarded by the weakness of humanity. But the laws of humanity at length triumphed, and toleration came to be considered as a duty." *Muzzy* v. *Wilkins*, 107; 1 Hutch. Hist. Mass. 288, 289. When this modern doctrine of toleration makes that a duty and a virtue which was formerly a sin, the change of doctrine is palpable. But it is immaterial whether the changes that have occurred are or are not changes in matters of substance;—changes have occurred; and it is settled that the court is not authorized to determine what is really and intrinsically substantial and essential in matters of doctrine. *The Dublin case*, 38 N. H. 510, 563. The experience of mankind furnishes no test of doctrinal substance. That which is insignificant and immaterial to one, is momentous and infinite to another. The history of ecclesiastical controversy and schism shows that no differences of theology, discipline, or form or ceremony, are so small as to be below

the jurisdiction of conscience, and within the lower jurisdiction of a court of law. "Men have in all ages suffered martyrdom for what appear to be the merest trifles." *Muzzy* v. *Wilkins*, 107. The maxim, that the law does not concern itself about trifles, cannot be applied, by a civil tribunal, in the science of divinity or the domain of religious scruple. The law decides what is a trifle in some secular things;—an ecclesiastical tribunal, established in this country by a sect for its own voluntary government, or established in other countries by law, decides by its sectarian standards what is a trifle in spiritual and ecclesiastical affairs;—but the law of New Hampshire has not, and, without an established religion, cannot have, any sectarian standards or legal tests by which to determine what is a trifle in faith or worship. Therefore, if the court takes cognizance of any variation, it must suppress every one, not excepting such as appear to some to be infinitesimal. The restoration would be thorough and impartial. Who would escape correction?

"Who is capable of ascertaining precisely who are Calvinists and who Arminians, who are Arians and who Socinians? It would many times puzzle a jury of theological doctors to decide. I may add, it would puzzle many people to pronounce as to their own creed.    *    * It would require a very nice compass, and a skilful theological surveyor, to run the divisional line between Calvinists and Hopkinsians. What allowance shall be made for the variation of the needle? We have new and old Calvinists—rigid and liberal Hopkinsians—new and old divinity." *Muzzy* v. *Wilkins*, 78. However difficult the exercise of such a power might be, the constitution could have been so framed as to require the court to exercise it; but the consequences are proper to be considered when we inquire whether it is probable that such a duty has been imposed upon the court. *U. S.* v. *Fisher*, 2 Cranch 390; 1 N. H. 114. And one of the inevitable consequences of setting up ecclesiastical jurisdiction and holding every sect to its original track would be, that the court would be compelled to encumber the freedom of nearly all the pulpits in the state with very embarrassing injunctions, and, practically, to close many of them entirely. The frequent occurrence of discontent on the part of one or more individuals in a parish would render it a busy and vexatious jurisdiction, and an evil intolerable in a free country. Under such a system, very few pulpits would have escaped an injunction during the anti-slavery controversy; and very many would now be restrained in their utterances on the alcoholic question. According to the testimony of Dr. Wayland and all other Calvinistic authorities, large numbers would be repressed in regard to their present doctrine of election. As suggested by Chancellor WALWORTH, the apostasy on the subject of witchcraft would call for censure and restitution. 1 Lecky's Hist. Rationalism, ch. i. Toleration and prohibition of cards, dancing, and tobacco would be subjects of judicial revision. There would be no end of the inquisitorial process. The court would be bound to rectify all teaching and practice, ritual and discipline, ceremony and ornament, posture and intonation,

personal character and life, profound mysteries of theology, concerns of the spiritual kingdom involved in the life that now is, and an infinite variety of metaphysical distinctions quite as refined as that between Homoousians and Homoiousians. " The following practices are unlawful : First, the elevation, during or after the prayer of consecration, of the paten and cup. Secondly, kneeling or prostration before the consecrated elements. Thirdly, the use of lighted candles on the communion-table during the celebration of the Holy Communion, such candles not being wanted for giving light. Fourthly, using incense in the celebration of the Holy Communion. And, fifthly, mixing water with the wine used in the administration of the Holy Communion." *Martin* v. *Mackonochie*, L. R., 2 P. C. 365. Such is some of the work of an ecclesiastical court. An individual may so make a deed or will as to impose upon a secular court a very arduous duty in ascertaining and carrying out his intention with reference to an ecclesiastical or religious use of his property. But ecclesiastical jurisdiction, subjugating every parochial corporation in the state, making every ecclesiastical question a question of parochial corporate power, and usurping the place of parochial independence (the only ecclesiastical system established by the constitution), would be troublesome to others as well as the court.

Suppose a church incorporated as a religious society, or a parochial corporation at its organization, adopting the sacraments and tests of a church : this court, having assumed the office of censor of the sermons which this Dover society is to be permitted to hear, will not be at liberty to neglect any of the duties of its ecclesiastical jurisdiction ; but, upon a question of parochial corporate power, and aside from any question of a parochial use of property more limited than parochial independence, must decide whom the society shall admit to baptism and whom to communion, and dictate in detail the administration of its sacred rites. Suppose, in the exercise of the ecclesiastical jurisdiction, the court encounters societies and pastors (such as we read of, and such as we may come into collision with every day) whose consciences lead them to martyrdom ; suppose, on a question of the communion, the court overrules the decision of the majority of such a society, and holds that they have transgressed the rules or usages of their sect, and the majority and their pastor take the position occupied by Calvin, in the case of Berthelier, when he declared he would sooner die than offer holy things to the excommunicated—the irresistible force of a perpetual decree in conflict with the immovable pertinacity of an everlasting religious fervor—multiplied punishment for incessant contumacy : it is safe to conclude that the people of New Hampshire, by the comprehensive securities of religious liberty and parochial independence in their organic law, did not mean to impose upon the court the duty of such a contest over a question of parochial corporate power. The argument from inconvenience is overwhelming.

" It is impossible," says Sydney Smith, " to arrive at any knowledge of a religious sect by merely detailing the settled articles of their be-

lief;—it may be the fashion of such a sect to insist upon some articles very slightly ; to bring forward others prominently; and to consider some portion of their formal creed as obsolete.  As the knowledge of the jurisprudence of any country can never be obtained by the perusal of volumes which contain some statutes that are daily enforced, and others that have been silently antiquated; in the same manner the practice, the preaching, and the writing of sects are comments absolutely necessary to render the perusal of their creed of any degree of utility."  Sydney Smith's Essay on Methodism, Ed. Rev. 1808.  "I know that a creed is one thing as written in a book, and another as it exists in the minds of its advocates.  In the book, all the doctrines appear in equally strong and legible lines.  In the mind, many are faintly traced and seldom recurred to."  3 Channing's Works 169.

Very much depends upon the comparative importance attached to different doctrines, and the degree of thoroughness and strength with which they are grasped.  A variation in these matters may give a new complexion and a new nature to the entire system of belief.  And thus, in a printed creed, confession, or covenant, a total metamorphosis may, in time, insensibly take place without any typographical amendment. There has been a general transition of this kind in New England since the time of Edwards,—a transition discernible by comparison as plainly as many others which have attracted more attention, because by their suddenness and violence they produced more agitation and disturbance. In several denominations, if not in all, the whole character of theology has been gradually altered during the memory of men now living, by changes in the general tone of preaching, such as the transfer of emphasis and reiteration from divine wrath to divine benignity.  And if the court could decide what is material in such matters, it might be difficult to find anything more material than a revolution in the average strain and drift of preaching, though unaccompanied by open schism and revolt, which are rendered unnecessary by the universality of the movement and the elasticity of creeds.  Here would be a boundless field for the employment of the ecclesiastical jurisdiction in the destruction of religious liberty.  If it were necessary in this case to seek for light in surrounding circumstances and antecedent probabilities, the current of ecclesiastical history observable in all enlightened nations, and specially in New England, as well as the general character and tendencies of our institutions, would raise an irresistible presumption that the framers of the constitution intended to secure to parishes some margin of doctrinal variation, and not to require them forever to elect public teachers whose sentiments should precisely conform, in every punctilio, to an unalterable standard.

The parochial power of electing public teachers is granted or guaranteed by the constitution.  Whether the constitution creates, establishes, and grants it, or recognizes, declares, and guarantees it, is immaterial.  There can be no objection, in this case, to calling it a power granted.  As the power is granted by the constitution, which is

the supreme law, we are not at liberty to look anywhere for a limitation of the constitutional power, except in the constitution itself. And when we examine the constitution to see what bounds are fixed around this parochial power, we find in the proviso in which the power is granted no limitation whatever. The language is,—"*Provided, notwithstanding,* that the several towns, parishes, bodies corporate, or religious societies shall at all times have the exclusive right of electing their own public teachers, and of contracting with them for their support and maintenance." The grant is absolute and unqualified; but the clause immediately preceding the proviso empowers the legislature to authorize parishes "to make adequate provision at their own expense for the support and maintenance of public Protestant teachers of piety, religion, and morality." No question of teaching practical piety, practical religion, or practical morality arises in this case; and, in respect to doctrinal religion and theological theories, whatever reasons there may be for holding the grant of elective power to be entirely unqualified, it cannot be claimed that it is qualified in any other manner, or to any other extent, than by the word "Protestant." And, if it be conceded for the purposes of this case that it is qualified by that word, the question arises, What is the meaning of "Protestant" in the constitution? The word occurs in the constitution four times with one meaning. The legislature may authorize parishes to support "public Protestant teachers of piety, religion, and morality." The governor shall be "of the Protestant religion;" senators shall be "of the Protestant religion;" representatives shall be "of the Protestant religion;" "and the qualifications for councillor shall be the same as for senator." Part I, Art. vi; Part II, Arts. xiv, xxix, xlii, lxi. If there is any limitation of the parochial power of electing public teachers, it is no other than the "Protestant" limitation of the power of electing governors, senators, representatives, and councillors. If Abbott is not constitutionally disqualified by his religion for the offices of governor, councillor, and member of the legislature, he is not disqualified by his religion for the office of a public teacher of this Dover parish. Is he a "Protestant," within the meaning of that word, as used in the constitution?

The original historical meaning of the word is significant. The first Protestants acquired the name in Germany, when a Catholic decree prohibited innovation in religion. Certain persons "entered a solemn protest against the decree, as unjust and impious. On that account they were distinguished by the name of Protestants—an appellation which hath since become better known and more honorable by its being applied indiscriminately to all the sects, of whatever denomination, which have revolted from the Roman see." 2 Prescott's Robertson's Charles V 208; 3 Putter's Political Constitution of the Germanic Empire 438; Rees's Cyclop., Art. Protestant. "Hence arose the denomination of Protestants, which from this period has been given to those who renounce the superstitious communion of the Church of Rome." 4 Mosheim's Ecc. Hist. 72. And the sects of deists and theists, of the class of Thomas Jefferson, Benjamin Franklin, Ethan

Allen, Gov. Plumer, and the defendant Abbott, have revolted from the Roman see, as the majority of the Protestant sects have revolted from it, by seceding from other Protestant sects whose ecclesiastical genealogy runs, through a series of revolts and secessions more or less numerous, back to the Catholic church. The Protestant party was organized for the purpose of resisting certain doctrines and practices of Catholicism in church and state; and the whole force of the Protestant name, in its popular as well as its etymological signification, lies in its expression of hostility to Rome.

Protestantism is the Protestant religion—the religion of Protestants. As a system of theology, it is positive and negative,—positive in its acceptance of affirmative doctrine, negative in its rejection of Catholicism. Mere negation is not a system of theology; and, as a system of theology, and for some ecclesiastical purposes, Protestantism is more than a negation of Catholicism. What its positive theological limits are, is a question upon which theologians are divided. The prevailing ecclesiastical opinion is, that Unitarianism is outside of those limits; and if the court hold that the constitutional parochial power of electing public teachers is limited by the Protestant test, and interpret the test as if it were used for a purpose of technical, positive theology, according to the clear weight of theological authority applicable to the execution of such a purpose, the decree is precisely the opposite of what it should be: it should suppress Unitarianism, instead of suppressing all doctrines subversive of Unitarianism. Fortunately for the plaintiffs and all other Unitarians, the Protestant test of the constitution is a legal and not an ecclesiastical one, and is founded on political and not on theological reasons. Inadequate for a theological system as a mere negation is, it is amply sufficient for the purpose of a legal official test. And Protestantism, as a negation of Catholicism, is the Protestant test of the constitution,—the legal test inherited by us and our ancestors, in this and in the old country, for many generations.

Two examples, separated by long intervals of time and space, will suffice to illustrate the negative meaning of the word "Protestant" in its legal and common use. In 1641, during one of those English anti-Catholic agitations (raised by alarms of Catholic conspiracies) that frequently broke out after the reign of Mary, the House of Commons entered into a formal promise, vow, and protestation that they would maintain and defend "the true reformed Protestant religion, expressed in the doctrine of the Church of England, against all popery and popish innovations within this realm, contrary to the same doctrine." Two days afterwards, the house passed the following explanatory resolution: "Whereas, some doubts have been raised, by several persons out of this house, concerning the meaning of these words contained in the protestation lately made by the members of this house [viz., the true reformed Protestant religion, expressed in the doctrine of the Church of England, against all popery and popish innovations within this realm, contrary to the same doctrine], this house doth declare

that by those words was and is meant only the public doctrine pro-fessed in the said church, so far as it is opposite to popery and popish innovations." 1 Clarendon's Hist. of the Rebellion 410, 412. Dr. Todd, of Massachusetts, the distinguished author and orthodox clergy-man, in a recent pamphlet on "fashionable murder" (by abortion), which he vehemently denounces as a crime and sin so atrocious and prevalent, that, if it continues, "the wrath of God will burn towards our land, and his indignation will glow till we are consumed," writes thus: "I am sorry to learn, from undoubted testimony, that the prac-tice is far more common among Protestants than among Catholics." If religionists of the school of Jefferson and Abbott should claim that in this passage they, as a sect or class, are acquitted by the author, and excepted out of his condemnation of Protestants, Dr. Todd would be astonished at the difficulty encountered by a skilful writer in mak-ing himself understood, in the common and familiar language of the country. His intelligent readers would not understand that he ex-empted deists or theists from his censure of Protestants. When re-proaches are cast upon Protestants, infidels must take their share; and when constitutional rights are legally administered, despised heretics are not defrauded.

The language of the constitution is to be understood in the sense in which it was used at the time of its adoption. 1 N. H. 55; 44 N. H. 635; 8 Ired. 147, 150. The Protestant test is to be understood in the ordinary and legal sense perfectly familiar to the men who, in recon-structing their political institutions in 1783, allowed the test, with many other ancient things, to remain. Among the other things allowed to remain was "trial by jury," which imports a unanimous decision of twelve jurors, because, in the common and legal language of that time, "trial by jury" carried that signification. 41 N. H. 551. And at that time the Protestant test had, in law, and in civil, political, gov-ernmental, and common usage, a single meaning, as well established and known as the definition of trial by jury; and that meaning dis-abled none who were ecclesiastical descendants of the Catholic church, in any line of dissent and secession. Whether its meaning was broader than that, there is no occasion in this case to inquire. It was no new thing in 1783. It was then understood to be what it had pre-viously been, no more and no less. What it had been, a glance at his-tory will inform us: an extended examination of historical authorities is not necessary: a very slight acquaintance with our legal annals can leave no one in doubt. The subject is a legal and not a theologi-cal one. The test is part of a political, and not of an ecclesiastical document; and what we want to know is its common, political, and legal sense. It is nothing to the purpose to ascertain what technical theological meaning a Protestant test might have in the minds of theo-logians, if used for the ecclesiastical purpose of a sectarian classifica-tion, or the exclusion of doctrines inconsistent with the harmony of a church. The question is, what meaning this particular historical test actually had in civil government, where it was used, not for the

purpose of a theological discrimination, but for the purely political purpose of repressing and disabling what was supposed to be a foreign allegiance to papal supremacy inconsistent with the safety of a non-Catholic state.

The practical construction given to the constitution by the men who framed it, and their contemporaries, and their successors inheriting their opinions, is to be considered. "For laws are founded in general upon the perception of an evil or a danger, or of a public want, and are often framed with such express reference to it as to leave a latent ambiguity in their expressions, easily solved by those who shared in the perceptions of the framers of the laws, but not apparent to after generations who have lost by the lapse of time that key to the interpretation." *C. R. R.* v. *Greely,* 17 N. H. 63; *Co.* v. *Fernald,* 47 N. H. 458, 459; Cooley's Con. Lim. 67. The practical construction shows that the Protestant test is an anti-Catholic test and nothing else, or that, in its widest possible sweep, it does not disable for unbelief any non-Catholic who has, directly or indirectly, recently or remotely, by his own action or the action of his ancestors, become separated from the Roman Catholic church.

The constitution containing the Protestant test went into operation in June, 1784. In March, 1785, William Plumer was elected to the house of representatives. He was then well known as a deist or theist (the difference between deism and theism is not material in this case), who had been a zealous Baptist preacher though not ordained, and had traversed the state in that capacity, but had apostatized before he ceased from preaching. The circumstances and extent of his apostasy were notorious, and calculated to excite opposition. He was reëlected to the house in 1788, 1790, 1791, 1797, 1798, 1800, and 1801, and was several times speaker of that body. By election to the United States senate in 1802, he was withdrawn from state office. He was a member and president of the state senate in 1810 and 1811, and was governor in 1812, 1816, 1817, and 1818. His deism was openly avowed and never recanted. He became a politician, and did not give unnecessary offence by assailing the religion of others; but his deism was known throughout the state to be as settled and confirmed as that of Jefferson. His biographer speaks of him as an inquirer after truth. He was such an inquirer as Jefferson. He inquired after truth all his life; but during his last seventy years he found nothing that he believed to be religious truth but deism, and this fact was universally and distinctly understood by the people of the state. He first held Protestant office at the age of twenty-six, before the organization of political parties, when there could be no motive to screen him from the constitutional test so recently adopted, when his exemption could not be allowed by any change in public opinion, or by personal influence, or on the ground of military service, or any peculiar merit, and when his extraordinary apostasy called for the application of the test if it had been understood that it disabled any but Catholics. He was afterwards the leader of his party, and repeatedly its candidate for the highest office, and often

successful in contests far more acrimonious than any that have since occurred. And yet no attempt was ever made to exclude him from the legislature, and, throughout his long and active public life, though he was constantly and vehemently opposed on the ground of his infidelity as well as for political reasons, it is certain that it was not understood that he was constitutionally disqualified for Protestant office.

And, from 1785 to the present time, there has been in the legislature a succession of similar precedents, sufficient to show the universal understanding that the test is merely anti-Catholic. Within a few years past, Catholics have held the representative office, in known contravention of the constitution ; but this has resulted from a change of public opinion as to the necessity and propriety of excluding them. The test would have been enforced against them in 1785 ; or, if such men as Lafayette and Carroll had been citizens of the state and admitted to the legislature, the test would have been understood to be waived in their favor ; but no waiver of it would have been thought necessary for Jefferson and Franklin. It has always and universally been as well understood that, under the test, all others were eligible, as that Catholics were not. And to hold that every non-Catholic in the state is disqualified for the offices of governor, councillor, senator, and representative, who does not come up to some other standard of theological soundness, is a revolutionary decision. Men still live who, with a majority of their fellow-citizens, repeatedly elected Plumer to the Protestant office of chief magistrate. These venerable men will be startled by the charge now made, that his holding the highest office in their gift was a violation of the constitution. They will be surprised by such a manifestation of the irreverent and innovating spirit of the present generation. They will wonder how the settled constitutional principles and practices of the fathers could be subverted in a case of religious persecution.

If Judge WOODBURY had delivered his opinion on this point from the bench, he could hardly have stated it more explicitly than he did in his speech against the test in the constitutional convention of 1850, when he said,—"This test crept into the constitution originally under a temporary impulse.   *   *   Tradition says, and I probably had it in early life from the venerable parent of the member from Epping (Mr. Plumer),—that parent the Nestor of the politicians of that generation, and sole survivor of the convention of 1791,—that the provision was inserted in 1784 to repel taunts which had been flung out by some, after the French alliance, that there was to be an 'alliance also with the French religion, and the establishment of it here. The provision fell then still-born, so few Catholics existed in the state.   *   *   If any soreness against Catholic persecutions of the puritans abroad mingled with this, and rendered prejudice stronger with some against erasing the test, they ought, for more recent persecution by Laud and the Episcopalians in England, to have excluded them also. But it was right to exclude neither.   *   *   There is now no dread of French influence or French religion.   *   *   It is likewise contrary to all

sound experience and reason to say, as we do, that Catholics may vote but not be voted for.  *  *  So it is inconsistent to  *  *  agree, as we do, in the constitution of the Union, that Catholics may be fit and safe for members of congress, senators, cabinet officers, yea, presidents, and yet denounce them as unfit and unsafe at home to represent one hundred and fifty polls in one of our small townships.  *  *  Why not as well explicitly say, and not do it covertly, that none but Protestants are fit for a republic?  Why not say that Catholic Maryland is unfit?  Catholic Ireland?  Catholic France?  *  *  Indeed, this test debars man from what we allow to the degraded African, as he is eligible here to hold office as well as to vote.  *  *  The Protestant himself cannot now vote here for a Catholic.  *  *  In most Catholic countries Jesuitism is banished and the inquisition abolished, and the pope himself has become quite a reformer and republican.  *  *  What sect did Sidney, or Locke, or Jefferson, or Madison think fit to be trusted with legislative power?"  1 Woodbury's Writings 486, 487, 504.

If the sole reason for inserting " Protestant" in the constitution was, as Judge WOODBURY and Gov. Plumer understood, the tendency of the French alliance to introduce the established Catholic religion of France, it is the key of interpretation.  If that was the sole danger which the test was intended to avert, it determines the meaning of the word, which the court are bound to declare.  When WOODBURY said, " The provision fell then still-born, so few Catholics existed in the state," he did not understand that, in the absence of Catholics, the test could reach Gov. Plumer, whom he described as " the Nestor of the politicians of that generation."  It had not occurred to him that Jefferson (to whom he referred) and Plumer (who was then alive, and whose son was a member of the convention) could have been barred by the test.  If he had supposed that they could have been within its proscription, he would· have adduced that circumstance as an additional reason for its abolition.  And it would seem that he did not understand that an African would be excluded by an African religion.

The test was discussed by others in the convention of 1850.  It was asserted that it was not " safe to elect a man governor who was sworn to the pope of Rome, and believed that all Protestants were heretics and should be persecuted unto death;" that it was the religion of Catholics that " though they might be bound by all the oaths that could be imposed on them, they might be absolved by the pope;" that the French had never " yet been able to maintain a republic,  *  *  because they were bound by another power—popery."  But it was not suggested that the test had a two-fold character or operation, or that it excluded any but Catholics.  The convention was a very remarkable assembly of the highest learning and ability of the state, both the political parties of the time being amply represented in it by men of experience and distinction in public affairs.  The authority of the convention is entirely satisfactory and decisive as to the universal understanding of the meaning of the test.  They voted almost unanimously to abolish the test, and the debates show conclusively that they understood it to be merely

anti-Catholic. There were clerical and other members who would not have voted for total repeal if they had suspected that the test was also anti-infidel. Though not disposed to bring forward an anti-infidel test as a new measure, some would not have voted to expunge an existing test of that kind without saying a word on its anti-infidel character when its abolition was discussed. If it had been understood to be a double-barrelled weapon, pointing in opposite directions at deists and Catholics (two classes of people most violently opposed to each other in religion), the convention would not have voted to destroy both barrels without any attempt being made by anybody to destroy one and save the other, and without any other reason for the destruction of both being given or called for than the bearing of one on Catholics. And the people, in refusing to strike out the test, understood they were voting upon a purely Catholic question.

Judge WOODBURY was mistaken in supposing that the Protestant test in the constitution was due to a temporary impulse excited by the French alliance. The same test was in the constitutions of some of the states before that alliance. 9 Bancroft's Hist. U. S. 261, 275, 279, *n.*, 369, 481. At the commencement of the revolutionary war, political equality was extended to Catholics in but few of the colonies. 3 Hildreth's Hist. U. S. 382, 385; Baird's Religion in Am. 542. "The French alliance had * * a powerful effect in diminishing the deep-seated prejudices against Catholicism." 3 Hildreth's Hist. U. S. 385. When Benedict Arnold, in 1780, endeavored to vindicate his desertion of the American cause, his denunciation of the French treaty as an alliance with "the enemy of the Protestant faith" was an appeal to the negative and not to the positive religious sentiment of the country, —to the ancient spirit of anti-Catholicism, which came from Europe with the first immigrants, and was quite as violent and inveterate in the most irreligious as in any others. The repeal of some of the harsher statutes against the Catholics was so unpopular as to produce in 1778 violent commotions in Scotland, and in 1780 a series of riots in London, during which that city remained for several days in the hands of a furious and destructive mob. *King v. Gordon*, 21 Howell's St. Tr. 485; 2 May's Const. Hist. Eng. 320, 321; 3 Hildreth's Hist. U. S. 334. The Protestant test was an old one in 1783. It had been in use in England long before the settlement of Portsmouth, Plymouth, or Jamestown; had been sent from the mother country, and set up here by the British government; had been preserved by the provincial government; was not removed by the authors of the state constitution. The fear of Catholic power had possessed the minds of the people of New England and other American colonies, and the minds of their ancestors, and had been a controlling and habitual cause of legislation and administration in this province and in other colonies from the beginning, and in the mother country and on the continent of Europe from the times of the reformation.

In the constitution of New Hampshire, the test was merely an English colonial inheritance,—a continuation of the usage and general

plan of Catholic disabilities that had always prevailed here, and had long prevailed in other Protestant countries, corresponding to a similar system of Protestant disabilities in Catholic countries.   It was a surviving remnant of the rigorous system practised against each other by both parties in their long, desperate, and bloody struggle for the mastery, and for liberty and life.   For many generations, the English and Scotch people lived in constant fear of Catholic succession in their own government, and Catholic invasion and insurrection in their own territory.   Their national existence was in frequent peril from Catholic conquest; and their antipathy to Catholics, in course of time, grew into a fierce national animosity, which was entertained as warmly by men of no religion as by the most pious and devout.   And the feeling was not less strong on the other side.   The conflict between the Catholic and Protestant parties filled the most civilized states of Europe with wars, massacres, and barbarous atrocities, transcending, in enormity, the religious crimes of contemporary paganism.   At the time of the adoption of our constitution, the sanguinary contest had abated; but an independent Protestant nation without a Protestant test, or an independent Catholic nation without a Catholic test, would have been a marvellous case of innovation.   If the framers of our constitution had omitted the Protestant test, they would thereby have repealed a principle of fundamental law under which they and their fathers had lived since the reign of Mary.   From the end of that reign until 1829, a period of two hundred and seventy years, England had a Protestant test, and for a long time Catholic priests were disqualified to live on English soil. 1 Hale P. C. 75, 76, 328–338; 1 Hawk. P. C., ch. 12, 13, 14, 15; 2 Camp. Ch. Justices 391; Com. Dig., *Justices* (K, 9); *id. Justices of the Peace* (B. 14, 15, 17, 18, 19); 4 Burn's Justice, title *Popery.*

The Virginia charter of 1609, and the New England charter of 1620, prohibited the migration of Catholics to those colonies.   1 Haz. Hist. Coll. 72, 117.   And Mason's grant of New Hampshire, in 1629, was made with the " exceptions, reservations, limitations, and declarations " of the New England charter.   1 N. H. Hist. Coll. 307.   The royal charter or letters patent of 1679, or commission of President Cutt, as it is usually called, which inhibited the jurisdiction exercised by Massachusetts over New Hampshire, dissolved their union, and established a frame of government here, may be regarded as the constitutional foundation of New Hampshire provincial law, from 1679 to the revolution.   *State* v. *Rollins*, 8 N. H. 562, 563; 8 N. H. Hist. Coll. 11; 1 Story Com. on the Con., sec. 80.   At the time of the revolution, that constitution was prefixed to the provincial statutes in the printed volume of laws, as the state constitution has since been prefixed to the various editions of the statutes of the state.   The names of the offices of president and council, used in the provincial constitution, were continued in the temporary government of 1776, and in the constitution of 1784.   The provincial constitution followed the Massachusetts charter, English statutes, English policy, and English usage, in requiring that the president, and all other members of the council,

in whom the chief powers of government were vested, should take the oaths of allegiance and supremacy. Laws of 1771, p. 1; 8 N. H. Hist. Coll. 1.

The oath of supremacy was designed to exclude Catholics by its renunciation of the pope's authority. 1 Bl. Com. 368; 2 May Const. Hist. Eng. 295. "The acts of supremacy and uniformity form the basis of that restrictive code of laws deemed by some one of the fundamental bulwarks, by others the reproach of our constitution, which pressed so heavily for more than two centuries upon the adherents to the Romish church." 1 Hallam Const. Hist. Eng. 112. In 1559, by the act of supremacy,—the first act of the reign of Elizabeth,—all beneficed ecclesiastics, and all laymen holding office under the crown, were obliged to take the oath of supremacy, and, by 5 Eliz., c. 1, every member of the House of Commons was obliged to take the same oath. 1 Hallam C. H. Eng. 116; 2 May C. H. Eng. 293; Hale P. C. 328.

The substance of the oath was,—" I, A B, do utterly testify and declare that the queen's highness is the only supreme governor of this realm, and all other her highness's dominions and countries, as well in all spiritual and ecclesiastical things or causes as temporal; and that no foreign prince, person, prelate, state, or potentate, hath, or ought to have, any jurisdiction, power, superiority, preëminence, or authority, ecclesiastical or spiritual, within this realm; and therefore I do utterly renounce and forsake all foreign jurisdictions, powers, superiorities, and authorities, and do promise that from henceforth I shall bear faith and true allegiance to the queen's highness, her heirs and lawful successors." Elizabeth's contemporaneous exposition of the act and the oath was, that the crown did not claim "authority and power of ministry of divine service in church," nor any other authority than that anciently due to the crown; "that is, under God, to have the sovereignty and rule over all manner of persons born within these her realms, dominions, and countries, of what estate, either ecclesiastical or temporal, soever they be, so as no other foreign power shall or ought to have any superiority over them,"—showing clearly that the oath was aimed at the supposed supremacy of the pope over all Catholics. "This interpretation was afterwards given in one of the thirty-nine articles, which, having been confirmed by parliament, it is undoubtedly to be reckoned the true sense of the oath." 1 Hallam C. H. Eng. 112. "The Presbyterians, the Independents, and the Baptists had no scruple about the oath of supremacy." 3 Macaulay's Hist. Eng. 65; Belknap's Hist. N. H., ch. 3.

After imposing the oath of supremacy, the New Hampshire provincial constitution of 1679 requires "that liberty of conscience shall be allowed unto all Protestants;" and the meaning of "Protestants," as here used, is shown with absolute certainty by a document referred to in the next sentence, where the council are authorized "to cause proclamation to issue and be made in our name, to the inhabitants of the said province of New Hampshire, thereby signifying that we have taken them into our immediate government and gracious protection:

and letting them further know that we have written to the governor and council of the Massachusetts Bay, to recall all such commissions as they have granted for exercising any jurisdiction" in New Hampshire. The provincial constitution, and the order to the Massachusetts government thus referred to, were issued by the king in council, were parts of one transaction,—Belk. Hist. N. H., ch. 6 ; 3 Palfrey's Hist. N. E. 326, 402,—and were undoubtedly drawn by the law officers or legal advisers of the crown. They were contemporaneous decrees of the British government, relating to the same subject-matter, of equal force and authority, and are to be interpreted as if they were parts of one decree, because a government is supposed to have one object in view and to act upon one system. 12 N. H. 290 ; 28 N. H. 71 ; 37 N. H. 248, 304. The order to the Massachusetts government recites that "for many months past our councill hath been taken up in the discovery and prosecution of a popish plott ; and yet there appears little prospect of any speedy leasure for entring upon such regulation in your affaires as is certainly necessary ;" and requires that all "good subjects (not being papists)" shall be allowed "freedom and liberty of conscience," and shall not "be by law subjected to fines or forfeitures or other incapacities" on account of their religion ; that all commissions granted by Massachusetts "for the governing within" New Hampshire, be recalled, and declares such commissions void. Hutch. Coll. 519. We know, then, upon the authority of the British government itself, the author of our provincial constitution, giving the definition at the time it composed that instrument, that the word "Protestant" therein contained means "not being papists."

Among the written instructions given by the same government to Allen, governor of New Hampshire, with his commission, dated in 1692, is this : "You are to permit liberty of conscience to all persons except papists." 2 N. H. Prov. Papers 65. Under a constitution thus interpreted to them by the government that made it, the people of this province had been living nearly an hundred years when the revolutionary war began. The legal meaning of Protestantism in our law has never been modified. And, as the whole system of provincial law, so far as it was consistent with independence, and not repealed, was by special act continued through the revolution, it may be truly said that the same meaning passed with the word itself, without interruption, into the constitution of the state ; and that the word now remaining in the organic law, where it has been one hundred and eighty-nine years, has the same meaning it had when it was put there by the British government.

When the new government went into operation here in 1680, under the constitution of 1679, the code of laws enacted by the provincial legislature was, in general substance and style, a copy of Massachusetts statutes. But in relation to a religious test there was a notable departure from the Massachusetts model,—a departure caused by a well-known dissimilarity.

"While in the colonization of Massachusetts religious motives were

foremost, the planters on the Piscataqua established themselves here chiefly for purposes connected with commerce and the fisheries." Peabody's Hist. South Parish of Portsmouth 45; 3 Woodbury's Writings 201; Lawrence's Hist. N. H. Churches 317; 18 Monthly Law Reporter 301; 4 N. H. Hist. Coll. 6. The difference was such that, when the New Hampshire settlers passed under the jurisdiction of Massachusetts, it was agreed that they should be exempt from the operation of the Massachusetts law by which church-membership was made a test of the right to vote. Belk. Hist. N. H., ch. 2. But for their exemption from that test, the union with Massachusetts would have produced a disfranchisement of New Hampshire voters, to which they would not have been easily reconciled. And the same difference appeared after the union of the two colonies was dissolved: in Massachusetts it was the duty of towns to employ ministers; in New Hampshire it was their right, but not their duty. And when the colonies became states, the same diversity of spirit continued in their bills of rights. The Massachusetts form was imperative: "It is the right as well as the duty of all men    *    *    to worship the Supreme Being. *    *    The legislature shall    *    *    authorize and require" towns and other parishes to support public worship and religious instruction (5 Mass. 257);—but the New Hampshire copy (1783) was permissive: "Every individual has a natural and unalienable right to worship God according to the dictates of his own conscience and reason.    *    *    The people    *    *    empower the legislature to authorize" towns and other parishes to support public worship and religious instruction; and the Massachusetts provision in relation to compulsory attendance at church was wholly omitted. The New Hampshire constitution (1783) required all civil and military officers "(town officers excepted)" to take an oath of allegiance, which contained the following declaration: "And I do further testify and declare that no man or body of men hath or can have a right to absolve me from the obligation of this oath, declaration, or affirmation; and that I do make this acknowledgment, profession, testimony, and declaration, honestly and truly, according to the common acceptation of the foregoing words, without any equivocation, mental evasion, or secret reservation whatever." This declaration was taken from the Massachusetts constitution, into which it had been copied from ancient forms of English oaths designed to detect Catholics, and aimed at the supposed theory of papal supremacy and absolution, and the alleged equivocation and casuistry of Jesuits. *King* v. *Guy Fawkes*, 2 How. St. Tr. 159, 171–174, 178, 180, 181; *King* v. *Langhorn*, 7 *id.* 520, 543–570; *Miller* v. *Salomons*, 7 W. H. & G. 475, 519, 536; *Jardine's Gunpowder Plot* 219, 233. But New Hampshire did not copy the Massachusetts context,—"I, A B, do declare that I believe the Christian religion, and have a firm persuasion of its truth." This omission was characteristic; and its significance could hardly be over-estimated in ascertaining the meaning of the Protestant official test in New Hampshire, if it had any other than an anti-Catholic meaning anywhere else.

In 1662, the king, in a mandate directed to the Massachusetts government, confirmed the Massachusetts charter, pardoned all political offences committed during the time of the English commonwealth, and undertook to protect Episcopalians against puritan persecution in this manner: "Since the principle and foundation of that charter was and is the freedom and liberty of conscience, wee do hereby charge and require you that that freedom and liberty be duely admitted and allowed so that they that desire to use the booke of common prayer" undergo no disadvantage, "they using theire liberty peaceably, without any disturbance to others; and that all persons, of good and honest lives and conversations, be admitted to the sacrament of the Lord's supper, according to the said booke of common prayer, and their children to baptisme.    *    *    Commanding all persons concerned that    *    *    all the freeholders of competent estates, not vicious in conversations, orthodox in religion (though of different perswasions concerning church government), may have their vote in the election of all officers, civill or military."    Hutch. Coll. 377.    In 1665, Massachusetts, feigning a partial obedience to the royal edict, repealed the church-membership test of voters, and enacted that " all Englishmen, presenting a certificate under the hands of the ministers or minister of the place where they dwell that they are orthodox in religion and not viceous in their lives, and also a certificate under the hands of the selectmen    *    *    that they are freeholders and are    *    *    rateable    *    *    to the full value of ten shillings, or that they are in full communion with some church among us,    *    *    being twenty-four years of age, householders and settled inhabitants," might be made voters by special acts of the general court " according to the rules of our patent."    Mass. Charters 117; 3 Palfrey's Hist. N. E. 65.

The New Hampshire code of 1680 conferred the elective franchise upon all " Englishmen, being Protestants, that are settled inhabitants and freeholders    *    *    of the age of twenty-four years, not viceous in life, but of honest and good conversation, and such as have £20 rateable estate,    *    *    having also taken the oath of allegiance to his majesty." 8 N. H. Hist. Coll. 23.    In adopting the Massachusetts statute, the people of New Hampshire struck out the orthodox test, because it was not agreeable to the religious condition of this province; and they inserted in lieu thereof the Protestant test, because they understood it to be a criterion of soundness on the Catholic question alone, on which question they who had no religion at all agreed with the orthodox. They used the word " Protestants " in the sense in which it was used by the British government in the provincial constitution under which they were living and legislating.

A proclamation for a fast, issued by the council and general assembly in March, 1681, runs thus: " Ever seriously and loyally imploring the divine favor for the continuance of his majesty's life and prosperous reign, as the protection of God's cause and church against the popish party throughout the world."    Belknap's Hist. N. H., App. No. 30; 8 N. H. Hist. Coll. 63.

In 1682, Cranfield's commission, which was substantially a renewal of the constitution of 1679, authorized the lieutenant-governor to administer to the council " the oaths of allegiance and supremacy, and the test mentioned in the act of parliament, made in the twenty-fifth year of our reign, entitled an act for preventing dangers which may happen from popish recusants,"—the assembly to take the oaths of allegiance and supremacy. 1 N. H. Hist. Coll. 262, 263 ; 8 *id.* 80 ; Belk. Hist. N. H., App. No. 51. The act of parliament referred to was the act of 1673, commonly called the test act, which drove from office the duke of York, the king's brother and heir presumptive of the crown. " The act of supremacy  *  *  had imposed on all accepting temporal as well as ecclesiastical offices an oath denying the spiritual jurisdiction of the pope." 2 Hallam's C. H. Eng. 393. But in time, some of the enacting clauses were thought not to be sufficiently stringent. " It was found also by experience that persons attached to the Roman doctrine sometimes made use of strained constructions to reconcile the oath of supremacy to their faith. Nor could that test be offered to peers who were excepted by a special provision. For these several reasons, a more effectual security against popish counsellors, at least in notorious power, was created by the famous test act of 1673, which renders the reception of the sacrament according to the rites of the Church of England, and a declaration renouncing the doctrine of transubstantiation, preliminary conditions without which no temporal office of trust can be enjoyed. In this fundamental article of faith no compromise or equivocation would be admitted by any member of the church of Rome." 2 Hallam's C. H. Eng. 393. "The test act directs all officers, civil and military, to take the oaths " of allegiance and supremacy, "and make the declaration against transubstantiation," and " receive the sacrament of the Lord's supper, according to the usage of the Church of England, within six calendar months after their admission " to office. 4 Bl. Com. 59.

The design of the test was to exclude Catholics. 2 May's C. H. Eng. 304 ; 1 Burnet's Hist. Own Times 347–352 ; Echard's Hist. Eng. 889 ; 11 How. St. Tr. 1165. " It was brought in by the patriots in the reign of Charles II, under their apprehensions of popery and a popish successor, and is styled an ' Act for preventing danger which may happen from popish recusants,' and the same is said to be its design in the preamble. And when, during the debate in the House of Commons, it was observed that it was drawn in such a manner as to comprehend the Protestant dissenters [by the sacramental requirement], the court party endeavored to avail themselves of that circumstance in order to defeat the bill; but the dissenting members disappointed them by declaring that they had rather confide in the justice and generosity of parliament to pass some future bill in their favor, than by the occasion of retarding or defeating the security which the present bill was calculated to afford to the liberties of their country." Bl. Com. Appendix 97, Am. ed. 1773 ; 2 Hallam's C. H. Eng. 394 ; 2 May's C. H. Eng. 304 ; 1 Macaulay's Hist.

Eng. 208 ; 6 Hume's Hist. Eng. 117 ; 12 Lingard's Hist. Eng. 271 ; 3 Palfrey's Hist. N. E. 19. The earl of Bristol, a Catholic, in the House of Lords, advocated the passage of the test act, on the ground that there was a " necessity of a timely remedy, since " fears and jealousies had " indeed most violently seized and distempered the minds of the major part of his majesty's Protestant subjects." He declared that the act was " full of moderation towards Catholics," and that, " notwithstanding the allarms of the *encrease* of *popery* and *designs* of papists," the act provided no severe measures. " Is not the moderation of the House of Commons to be admired," he asked, " that they have restrained it to the sole point of debarring their adversaries from offices and places, and from accessions of wealth by favour of the sovereign ? " Echard's Hist. Eng. 892. Lingard suggests that the course of the earl was hypocritical. 12 Lingard's Hist. Eng. 270.

It is difficult here and now to imagine the state of things in which Protestant dissenters supported the test act,—voluntarily disabling themselves for the sake of disabling their dreaded enemies,—and in which a Catholic could even pretend to support it for the purpose of allaying public apprehension and disarming hostility. But it is not difficult to understand the meaning of Cranfield's commission, when, after providing for the oath of supremacy and the operation of the test act, it required that liberty of conscience " be allowed unto all Protestants."

By his commission, Cranfield was made vice-admiral, and, as such, was to receive instructions " from our dearest brother, the duke of York, or high admiral of our foreign plantations." In 1683, Edward Gove, a leading man, who served in the assembly for the town of Hampton, " made it his business to stir the people up to rebellion, by giving out that the governor, as vice-admiral, acted by his royal highness' commission, who was a papist, and would bring popery in amongst them." Belk. Hist. N. H., App. No. 33 ; 8 N. H. Hist. Coll. 171. England had been and continued to be in a ferment on the same subject. 6 Hume's Hist. Eng., ch. 67, 68. Three years before, the Commons passed a bill excluding the duke from the throne : five years afterwards, the nation expelled him. The overthrow of his Catholic administration accomplished the object of Gove's enterprise. The New Hampshire rebel " was convicted, and received sentence of death in the usual hideous form." In the revolution of 1688, his treason triumphed on a large scale.

In 1684, Cranfield caused Rev. Joshua Moodey, of Portsmouth, to be prosecuted, convicted, and imprisoned, for obstinately refusing to administer the sacrament of the Lord's supper, according to the manner and form set forth in the book of common prayer of the established Church of England, and obstinately using some other form. Belknap's Hist. N. H., ch. 8, and App. No. 36. In his defence, Moodey pleaded, among other things, the liberty of conscience granted to all Protestants in the provincial constitution ; and by a minority of the court this was held a good plea and a perfect defence. The decision of the

majority of the court has not acquired sufficient weight to be cited as an authority.    In 1685, one of the complaints against Cranfield, tried before the Lords of Trade, was, that he had persecuted "ministers contrary to his majesty's commission, which grants liberty of conscience to all Protestants."    Belknap's Hist. N. H., ch. 8 ; 1 N. H. Hist. Coll. 268.

At the English revolution of 1688, the act of 1 W. & M., sess. 2, c. 2, settled the crown first on William and Mary, then on the survivor of them, and then on the issue of Mary ; upon failure of such issue, it was limited to Anne and her issue ; and lastly, on failure of that, to the issue of William.   "This settlement included all the Protestant posterity of King Charles I, except such other issue as King James might at any time have, which was totally omitted through fear of a popish succession." 1 Bl. Com. 214.   The act of settlement, alleging that "it hath been found by experience that it is inconsistent with the safety and welfare of this Protestant kingdome to be governed by a popish prince, or by any king or queene marrying a papist," enacted "That all and every person and persons that is, are, or shall be reconciled to, or shall hold communion with the See or Church of Rome, or shall professe the popish religion, or shall marry a papist, shall be excluded and be forever uncapeable to inherit, possesse, or enjoy the crowne and government. *   *   And in all and every such case or cases, the people of these realms shall be and are hereby absolved of their allegiance.   And the said crowne and government shall from time to time descend to and be enjoyed by such person or persons, being Protestants, as should have inherited and enjoyed the same in case the said person or persons soe reconciled, holding communion, or professing, or marrying as aforesaid, were naturally dead."   And the sovereign was required to make the declaration against transubstantiation.

The discovery of the conspiracy to assassinate the king in 1696 was one of the occasions of intense anti-Catholic excitement that frequently occurred after the reign of Mary, when a paroxysm of terror and fury came upon all the anti-Catholic people of the British empire in all parts of the world.    The first statute in the volume of New Hampshire Laws, compiled by order of the general assembly in 1771, was enacted in 1696.    The preamble is,—"_Whereas_, a late horrid and detestable conspiracy against his majesty's sacred person" has been discovered ; and the first section requires all males, "from sixteen years old and upward," to "take the oaths appointed by act of parliament, to be taken instead of the oaths of allegiance and supremacy."    The act of parliament referred to was 1 W. & M., c. 8, which abrogated the oath of supremacy of 1 Eliz. and the oath of 3 Jac. I, commonly called the Oath of Allegiance and Obedience.    The statute 3 Jac. I, c. 4, was entitled "An acte for the better discovering and repressing of popish recusants," and contained the following preamble : "Forasmuch as it is found by daylie experience that many of his majestie's subjects that adhere in theire hearts to the popish religion by the infection drawne from thence, and by the wicked and develishe councell of Jesuits, semi-

naries, and other like persons dangerous to the church and state, are soe farre perverted in the pointe of theire loyalties and due allegiance unto the king's majestie and the crowne of England as they are readie to entertaine and execute any treasonable conspiracies and practices, as evidently appeares by that more than barbarous and horrible attempt to have blownen up with gunpowder the kinge, queene, prince, lordes, and commons, in the Howse of Parliament assembled." Section 9 of this act prescribed the following oath of allegiance:

" I, A B, doe truely and sincerely acknowledge, professe, testifie, and declare " that King James is lawful king, &c., " and that the Pope, neither of himself nor by any Authority of the Church or Sea of Rome, or by any other meanes with any other, hath any Power or Authority to depose the King, or to dispose any of his Majestie's Kingdomes or Dominions, or to authorize any Forraigne Prince to invade or annoy hym or his countries or to discharge any of his Subjects of their Allegiance and Obedience to his Majestie. * * And I doe sweare from my heart that notwithstanding any Declaration or Sentence of Excommunication or Deprivation made or graunted, or to be made or graunted, by the Pope and his Successors, * * or any Absolution of the saide Subjects from theire Obedience, I will beare Faithe and true Allegiance. * * And I doe further sweare that I doe from my heart abhor, detest, and abjure, as impious and hereticall, this damnable Doctrine and Position that Princes, which be excommunicated or deprived by the Pope, may be deposed or murthered by theire Subjects, or any other whosoever. And I doe believe, and in my conscience am resolved, that neither the Pope nor any person whatsoever hath power to absolve me of this oath or any parte thereof, * * and doe renounce all Pardons and Dispensations to the contrarie ; And all these things I doe plainly and sincerely acknowledge and sweare, according to these expresse wordes by me spoken, and according to the playne and common sense and understanding of the same wordes, without any equivocation or mentall evasion or secret reservation whatsoever."

For the oath of supremacy of 1 Eliz., and the oath of allegiance and obedience of 3 Jac. I, the act 1 W. & M., c. 8, substituted the following: 1, To be faithful, and bear true allegiance to the sovereign ; 2, " I, A B, doe Sweare That I doe from my Heart Abhor, Detest, and Abjure, as Impious and Hereticall, that Damnable doctrine and Position That Princes Excommunicated or deprived by the Pope or any Authoritie of the See of Rome, may be Deposed or Murthered by theire Subjects, or any other whosoever; And I doe Declare that noe Forreigne Prince, Person, Prelate, State, or Potentate hath or ought to have any Jurisdiction, Power, Superiority, Preëminence, or Authoritie, Ecclesiasticall or Spirituall, within this Realme." And these oaths, which no Catholic could take, were required by the New Hampshire provincial act of 1696 to be taken, " on due notice of time and place," by " all male persons " " from sixteen years old and upward," under penalty of imprisonment or fine and bonds of good behavior,—the notices to be given and the oaths administered by " by two or more justices of

the peace, appointed thereto by the Lieutenant-Governor, for each town." The provincial act remained in force until the American revolution of 1776 ; and it then became void, not because it prohibited Catholic allegiance, but because it required the British allegiance, which was ruptured by that revolution.

Upon the discovery of the conspiracy of 1696, an association was formed in England and her colonies, including New Hampshire, by the written agreement of hundreds of thousands to stand by the Protestant succession. 4 Macaulay Hist. Eng. 531, 545 ; 8 N. H. Hist. Coll. 356 ; 2 N. H. Prov. Papers 258. And the multitudes who composed that Protestant Association in England and America, and elsewhere, as distinctly understood that they combined against nothing but Catholic supremacy, as the signers of the American Association test of 1776 understood that they combined against British supremacy.

The statute 3 Jac. I, c. 4, was passed on the discovery of the Gunpowder Plot ; and the sentiment of the people was manifested here, on the anniversary of that discovery, by such excessive demonstrations, that it was necessary, as late as 1771, to continue a temporary law made to prevent disorders in the annual celebration of that anti-Catholic jubilee. Temporary Laws 1771, p. 44.

In 1701, " upon the impending extinction of the Protestant posterity of Charles the First," on whom the crown had been settled, it became necessary for parliament to pass another act of settlement, " and the Princess Sophia * * was the nearest of the ancient blood royal who was not incapacitated by professing the popish religion. On her, therefore, and the heirs of her body, being Protestants, the remainder of the crown, expectant on the death of King William and Queen Anne without issue, was settled." 1 Bl. Com. 216. On that foundation the settlement of the British crown remains to the present time. And when Blackstone says that Sophia was the nearest heir who was not incapacitated by Catholicism, and that therefore the remainder of the crown was settled on her and the heirs of her body, being Protestants, he could not more plainly declare that in English government, English law, and English policy, the idea of Protestantism was the idea of hostility to Catholicism. The new and additional regal test, introduced in 1701, which required the possessor of the crown to join in the communion of the church of England, as by law established,— 1 Bl. Com. 216,—was designed by the Episcopalian majority of English Protestants to strengthen the state church ; was an Episcopalian and not a Protestant test ; and it in no way affects the meaning of the Protestant test. And that part of the coronation oath prescribed at the revolution, by which the sovereign was bound officially to maintain the Protestant reformed religion established by law, was one of the guaranties of a sectarian constitution. The Protestant reformed religion established by law was the sectarian religion of the established church. Burke's Letter to Sir H. Langrishe, 3 Burke's Works 462, 463 (1st. Am. ed.). The Protestant test, alone, excluded from the throne no member of any of the races then and

there practically recognized as human beings, in whose ecclesiastical pedigree the Catholic church was found, and who refused to be reconciled to that church. But that test not being enough for the purposes of the sectarian inequality established by law, the other sectarian tests were affixed to the crown. " The king may *inherit* the crown as a *Protestant,* but he cannot *hold* it according to law, without being a Protestant *of the Church of England."* 3 Burke's Works 462.

In 1714, the act of parliament 1 Geo. I, st. 2, c. 13, " For the further security of his majesty's government, and the succession of the crown in the heirs of the late princess Sophia being Protestants," referring, in the preamble, to 12 & 13 W. III, c. 2; which settled the succession of the crown upon the princess Sophia, and the heirs of her body " being Protestants," and to several other acts for the security of the succession of the crown " in the Protestant line," required all officers, civil and military, and all ecclesiastical persons, schoolmasters, and lawyers, to take the oath of allegiance and abjuration of the pope's supremacy, in the form established at the revolution of 1688, and also an oath to maintain the succession of the crown in the heirs of " Sophia being Protestants." And these oaths were taken by the clergy, and all civil and military officers in New Hampshire, on the accession of George II in 1727. 4 N. H. Hist. Coll. 384. Anti-Catholic oaths, and the declaration against transubstantiation, constituted the Protestant test of the province—2 N. H. Prov. Papers 57, 58, 59, 63, 65, 306, 307, 314, 315, 320, 321, 326, 330, 367, 368, 369, 375, 376, 408, 658, 663, 665, 668, 679, 697, 706, 711, 713, 727 ; and the object of the test has never been changed.

The principle upon which the descent of the crown was settled was applied to the inheritance and conveyance of real estate in a manner that clearly exhibits the character of the Protestant test. It was enacted by 3 Jac. I, ·c. 5, that any child going beyond seas, under certain circumstances, without license from the government, should take no benefit of real estate until such child, being of the age of eighteen years or more, should take the oath, etc., and " the next of his or her Kinne which shall be no Popishe Recusant, shall have and enjoy the saide " real estate. The act 11 & 12 W. III, c. 4, entitled " An Act for the further preventing the Growth of Popery," provided that " If any Person, educated in the Popish Religion or professing the same, shall not, within Six Months after he or she shall attaine the Age of Eighteene Yeares, take the Oaths of Allegiance and Supremacy, and also subscribe the Declaration, ＊ ＊ every such person shall ＊ ＊ be disabled and made incapable to inherit " real estate, and " during the Life of such Person, or until he or she doe take the said Oaths, and make, repeate, and subscribe the said Declaration, ＊ ＊ the next of his or her Kindred which shall be a Protestant, shall have and enjoy the said " real estate, and " every Papist ＊ ＊ shall be disabled and is hereby made incapable to purchase " real estate, and all conveyances of real estate, or interests or profits therein, to or for the benefit of any such person, shall be utterly void. The subject-matter of these

statutes was one and the same, and " the next of his or her Kinne which shall be no Popish Recusant," in the former, is synonymous with " the next of his or her Kindred which shall be a Protestant," in the latter.   " The 3 Jac. I, c. 5, gives the pernancy of the profits, in cases of disabilities, to the next of kin that is not a popish recusant; and R. Ow. [Roger Owen] was the next Protestant of kin."   Bac. Ab., *Papists* (C), 2.   " It is enacted by the statute 11 & 12 Will. III, c. 4, that every papist, who shall not abjure the errors of his religion by taking the oaths to the government and making the declaration against transubstantiation," is disabled.   2 Bl. Com. 257.   The only legal distinction between a Catholic and a Protestant was thus distinctly declared to be, taking the oaths to the government and making the declaration.   And in a great number of statutes the terms " papist" and " Protestant " were used in the unmistakable signification pointed out by those oaths and that declaration, which were established boundary lines between the two parties.   Bac. Ab., *Papists.*

12 Anne, sess. 2, c. 14, related to " every papist   *   * and every child, not being a Protestant under the age of one and twenty years, of every such papist." 1 Geo. I, st. 2, c. 55, required every " popish recusant or papist " to take the oaths and make the declaration, or register his or her name and real estate, under the penalty of forfeiture of the real estate, " two third parts thereof to the king, and the other third part thereof to such person or persons being a Protestant or Protestants, who shall sue for the same." 3 Geo. I, c. 18, s. 4, provided that no sale of real estate to " any Protestant purchaser " should be avoided by the disabilities of a Catholic grantor.   8 Geo. II, c. 25, and 21 Geo. II, c. 21, were acts " to indemnify Protestant purchasers of estates of papists." 12 Geo. III, c. 10, 14, Geo. III, c. 37, and 17 Geo. III, c. 45, were acts " for allowing further Time for Inrolment of Deeds and Wills made by Papists, and for Relief of Protestant Purchasers."   In the reigns of Geo. II and Geo. III, twenty-six statutes were passed in relation to the extension of time for the enrolment of deeds and wills " made by papists," and the relief of " Protestant " purchasers, devisees, and lessees.   In 1791, the act 31 Geo. III, c. 32, after a preamble that " divers penalties and disabilities have been imposed on papists,   *   * and certain principles have been attributed to them which are dangerous to society and civil liberty, and which they are willing to disclaim," provided that any Catholic taking certain oaths, including an oath to maintain the succession of the crown in the heirs of Sophia " being Protestants," should not be prosecuted " for being a papist," " or for hearing or saying Mass," or " for teaching and instructing youth," but no Catholic schoolmaster should " receive into his school for education the child of any Protestant father."   In some cases, conformity to the established church was added to the Protestant tests, but such conformity was not a necessary ingredient of Protestantism; Protestant non-conformists or dissenters were as trustworthy adherents of the Protestant cause as the bishops of the establishment.

The courts and legal profession used the word "Protestant" in the anti-Catholic sense in which it was used by the executive and legislative branches of the government. In 1712, Lord Ch. J. PARKER said,— "The reason of the parliament in forming this design probably was, that they looked upon the landed interest to be the strength of England; for that such interests and estates in lands give great authority and influence over their particular tenants and other dependants; that it might influence elections to parliament, if papists have power to make their tenants freeholders. * * The lawmakers seem to have esteemed estates and interests in lands to be weapons, which papists, when they had them in their hands, made use of against the public and the government. * * This would be the same as if the trust had been created by a Protestant; for, if this be not an interest within the act, a papist may purchase it from a Protestant, as well as have it given him by a papist." *Roper* v. *Radcliffe*, 9 Mod. 181, 191, 193, 199.

In *Ratcliffe's case*, Stra. 267, five judges delivered their opinions on the question whether, after 11 & 12 W. III, c. 4, a Catholic tenant in tail could suffer a recovery to the use of himself in fee. "This is a case of very great consequence, * * as it affects the estates of multitudes of papists and Protestants who have purchased under them. * * The first and plain view of this law was to prevent the great mischief that had been experienced from the power which the moneyed men amongst the papists had of increasing their landed interest in England, and consequently of investing themselves with a large share of power and influence in the country. * * It was the intent of the statute in general to prevent the acquisition of estates by the papist; and, therefore, if there is a deficiency of any words which might directly comprehend them, we may supply it for that purpose. Thus I take a devise to be within the statute. * * But I can go no further. * * If we should attempt to carry it further, the mischief aimed at will not be prevented, but increased. * * The effect of such a construction will be to fix a perpetuity to the estates of all the papists in England, and, instead of removing by degrees all the landed interest out of popish into Protestant hands, it will tend to keep it entirely amongst the Roman Catholics; for, to make a papist incapable of suffering a recovery, equally hinders the sale to a Protestant or a papist. * * But, say they, * * are not you giving a papist tenant in tail in possession a power to bar a Protestant remainder-man? and does not this tend to keep the land among the papists, instead of drawing it to the Protestants?" Opinion of Baron PAGE. "The statute does not * * restrain a papist from suffering a recovery to the use of a Protestant. But whether it intended to take away this power when it is to be used for the benefit of a papist, is the question. * * Another objection has been made, that to destroy this recovery * * would be dangerous to many Protestant purchasers who have come in under such titles. But * * it is now removed by the statute 3 Geo., cap. 18, which secures Protestant purchasers * * by enacting 'that no purchases, made or hereafter to be made by Protes-

tants of papists, shall be impeached on account of any disability the papists were laid under.' * * 1. To establish this recovery is to give papists a power of cutting off Protestant remainder-men, and, so far, taking away the very landed interest of Protestants. 2. They will be able by this means to turn the course of descent, as it shall serve the purpose of removing the estate out of a Protestant into a popish line. 3. They will have a power of making themselves tenants in fee, and, upon occasion, to distribute freeholds in a county, and influence the state of our legislature by the votes they make at their election." Opinion of Mr. Justice FORTESCUE. And the terms "Protestant" and "papist" were employed in the same manner by the other judges.

In *Thornby* v. *Fleetwood*, Stra. 318, counsel discussed the statute 3 Jac. I, c. 5, which provides that "the next of his or her Kinne which shall be no Popishe Recusant shall have and enjoy the saide" real estate. Counsel for plaintiffs said,—"When, by the statute of 3 Jac., they disabled an offender against that statute from enjoying any estate, they immediately directed the next Protestant of kin to take the profits." And counsel for the defendant said,—"3 Jac. does not introduce any new law when it speaks of the profits, but only directs the application of them to the next Protestant of kin."

In *Smith* v. *Read*, 1 Atk. 526, Lord Chancellor HARDWICKE said,— "If this plea was not allowed it would affect numberless inheritances, and Protestants more than papists." In *Farrell* v. *Crosbie*, Wallis & Lyne 154, 158, 162, decided in 1773, the Lord Chancellor of Ireland said,—"The first issue which by the decree was ordered to be tried was, what religion *John Cahill* the elder was of upon the 20th day of January, 1756, and before and after. The true question to be resolved by the trial upon that issue was, whether this *John Cahill* was or was not a Protestant. * * The verdict returned to the court upon this issue was, that *John Cahill* was not a Protestant; * * and that fully answers the doubt of the then Chancellor arising upon * * the facts stated in the pleas. By these it appears that the real merits of the case were, whether *John Cahill* the elder was a Protestant or a papist. * * The jury found that John the elder was a papist." In *Moore* v. *Butler*, 2 Sch. & L. 250, 259, 260, which arose on the Irish statutes, 2 Anne, c. 6, and 8 Anne, c. 3, and was decided in 1805, Lord Chancellor REDESDALE said,—"The purpose of the first of these acts was to disable papists from purchasing lands in future, and to make all land of which any papist was or should be seized * * of the nature of gavelkind; * * and in case of conformity of the eldest son, the act reduced the father to the condition of tenant for life, and gave the inheritance to the conforming son. * * It was conceived that the first act was evaded in consequence of those, who had a right to avail themselves of it, not doing so. The second act, therefore, gives a right to any Protestant to avail himself of the former act for his own benefit, and to file a bill for a discovery of all trusts or purchases made by or on behalf of papists, * * and to take the benefit of the same as if made to or for such Protestant discoverer. * * To evade these

restrictive laws, contrivances were used which perplexed almost every
title, and made every Protestant insecure in the possession of lands
derived through a papist." "In consequence of the acts of Queen
*Anne*, if any conveyance were made of an estate to a papist, into what-
ever hands the estate might afterwards come the title was always in
peril from a Protestant discoverer; and the titles of many persons,
Protestants as well as papists, were liable to be thus impeached.    *    *
If a Protestant discoverer held in trust for a papist, the estate was
again subject to discovery, and might be decreed to a new claimant;
but not so if he held in trust for a Protestant." *O' Gorman* v. *Comyn*,
2 Sch. & L. 137.

In *Petre* v. *Auckland*, 2 B. & P. 139, 144, 148, 149, *Matlem* v. *Bing-
loe*, 2 Comyn 570, *Hill* v. *Filkin*, 2 P. Wms. 3, 6–13, *Carteret* v.
*Carteret, id.* 132, and in a great number of English cases, the word
"Protestant" is so used as clearly to show that it means "anti-Catho-
lic," and no more. An act of parliament, in 1698, mitigating the
ancient penalty attached to the crime of Unitarianism, declared Unitari-
anism to be blasphemous, impious, contrary to the doctrines and prin-
ciples of the Christian religion, and greatly tending to the dishonor of
Almighty God; but Unitarians, though punished as blasphemous and
impious criminals, whose ministers were held not to be "Godly preach-
ers of Christ's Holy Gospel," were Protestants nevertheless. *Attorney-
General* v. *Shore*, 9 Cl. & Fin. 499; 11 Simons 615, 630, 639. *Shrews-
bury* v. *Scatt*, 6 C. B. (N. S.) 1–222, is a case arising upon the private
act, 6 Geo. I, c. 29, confirming a family settlement of the earl of
Shrewsbury. The eighth section of the act,—pp. 71, 116,—contains the
proviso that neither the first nor any other son or sons of certain persons,
nor certain other heirs male of certain persons, who shall, within six
months after he or they shall attain the age of eighteen years, take the
oaths appointed by 1 W. & M., c. 8, to be taken instead of the oaths of
supremacy and allegiance, and also subscribe the declaration against tran-
substantiation, "and who shall from thenceforth continue a Protestant
until he or they shall attain the age of twenty-one years, shall, after he or
they shall attain the said age, and while he or they continue Protestants,
be disabled. from" conveying any of "the premises hereby settled."
The heirs referred to could not "continue Protestants," unless they
were Protestants at the point of time when they began to continue:
the test of their being at that point of time Protestants, in the legal
sense, was their taking the oaths and subscribing the declaration. The
proviso was a recognition (by the legislature and the judges consulted
when the bill was considered by the committee of the House of Lords,
pp. 61–64, 79, 99, 103–105) of those who could take the oaths, includ-
ing the declaration, as Protestants in the legal sense. The entire re-
port of the case is a clear illustration of the negative, anti-Catholic
meaning of the word "Protestant," when used for legal purposes.
Chief Justice COCKBURN said,—p. 175,—"Then was introduced this
proviso upon the enactment prohibiting alienation, viz., that the tenants
in tail should have    *    *    the power of aliening the estates, if they

would take the oaths which in those days were the test of adherence to the Protestant faith."

It was enacted here, in 1701, that " No person serving as a justice, juror, witness, or otherwise, shall be required to use any other ceremony in taking of their respective oaths than lifting up the hand, as hath been accustomed." N. H. Prov. Laws 1771, p. 26. Jews and others, whose consciences would not allow them to swear " upon the true faith of a Christian," were prevented from taking some English oaths containing those words. But those words were not in the oath of supremacy, the declaration against transubstantiation, or the test oaths adopted at the English revolution by 1 W. & M., c. 1 and 8. From that revolution to the 13 Wm. III, no oath was required that would exclude Jews from parliament. The oath of supremacy, the declaration against transubstantiation, and the oaths of the Protestant revolution of 1688, were Protestant tests. To exclude Jews, something more than a Protestant test was necessary. They were excluded when something of a technical Christian character, such as a Christian sacrament, or an acceptance of a Christian faith in a theological sense, as the ground of the obligation of an oath, was added to the legal sense of a Protestant test. *Miller* v. *Salomon*, 7 W. H. & G. 475; 8 *id.* 778; *L. & C. R. Co.* v. *Heaton*, 8 E. & B. 952. In 1783, the people of New Hampshire not only did not make any such addition, but, in their copy of the Massachusetts official oath, they struck out the declaration of belief in " the Christian religion " and " firm persuasion of its truth," thereby distinctly signifying their intent not to exclude from Protestant office those who do not accept Christianity as a positive system of theology. The signification of Protestantism in oaths, state papers, public documents, statutes, charters, commissions, and judicial decisions, has prevailed in common speech and popular usage. 1 Hallam Const. Hist. Eng. 106 (11th Eng. ed.) ; 2 May Const. Hist. Eng. 318–321, 327, 499 (Am. ed. 1865) ; Echard Hist. Eng. 483, 493, 494, 890, 897, 898, 950 ; 4 Hume Hist. Eng. 182, 183, 199, 203, 253 (Am. ed. 1850) ; 5 *id.* 8, 9, 147, 178, 184, 187, 419, 467 ; 6 *id.* 334 ; 2 Macaulay Hist. Eng. 91, 93, 101, 118, 163, 359, 364, 392, 448, 457 (N. Y. ed. 1849) ; 3 *id.* 64, 107, 130, 179, 190, 191–194 : 5 *id.* 248, 251 ; 12 Lingard Hist. Eng. 268 ; 1 Martineau Hist. Eng. 375, 385, 437, 504, 506 ; 3 Burnet Hist. Own Times 326 ; 3 Burke's Works 431–446 (1st Am. ed.) ; 2 Camp. Ch. Justices 9 ; Macaulay Essays 1, 69, 153, 303, 312 (Am. ed. 1847) ; Sydney Smith Essays 5, 63, 64, 260, 261, 433, 434, 441–443, 472, 474–476 (Am. ed. 1848) ; Eng. Ann. Register 1780, *Protestant Riots ; id.* 1850, pp. 198, 200 ; 2 Life of Lord Eldon 40, 41, 439, 444 ; 1 Elliott Hist. N. E. 228 ; 9 Bancroft Hist. U. S. 272, 275, 278, 317, 318, 499 ; John Wilson Essays 180 (Phil. ed.) ; Jardine Gunpowder Plot 17, 79, 142, 145, 172, 304 ; 10 Camp. Lives Ld. Ch. 88. "'Sir William Petre had been secretary of state under Henry and his three children ;' that is to say, issuing warrants for the persecution of papists and Protestants under Henry, of Catholics under Edward, of Protestants under Mary, and of papists once more under Elizabeth."

3 Reeves Hist. Eng. Law (by Finlason) 509, note *b*. "For the sake of his ambition, he [Shaftesbury] would have been ready to prosecute Catholics or Protestants with indiscriminate zeal." 4 Camp. Lives Ld. Ch. 170. In the panic raised by the "popish plot" of 1678, Shaftesbury "suggested to the Londoners to prepare for the defence of the city, as if a foreign enemy were at its gates; and he was supposed to have suggested to Sir Thomas Player, the chamberlain, the noted saying, 'that were it not for these precautions, all the Protestant citizens might rise next morning with their throats cut.'" 4 Camp. Lives Ld. Ch. 197. When Lord CAMPBELL speaks of the outrages committed in Lord George Gordon's riots in 1780 as "having proceeded entirely from Protestant fanaticism,"—8 Camp. Lives Ld. Ch. 45,—he does not mean to describe the fanaticism as of a positive theological character, or to suggest that the rioters assented to the truth of the Christian religion as taught in ·the New Testament, or that their Protestant religion was anything more than the religion of non-Catholics. The sixty thousand members of the Protestant association, who went up to the House of Commons with the cry of "no popery" to present the "monster petition" against the toleration of Catholics (three years before the adoption of our state constitution), were all Protestants; and so were those engaged in the Protestant riots; but large numbers of them had no religion except hatred of Catholicism.

One clause of the "declaration against popery," required by 30 Charles II, st. 2, c. 1, was, that the declaration was made "in the plain and ordinary sense of the words read unto me, as they are commonly understood by English Protestants, without any evasion, equivocation, or mental reservation whatsoever, and without any dispensation," etc. "There [in the decree of the council of Lateran] all secular lords and princes, higher and lower, are injoined to root. all Heretics out of their territories.　*　*　The reward of their merit who will engage thoroughly in this blessed work, for the utter exterminating of Heretics [Protestants] everywhere, is no less than pardon of all sins, and a greater measure of glory in Heaven. So that our Papists may not only skip clear over purgatory, and jump up into Heaven immediately, but obtain a more glorious crown there than others, by doing such barbarous execution upon Protestants." 7 How. St. Tr. 562, 563. Such language does not convey the idea that those heretics (*alias* Protestants) who rejected Christianity as a system of theology, or those who were in a state of theological destitution, were to be spared. Such language shows the idea of Protestantism as expressed in popular and legal speech; and it also shows why non-Catholics, of every form of theological belief, unbelief, and absence of belief, who entertained the ancient Protestant opinion of Catholics, were equally filled with Protestant frenzy. The great body of English people have long been anti-Catholic; but formerly the word "anti-Catholic" was not in common use; "Protestant" was as familiar and habitual a designation of the anti-Catholic party, as "papist" was of the Catholic party.

John Adams wrote in his diary, under date of May 23, 1779, "There

are many Protestants here (in France) who believe nothing; they are atheists." 3 Adams's Works 209. In 1786, Judge DANA of the supreme court of Massachusetts charged a jury, in an important case, that the constitutional provision in relation to " public Protestant teachers " " meant teachers of any persuasion whatever, Jew or Mohammedan." 1 Amory's Life of James Sullivan 185. Chief Justice SMITH, who voted in the constitutional convention of 1791 to expunge the Protestant test, was of opinion that it was merely an anti-Catholic test, as is evident from an address delivered by him at Exeter in 1838. 6 N. H. Hist. Coll. 203.

The French wars, and the universal use of such books as the illustrated editions of Fox's Book of Martyrs, tended to keep alive, among all classes of New Hampshire colonists, the violent antipathy to Catholics that came with every immigrant. Belk. Hist. N. H. (ed. 1862), pp. 120, 137, 199, 200, 206, 272; Drake's Indian Captivities 77; Charlevoix Hist. N. France (ed. 1774), pp. 383, 384; Hutch. Coll. 131; 1 N. H. Hist. Coll. 17, 31, 44, 51, 108; 4 *id.* 251; 8 *id.* 405–426, 442. In 1776, the Protestantism of these colonies was found to be an obstacle in the way of enlisting the Catholic province of Canada in the struggle for American independence. 2 Garneau Hist. Canada 120, 148, 149, 150.

The commission of the last provincial governor of New Hampshire, dated in 1766, required him and the council and the general assembly to take the oath to maintain the succession of the crown in the heirs of Sophia " being Protestants," and the other oaths of 1 Geo. I, st. 2, c. 13, and to make and subscribe the declaration against transubstantiation, according to the test act of 1673, " Intitled An Act for preventing Dangers which may happen from Popish Recusants; " and authorized the governor in person, or by officers to be appointed by him in that behalf, to administer the same oaths to any person in the province, and to administer said declaration unto such persons belonging to the courts as should be obliged to take the same. Prov. Laws 1771, p. 7. The phrase, " succession of the crown in the Heirs of the late Princess Sophia being Protestants," occurs five times in the commission; the title of the test act occurs once; and the " declaration " required by that act occurs four times. The governor served under this commission until the beginning of the revolution in 1775. The charter of Dartmouth college (1769) required all officers " appointed for the publick instruction and government of said College," to take the oath to maintain the succession of the crown in the heirs of Sophia " being Protestants." A constitution proposed in 1779, containing the Protestant test,—4 N. H. Hist. Coll. 157,—was rejected by the people not because of any objection to the test.

Among those who voted for the constitution with its Protestant test, in 1783, were many former members of the provincial legislature and others, including probably nearly all the leading men of the day, who had necessarily taken the abjuration of the supremacy of the pope, the oath to maintain the Protestant succession, and the declaration

against transubstantiation. And although their provincial official oaths terminated with provincial office, they approved of the purpose and spirit of those oaths, and continued to carry them into governmental action. They no longer maintained the succession of the crown in the heirs of Sophia " being Protestants ;" but they maintain the succession of a Protestant elective government by legal language with which their colonial experience had made them familiar. In that language the word " Protestants," and various words signifying " Roman Catholics," had always been so associated that the dividing line was equally well indicated by either form of expression. When the former was employed as a term of limitation, it excluded no other persons than those designated by any word descriptive of the latter. The provincial Protestant test retained by the people of New Hampshire in their state government was one under some form of which they and their fathers had lived, here and in the old country, since the accession of Elizabeth ; they transcribed an old customary term, which, by long use in all branches of the government, had acquired the fixed and definite legal signification of an anti-Catholic test and no other ; they followed the form of the act of parliament establishing the succession of the British throne, which many of them had sworn officially to maintain in the heirs of Sophia " being Protestants." That limitation was universally understood, in England and America, to be as purely an anti-Catholic test, as the oath of supremacy, or the declaration against transubstantiation.

The Protestant test of 1868 is the Protestant test of 1783. The Protestant test of 1783 is an historical fact, to be determined by historical evidence, of which the court takes judicial notice. The historical fact is, that the religion of Protestants, as a legal test, is the religion of non-Catholics.

The meaning of a constitutional or statutory provision is often shown by the nature of the danger which was apprehended, and against which the legal barrier was supposed to be necessary. 1 N. H. 272; 17 N. H. 63 ; 22 N. H. 468, 471 ; 44 N. H. 374; 45 N. H. 220, 221 ; 46 N. H. 124; 14 Ohio St. 80, 87; 4 Wheat. 629; Cooley Const. Lim. 65 ; *Lyde* v. *Barnard*, 1 M. & W. 101, 114 ; *Miller* v. *Salomons*, 7 W. H. & G. 475, 522. "The mischiefs intended to be remedied are the rule whereby acts of parliament are to be expounded." *Roper* v. *Radcliffe*, 9 Mod. 204 ; Co. Lit. 381, *b*.

When, by the act of 1777, which recited that "the public enemy" "threatened an invasion of this state," the committee of safety were authorized to arrest and imprison " any Person whom the said Committee of Safety shall deem the Safety of the Common Wealth requires should be restrained of his personal Liberty, or whose enlargement within this state is dangerous thereto," the persons to be restrained of their liberty were designated by the general purpose of the law, shown by the history of the time ; from which it appears that " the public enemy" was Great Britain, and that the dangerous persons to be taken into

custody were tories, and not persons infected with heresy or contagious disease, whose enlargement within the state might be a public danger greater than toryism. The statute, interpreted as it should be by the supposed necessities of public safety upon which it was known to be founded, would authorize the seizure and detention of those only whose confinement would tend to avert, not moral, theological, or pestilential danger, but the particular kind of political mischief which the statute was designed to suppress. And if the committee of safety had arrested and imprisoned an advocate of deism, Unitarianism, or some anti-scriptural science, on the ground of his being a dangerous person propagating an infidelity that would put many souls in peril of perdition and expose the state to divine wrath, they would have been liable in trespass for assault and battery. Their action would have been authorized by the letter, but not by the meaning and legal construction of the statute. So the supposed danger against which the Protestant tests of England and America were erected was not deism, nor theism, nor any form of unbelief, or denial of any system of non-Catholic Christian theology, but Catholicism alone,—and Catholicism, not as a system of theology, but as an alleged system of political principles, in which the fidelity of the citizen to the state was believed by non-Catholics to be subordinated to the supremacy of the pope in all secular affairs,—a system supposed to include a papal power of deposing all princes, overturning all governments, discharging Catholics from their civil allegiance, combining them in the support of arbitrary power, inspiring them with a malignant, murderous, and implacable enmity towards every Protestant nation, and holding them in a constant conspiracy against the peace and liberty of every Protestant community in which they lived. It is not the duty of courts, in their official capacity, to express or entertain the opinion that this view of Catholicism was true, or that it was false; but the fact that this was the Protestant view is a matter of history, very material in this case. It is our duty to search for the reason that induced the people of New Hampshire, in 1783, to retain the Protestant test in their constitution; and very little investigation is needed to ascertain that the hereditary design of the test was to exclude Catholics and no others. Catholic and Protestant nations have changed or are changing their faith and their practice in regard to tests; but the Protestant test of New Hampshire is to be read in the light of the last century, as a proscriptive custom transmitted from earlier times, produced and perpetuated by a particular historical motive in which there is no trace of theology.

"As to papists, what has been said of the Protestant dissenters would hold equally strong for a general toleration of them, provided their separation was founded only upon difference of opinion in religion, and their principles did not also extend to a subversion of civil government. If once they could be brought to renounce the supremacy of the pope, they might quietly enjoy their seven sacraments, their purgatory and auricular confession, their worship of relics and images, nay, even their transubstantiation; but, while they acknowledge a foreign

power superior to the sovereignty of the kingdom, they cannot complain if the laws of that kingdom will not treat them upon the footing of good subjects." 4 Bl. Com. 55. After a short summary of the penal laws against Catholics, Blackstone adds,—" They are rather to be accounted for from their history and the urgency of the times which produced them, than to be approved (upon a cool review) as a standing system of law. The restless machinations of the Jesuits during the reign of Elizabeth, the turbulence and uneasiness of the papists under the new religious establishment, and the boldness of their hopes and wishes for the succession of the Queen of Scots, obliged the parliament to counteract so dangerous a spirit by laws of a great and then perhaps necessary severity. The powder treason in the succeeding reign struck a panic into James I. * * The intrigues of Queen Henrietta, in the reign of Charles I, the prospect of a popish successor in that of Charles II, the assassination plot in the reign of King William, and the avowed claim of a popish pretender to the crown in that and subsequent reigns, will account for the extension of these penalties at those several periods of our history. But, if a time shall ever arrive, and perhaps it is not very distant, when all fears of a pretender shall have vanished, and the power and influence of the pope shall become feeble, ridiculous, and despicable, not only in England but in every country of Europe, it probably would not then be amiss to review and soften these rigorous edicts,—at least till the *civil* principles of the Roman Catholics called again upon the legislature to renew them. * * This hath partly been done by statute, 18 Geo. III, c. 60, with regard to such papists as duly take the oath therein prescribed of allegiance to his majesty, abjuration of the pretender, renunciation of the pope's civil power, and abhorrence of the doctrines of destroying and not keeping faith with heretics, and deposing or murdering princes excommunicated by authority of the see of Rome." *Id.* 57, 58.

In 1781, ERSKINE spoke of the restrictions imposed upon the Roman Catholic religion as " imposed not because our ancestors took upon them to pronounce that faith to be offensive to God, but because it was incompatible with good faith to man,—being utterly inconsistent with allegiance to a Protestant government, from their oaths and obligations to which it gave them not only a release, but a crown of glory, as the reward of their treachery and treason." *King* v. *Gordon*, 21 How. St. Tr. 596. In 1810, Lord ELDON, in the House of Lords, said that " the enactments against the Catholics were meant to guard not against the abstract opinions of their religion, but against the political dangers of a faith which acknowledged a foreign supremacy." 1 Twiss's Life of Eldon 435, 483, 501, 577–580 ; 9 Camp. Ld. Ch. 305. And the parliamentary debates on Catholic emancipation, during the many years that measure was in agitation, substantiate ELDON'S statement of the ground on which Protestant tests and all anti-Catholic legislation were based. In 1819, Lord Grey " introduced a bill to do away with the declaration against transubstantiation, so that Roman Catholic peers might sit in parliament, as they had done from the reformation till the latter part of the

reign of Charles II. But the Lord Chancellor (ELDON) opposed the principle of the measure as most dangerous. He said that ' the law of Charles II had been reënacted in the first parliament of William III, the founder of our civil and religious liberties. It had been thought necessary for the preservation of these that papists should not be allowed to sit in parliament, and some test was therefore necessary by which it might be ascertained whether a man was a papist or a Protestant. The only possible test for such a purpose was an oath declaratory of religious belief; and, as Dr. Paley had observed, it was perfectly just to have a religious test of a political creed. He entreated the House not to commit the crime against posterity of transmitting to them, in an impaired and insecure state, the civil and religious liberties of England.' " 9 Camp. Lives Ld. Ch. 388. The Protestant test, formerly " thought necessary for the preservation of" " the civil and religious liberties " of non-Catholic states " against the political dangers " " of a political creed," cannot be legally used for religious persecution and the destruction of the liberties it was intended to preserve.

In 1821, Mr. Canning, in the House of Commons, said,—" Undoubtedly, if we look back to the times preceding the reformation, we should find that no class of society was then precluded from the political service of the state. The distinction grew up with the reformation—a transaction affecting the whole of Europe, and the policy external and internal of every state composing the European commonwealth ; which changed the line of demarcation between nations, and separated each people among themselves. A Protestant and a Catholic interest grew up, which divided and classed the nations of Europe ; and within each nation took place a correspondent division and classification ; which had the double effect of arraying different parts of the same community against each other, and creating in each part respectively a sympathy with foreign states. Similarity of creed was brought into competition with identity of country ; and in many instances     *     *     it could not be denied the religious sentiment was too strong for the patriotic.     *     *     He therefore did not contend     *     *     that, at the period immediately subsequent to the reformation, those who continued attached to the church and court of Rome     *     *     might not be justifiably excluded from political power.     *     *     But he did contend for the fact that whatever disqualification was then imposed on the Roman Catholics by the governing power was justified on the ground of danger from foreign interference, foreign connection, and foreign alliance ; and that, without one exception, that danger was stated as constituting the sole necessity for such disqualification." And he urged that, as that danger had ceased, the disqualification ought to cease. 4 Canning's Speeches 289–291. In another speech in the same year, he asserted that it had always been made ground of charge against Catholics that their connection with a foreign power was political as well as spiritual ; that they " entertained a political predilection, or acknowledged the obligation of political obedience toward a foreign power. That

foreign power in the earliest times of the reformation was the pope, then formidable in temporal as well as in spiritual preponderance, and arrogating supremacy over the temporal concerns of princes, which those who admitted could be but imperfect in their allegiance to their lawful sovereigns. In later times, an exiled family  *   *  became the rival of the reigning dynasty of England.  *   *  Concurring in the religion of the exiled family, the Roman Catholic subjects of the British crown were held also to be devoted to their political claims. The Roman Catholic was presumed to be essentially a traitor.  *   *   It was devised to detect him by the oath of transubstantiation." *Id.* 274, 275, 395.

Bishop Burnet, one of the most mild and tolerant men of his time, declared that it was certain that "all papists must at all times be ill subjects to a Protestant prince." 3 Burnet's Hist. Own Times 253.

The disloyalty of Catholics under a non-Catholic government was pointedly asserted in the English declaration of rights, which was recited and ratified in the act of settlement, 1 W. & M., sess. 2, c. 2, and which contained a list of wrongs charged upon James II, and a corresponding list of rights formally declared. One of the alleged wrongs was, "causing severall good Subjects, being Protestants, to be disarmed, at the same time when Papists were both Armed and Imployed contrary to law;" and the corresponding right asserted was, "that the Subjects which are Protestants may have Arms for their Defence." The law violated by allowing Catholics to be armed was (3 Jac. I, c. 5) entitled "An Acte to prevent and avoid dangers which may grow by Popish Recusants," which provided for depriving "Popish Recusants" of armor, gunpowder, and munition. By 1 W. & M., c. 15, entitled "An Act for the better securing the Government by disarming Papists and reputed Papists," no person refusing to make the declaration against transubstantiation was allowed to have "any Arms, Weapons, Gunpowder, or Ammunition." The difference on this subject between the bill of rights and these statutes was, that the former was the guaranty of a right to the anti-Catholic party, and the latter were denials of the same right to the Catholic party. And the alleged cause of this distinction between the two parties was frequently recited in the anti-Catholic legislation imposing oaths, tests, disabilities, and penalties. The preamble of 3 Jac. I, c. 4, was, "that many of his Majesties Subjects that adhere in their Hearts to the Popish Religion, by the infection drawne from thence and by the wicked and devilishe councell of" priests, "are soe farre perverted in the pointe of theire Loyalties and due Allegiance unto the King's Majestie and the Crowne of England, as they are readie to entertain and execute any treasonable Conspiracies and Practices." There were Protestant dissenters whose religion was not tolerated; but they were not disarmed, because they were not accused of being "perverted in the pointe of theire Loyalties" "by the infection drawne from" their religion, or "by the wicked and devilishe councell of" their priests; because they were no more suspected of being eager to engage in insurrection or to aid invasion than

the most zealous members of the established church; because they could be relied upon to use their arms against the hostile movements which the Catholics were believed to be constantly plotting.

In *Rex* v. *Guy Fawkes & a.,* 2 How. St. Tr. 159, 171, 174, 179, Lord COKE, then attorney-general, opening the case for the crown, said,— "The principal offenders are the seducing Jesuits;" "their studies and practices principally consist in two *dd's,* to wit, in deposing of kings and disposing of kingdoms;" and, after quoting Catholic writers on the subject, he continued,—" Their conclusion therefore is, that for heresy   *   *   a prince is to be deposed and his kingdom bestowed by the pope at pleasure, and that the people, upon pain of damnation, are to take part with him whom the pope shall so constitute over them." Upon the anti-Catholic laws of Elizabeth, he commented thus : " Concerning the execution of these laws, it is to be observed likewise, that whereas in   *   *   the five years of Queen Mary there were cruelly put to death about three hundred persons for religion,—in all her majesty's time, by the space of forty-four years and upwards, there were, for treasonable practices, executed, in all, not thirty priests, nor above five receivers and harborers of them; and for religion not any one." And the same common opinions of those times were repeated by him in *Rex* v. *Garnet,* 2 How. St. Tr. 217, 219–238.   Garnet, in his examination before the privy council upon his participation in the gunpowder plot, was first questioned by Lord SALISBURY, whose "interrogatories were about the authority of the pope," and who said,—" You see, Mr. Garnet, we deal not with you in matters of religion." "The political consequences of this transaction (the gunpowder plot) were important and permanent.   It fixed the timid and wavering mind of the king in his adherence to the Protestant party in opposition to the Roman Catholics; and the universal horror, which was naturally excited not only in England but throughout Europe by so barbarous an attempt, was artfully converted into an engine for the suppression of the Roman Catholic church; so that the ministers of James I, having procured the reluctant acquiescence of the king and the cordial assent of public opinion, were enabled to continue in full force the severe laws previously passed against papists, and to enact others of no less rigor and injustice.   Even after the lapse of more than two centuries, the excitement of the public mind on this subject, stimulated as it has been from time to time by the occurrence of other plots real and pretended, has not wholly subsided; and in our own times, during the frequent discussions respecting the propriety of relieving Roman Catholics from civil disabilities, the gunpowder plot was repeatedly referred to as a practical proof that the doctrines of the Roman Catholic religion were inconsistent with the safety of a Protestant government." Jardine's Narrative of the Gunpowder Plot 2, 3, 193.

In *Rex* v. *Busby,* 8 How. St. Tr. 525, 529, counsel for the crown stated, in opening the case,—" The prisoner is indicted upon a statute made in the 27th Eliz., which makes it treason for any subject born to take orders from the see of Rome, and afterwards to remain in Eng-

land ; which law I conceive was not only made for the security of the government, but also in favor of the lay papists themselves ; for, though several statutes were made to keep them within the bounds of their allegiance and to secure the government from their villanous designs, yet it was experimentally found true that no dangers or penalties whatsoever could deter or hinder them from plotting against the state in order to bring us back to the slavery of Rome, whilst those juggling managers of their consciences were suffered to come amongst us." In a letter on the penal laws against the Irish Catholics, Burke says " that no Catholick, even in the ferocious Acts of Queen Anne, was disabled from voting on account of his religion. The only conditions required for that privilege were the oaths of allegiance and abjuration—both oaths relative to a civil concern." 3 Burke's Works 435 (1st Am. ed.).

The Catholic historian Lingard, narrating that in 1570 the pope issued a bull pronouncing Queen Elizabeth guilty of heresy, depriving her of the crown and absolving her subjects from their allegiance, states that Felton, who was executed for affixing a copy of the bull to the gate of the Bishop of London, " suffered the death of a traitor, glorying in the deed, and proclaiming himself a martyr to the papal supremacy." 8 Lingard Hist. Eng. 47, 48. Lingard further says, in reference to a number of Catholic priests condemned in 1581, that the hesitation of six of them " to deny the deposing power (a power then indeed maintained by the greater number of divines in Catholic kingdoms) rendered their loyalty very problematical in case of an attempt to enforce the bull by any foreign power." *Id.* 114.

In 1788, the Catholics having sought some relaxation of the laws, and a committee of Catholics waiting upon the prime minister of England he desired from them some authentic evidence that the dangerous political tenets imputed to them were not then held by the Catholic church ; and, at his request, the following questions were sent to and answered by six of the principal Catholic universities of Europe :

" 1. Has the pope, or cardinals, or any body of men, or any individual of the church of Rome, any civil authority, power, jurisdiction, or preëminence whatever within the realm of England ?

" 2. Can the pope, or cardinals, or any body of men, or any individual of the Church of Rome, absolve, or dispense with, his majesty's subjects from their oaths of allegiance on any pretence whatever?

" 3. Is there any principle in the tenets of the Catholic faith by which Catholics are justified in not keeping faith with heretics or other persons differing with them in religious opinions in any transaction either of a public or a private nature ? "

The negative answers unanimously given are immaterial in this case ; but the necessity of presenting and answering such questions, to satisfy Protestants, indicates the object of Protestant tests. Eight years after the adoption of our constitution, the Catholics of Ireland obtained, from the authority of the pope, a written disclaimer of the alleged political principles for which they had suffered more than two hundred years, and against which Protestant tests were intended to guard.

In 1813, De Witt Clinton, as mayor of New York, delivering the opinion of the court of general sessions, in *People* v. *Bradley & a.,* said,—" The apprehensions which have been entertained of this [the Catholic] religion have reference to the supremacy and dispensing power attributed to the bishop of Rome as head of the Catholic church." The Catholic Question in America 112, and App. cxiii, cxvii. That such apprehensions arose from supposed allegiance to the pope, and related to secular and not to spiritual affairs, is sufficiently shown by the fact that, while Unitarian Protestants of unquestioned loyalty were condemned by the ecclesiastical courts of the Church of England, and burned as heretics, Catholic priests were tried by the civil tribunals, and hanged and quartered as traitors.

It is true that in various countries the feebler sects have often felt sure that those were unmitigated religious persecutions which were alleged by the ruling parties to be mere necessary defences of the state. But it is probable that such allegations have generally been made in perfect sincerity. There certainly have been times when the general rule was that Protestants were not peaceable subjects of Catholic governments, and when Catholics were not peaceable subjects of Protestant governments. Whether, in any instance, disloyalty was produced by persecution, or persecution by disloyalty, is a matter not involved in the present inquiry. It could not be expected that a Catholic would be an obedient and trusty subject of Elizabeth, or James I, or that a Protestant would be faithful to Philip II. But the people of New Hampshire, in 1783, retained the ancient Protestant test, not upon general philosophical speculation, but upon the current anti-Catholic opinion of that time and place,—an opinion entertained by them and their ancestors for more than two hundred years. Whether that opinion was at any time or at all times erroneous, is in this case immaterial. In the duty of interpretation, we cannot overrule the well-known historic object of the test, which was not to attach disqualifications to any theological belief, but to incapacitate the supposed disloyalty of those who acknowledged the supremacy of the sovereign pontiff. Bl. Com., Am. ed. 1773, App. 97, note, 113; 4 Reeves English Law 445; *Cranmer's case,* 1 How. St. Tr. 772, 798, 824; *Queen* v. *Campion,* 1 *id.* 1062, 1063; *Queen* v. *Parry,* 1 *id.* 1095; *King* v. *Green & a.,* 7 *id.* 218, 219, 224, 225, 258; *King* v. *Whitebread,* 7 *id.* 322, 412, 413; *King* v. *Langhorn,* 7 *id.* 489, 502, 504, 520, 548, 563, 567; *King* v. *Wakeman,* 7 *id.* 679; *King* v. *Ld. Geo. Gordon,* 21 *id.* 596–598, 645, 646; *King* v. *Crossfield,* 26 *id.* 99; *Troy* v. *Symonds,* 29 *id.* 504, 506, 513, 539–542, 545; *De Themmines* v. *De Bonneval,* 5 Russ. 288; *Case of the University of Oxford,* 10 Rep. 53, 56; *Case of St. Mary's Church,* 7 S. & R. 536, 552, 553; 1 Hallam Const. Hist. Eng. 64, 134, 135, 147, 152–154, 162–166; 3 *id.* 179; 2 May Const. Hist. Eng. 293, 294; Echard Hist. Eng. 662; 1 Hume Hist. Eng. 295, 318, 321, 412–419; 2 *id.* 271, 272; 3 *id.* 135; 4 *id.* 205, 216, 217; 1 Macaulay Hist. Eng. 57, 58, 216, 223; 2 *id.* 6, 8, 10, 21, 22, 434; 2 Froude's Hist. Eng. 321; 10 *id.* 60, 253, 403, 410; 1 Martineau Hist. Eng. 375, 393; 1 Motley Hist. U. Neth.

27, 130 ; 2 *id.* 290, 399 ; 6 Alison Hist. 379 ; Locke's First Letter on Toleration ; Macaulay's Essays 69, 304 ; Sydney Smith's Essays 366, 367 ; Baird's Religion in Am. 543 ; Draper's Int. D. Europe 338, 339, 446 ; 3 Canning's Speeches 307, 309, 312, 318, 331 ; 1 Guizot Hist. Civilization 123, 124 ; 3 *id.* 140, 141 ; 10 Works of John Adams 398.

Designed to secure civil loyalty and civil allegiance to the state, and to exclude nothing but the alleged civil loyalty and civil allegiance of Catholics to the foreign papal power, the test is a purely political and civil measure.   It never had any theological or spiritual significance or purpose.   By general consent, it has now become obsolete and nugatory as to Catholics, whom alone it was intended to disable.   To revive it against them, in its genuine character, for the purposes of loyalty and allegiance, as a security formerly supposed to be necessary in incessant contests with the papal power, would, in this age, be extraordinary ; to revive it, not against them, but for the oppression of a different class, against whom it was never designed to operate,—not resuscitating it as the political test it was during the period of its vitality, but remodelling it into a theological test and engine of religious persecution, and bringing it to life in that unconstitutional form—that is something freemen are not taught patiently to endure.

The true rule of construction was followed by the King's Bench in *Foone* v. *Blount,* Cowp. 464, where the question was, " whether a creditor who is a papist is entitled to receive his debt out of the money which has arisen by sale of the testatrix' real estate, according to the appointment of her will."   For the plaintiff, it was argued that the will conveyed no interest in real estate to the creditors, and that " the creditors, Roman Catholics or Protestants," should be paid.   For the defendant, it was argued that the law " in terms excluded Roman Catholics from any possible interest or profit arising out of land." Lord MANSFIELD, delivering the opinion of the court in 1776, said,— " The statutes against papists were thought, when they passed, necessary to the safety of the state.   *    *    But from the nature of these laws, they are not to be carried by inference beyond what the political reasons which gave rise to them require.   The political object the legislature had in view was to take off from the Roman Catholics that weight and influence which is naturally connected with landed property beyond what personal estate can give."   And it was held that the Catholic creditors should be paid because such payment was not prohibited by the political reasons and policy of the law.   And the same rule of construction being applied in the present case, the defendant Abbott is not disabled, by the political reasons and policy of the Protestant test, to be a public teacher of an incorporated parish.   Theism is not one of the mischiefs intended to be remedied by the test.   " By the infection drawne from " that faith, he cannot be classed with those who, at the date of the constitution and for two centuries before, were regarded by non-Catholics as inevitably " perverted in the pointe of theire Loyalties " to a non-Catholic government.   The nature of the danger which the test was intended to avert shows that Abbott is a

Protestant in the meaning of the constitution. The historic reasons of state, upon which the disqualification was founded, demonstrate the religion of Protestants, as a legal test, to be the religion of non-Catholics.

The common law, so far as it is adapted to our institutions and circumstances, and not repugnant to the rights and liberties contained in the constitution, remains in force until altered and repealed by the legislature. Constitution of N. H., Part II, art. 90; *Lisbon* v. *Lyman,* 49 N. H. 582. If religious inequality, operating in any way to the disadvantage of deists or theists, had been a rule of the common law, it would not be in force here, because it would be inconsistent with free institutions. But it is not a rule of the common law. In that system of jurisprudence there is nothing that gives Trinitarians or Unitarians, on account of the legal superiority of their religion, any advantage over a deist or theist in a court of justice. By the common law adopted in the constitution, or the constitution interpreted by common law analogies, Abbott is not disabled.

Christianity, in the sense of a system of theology miraculously revealed, and distinguished from natural religion, is not the basis nor any part of the common law. "Reason is the life of the law; nay, the common law itself is nothing else but reason; which is to be understood of an artificial perfection of reason, gotten by long study, observation, and experience, and not of every man's natural reason.   *   *   This legal reason *est summa ratio.*" The common law "is the perfection of reason." Co. Lit. 97, *b.* "Nothing is law that is not reason." *Coggs* v. *Bernard,* Ld. Raym. 909, 911. And whatever may be the definition of legal reason, it certainly does not include miraculous revelation. What is true in law, and what is substantial and essential in legal principle, the court are authorized to decide. But, as was said in *The Dublin case,* 38 N. H. 510, 563, "what is theologically true in religion it is agreed on all hands that the court are not competent to decide; nor have they power to determine what is really and intrinsically substantial and essential in matters of doctrine." *Burr* v. *First Parish in Sandwich,* 9 Mass. 298; *Field* v. *Field,* 9 Wend. 401; *Miller* v. *Gable,* 2 Denio 517. The court are authorized to determine all the principles of the common law in force in this state; the court are not authorized to determine a single principle of Christianity; therefore, in contemplation of law, the principles of Christianity are no part of the principles of the common law. If Christianity were in any sense, theoretically or practically, a part of the common law of New Hampshire, it would be the right and duty of this court to decide what Christianity is, and to enforce it as law, and as other laws are enforced, by the whole power of the state placed in our hands for the purpose. That would be law, which a majority of the court (if a majority could agree on the subject) should hold to be "theologically true in religion." At one time Trinitarianism would be law; at another, Unitarianism; to-day, Methodism; to-morrow, Catholicism. If the court should go back to 1783 for a standard, they must choose between Quakerism, Calvin-

ism, Universalism, and other religions. If they resorted to the earliest technically Christian period of the common law, they would adopt ancient Catholicism with the scientific doctrines of the theology of that age. Whatever theological law, permanent or fluctuating, were established, it would be enforced by the court, not only upon Mr. Abbott, but upon the whole population of the state; for the common law is uniform in its operation, and exempts no privileged classes. Without adopting a system of theology as law, Mr. Abbott could not be persecuted at common law: nothing but his theology is complained of as unlawful.

The profession and dissemination of all theological doctrines are equally lawful at common law. The sensibilities, feelings, and opinions of the community are protected from malicious outrages calculated to excite disorder and breaches of the peace;—blasphemy, a malicious attack upon the common religion of the country, is an outrage of that kind;—a weekly rest is deemed expedient, and the privilege of undisturbed worship is secured on the day set apart for the purpose by the prevailing religion. But it cannot be argued that a particular system of theology is established as law, by a mere effort to preserve peace and order through police regulations adapted to the actual condition of the people by whom that theology is, in fact, generally accepted. " The duty (of observing the Sabbath) arises solely from our relations to God, and not from our relations to man. Now, our duties to God are never to be placed within the control of human legislation. If the civil magistrate has a right to take cognizance of this duty to God, he has a right to take cognizance of every other. And if he has a right to take cognizance of the duty, he has a right to prescribe in what manner it shall be discharged ; or, if he see fit, to forbid the observance of it altogether. The concession of this right would, therefore, lead to direct interference with liberty of conscience. 　*　　* It is, however, the duty of the civil magistrate to protect every individual in the undisturbed right of worshipping God as he pleases. This protection every individual has a right to claim, and society is under obligation to extend it. And, also, as this is a leisure day, and is liable to various abuses, the magistrate has a right to prevent any modes of gratification which would tend to disturb the peace of society. This right is acknowledged in regulations respecting other days of leisure or rejoicing ; and there can be no reason why it should not be exercised in respect to the Sabbath." Wayland's Moral Science 190, 191 (11th ed.).

It is an indictable offence at common law maliciously to disturb a grave, because it is an outrage upon prevalent ideas of decency, and because it is calculated to produce a breach of the peace ; but no one would think of claiming that therefore the popular theory in regard to corporeal resurrection is established as law, or as any more lawful than any other theory on that subject. The term " malice," which expresses the gist of blasphemy, murder, and some other offences, is a familiar, technical, legal term of settled and definite meaning, well understood by the legal profession. In blasphemy, it imports an ill-bred and

malevolent disposition to cause annoyance, irritation, and such an injury to the feelings, by gross and indecent insult and indignity, as is a ground of damages in civil suits. It is lawful to controvert any theological system, to advocate or refute any theological opinion. The law of blasphemy does not limit the religious freedom of speaking, writing, and printing within the bounds of the true faith; it does not presume to know where those bounds are, or what the true faith is; but it considers mental and moral as well as physical sensibilities entitled to some protection against wanton assault and malicious mischief, and therefore it requires that attacks made upon certain popular sentiments, as to which the community is peculiarly sensitive, should be conducted with some limitations of good faith *(bonæ fidei,* not *veræ fidei),* and not for the mere malicious purpose of inflicting pain. In the case of seditious libel, *Rex* v. *Burdett,* 4 B. & Ald. 95, 131, 132, it was held that the question was, " whether the paper contained a sober address to the reason of mankind, or whether it was an appeal to their passions, calculated to incite them to acts of violence and outrage ;" " that every man ought to be permitted to instruct his fellow subjects ; that every man may fearlessly advance any new doctrines, provided he does so with proper respect to the religion and government of the country." And malice, in this technical, legal sense, is a fact to be found by the jury upon the evidence, and not a matter of law to be found by the court. Emlyn's Preface to How., St. Tr., pp. xxx, xxxi. The English courts have invaded the province of the jury at this point, as well as at other points; but this court has signified that it is not engaged in that invasion ; the practice and decisions by which the English courts substantially abolished the common law in relation to criminal malice are errors which have here been rectified. *State* v. *Bartlett,* 43 N. H. 224, 230–234.

" It never was a crime, at the common law, seriously and conscientiously to discuss theological and religious topics." *Updegraph* v. *Com.,* 11 S. & R. 394, 403. The court, in that case, affirm " that no author or printer, who fairly and conscientiously promulgates the opinions with whose truths he *is impressed for the benefit of others, is* answerable as a criminal ; that a malicious and mischievous intention is, in such a case, the broad boundary between right and wrong ; and that it is to be collected from the offensive levity, scurrilous and opprobrious language, and other circumstances, whether the act of the party was malicious ; " that " no man ever suffered at common law for any heresy ; " that " no preference is given by law to any particular religious persuasion ; protection is given to all by our laws ; it is only the malicious reviler of Christianity who is punished ; " and that " if, from a regard to decency and the good order of society, profane swearing, breach of the Sabbath, and blasphemy are punishable by civil magistrates, these are not punished as sins or offences against God." Bishop Warburton's Alliance, Book I, ch. 4, pp. 33, 34, 4th ed. In *People* v. *Ruggles,* 8 Johns. 290, 294, 295, it was held, Ch. J. KENT delivering the opinion, that " The free, equal, and undisturbed

enjoyment of religious opinion, whatever it may be, and free and decent discussions on any religious subject, is granted and secured; but to revile, with malicious and blasphemous contempt, the religion professed by almost the whole community, is an abuse of that right," and " a gross violation of decency and good order." In the New York constitutional convention of 1821, Mr. Root asserted that, in *People* v. *Ruggles*, " it had been declared that Christianity was a part of the law of the land." But KENT, who was a member of the convention, replied that Mr. Root " had not stated correctly the decision of the supreme court which he arraigned. The court had never declared or adjudged that Christianity was a religion established by law. They had only decided that to revile the author of Christianity in a blasphemous manner, and with a malicious intent," was indictable as an outrage upon public decency and decorum, tending to disturb the peace,—" not because Christianity was established by law, but because Christianity was in fact the religion of this country. * * The court never intended to interfere with any religious creeds or sects, or with religious discussions." Martin Van Buren expressed the opinion that the Christian religion was not a part of the law of the land; and KENT said that Mr. Van Buren " had given what he thought the just exposition of the case of the *People* v. *Ruggles*, in VIIIth Johnson's Reports. He never intended to declare Christianity the legal religion of the state, because that would be considering Christianity as the established religion, and make it a civil or political institution. The constitution had declared that there was to be no discrimination or preference in religious profession or worship. But Christianity was, *in fact*, the religion of the people of this state, and that fact was the principle of the decision. * * The legislature had repeatedly recognized the Christian religion, not as the religion of the country established by law, but as being in truth the actual religion of the people of this state." " The Bible itself had never been established as constituting a portion of our laws. * * A person could not be arraigned for expressing the most skeptical opinions, provided it was done in a decent manner." Debates of N. Y. Convention of 1821, pp. 462, 463, 574, 575, 576.

In Massachusetts, where the common-law offence of blasphemy was prohibited by statute, it was held, in *Com.* v. *Kneeland*, 20 Pick. 206, 220, 221, that " the word ' wilfully,' in the ordinary sense in which it is used in statutes, means not merely ' voluntarily,' but with a bad purpose. * * It does not prohibit the fullest inquiry and the freest discussion for all honest and fair purposes. * * Understanding the statute against blasphemy as we do, and as we have already explained it, that it is not intended to prevent or restrain the formation of any opinions or the profession of any religious sentiments whatever, but to restrain and punish acts which have a tendency to disturb the public peace, it is not repugnant to, but entirely consistent with," the constitutional guaranty of religious freedom. The same views are expressed in *State* v. *Chandler*, 2 Harring. 553, where it is said that every one who outrages decency so far as to incite others to a breach of the

peace, is indictable at common law. In these cases, legal, technical malice is held to be as much the gist of blasphemy, as it is the gist of murder; and it is settled by these and other authorities that Christianity is no part of the common law of this country. *Bloom* v. *Richards*, 2 Ohio St. 387; *McGatrick* v. *Wasson*, 4 Ohio St. 566; *Specht* v. *Com.*, 8 Barr. 312; *Lindenmuller* v. *People*, 3 Barb. 548; *Williams* v. *Williams*, 4 Seld. 526, 553; Cooley Const. Lim. 467–474; Stephens Criminal Law 90.

" The maxim, that Christianity is part and parcel of the common law, has been frequently repeated by judges and text writers, but few have chosen to examine its truth or attempt to explain its meaning. We have, however, the high authority of Lord MANSFIELD, and of his successor, the present chief justice of the Queen's Bench, Lord CAMPBELL,—Campbell's Lives of Chief Justices, vol. 2, p. 513,—for stating, as its true and only sense, that the law will not permit the essential truths of revealed religion to be ridiculed and reviled. In other words, blasphemy is an indictable offence at common law. The truth of the maxim, in this very partial and limited sense, may be admitted. But if we attempt to extend its application, we shall find ourselves obliged to confess that it is unmeaning or untrue. If Christianity is a municipal law, in the proper sense of the term, as it must be if a part of the common law, every person is liable to be punished by the civil power, who refuses to embrace its doctrines and follow its precepts; and if it must be conceded that in this sense the maxim is untrue, it ceases to be intelligible, since a law without a sanction is an absurdity in logic and a nullity in fact." *Andrew* v. *N. Y. B. & P. B. Society*, 4 Sandf. 156.

Webster's argument in *Vidal* v. *Girard's Executors*,—2 How. U. S. 127; 6 Webster's Works 133,—was a powerful appeal in behalf of the Christian ministry and religious education; but, as a legal argument in support of the proposition that Christianity is part of the law of the land, it was not successful. Judge STORY, delivering the opinion of the court sustaining the provision of Girard's will, which was contested on religious grounds, used the following language: " It is also said, and truly, that the Christian religion is a part of the common law of Pennsylvania. But this proposition is to be received with its appropriate qualifications, and in connection with the bill of rights of that state,    *    *    ' all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences: no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience; and no preference shall ever be given by law to any religious establishments or modes of worship.' Language more comprehensive for the complete protection of every variety of religious opinion could scarcely be used; and it must have been intended to extend equally to all sects, whether they believed in Christianity or not, and whether they were Jews or infidels. So that we are compelled to

admit that, although Christianity be a part of the common law of the state, yet it is so in this qualified sense, that its divine origin and truth are admitted, and therefore it is not to be maliciously and openly reviled and blasphemed against, to the annoyance of believers or the injury of the public. Such was the doctrine of the supreme court of Pennsylvania in *Updegraph* v. *The Commonwealth*, 11 Serg. & Rawle 394."

In this case, Judge STORY endeavored to follow the practice (of the United States courts) of adopting the construction of state law, as settled by state courts. And, in *Updegraph* v. *The Com.*, the judge delivering the opinion of the Pennsylvania court had said that " Christianity, general Christianity, is, and always has been, a part of the common law of Pennsylvania ; Christianity, without the spiritual artillery of European countries ;　*　*　not Christianity founded on any particular religious tenets ; not Christianity with an established church, and tithes, and spiritual courts, but Christianity with liberty of conscience to all men." But it was in substance decided in *Updegraph* v. *The Com.*, that Christianity is the law of Pennsylvania only in the sense explained by Chancellor KENT, that the law, for the purpose of preserving the public peace, prohibits malicious assaults upon the common sentiments of the people, including the religious opinions and feelings in fact generally entertained by them. And, to say that Christianity, in that sense, is law,—general Christianity, undefined and undefinable, without spiritual artillery, and not founded on any particular religious tenets,—is either to use language in a figurative and transcendental sense, useless for any practical purpose but mystification and deception, or to use it in no sense and for no purpose. Judge STORY, with a deferential use of the language of the state court, gave the explanation that it was to be understood only in the qualified sense that the divine origin and truth of Christianity being in fact generally admitted by the people, the public sentiment on that subject should not be maliciously assailed. This explanation was furnished by the decision in *Updegraph* v. *The Com.*, and it divested of all legal meaning the phrase that Christianity is law.

The propriety of that phrase was vigorously maintained at the trial of Abner Kneeland, by District-Attorney PARKER, who examined the authorities, and controverted Jefferson's view of the subject. Pamphlet Report of the Arguments in that case 49–51, 64–76 ; 4 Jefferson's Works 397 (vol. 6, pp. 303, 304, 311–319, ed. of 1861) ; Am. Jurist, Apr. 1833, p. 346 ; *Cowan* v. *Milbourn*, Law Rep., 2 Ex. 230 ; 2 Bishop Cr. Law, secs. 87–94.

The phrase has been used by the most eminent jurists of England. BLACKSTONE, quoting the words of Lord HALE, stated that blasphemy is punishable at common law, "for Christianity is part of the laws of England." 4 Bl. Com. 59 ; *King* v. *Taylor*, 3 Keb. 607 ; Vent. 293. But he had previously demonstrated, in the same chapter, that the law is without any technically Christian foundation. " Human laws can have no concern with any but social and relative duties, being intended only to regulate the conduct of man, considered under various relations, as a member of civil society. All crimes ought therefore to be esti-

mated merely according to the mischiefs which they produce in civil society; and, of consequence, private vices, or breach of mere absolute duties which man is bound to perform considered only as an individual, are not, cannot be, the object of any municipal law any further than as, by their evil example or other pernicious effects, they may prejudice the community, and thereby become a species of public crimes. * * The vice of lying, which consists (abstractedly taken) in a criminal violation of truth, and therefore, in any shape, is derogatory from sound morality, is not, however, taken notice of by our law unless it carries with it some public inconvenience, as spreading false news; or some social injury, as slander and malicious prosecution, for which a private recompense is given. And yet drunkenness and malevolent lying are *in foro conscientiæ* as thoroughly criminal when they are not, as when they are, attended with public inconvenience." 4 Bl. Com. 41. BLACKSTONE does not mean that Christianity is part of a system of common law, which, except in a few specified instances, takes no notice of malevolent lying; for such a statement, under the English practice of presuming malice, would be blasphemy. But, in view of a sectarian Christianity established by statute as the national religion, with a creed, and spiritual artillery, and temporal power; and the statute, which made it a crime for any person, educated in or having made profession of the Christian religion, to deny the Christian religion to be true, or the Holy Scriptures to be of divine authority, or to deny any one of the persons of the Holy Trinity to be God, or to maintain that there are more Gods than one,—4 Bl. Com. 44, 49,—there was a certain propriety in the remark that Christianity was part of the laws of England. For the purpose of persecuting men for their theology, it was a part of English statutes; but for the purpose of promoting common veracity, it was no part of the common law.

It is not strange that Lord HALE considered Christianity, in some sense, to be a part of the laws of England; for he left on record the following opinion: "I think that at common law, and so at this day, * * if the diocesan convicts a man of heresy, and, either upon his refusal to abjure or upon a relapse, decree him to be delivered over to the secular power, and this be signified under the seal of the ordinary into the chancery, the king might, thereupon, by special warrant, command a writ *de hæretico comburendo* to issue." 1 Hale P. C. 392, 405, 709; 4 Bl. Com. 97; 1 Neal's Hist. Puritans 102. If this opinion of Lord HALE is correct,—if at common law a bishop can, in this manner, send heretics to the flames,—there is no doubt that Christianity, defined as the Christianity of a bishop, is a part, and a very material part, of the common law. Such a system of ecclesiastical jurisprudence might operate as a considerable check upon the independence of courts of law, and affect the legal value of their decisions on ecclesiastical topics; but any judge, entertaining Lord HALE's opinion of the supremacy of a sectarian church, would conclude with him that the religion of that church is law, without regard to the consequences of announcing the opposite conclusion.

Although Lord HALE's opinion of Episcopal supremacy at common law was erroneous (20 Pick. 235), it points out the origin of the remark that Christianity is part of the laws of England. Catholicism was the law of various countries when it burned Protestants; Calvinism was the law of Geneva when Calvin was personally responsible for the burning of the Unitarian Servetus; Episcopalianism was the law of England when it burned Unitarians and Baptists; puritanism was the law of Massachusetts when Williams and Wheelwright were banished. Quakers were hung, and Quaker women were scourged through the streets of this town of Dover, under a Massachusetts law. When church and state are one, the Christianity of any sect established as the religion of the state is, to some extent, the law of the land; and, so far as other sects agree with the governing party, their faith is law. The maxim, that Christianity is part of the laws of England, is a relic of the time when the clergy ruled England; when ambassadors, judges, and chief ministers of state were ecclesiastics. It is the acknowledgment of a state religion; and it is immaterial whether the religion was originally established by statute or by a perversion of the common law under a sacerdotal domination practically absolute. In either case the maxim is not common law.

The laws of England are partly of pagan, partly of Jewish origin (4 Bl. Com. 409, 410); and it is not the general understanding in England or in this country that the founder of Christianity promulgated a scheme of civil government or municipal law. The common law takes cognizance of some overt acts, words, and conduct, but not of mere intent, desire, motive, or principle, not carried or threatened to be carried into action. And the operation of the law is not thus restricted by lack of proof; for if, in a civil or criminal case of any description at common law, the defendant confesses the possession of all mental and moral depravity, no judgment can be rendered thereon. As BLACKSTONE states, there is no general rule of law requiring men to be truthful. To be a common scold is an indictable offence; to be a common liar is not. Of the untruths provable by legal evidence, not one in a thousand can be visited by any legal reprehension. Even falsehood under oath is not punished, except in peculiar circumstances. Perjury is, only in a judicial proceeding, under a competent jurisdiction, and concerning a matter material to the question pending. And compulsory veracity in relation to the future is equally exceptional, and is materially circumscribed by the statutes of frauds and limitations. In what sense could Christianity be a part of a system of law, in which a promise without a legal consideration is void, and a moral consideration is not a legal one? "A contract without a consideration is ＊ ＊ not binding in law, though it may be in point of conscience." 2 Kent Com. 463; *Lang* v. *Johnson*, 24 N. H. 302, 307. And many promises, sustained by a consideration and by common honesty, are not enforced in law. A fortune, made by breaking a promise to restore or to pay for property acquired under some circumstances, may be retained without any legal censure whatever. There are cases of fraud, of accident,

and of trust, which neither courts of law nor of equity presume to relieve or mitigate." 1 Story Eq., secs. 61, 308. "Human laws are not so perfect as the dictates of conscience; and the sphere of morality is more enlarged than the limits of civil jurisdiction. There are many duties that belong to the class of imperfect obligations which are binding on conscience, but which human laws do not and cannot undertake directly to enforce." 2 Kent Com. 490; 1 Parsons Contracts 429, 434; 2 *id.* (5th ed.) 767–769; *Fox* v. *Mackreth*, 2 Bro. C. C. 400, 420; *Harrison* v. *Bush*, 5 E. & B. 344, 349. At common law, "the relief of the poor is not a legal obligation." "There are many precepts of the gospel which the law of England does not enforce as obligations. It is the duty of every man to 'honor his father and mother,' but the law of England has no method to compel such honor." *Steel* v. *Houghton*, 1 H. Bl. 51, 52, 62. "When some one remarked, 'Christianity is part and parcel of the law of the land,' Rolfe said to me, 'were you ever employed to draw an indictment against a man for not loving his neighbor as himself?'" 1 Henry Crabb Robinson's Diary 353, Am. ed., 1869. The common law makes a distinction between moral and legal obligation; does not compel the performance of such duties as charity, hospitality, kindness, humility, forbearance, mercy, and gratitude; and requires but a limited practice of veracity and honesty. And to say that Christianity is a part of such a system, is to say that miraculous revelation and inspiration are no part of Christianity, and to reproach the prevailing religion in an opprobrious manner, by reducing it to a fragment of natural religion, the legal rationalism of Lord COKE, and a very imperfect code of morality. When courts shall instruct juries that the golden rule is the preëminent rule of law on which verdicts are to be rendered; when legal decisions shall be avowedly based upon the Sermon on the Mount, or any of the precepts of the Christian revelation, there will begin to be some ground for the assertion that Christianity is a part of the law of the land. Until that shall be done, or until church and state shall be united, the assertion will continue to be a sounding and deceitful phrase,—a mere rhetorical expression, unintelligible in law and untrue in fact.

And it is no disparagement of the law to say that miraculously revealed Christianity is not a part of it, as it is no depreciation of a physical science or a mechanical art to say that miraculous revelation is no part of it. Every institution, art, and science is not ordained for the accomplishment of all the purposes of creation: some are assigned to one work, some to another; if each is equal to its office, it is sufficient. The common law is not designed to be either a civil agency of the church, or an ecclesiastical institution of the state. It does not claim either a divine or a human authority to propagate or patronize any system of theology, to enforce or interpret the divine law, or to control or regulate the relations between mankind and the supreme government of the universe. "An orange-woman stops up the pavement with her wheelbarrow, and a policeman takes her into custody. A miser who has amassed a million, suffers an old friend and benefactor to die

in a workhouse, and cannot be questioned before any tribunal for his baseness and ingratitude. Is this because legislators think the orange-woman's conduct worse than the miser's? Not at all. It is because the stopping up of the pathway is one of the evils against which it is the business of the public authorities to protect society; and heartlessness is not one of those evils." Macaulay's Essay on Church and State, Ed. Rev., Apr. 1839. Upon views of this kind, it was stipulated in the treaty with Tripoli, in 1796, that, "as the government of the United States is not in any sense founded on the Christian religion," no pretext arising from religious opinions should ever interrupt the harmony existing between the two countries. And such are the views taken by the common law, which, unperverted by the union of church and state, is adopted in the constitution of New Hampshire, and which, by its principles and analogies, supports the general doctrine of religious equality, and requires the construction of the Protestant test that disables no man for his theology.

All parts of the constitution relating to religion unite in demanding this construction of the test. "Toleration," said Chief Justice SMITH, "came to be considered a duty. With us it is exploded, for it implies an establishment which we have not. Here the doctrine of toleration has given place to the most perfect equality of rights." *Muzzy* v. *Wilkins*, p. 107; *Bloom* v. *Richards*, 2 Ohio St. 387; Cooley Const. Lim. 467, 469. The constitution does not establish one religion as orthodox, and tolerate another as heretical; but its guaranties of equality of religious rights are promulgated with much more particularity and emphasis than the guaranties of other rights,—so anxious were the framers of that instrument to guard against the possibility of mistake, and the strained legal constructions which the fraudulent spirit of intolerance had employed in former times. Under this constitution, an undertaking by one class of men, in ignorance or defiance of law, to tolerate the religion of another class, is a dangerous usurpation. The power of toleration is to be resisted because it is the unconstitutional power of persecution.

### THE CONSTITUTION OF NEW HAMPSHIRE.

#### PART FIRST.

##### BILL OF RIGHTS.

ARTICLE I. All men are born equally free and independent; therefore all government of right originates from the people, is founded in consent, and instituted for the general good.

ART. II. All men have certain natural, essential, and inherent rights,—among which are the enjoying and defending life and liberty, acquiring, possessing, and protecting property, and, in a word, of seeking and obtaining happiness.

ART. III. When men enter into a state of society, they surrender up some of their natural rights to that society, in order to insure the

protection of others; and without such an equivalent the surrender is void.

ART. IV. Among the natural rights, some are in their very nature unalienable, because no equivalent can be given or received for them. Of this kind are the RIGHTS OF CONSCIENCE.

ART. V. Every individual has a natural and unalienable right to worship God according to the dictates of his own conscience and reason; and no subject shall be hurt, molested, or restrained in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession, sentiments, or persuasion, provided he doth not disturb the public peace, or disturb others in their religious worship.

ART. VI. As morality and piety rightly grounded on evangelical principles will give the best and greatest security to government, and will lay in the hearts of men the strongest obligations to due subjection; and as the knowledge of these is most likely to be propagated through a society by the institution of the public worship of the DEITY, and of public instruction in morality and religion;—therefore, to promote those important purposes, the people of this state have a right to empower and do hereby fully empower the legislature to authorize, from time to time, the several towns, parishes, bodies corporate, or religious societies within this state to make adequate provision at their own expense for the support and maintenance of public Protestant teachers of piety, religion, and morality.

*Provided notwithstanding,* That the several towns, parishes, bodies corporate, or religious societies, shall at all times have the exclusive right of electing their own public teachers, and of contracting with them for their support and maintenance. And no person of any one particular religious sect or denomination shall ever be compelled to pay toward the support of the teacher or teachers of another persuasion, sect, or denomination.

And every denomination of christians, demeaning themselves quietly and as good subjects of the state, shall be equally under the protection of the law; and no subordination of any one sect or denomination to another shall ever be established by law.

The equality of freedom at birth, declared in Article I, is not limited to any particular religion, and the continuance of this equality is sedulously maintained throughout the constitution, except so far as the supposed allegiance of Catholics was regarded as inconsistent with the loyalty, obedience, and civil duties of citizenship. Article IV declares that the rights of conscience are unalienable and not surrendered to the government.

Article V guarantees to every individual the " natural and unalienable right to worship God according to the dictates of his own conscience and reason,"—not according to the Bible, nor according to the precepts of any particular faith,—and to entertain any sentiments on the subject of religion. " The object of this clause was to protect all,

the Mohammedan and the Brahmin, the Jew and the Christian, of every diversity of religious opinion, in the unrestrained liberty of worship and religious profession, provided the public peace should not thereby be endangered, nor the worship of others obstructed." *Donahoe* v. *Richards*, 38 Me. 380, 403, 410. " Its object was, to secure the utmost possible latitude of toleration for every species of religious sentiment, and for the avowal or profession of every species of religious opinion." *Com.* v. *Kneeland*, 20 Pick. 206, 221. That part of the article which relates to freedom of worship " embraces all who believe in the existence of God, as well Jews, Mohammedans, and deists, as Christians of every denomination ; " and that part which relates to freedom of religious sentiment, " clearly protects every citizen not only in *adopting* but in *professing* whatever tenets he may think right ; and necessarily includes the right of *advocating* and *disseminating* them. * * It has been suggested that this provision does not extend to atheists, because they do not believe in God or religion ; and therefore that their sentiments and professions, whatever they may be, cannot be called *religious* sentiments and professions. But this, in my opinion, is too narrow a construction. * * Both the spirit and the language of this provision include within its protecting power *all* sentiments and professions *concerning* or *upon the subject* of religion ; and guarantees to every one a perfect right to form or to promulgate such opinions and doctrine upon *religious* matters, and *in relation* to the existence, power, and providence of a Supreme Being, as to himself shall seem just." MORTON, J., in *Com.* v. *Kneeland*, 20 Pick. 206, 233, 234. If in that case there had been occasion to investigate the Protestant test in our constitution, which did not establish a religion " to the support of which *all* were to be holden to contribute, and upon the ministrations of which *all* were to be compelled to attend,"—a constitution under which Abner Kneeland had been a parochial Protestant minister and a Protestant member of the legislature, instead of being imprisoned for blasphemy as he was in Massachusetts,—it would seem that there could have been no difficulty in ascertaining how the test, as originally understood and intended, was, in the general judgment of the Protestant world of 1783, consistent with guaranties of religious equality.

Even if this equality had been confined to worship, it could not be destroyed by interpolating, in Article V, any sectarian ideas of the Deity. Trinitarians who acknowledge, and Unitarians who deny, the Deity of Christ, cannot, in precise and critical theological language, be said to worship the same God ; but their religious equality before the law is not disputed. The Supreme Being, worshipped by Catholics and Protestants in general, was worshipped by the Jews many ages before the theological systems of Catholicism and Protestantism were introduced into the world ; and there has been a greater change in the prevalent ideas of New England Protestants in regard to the attributes of the Deity, in a century, than among the Jews for thousands of years. And if the court should assume to put a stop to that innovation, they would usurp the spiritual jurisdiction of the extinct inquisitions of the

ancient Catholic, Episcopalian, and Calvinistic churches, and there would be an end of the religious liberty so solemnly and amply guaranteed.

The guaranty of religious freedom and equality in Article V accords with Article XXXVIII, which declares that "a constant adherence to justice, moderation, temperance, industry, frugality, and all the social virtues, are indispensably necessary to preserve the blessings of liberty and good government;" and with Article LXXXIII, Part II, of the constitution, which makes it "the duty of the legislators and magistrates" "to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and economy, honesty and punctuality, sincerity, sobriety, and all social affections and generous sentiments among the people." In these passages, the noticeable absence of all allusion to miraculous revelation, or any particular form of theology, could not have been accidental.

The name of the Deity in Article V has the same meaning as the same word in Article LXXXIV of Part II of the constitution, which prescribes the form of official oaths with the clause "So help me God;" and that meaning is furnished by the oaths of witnesses at common law, which require a sense of accountability to the Supreme, a belief in a divine government that punishes falsehood. At common law, oaths are administered to witnesses of every religion of which such belief is a part, and in any form considered obligatory to the witness. Atheism (supposing it to be a possible faith) is the only religion that excludes a witness; and the exclusion is not a punishment of atheism. *Chase* v. *Blodgett*, 10 N. H. 22, 29. A deist, a theist, or a pagan, is as competent as a Catholic, a Lutheran, or a puritan. 1 Gr. Ev., secs. 368–371; *Rex* v. *Bosworth*, Stra. 1112; Com. Dig., Quaker; *King* v. *Morgan*, 1 Leach C. C. 54; *Mildrone's case, id.* 412; *King* v. *White, id.* 430; *King* v. *Taylor*, Peake 11; *Mee* v. *Reid, id.* 23; *Cooper* v. *Bisbee*, 4 N. H. 329, 336; *Maden* v. *Catanach*, 7 H. & N. 360; *Reg.* v. *Entrehman*, Car. & M. 248; *Reg.* v. *Serva*, 2 C. & K. 53, 56; 1 Smith's Ldg. C. 195; Arch. N. P. 25; 2 Saund. Pl. & Ev. 1274; 1 Phil. Ev. 14–22; 1 Stark. Ev. 93; 3 Bl. Com. 449; Burn's Justice, Oaths, 537; Cooley Const. Lim. 478; 6 Camp. Ld. Chanc. 199–201; 9 *id.* 55; Webster's Argument in the Girard Will Case, 6 Webster's Works 168. The theory that morality and piety accompany an intellectual assent to the correctness of certain theological dogmas, and that immorality and impiety are a consequence or incident of the non-acceptance of a particular creed, has prevailed, in various parts of the earth, among different tribes more or less civilized; but it is not the theory of the common law or the constitution of New Hampshire. Long before our state constitution was written, it had been settled by the highest legal authorities that the notion of a man's rejection of Christian theology destroyed his sense of moral obligation (including the moral duty of veracity), and rendered it unsafe to receive his testimony, was never a principle of the common law. And the common law, which authorizes and requires a witness to pledge himself to testify under a sense of responsibility to the infinite power which he acknowledges, recognizes his

religion as lawful. He cannot, in law, be said to deny God, who, in law, is allowed and compelled to testify because he believes in God. And freedom of religious profession, sentiment, and persuasion being as plainly established as freedom of worship, an atheist can no more be hurt, molested, or restrained, than a pagan, a theist, a Unitarian, or a Trinitarian. By the express terms of Article V, religious equality has no other limits than the disturbance of the public peace and the infringement of rights necessary to the enjoyment of that equality. The anti-Catholic test was, in the minds of the men who constructed and adopted the constitution, a protection against a certain supposed foreign political allegiance, and not a theological discrimination. To their apprehension there was no incongruity in the constitution; and it is not for us to interpolate discrepancies in behalf of religious inequality, which is religious persecution.

The sole object of Article VI is to obtain " the best and greatest security to government," and the " strongest obligations to due subjection," and not to provide for the spiritual welfare of the people. The careful selection of phraseology by which all oversight and charge of the religious interests of individuals was omitted as being not a legitimate function of government, and by which loyal subjection to the government was asserted as the object of the article, establishes its meaning too plainly to admit of doubt or cavil. And the use of the word " Protestant " was, in the non-Catholic view of 1783, in perfect harmony with, and specially designed to carry out, that object; for it is as certain that the loyalty and obedience of Catholics were commonly distrusted by non-Catholic governments, as that Catholics generally in Catholic countries gave to Protestants neither office nor religious equality. The public teacher of an incorporated parish, as we have seen, holds a civil office,—as purely civil, in contemplation of law, as the office of selectman or president of a railroad. And if it should be held that by Article VI the Protestant test was imposed upon such a public teacher, it must also be held that it was imposed only to prevent the dissemination of sentiments inconsistent with perfect allegiance to the state, for the sole purpose of securing loyalty and subjection to the government, according to the express terms of the article, and not for the purpose of persecuting men for their theology. If the test, now so odious that it has become obsolete, is to be revived at all, it cannot disable any class whose allegiance was not discredited in 1783; and the class to which Jefferson, Franklin, Ethan Allen, and Gov. Plumer belonged, although regarded by many as entertaining the worst theological opinions, were not esteemed less loyal than any other class of men. It would be contrary to legal rudiments to extend the test beyond the class of cases which were within the mischief the test was intended to remedy.

" Evangelical " was formerly synonymous with " Protestant," both being used indiscriminately as a mere designation of the anti-Catholic party. 5 D'Aubigne Hist. Ref. 426, 431, 497; 1 Marsden Hist. Churches 144, 145; 3 Hume Hist. Eng. 370; Adler's German Dict.,

5th ed., 186; 1 Laveaux French Dict., 2d ed., 782. .In the con-
stitutional convention of 1850, that was said to be the meaning of
"evangelical" in Article VI. The word is now used, for ecclesiastical
purposes, by orthodox denominations, to distinguish themselves from
Unitarians, Universalists, and others. And if it is taken with the
ecclesiastical ·signification which it has in nine tenths of the churches
of the country, and if, with that signification, it modifies the Protes-
tant test, and if the test, with that modification, is applied to the office
of parochial public teacher, the decree in this case should prohibit
Unitarian preaching instead of .prohibiting all preaching except Unita-
rian. It would be our duty, upon proper application, to silence the
pulpit of every incorporated Unitarian and Universalist parish in the
state; and Unitarians and Universalists would be disqualified for the of-
fices of governor, councillor, senator, and representative. In Dr. Baird's
classification, the unevangelical denominations were Catholics, Unita-
rians, Christian Connection, Universalists, Swedenborgians, Tunkers,
Jews, Rappists, Shakers, Mormons, atheists, deists, socialists, and Four-
rierists ; and spiritualists are now added to the same category. But
religious equality is asserted in the · constitution so explicitly, strenu-
ously, and repeatedly, and with such great variety and intensity of
expression, that it cannot be overborne by a word that has been used,
in common with "Protestant," as a simple designation of the anti-
Catholic party. And the. structure of Article VI tends strongly to show
that "evangelical" is there used merely to describe principles opposed to
Catholicism. The word occurs only in the preamble, and "Protestant"
occurs only in the enacting clause; whereas the idea of the preamble
and the enacting clause is the same, and is expressly declared to be
the security of the government, and the subjection,—that is, the alle-
giance and obedience,—of the people to the government, with which
Catholicism was, and infidelity was not, supposed to be inconsistent.
At all events, whatever the word separated from the context might mean,
even if it were literally irreconcilable with the guaranty of religious
equality, that guaranty is set forth with such superabundant fulness,
such an exhibition of profound earnestness, and radical, uncompromis-
ing purpose, that it would not be doubtful which must be held sub-
ordinate to the other. We must read the constitution with the
emphasis clearly indicated in its composition.

In a nation in which any form of religion is substantially uni-
versal or unopposed, the name of that religion naturally becomes, in
common usage, synonymous with religion in general; and " Christian-
ity " is frequently used in this sense. " I believe with Justin Martyr,"
said John Adams, " that all good men are Christians, and I believe
there have been and are good men in all nations." 10 Works of John
Adams 390, 45. " Christianity was at first regarded as embracing so
wide a range, that Justin did not hesitate (Ap. 1, c. 46) to consider
Socrates, and all those who had lived up to the light of reason, as
Christians." Hase Hist. Christianity 74. One of the definitions of
" Christian " in Worcester's Dictionary is, " In the most general sense,

an inhabitant of Christendom." "In *a general sense*, the word *Christians* includes all who are born in a Christian country or of Christian parents." Webster's Dictionary. The word "Protestants," as sometimes used, includes none who are not Christians in this or some other sense. In this general sense Abbott is included, as well as in the legal, non-Catholic sense of the Protestant test.

"What a lamentable case it is to see so many Christian men and women strangled on that cursed tree of the gallows, insomuch as if, in a large field, a man might see together all the Christians that but in one year in England come to that untimely and ignominious death, if there were any spark of grace or charity in him, it would make his heart to bleed for pity and compassion." 3 Inst. 243. In the Plymouth colony it was a capital crime for "any Christian (so called)" to "be a Witch;" it was a crime for "any Christian so called" to "speak contemptuously of the Holy Scriptures;" and it was provided, "if any Christian so called shall, within this jurisdiction, go about to subvert or destroy the Christian Faith or Religion, by broaching or maintaining any * * dangerous Error or Heresie * * tending to corrupt and destroy the souls of men," he "shall be fined, banished, or otherwise severely punished." Plymouth Laws, p. 244, sec. 8; p. 247, sec. 11; p. 248, sec. 12. In Massachusetts, it was enacted, in 1646, that, "if any Christian within this jurisdiction shall go about to subvert and destroy the Christian faith and religion, by broaching and maintaining any damnable heresies," he "shall be sentenced to banishment;" in 1652, it was made a crime for any person, "professing the Christian religion, above the age of sixteen years," to deny any of the books of the Old or New Testament "to be the written and infallible word of God;" and there was a special penalty for any negro or mulatto who should "presume to smite or strike any person of the English or other Christian nation." Ancient Charters Mass. 120, 748. The New Hampshire code of 1680 retained the Massachusetts statute, that, "If any Christian soe called be a witch, that is, hath or consulteth with a familiar spirit, he or they shall be put to death." 8 N. H. Hist. Coll. 11. If Mr. Abbott, with his present religion, had lived under that law, and had been accused of witchcraft, he would not have escaped on the plea of not being a Christian.

In 1684, the sending of Indian allies by the governor of New York to aid in suppressing "a sudden rising intended by the Indians in these eastern parts" was called "a work of piety and charity for preventing the effusion of christian blood." *Id.* 252. In 1714, it was stated in the preamble of an act copied from a Massachusetts statute, that "the over great number and increase" of "Indians and other slaves" "is a discouragement to the importation of white christian servants." Laws 1771, p. 53. In 1718, an act was passed restraining "inhuman severities" toward "christian servants," and making it a capital offence to kill an "*indian* or *negro* servant." *Id.* 101. Who some of the "christian servants" were is shown by the act of 1701, which provided that persons convicted of larceny might be disposed of "in service." *Id.*

16, 17, 61, 62. If Abbott had, been in that service, and had been ill-treated by his master, he would not have been deprived of the protection of the law on the ground that he was not a Christian servant.

Narrow, technical definitions of Christianity abound. in sectarian controversies, and in the history of united church and state, at levels of civilization lower than that of New Hampshire in 1783. Eleven years before the settlement of New Hampshire, Bartholomew Legatt and Edward Wightman were burned in England for being guilty of that Unitarianism which the decree in this case undertakes to perpetuate. The writs *de hæretico comburendo* issued in their cases are given. in 2 How. St. Tr. 731–738. The writ for burning Legatt, directed to the sheriffs of London, contained a preamble, reciting, among other things, that " the reverend father in Christ, John, bishop of London," had certified that " in a certain business of heretical pravity," " with the advice and consent as well of the reverend bishops and other divines as also of men learned in the law in judgment sitting and assisting," he had decreed Legatt " to be an obdurate, contumacious, and incorrigible heretic, and rotten, contagious member, to be cut off from the church of Christ and the communion of the faithful," and had left him " as a blasphemous heretic to our secular power to be punished with condign punishment, as by the letters patent of the said reverend father in Christ, the bishop of London, in this behalf thereupon made, is certified unto us in our chancery." The mandatory clause of the writ runs thus : " We command you that you cause the said Bartholomew Legatt, being in your custody, to be publicly committed to the fire, before the people, in a public and open place, at West Smithfield, for the cause aforesaid, and the said Bartholomew Legatt to be really consumed in the said fire, in detestation of said crime, and for an example to other Christians lest they fall into the same crime." Concerning the execution of Legatt, an orthodox historian writes,—" In this very Smithfield how many saints, in the Marian days, suffered for the testimony of Jesus Christ ! Whereas, now one therein dieth in his own blood for denying him. * * Refusing all mercy, he was burned to ashes. * * Oh, that he might be the last to deserve " such manner of death. 2 How. St. Tr. 730. It is not by sectarian precedents and ecclesiastical authorities of this kind that the language of the constitution is to be interpreted.

*Butts* v. *Penny*, 2 Lev. 201, " was an action of trover brought for negroes ; and it was found by a special verdict, that the negroes were *infidel, and the subjects of an infidel prince*, and were usually bought and sold in the plantations as merchandise, by the custom of merchants, &c. The court seemed to hold that negroes, being usually bought and sold as merchandise, *and also being infidels*, there might be a property in them sufficient to maintain trover. But it was adjourned, and it does not appear that any judgment was ever given. In this, and some subsequent cases, the infidelity of negroes was considered as a ground of property in them. There have been times, indeed, when it

was holden, to the disgrace of human nature, not only by *Mahometans*, but by those who professed to be Christians, that the whole race of infidels might rightfully be reduced, by fire and sword, to the dominion of the faithful. Those were not times in which the rights of men would be respected or understood. By a progress in improvement, more just and enlightened opinions have been entertained. The spirit of bigotry dictated that heathens were unworthy of all confidence and belief, and hence they were excluded from testifying in a court of justice. The bitterness of that spirit cannot, perhaps, be more strongly shown, than by repeating what it induced so great and good a man as Sir EDWARD COKE to express in *Calvin's case*, 7 Rep. 17, that 'All infidels are in law perpetual enemies; for between them, as with the devils whose subjects they be, and the Christian, there is perpetual hostility, and can be no peace. * * And herewith agreeth the book in 12 H. 8, fol. 4, where it is holden that a pagan cannot have or maintain any action at all.' But these principles have since, by repeated decisions and constant practice, been exploded; and they are gone, I hope, forever, with the bigotry from which they originated. Chief Justice WILLES, speaking of the foregoing opinion of Lord COKE, thus with great justness expresses himself: ' But this notion, though advanced by so great a man, is, I think, contrary, not only to the Scripture, but to common sense and common humanity; and I think that even the devils themselves, whose subjects he says the heathens are, cannot have worse principles.'" Judge SEDGWICK's opinion in *Greenwood* v. *Curtis*, 6 Mass. 358, 366, *n.* These exploded principles were not held by those only who were Christians in a theogical sense: they were also held by those who were Christians only in an ethnological sense.

"Perhaps no name in the English language has been more improperly applied than that of *Christian*. In its original application, it designated persons who were born from above ; *now* it is applied to all born in a nation of this world called a Christian land. * * It is given to many merely because they have been baptized in the name of Christ. They have had his name called over them by a minister, and, as if there was some charm or incantation in the mere sound of the name, they are called Christians. If baptism makes men Christians, it is evident there are many Christian drunkards, and Christian swearers, and Christian liars, and Christians who practise every kind of iniquity. * * If these are Christians, the difference between heathenism and Christianity does not consist in any change of heart and life, but in being washed with water. * * Others are called Christians, because they are descended from religious parents. * * No man can go to hell by substitute, nor can he find admittance to heaven by the Christianity of others. * * Every true Christian is born again. * * To have any title to the name, it is absolutely necessary to have the character of a Christian. * * Many are called by this name because they can talk about the doctrines of Christ. The religion of Jesus to such seems to be a matter of mere speculation ; for, while the most orthodox doctrine flows from their lips, their hearts seem unimpressed

with its importance, and their lives at variance with it. * * Is an orthodox creed all that is necessary to constitute a Christian? Or do any imagine that God has given us his word, to see * * how orthodoxly we shall speculate, and how wickedly we shall live? * * Some receive the appellation Christian, because they are what is called *morally decent* in their conduct among men. ·Without true morality, no man can be a Christian; but *mere morality* is not Christianity. Many of the sages of antiquity were what is called *moral men*, yet were ignorant of Christ and his revelation. * * Others are called by the name Christian, because it is supposed they have been converted. Without conversion to God, no man is a Christian. * * But in this we are liable to deception. If the animal passions have been moved, alarm of conscience experienced, and some sudden feeling of joy produced in the mind, these are considered by many true conversion. All these have been produced in many, to a very extreme degree, who continue ignorant of Christ, and walk after the course of the world. The passions may be moved, the conscience alarmed, and the mind made joyful, from a variety of causes unconnected with the gospel of Christ. The peculiar tone, the bodily gesticulation, and furious declamation of a preacher have produced these things in a whole congregation; while the understanding has not been addressed, nor the gospel preached. Sympathy may produce tender feelings, mere dread of present or eternal danger may excite alarm of conscience, and joy may be produced in the mind, not from the hope revealed in the gospel, but from the hope that we are better people. * * How many, in giving an account of their conversion, seem to think that feelings are all that is necessary to prove it genuine. * ·* Many, moreover, receive the name Christian because they are members of some Christian church. Such ought to be Christians, not in name only, but also in deed and truth. But, alas! whilst their names are on the list of the living in Jerusalem, they still continue in the congregation of the dead. * * They are to be found at meeting to-day, and at the play-house to-morrow; at the Lord's table on the first day of the week, and at the card table the other six. * * Will a name and a place here among the saints prove a covert from the tempest and a refuge from the storm, in the terrible day of the Lord? No. Jesus will gather out of his kingdom all things that offend and those that do iniquity, and cast them into the lake of fire and brimstone, which is the second death." ' The Panoplist (N. S.), vol. 1, p. 11.

Such is the general doctrine of the Christian church,—a man is not a Christian without orthodox theology, Christian character and life, sound theoretical, practical morality, regeneration, and salvation secured by grace through faith in the crucifixion as a propitiatory sacrifice. But it is not pretended that the constitution or the law provides any process or tribunal for the determination of all these points. No one imagines that the word "Christians" is used in the constitution in this technical, ecclesiastical sense. In what sense is it used? It does not mean sound theology; for, as this court has declared, "it is agreed

on all hands" that the court is not authorized to decide what sound theology is. *The Dublin case*, 38 N. H. 510. As it does not mean all the doctrines of sound theology, it does not mean any one of them: the court has no more power to decide upon the soundness of one, than it has to decide upon the soundness of all,—no more power to decide what the true doctrine of the Messiahship is, or that it was a doctrine taught by Christ, than to decide what any other true doctrine is, or to settle all the doctrines taught by him. If it means character, life, and morals, it is admitted on all hands that Abbott is a Christian, and that the decree is wrong. It does not mean sound morality. It is admitted on all hands that, in the elections of parochial public teachers, the court has not a veto power to be exercised when the moral characters of the persons elected do not meet the approbation of the court; that the court cannot reverse the decision of the electors by removing from parochial, executive, or legislative Protestant office an infamous person elected by the competent authority; and that the court cannot forbid parishes " to allow, suffer, or permit" any person to preach in their meeting-houses, who, in the opinion of the court, is not morally sound. And as the word " Christians," in the constitution does not mean the theology or the moral principles and practice of Christ, so it does not mean the belief that those principles were unknown in the world before they were announced by him. The decision in this case is, that a man who calls himself a Christian, and assents to the truth of the Christian religion as taught in the New Testament as he understands it (whether he understands it rightly the court cannot determine), is a Christian. If he conforms to that definition, his Christianity is *res adjudicata,* although in theology he is a deist who believes Christ was a deist; although in practical morals he is totally depraved; and although he agrees with Buckle when he says,—" That the system of morals propounded in the New Testament contained no maxim which had not been previously enunciated, and that some of the most beautiful passages in the apostolic writings are quotations from pagan authors, is well known to every scholar; and, so far from supplying, as some suppose, an objection against Christianity, it is a strong recommendation of it, as indicating the intimate relation between the doctrines of Christ and the moral sympathics of mankind in different ages. But to assert that Christianity communicated to man moral truths previously unknown, argues, on the part of the assertor, either gross ignorance or else wilful fraud." 1 Buckle's Hist. Civ. Eng. 129, *n.* 14, Am. ed. 1861. Christianity, as a system of theology and morals, stripped of theological and moral soundness, and of the Christian origin of Christian ethics,—does the constitution establish such Christianity as that for an ecclesiastical purpose?

There is no way to condemn Abbott but by the device of nominal Christianity. What kind of religion is that? It is not Christianity, and therefore it is something spurned by the whole Christian church. It is not that religion, because it is nominal, and because it must be something the court can authoritatively define, declare, and establish.

It is nominal, that is, theoretical, unsubstantial, of no consequence. Unitarian Christianity is to be maintained, and infidelity put down, by something immaterial. This immaterial, Christian nominalism, by which Abbott is condemned, is not what a man is, nor what the court think he is, but what he chooses to say he is. For simplicity, facility, and convenience, it is unsurpassed. It is a man's election of himself into the popular party by calling himself a Christian, and professing to believe what he professes to believe the religion of Christ was. It is an easy method for one, ambitious of such martyrdom as the civilization of the age allows, to gain that distinction by indulging a verbal crochet.

For all the purposes of this case, the religions of Jefferson and Abbott are undistinguishable, except in name. This is Jefferson's religion: Jesus " endeavored to bring " the Jews " to the principles of a pure deism." " To the corruptions of Christianity I am indeed opposed; but not to the genuine precepts of Jesus himself. I am a Christian, in the only sense in which he wished any one to be." 4 Jefferson's Works 422, 479, ed. 1861. Abbott's religion, as set forth in the sermon complained of by the plaintiffs as containing the sum and substance of his heresy (preached upon the text, Luke ix, 49, 50, And John answered and said, Master, we saw one casting out devils in thy name, and we forbade him, because he followeth not with us. And Jesus said unto him, Forbid him not: for he that is not against us is for us) is this: " How shall we define Christianity ? * * Let us briefly compare what *Jesus himself* seems to have taught, and what *his disciples* have taught in his name. If I have truly caught the spirit of his teachings, Jesus taught nothing essentially different from pure theism. That faith in the Divine, which is the soul of theism, he rendered more intense and vital by the marvellous way in which he himself lived it; and he gave it more definite directions upwards to God and outwards to man,—but no new truth that can be stated in words can be traced to his lips. All his great sayings of ethical or spiritual importance can be paralleled in other ancient authors. The career of Jesus seems to me to derive all its power over the souls of men, all its influence over the course of history and the progress of civilization, from the one fact that he put pure theism into an individual life, and that this life tends perpetually to put theism into the life of humanity. Love to God and to man is the epitome of his instruction, and this is simply faith in the Divine in its twofold aspect. Hence I deem it right to say that Jesus was himself not a Christian, but a simple theist; and that simple theism is the entire burden of his life and doctrine. Quite otherwise is it, when we come to his disciples. The same narrow spirit which made John prohibit the stranger from casting out devils (whatever that may be), unless he would accept the yoke of discipleship, has ever since, despite the reproof of Jesus himself, appeared and ruled in the Christian church. * * I claim to be neither a Unitarian nor a Christian, but simply a theist. The convictions I have expressed to you the past three years have not changed

except to strengthen and intensify. Jesus I believe to have been a theist, and Christianity I believe to be a perversion of theism. In resigning the names Unitarian and Christian, I do so with full knowledge of the grave, practical consequences that must ensue; but, wishing ever to be docile to the teachings of life, this step seems to me the plain lesson of recent circumstances. Outside of Christianity must my protest against error and sin henceforth be heard; but not outside of religion,—not, I trust, outside of spiritual fidelity,—not, I believe in my soul, outside of God. Face to face with him at every step, let us toil faithfully on."

Jefferson, a deist, believing that Christ was a deist, calls himself a deist and a Christian, using those words as synonymous, and not in the sense of that Christianity which he regards as "the corruptions" of the deism of Christ. Abbott, a theist, believing that Christ was a theist, and not a Christian, that is, not one of that class of Christians whose Christianity is "a perversion" of his theism (or, as Jefferson expresses it, "the corruptions" of his deism); Abbott, believing this, and fearing that, if he calls himself a Christian, he will be understood to belong to that class to which he thinks Christ did not belong, calls himself a theist and not a Christian. Jefferson asserts his legal, moral, and ecclesiastical right to call that Christianity which he believes to be the religion of Christ: Abbott resigns the Christian name because others use it to describe that which he believes to be a perversion of the religion of Christ. Jefferson insists upon and exercises the right of calling things by what he considers their right names,—a right disclaimed by nobody but Abbott, whose idiosyncrasy, but for his established character as a sincere religionist and ingenuous devotee, would expose him to the suspicion of having an inclination to be persecuted. By the circumstance that others do not agree with Jefferson and Abbott, or with each other, as to what the religion of Christ was, Jefferson is not, and Abbott is, deterred from calling it Christianity. Each claims to be "a Christian in the only sense in which" he believes "Christ wished any one to be." And yet, according to the nominal distinction, one of these men is a Christian and the other is not, because one does and the other does not call himself a Christian, although both mean the same thing. To condemn Abbott by such a refinement, is alike discreditable to religion and law. It were better for church and state that he be let alone. If Jefferson were here in Abbott's place, being a nominal Christian, that is, calling himself a Christian, and accepting "the principles of a pure deism," which he believed Christ taught, the court would permit a parish to permit him to preach Abbott's religion in the meeting-house of the parish, although the court would not permit the parish to permit Abbott himself to preach it there. As a religious standard, without doctrine or virtue, faith or works, reformation or rectitude, discipline or ceremony, reality or formality, substance or shadow, this nominal Christianity is exceedingly nominal. *De minimis non curat lex.*

The true construction of the constitution is that which makes every

parish theologically independent of the state, and leaves the pulpit of every parish in the control of the parish, free from the theological correction of secular tribunals. The constitution, like the common law adopted by it, is neither a medical theory (*Boardman* v. *Woodman*, 47 N. H. 148, 150) nor a theological system. It is human law, reverently recognizing the inviolability of religion; not impiously usurping the direction of spiritual affairs; permitting no executive, legislative, or judicial encroachment upon the kingdom that is not of this world; meddling not, and allowing no earthly power to meddle, with those rights for the exercise of which, men, in their individual, parochial, and ecclesiastical capacities and relations, are responsible only to the divine government. Upon these fundamental and acknowledged principles of the constitution, the word "Christians," in Article VI of the bill of rights, does not give the court any spiritual jurisdiction, or any temporal power to invade the province or infringe the liberty of the church; and therefore is not an ecclesiastical criterion or religious limitation which the court is to apply, and is not used in any theological sense which the court is to enforce. It does not authorize the court to demolish parochial independence, erect a hierarchical system of license and prohibition, and appropriate the ecclesiastical sovereignty. It does not force the law to profane the territory of the church, nor subject religion to the dishonor and degradation of nominal and actual insignificance.

Nothing less than the broadest possible definition of the word is compatible with the general tone and spirit, or with the letter of the constitution. When it is declared in Article I, that "all men are born equally free and independent;" in Article IV, that the rights of conscience are unalienable; in Article V, that "every individual has a natural and unalienable right to worship God according to the dictates of his own conscience and reason; and no subject shall be hurt, molested, or restrained in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession, sentiments, or persuasion, provided he doth not disturb the public peace or disturb others in their religious worship;" and in Article VI, that parishes "shall at all times have the exclusive right of electing their own public teachers," and that no person of one sect "shall ever be compelled to pay toward the support of" teachers of another sect; and that "every denomination of Christians, demeaning themselves quietly and as good subjects of the state, shall be equally under the protection of the law, and no subordination of any one sect or denomination to another shall ever be established by law,"—all these provisions are to be taken together, according to a familiar and elementary rule of construction; and the evident design of them all is, to establish equality and not inequality. It was not meant that any class of citizens, "demeaning themselves quietly and as good subjects of the state," should not "be equally under the protection of the law." It was not meant, for instance, that a subordination of Jews to Mohammedans, or to any other class, might

"be established by law." Such a law would be a plain violation of the constitution.

We may be sure that the men who framed that instrument did not resort to the artifice of asserting the legal principle of religious equality, again and again, in the broadest and most explicit terms, in the first five articles, and in the proviso of Article VI, with the singular purpose of insidiously undermining the whole in a postscript. Especially may we be confident, since the postscript purported a mere confirmation, illustration, or application of the principle they had just laid down. Their work was not a scheme of false pretences, clothed in dark, equivocal, and mysterious forms. It was not a subtle and obscure machination of intolerance, to be discovered and put in operation by astute construction. In the most positive and definite manner, they declared that government can interfere in religion for no other purpose than to preserve the public peace, and the fealty indispensable to its own existence. And if they had meant that any class of men, " demeaning themselves quietly and as good subjects of the state," but not coming within some theological definition of " Christians," might be deprived of the rights so solemnly and repeatedly guaranteed to all, they would have so said. They had no motive to impose upon the court the duty of developing, by conjecture, exceptions to the general rule of religious equality. And the great pains taken by them, in reiterating the rule so strongly and so often, seems to indicate a fear that attempts would be made to introduce exceptions contrary to their design.

It is to be particularly observed, that the paragraph in which the word " Christians " occurs is devoted to the subject of religious equality; that it is a mere reäffirmance of the general right, in the details of being equally under the protection of the law, and free from sectarian subordination; and that it does not relate to the qualifications of parochial public teachers or other civil officers. It prohibits the establishment of any form or substance of state religion, or any sectarian monopoly or superiority. Its sole object evidently is, to reinsure equality; and, from a provision of that kind, it is impossible to infer an intention to permit inequality, particularly when it follows so many unlimited provisions of the same nature. If an exception to the general rule had been intended, it would not have been left to be implied from an equivocal word in a reinforcement of the rule. " Where rights are infringed, where fundamental principles are overthrown, where the general system of the laws is departed from, the legislative intention must be expressed with irresistible clearness to induce a court of justice to suppose a design to effect such objects." *U. S.* v. *Fisher*, 2 Cranch 358, 390 ; *Smith* v. *Spooner*, 3 Pick. 229, 230.

The Catholic exception was created by the word "Protestant," which, for legal and ordinary secular purposes, had been the common English negative of " Catholic " more than two hundred years, and was the familiar description of a familiar legal test relating, not to theological soundness, but to political fidelity, and designed solely for a barrier

against a supposed supreme civil allegiance to the pope.   No theological test being imposed and no religion established, but, on the contrary, state religion being multifariously prohibited, such a negative and unsectarian term was peculiarly appropriate.   In the mixed secular and ecclesiastical government of England, which established a religion instead of religious equality, positive terms and theological tests were sometimes used in addition to the negative Protestant test.   Burke, in his Letter to Sir H. Langrishe, said that " to form an operose ecclesiastical establishment," something more was needed than a religion which " was nothing but a mere *negation* of some other."   But in the religious plan of our constitution, excluding an ecclesiastical establishment, negatives are freely used.   There is in it not a sentence that affirmatively establishes any religion; not a sentence that prohibits any but a state religion ; not a sentence, taken in the sense and the view of the time in which it was written, that is incompatible with religious equality.   And when we find this equality asserted as affirmatively and positively as a state religion is asserted in some English statutes, and when we consider that religious equality and a state religion cannot coexist in any government, we realize the impossibility of building up a state religion in New Hampshire on any inference or implication.   In the absence of the affirmative and positive establishment of religious equality, a foundation for a legislative structure of religious inequality might, by an intolerant application of ecclesiastical definitions to legal language, have been inferred from the supplemental provision that " every denomination of Christians, demeaning themselves quietly and as good subjects of the state, shall be equally under the protection of the law; and no subordination of any one sect or denomination to another shall ever be established by law." But, in the full measure of constitutional, positive, religious equality, there is no room for an antagonistic inference of a state religion.

Whatever ecclesiastical, technical meanings, among particular classes, or in special connections, or for theological purposes, the word " Christians " might have had, it was capable of, and was often used in, a general sense that included such men as Jefferson, Franklin, and Plumer ; and it is to be so understood here, because in no other sense is it consistent with the rest of the constitution.   A word susceptible of a liberal as well as a restricted meaning is generally to be so interpreted as to harmonize with unambiguous clauses of the context in favor of the large liberties and equal rights impregnably intrenched on every page of the constitution.   The supplemental provision, asserting denominational equality in law and prohibiting sectarian subordination, taken in connection with all the previous stipulations relating to the same general subject, shows that the authors of the constitution exerted themselves to the utmost, by repetitions of the guaranty of religious freedom and equality, in numerous forms of expression well-nigh exhausting the power of language, to establish that guaranty beyond the reach of doubt, and, by an extraordinary display of safeguards, to render it obviously and conspicuously unassailable.

The conclusions are,—

The power of electing public teachers is granted to all parishes by the constitution:

This power, if limited in any respect, is not limited by any other than the Protestant official test:

Abbott is a Protestant within the meaning of that word as used in the constitution:

And this Dover parish, in the exercise of its constitutional power, is authorized to elect him to be one of its public teachers.

How are these legal conclusions to be avoided? By denouncing Abbott as an infidel? That is something not to be heard here, however effective it may be elsewhere. It is said that, recently, since the commencement of this suit, Abbott, in a sermon, publicly delivered in Dover, gave it as his legal opinion that he is not a Protestant in the meaning of the constitution. Concerning this statement of his opinion on a question of law, there are several observations to be made. In the first place, it is evident that nothing but his admitted perfect integrity and absolute artlessness save him from the imputation of enjoying persecution, and taking extraordinary pains to proclaim his opinions whenever they can do him any harm. In the second place, although it would be no great cause of wonder that such a youth should adopt a heresy notwithstanding the devotion of his life to the study of theology, it would be strange if a court of law should condemn his religion by affecting a reliance upon his opinion of law, which he has not studied at all. In the third place, if this man Abbott's ignorance of law is to destroy not only his own constitutional rights, but to give the constitution an erroneous construction that destroys the independence of every parish in the state, puts all ecclesiastical affairs under the control of this court, and abolishes religious liberty, a thorough legal education is a more important part of a preparation for the ministry than has heretofore been supposed. In the fourth place, if he is relied on as a legal authority, his whole opinion, and not a partial statement of it, is to be taken. " I have believed," says he, " and believe still, that our (the defendants') right to occupy the church is clear, both legally and morally ; for a fair majority of any society may rightfully control the use of its own buildings."

The right of a parish to elect its own public teachers is but an instance of the right of " every individual   *   *   to worship God according to the dictates of his own conscience and reason," which the constitution declares to be " a natural and unalienable right." The unalienable right of freedom in worship necessarily includes the right of selecting the public teachers who conduct the parochial worship, and of listening to their teachings in the parochial meeting-house. The right, being unalienable in the individual, is not lost by his becoming a member of a parish. It is impracticable for the members of a parish to exercise it in their collective, parochial capacity, except by major vote, or major silence, or some other manifestation of the will of the

majority, the minority being entitled to withdraw. The right is unalienable in the parish, as in each member. The unalienable power of the parish rests upon first principles, and is of the very essence of our institutions. 2 Channing's Works 270, ed. 1849.

"The same principle prevails in these incorporated societies (all corporations) as in the community at large, that the acts of the majority, in cases within the charter powers, bind the whole." 2 Kent Com. 293. "The general principle of the right of the majority to control the minority, in all the operations of the company, within the legitimate range of its organic law, is implied in the very fact of its creation, whether expressly conferred or not." Redfield on Railways, sec. 20, 3, 2d ed. If the constitution had not provided that parishes "shall at all times have the exclusive right of electing their own public teachers," they could, like other corporations, lawfully elect their officers, agents, and servants, of any and all denominations,—Trinitarian, Unitarian, and theistic. The right is inherent, and exists, unless prohibited. But the express constitutional grant of elective power to parishes leaves no occasion and no room to erect that power on any other foundation, and perpetuates it unmistakably beyond the possibility of destruction or modification under the constitution as it is.

When an incorporated parish elects a public teacher, and he accepts the office, and the terms of an unwritten contract between them are to be implied, the known opinions and usages of the parish and of other parishes may, by mutual understanding, become a part of the contract, or may tend to show a part of the contract; but known opinions and usages cannot limit the right of election—*Baker* v. *Fales*, 16 Mass. 488, 508: a repeal of the constitution cannot be implied from the circumstances, parochial opinion, and usage, as a contract may be.

The control of a meeting-house, with a sectarian restriction, might be given to a parish, and the restriction might be enforced. Although the parish would not be obliged to accept the gift (and the restriction might be such that the parish would not have the legal capacity to accept it), it would not be allowed to use the house without conforming to all valid and binding restrictions; but a restricted use of the house would not affect the constitutional elective power, which is a part of the legal nature of the corporation. If the owner of the property should legally devote it to a Unitarian use, or a Christian use, or a Unitarian Christian use, and a question should arise as to the theological nature of a use to which the property was applied, the court would inquire, not what is true Unitarianism, or genuine Christianity, or pure Unitarian Christianity, but what was the nature of the use intended by the donor, and would ascertain his intention by settled rules of law; but his intention could not change the independent unsectarian nature given to a parochial corporation by the constitution of the state.

The elective power of railroad, manufacturing, and banking corporations chartered by the state, not being secured by the constitution, may be regulated by the legislature and by the corporations. But the elective power of parishes is granted with greater emphasis than the

elective power of towns. And as the constitutional power of a town to elect representatives cannot be abolished or limited by the legislature, or by the town, except by terminating the corporate existence of the town, so the constitutional elective power of a parish cannot be abolished or limited by the legislature, or by the parish, except by terminating the corporate existence of the parish.

Suppose a town, having one hundred and fifty ratable male polls of twenty-one years of age and upward, to be incorporated by any name the most significant that can be devised to express its position on the temperance question, or any political subject; suppose, also, that, in the act of incorporation, the legislature declare that the town shall never elect a representative whose opinions on that question do not agree with the corporate name; suppose, moreover, that, in the outset, the voters of the town vote unanimously, and agree, and undertake to bind themselves and their successors and the town, by articles of agreement, by-laws, and instruments under hands and seals, in the most solemn forms, and by the most ceremonious proceedings, to abide forever by the limitations named in their legislative charter; and suppose, at the end of one hundred years, a majority of the town, for the first time, elect a representative whose principles are exactly opposed to those asserted in that charter, and in the name, votes, action, and uniform practice of the town,—no one would think of questioning the constitutional power and right of the majority to elect such a representative, and to be represented by him; because the provision of the constitution is, that such a town " may elect one representative." A minority would not ask us, upon incompetent evidence of the political opinions, proceedings, and usages of their predecessors, to interfere by injunction and destroy the constitutional political freedom of the town. So, if, in addition to the name adopted by the parish, Unitarianism had been expressly declared to be the religion of the corporation, by the legislature, in a general or special act of incorporation; and if the legislature had also enacted that the corporation should never elect any other public teacher than a Unitarian; and if the members of the corporation had bound themselves and the corporation, by articles of agreement, by-laws, and all other means, to abide by the act of the legislature; and if the corporation should thus abide one hundred years, the majority, at the end of that time as well as before, would have as indisputable a right to elect such a man as Jonathan Edwards, or President Wayland, or John Wesley, or Thomas Jefferson, for their public teacher, and to hear him preach and inculcate his own doctrines, as a town would have to change its opinion and its action on a political question; because the provision of the constitution is, that parishes " shall at all times have the exclusive right of electing their own public teachers." And where have the members of a parish a better right to receive the instructions of the teacher of their choice, and engage in religious exercises under his leadership, than in the meeting-house of the parish? For what other purpose does a parish have a meeting-house?

Suppose the name of a town to denote the political views of its

inhabitants (the names of some of our towns were in fact designed to carry a political significance, and the name of one (Jackson) has been changed for that very purpose), and the legislature change the name to one of the opposite meaning: no one would understand that the political corporate power of the town would be affected. So if, at the unanimous request of the members of this Dover parish, the legislature should to-morrow change its corporate name to The Baptist Society, The Methodist Society, The Episcopalian Society, The Puritan Society, The Trinitarian Society, The Buddhist Society, or The Independent Society, it would have no other theological corporate character or quality than it has to-day. As a corporate being, created by law, it is constitutionally incapable of any other theological capacity than independence. Under our constitution, parochial corporations are, by nature, as independent ecclesiastically, in their choice of public teachers, as towns are politically in their choice of representatives. However it may be in England or other jurisdictions in which the parochial elective power is not established by a constitution beyond legislative interference, and however it may be here in a case of corporate power not thus established, it is clear that a sectarian name of a New Hampshire parochial corporation has no more effect upon its constitutional unsectarian independence, than the name black or white has upon the natural color of a child. Calling such a corporation a railroad company would not give it the rights and duties of a common carrier. The legal capacity of a corporation depends upon the powers granted to it by law; and a parochial corporation, made theologically independent by the constitution, cannot be made sectarian by any names which the legislature or the members of the corporation may give it. Giving a member of such a corporation a Christian name does not legally bind him to a Christian character or a Christian faith; and, under our constitution, the name of such a corporation has no more legal effect upon its elective power, than a Christian name of one of its members has upon his constitutional right to choose and change his religion. A corporate name does not authorize a judicial destruction of a corporate constitutional right.

For these reasons it is immaterial whether the legislature or this Dover parish have made any attempt to restrict the parochial power of electing public teachers. Any such attempt would have been ineffectual and void,—a futile undertaking of ignorance to abolish the constitution. But if it were material, it would be found that neither the legislature nor the parish have made any such attempt. By a rule universally adopted, courts are bound to presume that the legislature have not intended to violate the constitution; and if one interpretation of a statute is in accord, and another in conflict with, the constitution, the former is generally to be preferred. 41 N. H. 555. There is, however, no opportunity to apply this rule in the present case, for there is not, and there never was, any statute, general or special, which can possibly be perverted to an assault upon the elective franchise of this parish. A similar rule of construction has been applied to conveyances

of property. In *Attorney-General* v. *Pearson*, 3 Meriv. 353 ; 7 Sim. 290 ; *Attorney-General* v. *Shore*, 7 Sim. 290, note ; 9 Cl. & Fin. 499 ; 11 Sim. 615, note ; 11 Sim. 592 ; 16 Sim. 210 ; and *Attorney-General* v. *Drummond*, 1 Drury & Warren 368 ; 1 Connor & Lawson 210 ; 1 H. L. Cas. 837,—(commented upon in *The Dublin case*, 554–560 ; *Robertson* v. *Bullions*, 11 N. Y. 257–262 ; *Smith* v. *Nelson*, 18 Vt. 554 ; and Story Eq., sec. 1191 *a.*, and note),—it was held that there was a presumption that certain grantors had not intended the propagation of Unitarianism, because that religion was unlawful when the conveyances were made : it was presumed that the grantors did not design, by their bounties, to disseminate the criminal principles, and promote the commission of the crime, of Unitarianism. But under our constitution, Trinitarianism and theism being as lawful as Unitarianism, that presumption cannot be applied in this case.

The provincial act of 1714 did not limit the power of towns (towns then being parishes) in the choice of ministers. The act of 1791 provided that each " town may, agreeably to the constitution, grant and vote such sum or sums of money as they shall judge necessary for the settlement, maintenance, and support of the ministry," without undertaking to ratify or modify the parochial elective power. The act of 1819 repealed the act of 1791 so far as it made towns parishes, and provided that religious societies might become incorporated with the same power of raising money by taxes upon the polls and ratable estates of the members that had been possessed by towns in relation to parochial affairs, and gave the parochial assessors and collectors of taxes the powers belonging to town assessors and collectors. This act merely transferred the parochial nature from towns to other corporations voluntarily organized. So far as parochial independence, in theology and the choice of public teachers, is concerned, there is no difference between towns as they were before 1819, and other parochial corporations as they have been since 1819. *N. Market* v. *Smart*, 45 N. H. 87, 101, 102 ; *Princeton* v. *Adams*, 10 Cush. 129, 133. In the language of the constitution and of our laws, the terms " parish " and " religious society " have the same meaning and effect. *Sutton* v. *Cole*, 8 Mass. 96, 98.

The third section of the act of 1819 provided that " each religious sect or denomination of christians in this state may associate and form societies." The word " christians " was used in the general sense in which it is used in the constitution. " Denomination of christians " is synonymous with the preceding words " religious sect." " Religious sect " is not qualified by " of christians ;" " each religious sect " " of christians " would imply that there are sects of Christians that are not religious, which is wholly inadmissible.

And it cannot.be supposed that, in the year in which Governor Plumer retired from public life, regarded by the majority of the voters of the state as " the Nestor of the politicians of that generation," the legislature to whom his last message was addressed excluded him from the benefits of this section, and prohibited him from becoming a member of a paro-

chial corporation. If a plot thus to dishonor the foremost politician of the day in this state had been suspected, it would have been defeated with signal marks of indignation. And it is now quite too late, after the lapse of half a century, to force upon legal language a theological, technical meaning, subversive of the constitutional system of religious equality, which the legislature must be presumed to have maintained. The same language is used in the act of 1827, entitled "An act empowering religious associations to assume and exercise corporate powers," under which this Dover parish was incorporated, and which is only an expanded copy of a part of the act of 1819. In the condensation of the statutes in 1842 and 1867, the word "Christians" was omitted, not because any change in the law was intended, but because, in the acts of 1819 and 1827, the word had no force as a term of limitation, and, in the revisions, superfluous words were often omitted.

The legislature may authorize parishes to "admit members," as was done in the acts of 1819 and 1827 ; and under that authority, and without it, parishes may refuse to admit as members those who do not accept certain creeds. But a parish which should restrict its membership would have the same constitutional power to elect public teachers of any and all denominations, as if its membership were unrestricted. For instance, this parish might have applied a Unitarian test to its members ; but the members would still have retained the right of electing Trinitarian or theistic public teachers. And the electoral power would not be destroyed or curtailed, if the legislature should directly prescribe the qualifications, and regulate the admission and expulsion of members. Tests of membership may affect the practical exercise of the power, but not its legal existence. So that in whatever sense the word "Christians," in the act of 1827, is to be taken, it does not touch the right of electing public teachers. The act of 1827 declares that parishes organized under that act "shall have authority to choose all such officers, and make and ordain all such by-laws and regulations as may seem expedient or convenient for the due government of such society, and the management of their funds." If this provision authorizes the election of public teachers, it is, to that extent, an unnecessary ratification of the constitution : if it does not authorize such election, there is no allusion in this or any other general law to the subject; and there is no special statute in any way relating to this parish.

The articles of association of this parish are dated Sept. 4, 1827, and are as follows: " Believing that the public worship of God has a salutary influence upon society by awakening and diffusing moral and religious affections, and considering there are many persons in this place who are unprovided with such means of religious instructions and accommodations for public worship as are most congenial with their own convictions of truth and duty,—Therefore the subscribers, for the mutual and better accommodation in the premises, do hereby unite and form themselves into a religious society by the name and

style of ' The First Unitarian Society of Christians in Dover,' and do hereby agree to be governed in their said associate capacity by such rules and by-laws as said society shall from time to time establish. Such persons as are desirous of uniting with them, may become members of said society by subscribing this agreement."

This agreement, and the by-laws of the parish, are as free as the statutes from all efforts to abrogate or qualify the elective power.   If the signers of this agreement had entered upon the task of repealing the constitution of the state, it cannot be supposed that they would have confined their exertions to the selection of their corporate name. And if we presume that they were men of ordinary understanding, it is as incredible that they engaged in such an enterprise at all, as that, being engaged in it, they left no other record of their adventure than the usual appellation of a common sect, who were known to be strongly opposed to the prevailing theology, and were regarded as infidels, but were not suspected of harboring a design against the constitution.

The legal purpose and effect of the corporate name of a town and a parish are the same; they have not changed since the time when towns were parishes; and they are stated in the acts of 1819 and 1827, which provide, in a usual form, that a parish may "assume a name and style by which such society may be known and distinguished in law,"—not a name by which the opinions of the first members may be known and distinguished in theology, nor a name by which a vain attempt to destroy the constitutional theological independence of the corporation might be held in remembrance in after times.   *Case of Sutton's Hospital*, 10 Rep. 32, *a, b ;* Co. Lit. 250 *a*, note *A ; Reg.* v. *R. J. S. Co.*, 10 A. & E. (N. S.) 839, 844 ; *Minot* v. *Curtis*, 7 Mass. 441.   There is no legal presumption that the first members assumed a corporate name for any other purpose than that authorized by the statute under which they formed themselves into a corporation.   And if there is a presumption of fact that their adoption of the Unitarian name indicated, with more or less accuracy, their theological opinions, and their intention to exercise their constitutional elective power by choosing Unitarian public teachers as long as they should retain the same opinions, it would still be a strained and far-fetched conclusion, and an unwarranted impeachment of their intelligence, to hold that they intended, by means of the name, to abdicate their own constitutional right, and also to reveal an absurd conspiracy to overthrow that part of the constitution which guaranteed to their successors, as well as to themselves, " the exclusive right" " at all times " " of electing their own public teachers."   So remarkable a scheme as that is not in the record, and cannot be presumed.

If the question were, whether the legislature or this corporation had entertained any project or made any movement against the constitutional guaranty of parochial freedom, they would be acquitted.   But no action or purpose of the legislature or the parish is entitled to any consideration in this part of the case, since, if it had been declared in the act of 1827 that all parishes, and, in the articles of

agreement, that this parish, should be free and independent, and might elect Trinitarian, Unitarian, or theistic public teachers, such a declaration would have been superfluous; and if it had been declared that none but public teachers of the denomination of the first members should ever be elected, such a declaration would have been void. The right of this parish to elect a Trinitarian or a theistic public teacher is a constitutional right; and that right includes the right to hear him preach doctrines subversive of Unitarianism. And, as the greater includes the less, the right of electing a Trinitarian or a theist to the office of parochial public teacher includes the right " to hire, employ, allow, suffer, or permit " such a person, without a formal election, to preach anti-Unitarianism to the parish or to those members of the parish who choose to hear him. The answer to the first question raised in this case is, that this parish has the corporate power " to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person, to preach and inculcate, in the meeting-house of said society, doctrines subversive of the fundamental principles of " Unitarianism.

II. The next question is, Did the parish, in the exercise of its corporate power, " hire, employ, allow, suffer, or permit said Francis E. Abbott" to preach theism " in the meeting-house of said society " ? Upon this question there seems to be no difference of opinion. By the decree, three of the defendants as wardens, " and all other wardens and members of said society," are "jointly and severally strictly enjoined and forbidden to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person, to preach and inculcate, in the meeting-house of said society, doctrines subversive of the fundamental principles of " Unitarianism. This means, for one thing, that theism is subversive of Unitarianism, and that the wardens and other defendants, members of the parish, and constituting the majority of it, did " hire, employ, allow, suffer, or permit said Francis E. Abbott " to preach theism " in the meeting-house of said society." The decree, running as it does against the wardens and all other members of the parish, and forbidding them to exercise the constitutional corporate power of allowing theism, Trinitarianism, or any other form of anti-Unitarianism to be preached in the meeting-house of the parish, will hardly be sustained by an allegation that the power thus destroyed was not exercised by the defendants. The fact that they, the majority of the parish, did exercise it, is the only occasion there could be for destroying it. The power is destroyed by the decree: whether it is destroyed because the majority exercised it, or because they did not, is a matter of no general interest or importance.

The evidence shows that the inference, unavoidably drawn from the terms of the decree, is correct: the power is destroyed because the majority did exercise it. On the 30th day of March, 1868, the parish " Voted, That the wardens shall adopt such measures as they may deem best for supplying the pulpit with preaching the ensuing year." On the 13th of April, a resolution was offered authorizing and instruct-

ing the wardens " to hire Rev. Francis E. Abbott to preach in this church the ensuing year," which was rejected by a majority of one. And at the same time it was voted " That the wardens be authorized and instructed to employ none other than Unitarian Christians to supply the desk in this house." This last vote was specially aimed at Abbott, who had declared himself to be neither a Unitarian nor a Christian. On the 27th of April, the animated contest between the two parties, into which the parish was divided on the question of employing Abbott another year, terminated in the success of the defendants. Both parties had received accessions of persons who had recently become members of the parish, and on that day both were thoroughly organized for the election of wardens, and there were no scattering votes. The wardens voted for by the defendants were elected by a small majority over the candidates of the plaintiffs' party. That final vote was decisive of the question that had agitated the parish. It showed that the defendants were the majority, and as such could employ Abbott. But at the same meeting, instead of appropriating the pulpit solely for his preaching, as they might lawfully have done, they passed the following compromise resolution :

. " Whereas, differences of feeling and sentiment have arisen and now exist among the members of the ' First Unitarian Society of Christians in Dover,' so much so that a division of the society seems imminent,— Now, therefore, for the purpose of conciliating and harmonizing said differences, Resolved, That each of the two divisions of said society be entitled to the use of its meeting-house one half of the time, alternating each Sabbath forenoon and afternoon, and that each division may have the use of it at any time when not used by the other; and in case both divisions should desire to use it the same evening, that division which the last preceding evening had the use of it shall yield to the other ; and that the pew rents be applied to lighting and heating the house."

This resolution was a rescission of the former vote which instructed the wardens to employ none other than Unitarian Christians, because it was totally inconsistent with it, as a vote to pay a salary of $2,000 would be a rescission of a vote to pay a salary of $1,000 ; and it was so understood, and for that reason the plaintiffs' party voted against it. It was an election of two public teachers,—the one who was the choice of the majority, known to be Abbott, and the one whom the minority should select,—each one to be paid by the division selecting him. The plaintiffs in their bill allege that the wardens and the other defendants, except Abbott, since that vote, " have suffered, allowed, encouraged, and employed said Abbott * * to occupy said house and the pulpit." The " two divisions of said society, named in the compromise resolution, are as distinct and well known as the society itself, and the majority division, according to the allegation of the bill, employed Abbott to preach one half of each Sunday, as they were authorized to do by the resolution. One of the plaintiffs testifies that one of the defendant wardens " admitted that he permitted Mr. Abbott to preach

in the house in accordance with the vote of the society." The accusation of the plaintiffs being that the majority division had employed Abbott to preach in the house, this testimony is introduced by the plaintiffs to prove that one of the defendant wardens admitted the truth of the charge. As the parish has had preaching but one half of each Sunday for ten years past, no complaint is made that the resolution deprives the minority of any desired opportunity of public worship. The resolution has not been rescinded, and is still in force as a valid vote and decision of the corporation. Upon the strictest legal principles, that resolution and the action of the majority under it were an election of Abbott to the office of parochial public teacher, on the conditions named in the resolution. What would become of Quaker preaching and the rights of Quaker societies, if any other election of their public teachers than a silent consent were necessary to the legality of their own preaching in their own meeting-houses? The majority of a Methodist parish elect the public teacher whom the bishop appoints, by listening to his preaching, and not electing any one else; and that silent consent of the majority is as good as a more formal election, however much opposition may be made by a minority. Suppose, in a parochial corporation of Methodists occupying a meeting-house placed by will or deed under its unrestricted parochial control, the majority "allow, suffer, or permit" the public teacher sent by the bishop to preach in the house, without any formal election or any corporate vote of any kind; and a dissatisfied minority apply for an injunction on the ground of informality of election : the court would not stop that preaching and command the majority not to " allow, suffer, or permit " it to go on. The majority of a parochial corporation may " allow, suffer, or permit " a person sent by a bishop to fill the office of public teacher of the corporation; and, as the whole of a right includes a part of it, the majority may " allow, suffer, or permit " him, without filling that office, to preach in a pulpit of which the parish has unrestricted parochial control. The compromise resolution of this Dover parish authorized the majority to do what they did. It was a vote to " allow, suffer, or permit " the majority " to hire " and " employ " " said Francis E. Abbott, or any other person, to preach and inculcate in the meeting-house of said society doctrines subversive of" Unitarianism. On the 30th of March, the parish authorized the wardens to supply " the pulpit with preaching the ensuing year." The parish could give that authority to the two divisions of the parish as well as to the wardens; for it has as clear a right to allow two persons, severally selected by the two divisions of the parish, to preach in its pulpit, as to allow one selected by the wardens or by a Methodist bishop to preach there. The wardens were of the majority: the wardens and the majority concurred. Against their concurrent action the bill was brought and the decree made. The will of the majority, that Abbott should preach what doctrines he pleased " in the meeting-house of said society," was manifested so clearly that the minority brought this suit to prevent the majority allowing anti-Unitarianism to be preached in the house. And

the decree does not proceed on the ground of any informality in the manner of allowing anti-Unitarianism to be preached there.   It deals not with things formal or temporary.   It is perpetual and unconditional. It forbids the present wardens, "and all other wardens and members of said society," "to allow, suffer, or permit," even by unanimous vote, "said Francis E. Abbott, or any other person, to preach" Trinitarianism, theism, or any other religion subversive of Unitarianism, "in the meeting-house of said society."   In that house religious liberty and parochial independence are suppressed forever.

The plaintiffs, in argument, claim that the right of parochial independence (destroyed by the decree) was not exercised by the defendants, because "their acts make them seceders from the Unitarian society, and entitle the plaintiffs to possession of the meeting-house to their exclusion."   This claim is refuted by the decree, which does not disfranchise the defendants for secession, nor exclude them from the possession of the house or the control of the corporation, nor transfer the possession or control to the plaintiffs, but runs against all members of the corporation, and forbids them to allow anti-Unitarianism to be preached in the house.   If the defendants had seceded from the corporation, and ceased to be members of it, the decree, instead of forbidding them to allow anti-Unitarianism to be preached in the house, would have forbidden them to exercise any control over the house, or to vote or take any part in the meetings of the corporation, and thus would have given to the plaintiffs' party the corporate control and possession to which they claim to be entitled.   As the decree leaves the defendants in the control of the corporation and its house, with power "to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person" selected by them, and not by the plaintiffs, to preach Unitarianism in the house, or to allow no one to preach there, it is not necessary to examine the question of secession thus decided by the decree in favor of the defendants.

Moreover, if the defendants were seceders from the corporation and not members of it, the bill should be dismissed, because it can be maintained only on the ground that they are members of the corporation, controlling it or its property in an unlawful manner.   If they were not members, they would be mere trespassers, and an action at law would lie, or the police could be called in to protect the house against invasion: there would be nothing in the case to give us chancery jurisdiction. When there is a plain and adequate remedy at law, and the plaintiffs' right has not been established at law, a bill for an injunction does not lie to prevent a simple trespass.

Furthermore, the evidence shows that the decree is quite right in deciding this point in favor of the defendants.   The defendants (except Abbott, who is not and never was a member of the corporation) form one of "the two divisions of said society" referred to in the compromise resolution.   They were one of "the two divisions" when they passed that resolution, elected the present wardens (described as wardens in the bill and in the decree), and gained the control of the

corporation-; and they still remain one of those "divisions," unless, since that time, they have ceased to be members of the corporation. Ordinarily, it would seem that living members of a corporation would not lose their membership, unless by some regulation of the corporation, or of the legislative power that creates the corporation, or by the exercise of some expulsive power on the part of the corporation, or by the intentional withdrawal of the members themselves. *Keith* v. *Howard*, 24 Pick. 292, 295; *Taylor* v. *Edson*, 4 Cush. 522. In this case, the majority and the minority became members of the parish by signing the agreement of organization, which is the only test and qualification of membership. It is not denied, in the bill or decree, that the majority legally and rightfully became members. And it is not pretended that there is any statute of the state or by-law of the parish which has destroyed their membership, or that they have suffered themselves to be expelled by the minority.

The act of 1827, and the present law, provide that members may withdraw by leaving a written notice with the clerk, and paying their parochial taxes. "The most perfect freedom in withdrawing from any such parish or religious society is given by the statute; but the mode of withdrawing is expressly pointed out; and it is a regulation which ought to be enforced, otherwise the greatest uncertainty would exist as to the persons who may be entitled to the rights, or subject to the liabilities of membership. The mode is easy, simple, and definite. It is by leaving a written notice with the clerk of the society from which the party is desirous of seceding." *Jones* v. *Cary*, 6 Me. 448. It was held in that case that the plaintiff, not having given the written notice, had not seceded from a parish of which he was once a member, although he had not been in the habit of attending public worship with the parish for ten years, and had, for a long time, usually attended, and contributed to the support of, the meetings of a parish of another sect. The majority, in the case before us, have not chosen to avail themselves of the privilege of secession allowed by law, and they are still liable as members to parochial taxation, and have a right to vote. *Oakes* v. *Hill*, 14 Pick. 442, 447, 448; *Keith* v. *Howard*, 24 Pick. 292, 295, 296.

A defeated minority may have a motive to retire; but a victorious party, after a severe struggle in the secure occupation of the ground which was the sole object of contest, do not usually abandon that ground to their antagonists. The struggle between these factions consisted of a very earnest effort of each to obtain the control of the pulpit, by carrying the election and obtaining the control of the corporation. The single point in controversy was, whether Abbott should be allowed to preach "in the meeting-house of said society." The defendants' party prevailed, and obtained the control, and, under a vote of the corporation carried by that party, Abbott was preaching there when the minority commenced this suit. How much evidence would be necessary to prove that the majority withdrew from the corporation as soon as they had gained the control of it, under these circumstances, is a subject of imagination: there is no evidence of that kind in the

case, and there is a very great amount of evidence to the contrary. By gaining and keeping the control of the corporation, the majority effectually manifested their intention not to secede from it. The circumstance that disturbs the plaintiffs is, that they being the minority, and the defendants being the majority, the majority have not seceded. The minority have resorted to this lawsuit because the majority have not fled. Why have the minority brought this suit, why are they here, what relief do they want, if the majority have run away from the corporation and left the minority in the control of it? And why does the decree leave the majority in the control of it, and forbid them, as " wardens and members of said society," " to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person, to preach " anti-Unitarianism " in the meeting-house of said society," if they are not members of the society, and have no right " to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person, to preach " anything in its house? If the defendants were deserters and not members, would that be a reason for decreeing the destruction of the independence of the parish? The decree, in the handwriting of the judge who is to write the opinion of the court of which the decree is the conclusion and result, drawn with fulness and precision, upon deliberate consideration, after the oral announcement of the decision, is, in substance and form, the authentic record and judgment of the court; and it is based on the unquestionable fact that the defendants have not seceded.

The plaintiffs claim that the majority " have left the Unitarian denomination," and thereby manifested an intention to cease to be members of this corporation. But this corporation, like every other incorporated parish, by virtue of the paramount article of its charter established by the constitution, has " at all times " the right of electing Trinitarian, Unitarian, and theistic public teachers, and to hear those teachers preach their own doctrines every Sunday in the year. Such a parish is not, in law, a denominational corporation. While the majority of a parish continue to entertain the faith of a particular denomination, and to elect public teachers to inculcate that faith, the parish may, for some purposes, be properly called by the name of that denomination ; but for any legal purpose, the denominational name has no significance or force, because the constitutional power of the parish is not limited by the corporate name. And as the members of a so-called Unitarian parish may be Trinitarians, or theists, and, whatever they are, may elect a Trinitarian public teacher, or a theistic public teacher, or both, it is irrational to say that, if a majority should exercise that constitutional right, they would thereby manifest an intention of withdrawing from the parish. It might as well be said that the exercise of any other parochial power is secession.

If a member of an unincorporated Unitarian church should become a Trinitarian and join a Trinitarian church, such conduct, in the absence of other evidence and in the absence of express statute, by-law, or agreement, might be sufficient to show his intention to withdraw

from the Unitarian church. His intent would be a matter of fact to be ascertained from evidence, and the antagonism of the two churches would tend to prove that he did not wish to belong to both at the same time, and he might have no expectation of revolutionizing the Unitarian church by converting a majority of its members to his views. But there is no similarity between the position of such a person in a hopeless minority in a Unitarian church, and the position of the majority of this parish who are in full and absolute control of the corporation.

The evidence on the question of intent, in the present case, is all on one side. The majority intended to remain members of the parish, and to constitute one of " the two divisions " of it; and whether they formed any other society or not is immaterial. They intended, as one of " the two divisions," and the majority division, to employ Abbott to preach, under the compromise resolution. And because they insisted upon retaining that position, he has, since the commencement of this suit, abandoned them, and refuses to be employed by them or to preach in the meeting-house. The plaintiffs assert that the majority " actually organized themselves into an association distinct from and antagonistic to " the parish. Both parties certainly may organize as many distinct and antagonistic associations as they please. The majority, having the right to allow a theist to preach in the house, have exercised that right, and if they had also formed a theistic association, incorporated or unincorporated, no antagonism would have arisen. The plaintiffs, in their bill, complained against all the defendants except Abbott, as persons " claiming to be members of the " parish, " and as members of an independent religious society " distinct from the parish. It might well be supposed that " religious society," the name given by the statutes to an incorporated parish, was used, in the bill, in the statute sense ; and as the defendants were not members of any " religious society " distinct from the parish, in the sense apparently intended in the bill, their counsel, in pleading, properly traversed that part of the bill ; and the evidence sustains the denial. Some of the defendants associated themselves together for the purpose of raising funds for Abbott's salary, and attempting (in vain, as it turned out) to satisfy his scruples, but without any purpose of ceasing to be members of the parish, or surrendering the control of it, or giving up the right to occupy the house under the compromise resolution. The idea of their intending to withdraw from the parish, cease to be members of it, and throw away the fruits of the victory they had just won, is, under the circumstances, simply preposterous ; and the decree so treats it. Neither the formal validity of the proceedings allowing Abbott to preach in the house, nor the membership of the majority, is controverted by the decree, which runs against all members of the corporation, the majority and the minority, and forbids them ever, even by unanimous vote, "to allow, suffer, or permit said Francis E. Abbott, or any other person, to preach " anti-Unitarianism " in the meeting-house of said society." In that house, the constitutional freedom of the parish is struck down for all time.

III. The next and last question is, whether there is any sectarian trust or limitation attached to "the meeting-house of said society,"— whether the use of the meeting-house of the parish is confined within any narrower theological lines than those of parochial power.   The answer to this question it is not difficult to find or to grasp.   A meeting-house, or the control of a meeting-house, given, without restriction, to an independent parish, is given to parochial independence.   That is the leading idea in what remains of the case to be considered.

It is perfectly easy for persons giving their own private property to a religious use, to limit that use, and devote the property to a particular faith.  *Princeton* v. *Adams*, 10 Cush. 129 ; *Guild* v. *Richards*, 16 Gray 309.   They need no professional assistance or technical learning to supply them with a peculiar phraseology.   Any intelligible language will answer the purpose.   They can have no difficulty in saying, in some comprehensible form, that they intend the dissemination of the thirty-nine articles of the English church, or the Westminster Catechism ; the doctrines of Luther, or Loyola, of Edwards, or Channing, or Jefferson ; the tenets held by some sect at a certain time, or such as it may hold from time to time in the course of its existence in a changing world.   If they intend a theological limitation, they will express it ; and then the court may be called upon to decide, by legal rules settled by the wisdom of ages, not what the true faith is, but what limitation is expressed by the words used.   *The Dublin case*, 38 N. H. 510, 563.   But when the builders of a meeting-house carefully avoid imposing any theological limitation, and put it under the unrestricted parochial control of an independent parish, as was done in this case, they devote it to the independence of the parish, and a judicial imposition of a sectarian limitation is a plain breach of trust.

The plaintiffs in the bill, and the court in the decree, describe the house as "the meeting-house of said society."   And this description expresses the unanimous opinion of all parties, their counsel, and the court.   For all the purposes of this case, the house is "the meeting-house of said society."   The corporation has the absolute parochial control of it, including the right to allow such preaching as it could allow, if, in addition to having the absolute control, it were the absolute owner.   On this point, as the bill, arguments, and decree show, nobody has any doubt.   Being the meeting-house of the parish, the building has no theological character other than what it derives from the legal character of the corporation that has the control of it ; and it cannot derive from the corporation a character that the corporation does not possess.   Being the meeting-house of the parish, it is free from all sectarian trusts and limitations, because the parish, a creature of law, is not, in law, a sectarian corporation,—is not sectarian in its corporate nature.   The legal character of the parish, being no more Unitarian than Trinitarian or theistic, the free character of the parish belongs to all property of which the parish has the full parochial control.   Unitarian, Trinitarian, and theistic uses of the house are equally within the scope of parochial power ; and the parish can appropriate

it to such uses because the parish has the absolute parochial control of it.

The control of the house belongs to a corporation that has a right "to allow, suffer, or permit said Francis E. Abbott, or any other person, to preach" anti-Unitarianism in its meeting-house? Where are the constitutional religious rights of a parish to be exercised, if not in its meeting-house? These sacred rights are not abstractions. They must be practically associated with rights of property in a meeting-house, or some other terrestrial thing. The enjoyment of them cannot be separated from the occupation and use of real estate; for real estate extends, in contemplation of law, from the centre of the earth *usque ad cœlum*, or indefinitely above and below the surface. Individuals can enjoy their rights, so far as legality is concerned, in their own houses,— their own in the sense of being in their legal control. Whether they have the title and the control, or the control only, is immaterial: mere title is nothing for this purpose: control, right of use, is indispensable. For religious uses, a house owned by A, and let by him to B as tenant, or held by A in trust for B's use, is the house of B, and not of A. For religious uses, this meeting-house is the meeting-house of this parish. The functions of the parish capable of being exercised in a meeting-house, can be lawfully exercised in the meeting-house of which the parish has full parochial control. The control of this house was given to this corporation by a vote that did not impose the condition that the parish should not exercise its functions in the house. What is the control of a meeting-house given to a parish for, if not for the enjoyment of the constitutional religious rights of the parish? When the control of a meeting-house is given to a parish, without a stipulation against the enjoyment of those rights in the house, the enjoyment of them there can be forbidden only by a super-constitutional power destroying the rights themselves.

As all parishes necessarily derive an independent nature from the constitution, it may be doubtful whether equity would not restrain a parish from encumbering its property with a trust calculated and evidently intended to destroy or impair the independence of the parish by limiting its electoral power. And it may be very doubtful whether equity would enforce the execution of a trust of that kind. Such a trust would be a palpable attempt to nullify the supreme article of the parochial charter, and a direct attack upon the public policy of parochial freedom established in the constitution; and there might be a question whether the creation of such a trust is within the parochial power. It might be said that a minority had an interest in preserving the corporate property free from a denominational trust, and that such interest was so secured that the destruction of it by the majority was not one of the purposes for which the corporation was created. It would hardly be claimed that a town could legally cause its town-house, purchased or built with town funds, to be conveyed in trust for the use of the town, on the condition or with the restriction that the town should continue to elect representatives of a specified political party. And it might be

impossible, in principle, to distinguish that case from a conveyance, by a parish, of its meeting-house, purchased or built with parochial funds, in trust, for the use of the parish, on the condition or with the restriction that the parish should continue to elect public teachers of a specified religious denomination.

An individual may convey his property in trust, for any stipulated legal use, personal or corporate, private or public, special or general, ecclesiastical, sectarian, educational, or commercial. And " it would be the duty of this court, on a proper application, to see that the trust was executed according to the intention of the donor, provided that his intention was expressed so plainly that it could be legally ascertained. When the intentions of the donor, as to the religious opinions which he means shall be supported, are expressed in general terms, and the disputed construction of those terms depends on an examination of religious doctrines and the history of theological opinion and controversy, the inquiries upon which the court are obliged to enter are of an unusual and embarrassing character. What is theologically true in religion, it is agreed on all hands that the court are not competent to decide; nor have they power to determine what is really and intrinsically substantial and essential in matters of doctrine. The difficulty of considering in legal tribunals questions which depend on such inquiries has led courts to act upon the rule that they will not interfere with the application which a trustee has made of a fund given to a religious use, upon the ground that the donor intended to limit the application of the fund, unless the intention to exclude the opinions to the support of which the fund has been applied has been plainly expressed by the donor. Courts of law are, by their habits and constitution, ill fitted for the investigation of such questions; and it will not be supposed that the founder of a religious charity intended the trustee, whom he selected to administer his charity, should be called to account in the legal tribunals for a misapplication of the funds to the support of religious opinions different from those intended, unless he has used appropriate and explicit terms excluding the doctrines to which the fund has been applied." *The Dublin case*, 38 N. H. 509.

In that case, the court had occasion to repeat the elementary rule that " The individual religious opinions of the donor cannot be received to enlarge or contract the meaning of general terms used in the instrument by which he established the charity." *Id.* 551–562. It is not a little extraordinary that it should now be necessary to repeat again the rule " which excludes parol evidence to vary or control a written instrument," especially in a case in which the statute of frauds requires the donor's intention to be proved by some writing signed by him. *Vidal* v. *Girard's Executors*, 2 How. U. S. 127, 197; *Storke* v. *Storke*, 3 P. Wms. 51, 52. If such evidence were received, one deed signed by a Unitarian, and another deed, composed of the same words, signed by a Trinitarian, might establish entirely different trusts ; two deeds, fac-similes, executed by one person at different periods of his life when he belonged to different sects, might be construed to express opposite

intentions; than which nothing could be a more absurd legal result. *Attorney-General* v. *Drummond,* 1 Drury & Warren 353, 370. Attempts in this class of cases to introduce such evidence, when there is no ambiguity, are exhibitions of the intrepidity with which sectarian zeal, worked up to an intemperate pitch, is capable of arraying itself against law and order, as if it were thought possible for the court to be carried away from their duty and their oaths by the ardor of a religious crusade.

In *The Dublin case,* the plaintiffs claimed that the word " Congregational " was used by one of the Congregational sects, in 1817, in a peculiar sense, and that the public instructions of the founder of the trust, and his connection with that sect, tended to show that he used the word in the peculiar sense. And if a sectarian trust were now created with a " Congregational " limitation, evidence of that kind might show a latent ambiguity. By parol evidence, two meanings might be shown, and the one intended by the founder could be proved. In *The Dublin case,* it was not shown that the term " Congregational " was used by any sect of Congregationalists, at the time and place in question, in any peculiar sense different from the common and generic meaning—pp. 471, 480, 551. In the present case, it cannot be claimed that there is any latent ambiguity, or that any language has been used in any peculiar or conventional sense, or that there is any pretext for receiving parol evidence in violation of those general and fundamental principles with which all lawyers are familiar. And yet a large quantity of parol evidence has been taken, nearly the whole of which is inadmissible under the primary rules of evidence so recently and pointedly reäffirmed in *The Dublin case.* A great mass of testimony, concerning the origin and early history of the parish, and the proceedings and religious opinions of its members, and the opinions of other persons and of Unitarians generally, is so clearly incompetent, that nothing should be allowed in the taxation of costs for obtaining it.

The statute of frauds,—act of Feb. 10, 1791,—which was in force at the date of the deed of the lot on which the meeting-house stands, provided " That all grants and assignments, and all declarations and creations of trusts or confidences, of any lands, tenements, or hereditaments, shall be manifested and proved by some writing signed by the party who is by law enabled to declare such trust, or by his last will in writing, or else they shall be utterly void and of none effect,"—implied trusts excepted. If any trust was attached to this meeting-house, it can be proved only by some writing signed by the party who declared the trust. The religious sentiments and conduct of the party declaring the trust, and of all other parties, are irrelevant and immaterial, and are excluded from our minds by the elementary common-law rule of evidence, and by the statute of frauds. *Graves* v. *Graves,* 29 N. H. 129; *Farrington* v. *Barr,* 36 N. H. 86; *Moore* v. *Moore,* 38 N. H. 382.

The deed of the meeting-house lot is dated June 10, 1828, is signed by the Dover Manufacturing Company, and, in consideration of $1,000,

acknowledged to have been paid by H., C., A., P., and O., " trustees of the first Unitarian Society in Dover, duly chosen by said society," conveys the lot to said H., C., A., P., and O., " trustees as aforesaid, and their successors, which from time to time may be chosen by said Unitarian society in their places, or the places of any of them, whenever the same, from any cause, may or shall be vacant.   *   *   To have and to hold said granted premises in trust for the use of the stockholders or proprietors of the meeting-house to be erected thereon, their heirs and assigns, and under such regulations, conditions, and restrictions for the sale and occupancy of the pews in said house, and for the use, care, custody, and control of said house, as may be prescribed by a majority of the votes of said stockholders, at any time previous to the sale or disposal of the pews in said house, in all cases counting one vote to each share of the stock represented in said house."

It is probably immaterial that the word " Christians," which the plaintiffs consider so important a part of the name of the parish, is ominously omitted in this, the only deed under which the parish claim any right to use the house.   A material fact is, that the instrument conveyed to the parish no right whatever in the lot or house, either of title or use.   Certain persons elected by the parish, and called trustees, were made the legal depositaries of the bare title—the dry legal estate—without any control of the property or right to use it.   But in the deed the parish was neither a trustee nor a beneficiary.   Another important circumstance is, that the beneficiaries were not described by any sectarian name, or required to hold or profess any religion whatever. They were such unnamed and unknown persons as might, by their contributions, aid in building a meeting-house on the lot, and who were designated as " stockholders or proprietors of the meeting-house to be erected thereon."   These contributors, called " stockholders or proprietors of the meeting-house," were not required to subscribe a list of theological articles before giving the money with which the house was built.   Toleration prevailed so far as to allow anybody to be a contributor.   The contributors might be, and, according to the elementary rule confirmed in *The Dublin case*, we have no right to know that they were not, all Trinitarians or theists.   The lot was conveyed in trust for their use, and no other use was declared in the deed.   So far as any trust was attached to the lot and house by this deed, it was neither Unitarian nor Christian.

" The use of the stockholders or proprietors of the meeting-house to be erected " on the lot was not a denominational use.   It was a use as free and unlimited as the corporate power of the parish.   It is immaterial, and we are not permitted by law to know, whether any of the so-called stockholders were ever members of the parish, or whether they had any theological opinions.   The nature and extent of the trust are to be proved by the deed from the Dover Manufacturing Company,— the party who declared the trust,—and by no other evidence, according to the statute of frauds, and the rule " which excludes parol evidence to vary or control a written instrument."   The use of the so-called

stockholders—the only trust declared in the deed—would have been the same if the directors of the Boston & Maine Railroad had been made trustees, because the trustees have no power, use, control, or beneficial interest in the trust. The so-called stockholders, that is, contributors, whoever they might be, were the sole beneficiaries; and they might be, and for aught we can legally know, were, all Presbyterians or Freewill Baptists; and they were entitled to appropriate the house to miscellaneous preaching.

Their use was to be under such regulations "for the use, care, custody, and control of said house as may be prescribed by a majority" of the contributors before the sale of the pews. And, on the 6th of March, 1829, before the sale of the pews, the contributors voted "That the general custody of said house shall be under the control of 'The First Unitarian Society of Christians in Dover.'" From that vote, and from nothing else, the parish derives its control of the house. A trust is not proved by the vote, for it is not "signed by the party who is by law enabled to declare such trust," as required by the statute of frauds. But it seems to be regarded by all parties as a regulation, authorized by the deed, and valid and binding. Taking it to be so, what is its meaning? It evidently means, for one thing, that the independent parochial corporation (designated by its corporate name, as corporations usually are) shall control the house to the extent of deciding who may preach, and what theology may be preached therein, as it could if it had the title as well as the control. If the contributors had intended that the corporation should have any less control, in respect to theology, than it would have of a house built by a parochial tax, they would have expressed that intention in the vote by which they gave the control to the corporation. If the corporation had bought the meeting-house lot, and built the house with money raised by taxation instead of contribution, and taken a deed in its corporate name, being theologically an independent corporation, it would have had the right "to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person, to preach" anti-Unitarianism "in the meeting-house of said society." That anti-Unitarian right it has now: that right, the decree says, the members of the parish shall never enjoy.

The vote giving the control of the house to the parish was not dictated by the deed. The contributors could have retained the control, or assigned it to any other parish, or any other person or persons. They were under no fiduciary restraint in that respect. The rights of the parish in the house begin and end with the control given it by individuals who were under no obligation to restrain the pulpit to Unitarian preaching, and who, for aught we can judicially know to the contrary, were all Trinitarians or theists. By the terms of the deed, the regulation for the use, care, custody, and control of the house was to be prescribed by vote of the contributors. Their vote is in writing, and can no more be varied by parol than can the deed. If there is no latent ambiguity in it,—and none has been or can be suggested,—its meaning is to be ascertained from its terms and not inferred from

extraneous evidence of the theological opinions of the contributors or the members of the parish. *The Dublin case*, 38 N. H. 551–562.

The name of the independent parish to which the control of the house was given by the vote of the contributors is "The First Unitarian Society of Christians in Dover." Was a sectarian limitation of the control imposed by the non-omission, in the vote, of the name of the independent corporation to which the vote gave the control? Did the contributors, of legally unknown and immaterial theological opinions, in giving the control to an independent corporation, limit the control to Unitarian Christian uses, by not departing from the universal usage of calling a corporation by its corporate name? To give property, or the control of property, to this independent parish for its corporate uses, must anything more be done than to give the property or control to the parish? Must the donor go further, and say, " I give you this for the uses of the parochial independence guaranteed to you by the constitution of New Hampshire? Unless he delivers an oration on the subject, and expatiates upon his intention of aiding the parish in the enjoyment of its constitutional rights, will the court, in violation of the statute of frauds, in violation of the law of evidence, in violation of all legal principle and all rational probability, presume that he intended his gift for the benefit of the parish only upon a condition at war with those rights, and subversive of the constitutional character of the parish? Have constitutional religious rights fallen into such disrepute as to raise a legal presumption that everybody who does not declaim in their favor is plotting against them?

Under the recent decision of this court, in *The Dublin case*, a sectarian limitation must be expressed in plain, appropriate, and explicit terms; and the sectarian sentiments of individuals cannot be shown, by extraneous evidence, to control or vary a writing in such a case as this. "It is a general rule that corporations must take and grant by their corporate name." 2 Kent Com. 292; 1 Bl. Com. 475; Bac. Abr. *Corporations* (C), 1; Angell & A. on Corp., sec. 99; Co. Lit. 250 a, *n.* (A). An intention to impose a sectarian limitation, in a transfer of the control of property to a corporation, is not plainly, appropriately, and explicitly expressed by designating the corporation by its corporate name, when it would be inconvenient to designate it in any other way, and when its name does not express its constitutional nature or the extent of its constitutional power,—when it is an independent and not a sectarian corporation. It is usual, in assignments, appointments, deeds, wills, leases, and licenses, to describe the assignee, appointee, grantee, devisee, lessee, and licensee by name. The use of a circumlocution as a substitute for the name would be a freak in which no one, knowing the name, would be likely to indulge. It would be unprecedented, useless, and troublesome. The omission of the name would be so extraordinary that it is impossible, from the presence of the name, to infer a special intent to create a sectarian limitation. When such a limitation can be imposed only by plain and explicit terms, and when the name is used for the purpose of identifying the independent parish,

the name, necessarily used for that purpose, is not an explicit declaration of another and totally different purpose, to wit, the creation of a sectarian limitation.

Whether a corporation is eleemosynary or civil can be known only from its charter. "Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence." *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 636. Whether this parish is technically an eleemosynary or a civil corporation, it is authorized, by its charter, to apply its "property or the income and proceeds thereof to the objects of its own creation, and to no other objects; and it would be restrained by injunction from diverting its property to other objects. It would ordinarily be allowed to sell its property in good faith, but, at the suit of individuals interested, might be forbidden to devote its property, or the income or proceeds, to any purpose not within the legitimate sphere of its corporate power,—not within the line of the general purpose and object for which the parish was incorporated. *March* v. *E. R. R.*, 40 N. H. 548; S. C. 43 N. H. 515; *Durfee* v. *R. R.*, 5 Allen 230, 242; *New S. Meeting-House Case*, 13 Allen 497, 506, 510.

Dartmouth college, by its charter, was created expressly for educational purposes; and if land, or the use or control of land, were given to that corporation without any condition or limitation in the deed, and the corporation should undertake to appropriate the land, and its use, income, and proceeds, to commercial purposes, it might be restrained by injunction. A corporation is nothing but a franchise or capacity which individuals are permitted to exercise, though, in legal fiction, it is called an artificial person, or an invisible, intangible body, existing only in contemplation of law. The capacity called Dartmouth college is merely educational; the commercial capacity is only that which is a necessary incident of the other; and property given to Dartmouth college is given to an educational and not to a commercial capacity.

"The charter is granted, and, on its faith, the property is conveyed" to the corporation. "'For the education and instruction of the youth' * * the charter was granted." "Dartmouth college is an eleemosynary institution," "a seminary of education incorporated for the preservation of its property and the perpetual application of that property to the objects of its creation." "The founders of the college contracted not merely for the perpetual application of the funds which they gave, to the objects for which those funds were given; they contracted also to secure that application by the constitution of the corporation." "From the very nature of the case, * * there was an implied contract on the part of the crown with every benefactor, that if he would give his money it should be deemed a charity, protected by the charter, and be administered by the corporation according to the general law of the land. * * There was also an implied contract between the corporation itself and every benefactor, * * that it would administer his bounty according to the terms, and for the

objects stipulated in the charter." *Dartmouth College* v. *Woodward,* 4
Wheat. 518, 627, 631, 641, 652, 689.

In the present case, by the act of 1827, this Dover corporation was
created as a parish or religious society, " capable in law to take, hold,
and possess, to them and their successors, for the use and benefit of such
society, by purchase, gift, grant, devise, or otherwise, any real or personal
estate, for the purpose of erecting and repairing a house of public worship
and a parsonage house, and other buildings necessarily connected there-
with, and for supporting the ministry in such society." The " house
of public worship " is for the exercise of the " natural and unalienable
right " which Article V of the bill of rights declares " every individual
has," " to worship God according to the dictates of his own conscience
and reason ;" and " supporting the ministry " is supporting " their own
public teachers," whom Article VI guarantees " the several    *    *
parishes   *   *   or religious societies shall at all times have the exclu-
sive right of electing." The act of 1827, and the bill of rights, are
the charter or constitution of the parish, and, as we have seen, the par-
ish, by its constitution, is free and independent, and not sectarian.

And now we have only to apply the law as laid down in the *Dart-
mouth College case.* The charter is granted, and on its faith the
property is conveyed, and the meeting-house placed under the control
of an independent parish. For the support of such public teachers as
an independent parish might elect, the charter was granted. The in-
dependent parish was authorized to devote its property, and the prop-
erty of which it might have the control, to the objects of its creation.
The founders of the parish contracted to secure the application of the
property by the constitution of the corporation. From the very nature
of the case, there was an implied contract between the corporation and
every contributor that it would administer his bounty according to the
terms and for the objects stipulated in the charter. Those objects were
the objects of an independent parish,—not manufacturing, mining, or
hotel purposes, which would not be parochial ;—but Trinitarian, Uni-
tarian, and theistic purposes are within the sphere of parochial indepen-
dence. Independence was guaranteed by the charter: the meeting-house
was placed under the control of the parish, on the faith of the charter,
and secured by the constitution of the corporation to the uses of inde-
pendency.

In the *Dartmouth College case,* an act of the legislature was held
unconstitutional and void, on the ground that it impaired the obligation
of a contract. From the donation of property to the corporation, the
contract was implied that the property should be applied to the legal
objects of the corporation, upon which the donors were presumed to
have relied. To that extent the doctrine of that case (whatever doubt
there may be as to the application of it there made) is indisputable : a
contract, limitation, condition, or trust, inconsistent with the character
of the corporation, cannot be inferred from a donation of property
to it. A donation of property, or the use or control of property, or
an assignment of elective power, to an independent parish, is not, by

implication, encumbered with a perpetual sectarian restriction in conflict with the constitutional character of the parish. If there had been no constitutional guaranty of parochial freedom, and, by general or special act of incorporation, this parish had been constituted sectarian and not independent, the meeting-house placed under its control might have been devoted to the sectarian purposes of the sectarian parish. And the principle that would produce that result, dedicates the house to the independent purposes of the independent parish. *Williams* v. *Williams*, 8 N. Y. 525, 530, 535, and all the cases before cited on the question of parochial power.

Suppose the inhabitants of a town harmonize on all political questions; the name of the town indicates their political views: some or all of them, in their individual capacities, purchase a lot of land, and cause it to be conveyed by trustees elected by the town, in trust, for the use of such persons as should contribute to build a town-house thereon, under such regulations of the use and control of the house as should be prescribed by vote of the contributors; the contributors, by vote, give the control of the house to the town; and, in course of time, the inhabitants adopt political opinions precisely opposite to those formerly held by them, and indicated by the name of the town: the court would not, by injunction, restrain the voters of the town from allowing political views subversive of their former opinions to be advocated in the house. It would be conclusively presumed that the intention was to give the control of the house to the town, for all the uses of a town-house within the sphere of all the corporate powers of the town, and not to restrict the use by the political signification of the name; that the name was employed in the vote of the contributors as the usual and most convenient means of identifying the donee, and not for the purpose of imposing on the use of the house a political doctrinal limitation. The material constitutional character of the corporation would be regarded, and not the immaterial political character of its name. And the constitution guarantees the political independence of towns no more explicitly or fully than it guarantees the ecclesiastical independence of parishes. This illustration is peculiarly satisfactory, because the towns of New Hampshire were parishes nearly two hundred years, and the independence of the parochial capacity, as it was in provincial custom and law, and as delineated in the constitution of the state, is the same, whether exercised by "towns, parishes, bodies corporate, or religious societies."

"Where a congregation become dissentient among themselves," said Lord ELDON, in *Attorney-General* v. *Pearson*, 3 Meriv. 400, "the nature of the original institution must alone be looked to as the guide for the decision of the court;" and the constitutional independent nature of the original institution of this parish must be our guide in this case. In England, the courts, while declaring their readiness to sustain dissenting congregations "according to their institution, if the doctrine preached is tolerated by law"—*Davis* v. *Jenkins*, 3 Ves. & B. 151, 158—have been greatly perplexed in ascertaining the nature of the institution of such congregations not incorporated nor in any

way connected with the ecclesiastical system of the state. But we labor under no embarassment in regard to an incorporated parish : its nature is far more plain and simple than a parish of the Church of England. A parish and minister of that church are, in the theory of the English law, as firmly bound by the established articles of religion, as a regiment by the army regulations. Its doctrines and discipline are enforced by the ecclesiastical courts of the same government that administers the discipline of the army and navy by military and naval tribunals. And, because the national ecclesiastical system is a part of the government which the people are presumed to sustain, the courts apply every fund given for the support of religion to the maintenance and propagation of the established religion of the country, unless the donor has directed otherwise. *Attorney-General* v. *Pearson,* 3 Meriv. 409 ; *Attorney-General* v. *Calvert,* 23 Beav. 248, 258 ; *The Dublin case,* 38 N. H. 557. The same rule is applicable here. Parochial independence being the established ecclesiastical system of the state, property given to, or in any way devoted to the use of, an unincorporated society, is presumed to be intended for the advancement of that system, in the absence of any legally expressed intention to the contrary. There is much less difficulty here, in applying property to its destined use, when it is placed by the donor under the control of a parish incorporated and therefore necessarily independent, than there is in England in applying to the use of the English church property placed under the control of a parish of that church : instead of construing the thirty-nine articles, we have only to ascertain what public teacher is the choice of the parish : his articles of religion this court is not authorized to inspect.

The English courts, on the other hand, under the influence of sectarianism established by law, and accustomed to professed uniformity and stability of doctrine, discipline, and ritual, as the prominent features of ecclesiastical institutions, formerly presumed everything against the introduction of the slightest degree of parochial independence. So averse were they to the popular election of teachers of religion, that the election of a vicar of the established church by the members of a parish of that church was held to be so lamentable a mischief as to be a very fit subject for the interposition of parliament. *Fearon* v. *Webb,* 14 Ves. 13, 25. And a trust created for the benefit of a society having the right to elect public teachers of all denominations seemed to them such a chimera, that they could scarcely conceive it possible that it had been designed ; and consequently it seldom occurred to them to inquire whether designs of that nature would be manifested by the natural and legal construction of the instruments by which religious trusts were established. Indeed, so thoroughly were they, in common with all other branches of the government, imbued with the spirit and addicted to the practice of a special sectarianism alleged to be apostolic and stationary, that they could have no adequate conception of absolute ecclesiastical independence as a parochial system. It was to them an anomaly and a puzzle. "It is very difficult to know what to do with

these dissenting societies," said Lord ELDON, in *Davis* v. *Jenkins*, 3 Ves. & B. 151, 154. One of his difficulties was, that sectarianism had so long been the law and the practice of the country that he supposed the founders of those societies must necessarily intend to perpetuate some sectarian faith, and not to leave the societies at liberty to choose and change their own religious opinions. It did not occur to him that any other intention was possible. And in vigorously carrying out that presumed intention, he threw the English law into confusion. An intent to perpetuate the sectarian opinions held at a particular time by the members of a congregation or the founders of a religious trust or charity being presumed, it became necessary, if legally possible, to ascertain what those opinions were; but, in ascertaining them, Lord ELDON resorted to parol evidence, in violation of the elementary common-law rule which forbids a written instrument to be controlled by such evidence, and in nullification of that part of the statute of frauds which requires every creation of a real estate trust to be proved by some writing signed by the party creating the trust.

The error in regard to parol evidence into which he fell, in his zeal to execute the presumed sectarian intent, was rejected in *The Dublin case* (pp. 551–562); and although, in the unprecedented dispatch with which the present case has been brought to a decision by special orders of the court setting aside the rules and the usual course of practice, counsel have overlooked this point in *The Dublin case*, Lord ELDON's error was a palpable one, that cannot be designedly adopted by a court that has once rejected it.

The nature of the original institution must be the guide for the execution of a trust when there is an original institution to promote which the trust is created. That is merely saying that legal trusts, legally proved, are to be executed. And the English principle of presuming an intent, in the creation of a trust, to follow the example and analogies of state institutions, is not inconsistent with a democratic form of government. In England, the presumed intent formerly was to establish a sectarian perpetuity; in New Hampshire, upon the same principle, the presumed intent is to establish an independent perpetuity; for parochial independence is as much the ecclesiastical establishment of this state, as parochial sectarianism is a part of the English system. In this case, there is no occasion to draw a presumption from the examples, analogies, or influences of state institutions, for it is a state institution with which we are dealing; the intent to be presumed is furnished by the independent nature of the institution to which the control of the meeting-house was entrusted.

If an English parish had been incorporated as a branch of the established church by the name of The Independent Society, and the control of a parish church had been assigned to it by a vote describing the assignee by its corporate name, and Lord ELDON, being asked by a minority of the parish to divert the house to independent uses, had followed the independent name instead of the sectarian nature of the original institution; or, if a case could be found in which a court had

held a sectarian name of an independent parish to be the guide, instead of the independent nature of the original institution, there would be one authority in favor of the plaintiffs in this case.

In *Attorney-General* v. *Gould*, 2 Law Times Rep., N. S. 495, decided in 1860, a chapel had been by deed put in trust in 1746 " for the use and benefit of the congregation of particular Baptists within the city of" N., and the question was, whether the congregation should be restrained to close communion in the use of the chapel. The master of the rolls said,—" This congregation has adopted the practice of strict communion, from its first institution until within a very short period of the present time. I have therefore to consider whether that usage has precluded this congregation from altering that practice, and from now adopting the practice of free or mixed communion. *     * Usage is only important in a legal point of view, where there is an absence of any instrument of endowment, or where the words of the instrument produced are ambiguous." He rejected evidence of the usage, and the congregation not being incorporated, and the nature of the original institution not appearing by legal evidence to be sectarian in the matter of the communion, he refused to interfere.

In *Attorney-General* v. *Bunce*, Law Rep. 6 Eq. 563, funds had been bequeathed for the benefit of a Presbyterian society, which in time became Baptist and employed Baptist ministers; and it was held that the use of the term " Presbyterian " did not amount to a requisition that any particular religious doctrines or mode of worship should be taught and observed, and that the court could not restrain the funds from Baptist uses. One of the grounds of the decision was, that the society must be regarded as independent. ·

The principle recognized by all the English authorities, that the nature of the original institution is the guide, is established in the *Dartmouth College case*, and all other American cases. But when we come to apply this principle, it must be borne in mind that no decisions, in cases in other jurisdictions, restraining parochial property to sectarian uses, can be of any weight in this state, unless it appears in those cases that the parishes for whose use the property was given were independent. And if cases can be found in which the property of independent parishes, or property devoted to the uses of independent parishes with no other limitations than such as attach to the property of such parishes, has been withheld by the court from independent parochial uses, such authorities will be useful landmarks of error. The Massachusetts constitutional guaranty of parochial independence seems not to have been copied by any of the states except New Hampshire and Maine; but, in New York and some other states in which the question has arisen, it has been held that the same independence exists under statutes authorizing the incorporation of religious societies. Some courts, falling into the error of Lord ELDON, have admitted incompetent parol evidence of theological opinion and ecclesiastical usage, to alter written conveyances of property made to, or for the use of, religious societies; and cases decided by that method are of no value as

precedents in this state. In *The Dublin case*, it was said that *Kniskern* v. *Lutheran Churches*, 1 Sandf. Ch. 439, was the only American case of that kind that the court had met with.

Before the decisions in *Robertson* v. *Bullions*, 11 N. Y. 243, *Petty* v. *Tooker*, 21 N. Y. 267, *Burrel* v. *A. R. Church*, 44 Barb. 282, and *Gram* v. *Society*, 36 N. Y. 161, the view prevailed in New York, to some extent, that parishes incorporated under the statutes of that state were, or might be, sectarian in their legal character. *Bellport* v. *Tooker*, 29 Barb. 256, 272. But that view was a mistake which was corrected in those decisions. Some remarks of GARDINER, president of the senate, in *Miller* v. *Gable*, 2 Denio 492, 548 (decided in 1845), which were based upon that mistaken view of the legal character of New York parishes, have been construed as an adoption of the sectarian tendencies of Lord ELDON, although the decision of the question before the court in that case—a decision made by the president and thirteen others of the seventeen members of the court—was entirely in favor of independence and against sectarianism, expressly settling the point that a meeting-house, held in trust for the use of "The Calvinistic Church in the city of New York," was not limited to Calvinistic doctrines. The *dictum* of President GARDINER, that, in a grant to an incorporated parish by name, "the corporate or denominational name, in connection with the contemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust in respect to doctrines esteemed fundamental," was founded on two errors,—a supposition that, under the statutes of New York, a denominational name indicated a sectarian legal nature, and the admission of incompetent parol evidence,—both of which errors he rectified in 1854, when he concurred, as chief judge of the court of appeals, in the decision of *Robertson* v. *Bullions*. In the meantime, the errors of his *dictum* had been quoted and followed by EDMONDS, J., in *People* v. *Steele*, 2 Barb. 397, decided in 1848. In *Kniskern* v. *Lutheran Churches*, 1 Sandf. Ch. 439, decided in 1844, land had been conveyed to trustees of a society called "The Lutheran Congregation of" C. & N., "for the common use and benefit of the said Lutheran Congregation forever." At the date of the deed, the congregation was organized, but it was not incorporated until some years afterwards. The nature of the society was not manifested by a charter or general act of incorporation; and the error of SANDFORD, assistant vice-chancellor, in altering the deed by inserting a sectarian institution upon parol testimony, in violation of the statute of frauds and the common-law rule of evidence, was sufficiently shown in *The Dublin case*.

But if the supposition, that under statutes of New York incorporated parishes were or might be sectarian in their legal nature, had not been a mistake, and if the *dictum* of GARDINER had not been retracted, and the decision of EDMONDS had not been overruled, that *dictum* and that decision would be of no avail to these plaintiffs until they established the theory that, under the constitution of New Hampshire, incorporated parishes are not independent. That theory is indispensable to the plaintiffs' case.

In *Smith* v. *Swormstedt*, 16 How. U. S. 288, 305, 307, it was decided that the general conference of the Methodist Episcopal church, an unincorporated institution, holding property in trust, might divide the property with the purpose of appropriating it to the dissemination of opposite theological views on the question of slavery, without regard to the original position of the conference on that question. That case exhibits the tendency of American law to sustain ecclesiastical independence. If there ever had been a contrary tendency in New Hampshire law (as we have seen there never was), it would have been eradicated by the constitution, which disabled the spirit of intolerance, and established religious equality as an unalienable right, and parochial independence as a state institution. And the proposition, that the control of property given to an independent parish enures for the benefit of parochial independence, is too plain to need the support of authorities, or to be overthrown by authorities, if there were any in conflict with it.

"Let us consider the reason of the case. For nothing is law that is not reason." *Coggs* v. *Bernard*, Ld. Raym. 911. In the deed and vote by which this corporation acquired the control of its meeting-house, why was every limitation of the control of the house carefully omitted? Because the deed was made, and the vote was passed, on the faith of the charter which created and described the nature of the original institution; because it was understood, and there was an implied contract, that the corporation should use and control the house, in the full exercise and enjoyment of parochial authority and power, for the objects stipulated in the charter—the objects for which the corporation was created—the objects within the scope of its corporate capacity, and the range of its organic law; and because that use was secured by the constitution of the parish, and the constitution and laws of the land. That use included the preaching of any doctrine the corporation was authorized by its constitution to inculcate: that was the use desired by the contributors: they relied upon the organic force and law of the corporation. The court cannot receive parol evidence of their being Unitarians, and then conjecture that they were so assured of Unitarian infallibility that they resolved to fasten it as an endless, unalterable encumbrance upon the house, and that, after organizing the corporation, without any attempt to abolish the constitution which made it theologically independent, they formally proceeded, by deed and vote, to establish Unitarianism as a sectarian perpetuity, when they studiously refrained from putting in the deed or vote a single statement or declaration on the subject, and inserted not a word that could convey a sectarian idea, except the name of the independent parish, which name it was necessary to use in order to identify the free corporation to which they committed the control of the house. Nor can the court alter the deed or vote, or make them to correspond with an impossible conjecture.

If, in putting the house under the control of the parish, the intention had been to forbid the parish controlling it for the uses for which the

parish was by law authorized to hold such property, is it reasonable to suppose that such an intention would not have been declared, as this court in *The Dublin case* held it must be, in plain, appropriate, and explicit terms? When the parish could apply its property to all uses within the charter powers,—when the charter expressly authorized the parish to apply its property to those uses,—is it possible to imply a contract that the parish would not apply property put under its control to the same uses? Can it be imagined that there was an understanding —an invisible, inaudible stipulation—between the parish and the contributors, whose vote placed the house under the control of the parish, that the parish would not apply the house to the uses of the parish?

The contributors, and the members of the parish, understood that the pulpit might be occupied by public teachers. What public teachers? Necessarily, the public teachers of the parish,—the public teachers whom the parish was authorized by the constitution to elect,—unless a different understanding was expressed in the plain, appropriate, and explicit terms which are necessary to create a sectarian limitation. *Wood* v. *Cushing,* 6 Met. 448, 456. That the parish can rightfully elect a public teacher who, in the pulpit of which the parish has legal possession and unrestricted parochial control, cannot rightfully preach the doctrines he was elected to preach; and that this state of things is brought about by a vote which simply gave the control of the pulpit and house to the parish, is a mystery not attributable to the perfection of reason.

If the parish had bought the land and built the house with money raised by a parochial tax assessed upon the polls and ratable estates of the members, and collected in the manner authorized by law, and had taken a deed, in common form, from the Dover Manufacturing Company to the parish by its corporate name, the parish would now "hold and possess" the land and the house, by force of the common law as well as the act of 1827, "for the use and benefit of" the independent parish, free from sectarian limitations. And if the deed had been "in trust for the use of the parish," describing it by its corporate name, the effect would have been the same as to the parochial use of the house: the parish not having the title could not convey the title; but its parochial control of the use, for the purposes of theological independence, would have been as absolute as if it held the fee. The corporate name of an independent parish carries no more sectarianism into a trust deed than it carries into any other deed. And the vote, transferring the control of the house to the independent parish by its corporate name, imposed no sectarian limitation that would not have been imposed by an absolute deed in common form from the Dover Manufacturing Company to the parish. A conveyance of property to an independent parish, or in trust for the use of such a parish, or a vote assigning the control of property to such a parish, is for the benefit of the members of the parish in the full enjoyment of their parochial capacity. This meeting-house was put under the parochial control of an independent parish by the vote of the contributors, and

was thereby devoted to the uses of parochial independence. There is no sectarian trust or limitation attached to it. The use of it is con fined within no narrower theological lines than those of parochial power. That is the answer to the third question, and the end of the law of the case, and of all the facts competent and material to be considered.

And, if we were to do what the law forbids,—if we should go beyond the legal proof, beyond the charter, the deed, the votes, the law, and the constitution, receive the inadmissible evidence which has been offered, ascertain by illegal means and methods the intention of the first members of the parish, and decide according to the merits and equities, without regard to legal rules,—we should find the same answer for the third question, and arrive at the same conclusion on the whole case. And it is agreeable to know, that the principles of natural justice are enforced by the application of those general and elementary principles of law, a faithful adherence to which is of paramount practical importance, as well as an imperative judicial duty. *The Dublin case,* 38 N. H. 565.

The money with which the meeting-house was built was raised by subscription, in pursuance of a vote of the parish. The contributors who furnished the money, and by their vote placed the house under the control of the parish, were members of the parish. As members of the parish, they first voted to raise the money by contribution, instead of taxation. As members of the parish, they contributed the money, and built the house. As members of the parish, they put the house under the control of the parish. They intended to give themselves and their successors (that is, the parish) entire parochial control,—just such control as the parish would have had if they, in their parochial capacity, had built the house, or bought it, with money raised for the purpose by a parochial tax. Their intention, as to the theological character and destiny of the house, was precisely what it would have been if they had collected the money of themselves by their own voluntary taxation, instead of their own voluntary contribution. They chose the form of contribution rather than the form of taxation, for the same reason that induces other parishes to make the same choice in raising funds for parochial purposes. They chose the usual form, and their choice had no theological significance.

They were not ignorant of their denominational polity. The first pastor of their parish says,—" There has never been, there is not now, among the Unitarians, anything that may be regarded as an authoritative statement of religious belief, because, in the spirit of Congregationalism, they have always rested upon and contended for the independence of each separate congregation." " Each [Unitarian] society manages its own affairs, temporal and spiritual, in its own way." 15 New Am. Cycl. 709. They were not ignorant of their denominational history. Parochial independence, which their denomination had such experimental knowledge of, they perfectly understood. On that founda-

tion they well knew their denomination had just risen to its conspicuous position, a flourishing set of apostate parishes glorying in their freedom.  On that denominational foundation of constitutional right, fully appreciated, universally acknowledged, judicially vindicated in the reported case of *Baker* v. *Fales (ante,* pp. 144, 147), and demonstrated to be absolutely invincible by Webster's inability to find an argument against it, they formed themselves into this independent parish. On the same foundation, and as the most important part of the same transaction, they built this house, and committed the control of it to themselves and their successors in their independent parochial capacity. They were intelligent men.  They were theologically liberal, in the large Unitarian sense.  They were honest.  They believed in the principle of parochial independence, admitted by everybody, and specially professed and practised by their denomination.  It was a fundamental principle of their Unitarian system : it greatly promoted their cause : they relied 'upon its assistance in the final triumph of the truth. Knowing what they knew, and believing what they believed, what could they do with the house but devote it to that principle of parochial independence, as Unitarian as it was constitutional, to which their denomination was publicly and irrevocably committed, to which they were indebted for their sudden denominational growth and prosperity, and in which they rejoiced with becoming joy and gratitude ?  They did put the house under the absolute parochial control of their independent parish.  Can there be a doubt of their intending to do what they did, or of the natural justice of the case ?  They were respectable men, morally and intellectually.  And it is due to their memories that they be exonerated from the plaintiffs' accusation of intending, in practice, to trample their avowed principles under foot, when those principles coincided with their view of their denominational interests.

From whatever side and in whatever light of law or justice we look at the case, it is impossible to discover anything favorable to the plaintiffs.  Here were men, who had abandoned the faith of their fathers (on points agreed on all hands to be essential, fundamental, cardinal, and vital), engaged in the business of forming themselves into an independent parish, and building a meeting-house for the use of the parish.  Would they be likely to put such a restriction upon their own use of their own house, that, if they should in the course of time reconsider and reconstruct their theology once more, they would deprive themselves of the benefit of their own investment ?  Would they, without any necessity for so doing, put themselves under bonds never again to change their opinions ?  Putting a restriction upon their own use of the house would be unnecessarily giving bonds, to the amount of its value, to keep their opinions unaltered.  Would their desire to debar their successors from the right of apostasy, which they had exercised, be so overpowering as to deface their own house with the humiliating inscription that they themselves should lose the control of it if they apostatized a second time ?

Then, as to the use of their successors.  The founders of this parish

may be supposed to have had some knowledge of ecclesiastical history, the laws of nature hitherto in operation, and the universal mutability of theology produced by the operation of those laws, especially in nations of education and intelligence, and more especially among those and the descendants of those who have apostatized from Catholicism. They must be supposed to have acted upon their knowledge of the historical and notorious fact. It would be uncharitable to suppose, in view of their own experience and the long experience of mankind, that they had the conceit to believe their faith could be held by their successors forever. Upon recantation of their former sentiments, they had adopted the Unitarian belief that the theology of Christ, and of his followers during his life, and for several hundred years after his death, was Unitarian, and that Trinitarianism was a heathenish corruption. That belief was a distinct recognition and affirmation of a historical and apparently inevitable fluctuation of doctrinal opinion. They did not intend, when their own remodelled theology should pass away, that this house, or its ruins, withdrawn from the uses of life, should become a monument of an extinct faith. They contemplated a use of unlimited duration, and to that end they put the house under the control and protection of their parochial corporation, the independence of which was a fixed principle of Unitarian as well as constitutional law.

In *McGinnis* v. *Watson*, 41 Penn. St. 9, decided in 1861, Ch. J. LOWRIE, delivering the opinion of the court, and commenting upon the rule laid down by Lord ELDON, says,—" We should grievously misapply this rule if we should interpret it as meaning that no congregation can change any material part of its principles or practices without forfeiting its property. This would be imposing a law upon all churches, that is contrary to the very nature of all intellectual and spiritual life. * * The guaranty of freedom to religion forbids us to understand the rule in this way. And all history forbids it. * * The principle is, that all intellectual or spiritual growth involves some change or development of opinions, principles, and practices. * * And the fact is, that, from the very origin of Christianity, such a change has been continually going on in the Christian church in all its branches, congregations, and members, without producing a forfeiture of the property held, even by those in which the change has been most decided. Changes in principles and practice are not incompatible with legitimate social succession, but are necessary elements of its normal progress." After citing ecclesiastical history in support of these views, the chief justice adds,—" In all the early colleges and universities of Europe, there is a similar departure from the original purposes of their creation and of their founders. Many of them were established with the expectation that they should teach the Ptolemaic astronomy. * * Nor can it be said that the authority, by which all those institutions passed over to the propagation of opinions contrary to the thought of the original founders, was grounded on mere might without right. All such institutions were created for the benefit of the people, and to meet this purpose, they must grow in form and principle with the demands that

are made upon them, and no founder can be presumed and hardly even allowed to have intended otherwise.    *    *    Whatever may be the limits that theologians may fix for the growth of the church in form or principle, we can fix none until the law can decide what particular church is perfect. All history reveals the church to us as an institution that is continually educating, developing, and changing society, and changing with the changes it produces, and this right to change is part of its freedom."

*Smith* v. *Nelson,* 18 Vt. 511, is a case of a legacy given for the benefit of a religious society, in which Ch. J. WILLIAMS, delivering the opinion of the court, says,—" Unless this right of the majority is recognized, and a gift or donation is to be construed as having reference to this state of our society, and as being intended by the donor to be controlled by a majority, property given, devised, or bequeathed to a religious society and for a religious purpose, might, in the course of a very few years, be wholly locked up and secluded from any useful or beneficial purposes; and we never ought to give such a construction to a legacy or gift, unless imperatively called on so to do by its explicit terms. *    *    Most probably, considering the times in which he [the testator] lived, the free and liberal institutions of the government under which he had been protected in his religious belief, and the tendency in all communities to divide into parties, one of which may prevail over the other for a longer or shorter time, he may have contemplated that time which witnesses changes in all things, might witness a change in that congregation even in great and important matters, and took no pains to guard against such changes by limiting or clogging the legacy with any conditions or stipulations which should prevent the congregation from having the benefit of it at all times to come while they had a pastor of their own choice.    *    *    Most religious societies have been at times divided on questions arising out of their articles of faith, and have altered them in many particulars,—by some deemed unessential, and by others essential. The situation of our country, our constitutional provisions in relation to religious freedom, forbid that the authority of those cases [*Attorney-General* v. *Pearson,* and *Attorney-General* v. *Shore,* sustaining the English sectarian theory] should be here recognized."

Similar views, in relation to a presumed intention of a donor not to deprive his successors of their religious liberty, were expressed by this court in *The Dublin case.*(pp. 563, 564), so far as an opinion on that point was called for by a Unitarian use of a legacy expressly limited to the support of the Christian religion and ministers of the Congregational persuasion, and not put under the general and unrestricted control of an independent parish.

Whether the views of these authorities are correct or not, they are views entertained by all Unitarians. They were entertained by the men who built this house, and put it under the control of their independent parish. These men claimed that they were not in the condition which they constantly and fervently denounced as bigotry and

sectarian thraldom. They exulted in their complete liberation from the trammels of sectarianism. They expected their successors, whether influenced by their apostate precept and example or not, would modify their faith, as they had modified the faith of their fathers, as those fathers had done before, and others before them, in that series of apostasies through which their pedigree ran back, through Catholicism, to their ancestral, historic paganism, and doubtless further back indefinitely, through many varieties of paganism in pre-historic ages. These Unitarians of 1829 were zealous advocates and champions of the right of individual and parochial apostasy. They had abandoned the Trinity, the vicarious atonement, the plenary, verbal inspiration of the Scriptures, and the five points of Calvin: they knew the length of another step like that: they proclaimed themselves a progressive denomination.

All Unitarian literature abounds in the sentiment that " There is nothing so revolutionary, because there is nothing so unnatural and so convulsive to society, as the strain to keep things fixed, when all the world is, by the very law of its creation, in eternal progress." Dr. Dewey, dedicating his meeting-house in the city of New York in 1839, said,—" We would consecrate this church, not to the pride of opinion, but to modesty and humility; not to assurance, but to inquiry; not to any unbecoming claim of unfallibility, but to the great principle of religious progress." " To free inquiry, then, we dedicate these walls." Channing's Discourse at the Dedication of Divinity Hall, Cambridge, 1826. " I stand now to teach, where in my childhood and youth I was a learner. The generation which I then knew has almost wholly disappeared. The venerable man, whose trembling voice I then heard in this place, has long since gone to his reward. My earliest friends, who watched over my childhood and led me by the hand to this spot, have been taken. Still, my emotions are not sad. I rejoice; for, whilst I see melancholy changes around me, and still more feel that time, which has bowed other frames, has touched my own, I see that the work of human improvement has gone on. I see that clearer and brighter truths than were opened on my youthful mind are to be imparted to succeeding generations.    *    *    I indeed take pleasure in thinking that the particular views which I have adopted, of the disputed doctrines of religion, will here be made known;—but I rejoice much more in thinking that this house is pledged to no peculiar doctrines; that it is not erected to bind my own or any man's opinions on this or on future times; that it is consecrated to free investigation of religious truth, to religious progress, to the right of private judgment, to Protestant and Christian liberty. Most earnestly do I pray that a purer theology, that diviner illuminations, that a truer worship, than can now be found in our own or in any sect, may be the glory of this house. We, who now consecrate it to God, believe in human progress. We do not say to the spirit of truth,—' Thus far and no farther.' We reprobate the exclusive, tyrannical spirit of the churches of this age, which denounce, as an enemy to Christianity, whoever, in the use

of his intellectual liberty, and in the interpretation of God's word for himself, may differ from the traditions and creeds which have been received from fallible forefathers. We rear these walls not to a sect, but to religious, moral, intellectual, Protestant, Christian liberty." Channing's Discourse at the Dedication of the Unitarian Church, at Newport, R. I., 1836. In September, 1841, Channing writes,—"It [New England Unitarianism] began as a protest against the rejection of reason—against mental slavery. It pledged itself to progress as its life and end; but it has gradually grown stationary, and now we have a *Unitarian orthodoxy*. Perhaps this is not to be wondered at or deplored, for all reforming bodies seem doomed to stop, in order to keep the ground, much or little, which they have gained. They become conservative, and out of them must spring new reformers, to be persecuted generally by the old."

This Dover parish, by dedicating its house to the Unitarian Christianity of 1829, devoted it not to "the traditions and creeds which have been received from fallible forefathers," "not to a sect," but to free inquiry, the right of private and parochial judgment, and the principle of progress to which Unitarianism was pledged as its life and end, and from which the denomination had not then, if it ever has, apostatized. And if we should decide, upon the incompetent evidence and the improper considerations upon which the plaintiffs ask us to act, we should find that, in point of fact, the Unitarians, whose money built the house, intended the legal force and effect of their vote. They meant to put the house under the control of a free parish, which, in exercising its right of free inquiry, could not be restrained by any hostile power, and, in redeeming the denominational pledge of progress, could not be lawfully commanded by any earthly tribunal to stand still.

And, disregarding even the Unitarian principle of progress, and taking the starting-point of Unitarianism as the standard, without inquiring into its progress, the plaintiffs' bill should be dismissed with costs. Freedom from sectarianism is, according to all Unitarian authorities, a distinguishing Unitarian characteristic. "To Channing, Unitarianism owes much of its freedom from sectarian and dogmatic trammels." 15 New Am. Cycl. 708. Unitarianism "is characterized by nothing more than by the spirit of freedom and individuality. It has no established creed or symbol. Its friends think each for himself, and differ much from each other." "I can endure no sectarian bonds." "We must shun the spirit of sectarianism as from hell." Such was the Unitarianism of Channing, expressed in his own words. The founders of this Dover parish, like all Unitarians of 1829, were Channing Unitarians; and they were followers of Channing in nothing more than in his detestation of that very spirit of sectarianism of which the decree in this case is intended to be an embodiment, and which is as anti-Unitarian as anything can be. Affixing a sectarian restriction to their meeting-house by simply putting it under the control of their independent parish, is an idea that did not occur to them.

On this subject, all Unitarian authorities agree. Rev. F. A. Farley,

in a sermon at the ordination of Rev. G. W. Briggs, at Fall River, Mass., said,—"Nowhere does it [the gospel] insist on a uniformity of faith. * * Nowhere does it threaten condemnation for mere error of belief, where the light enjoyed has been faithfully used to attain the truth." Rev. W. H. Furness, in a discourse at Hingham, said,—"Christ did not appear presenting opinions,—definite ideas to the intellect,—but he inspires true affection. It was not knowledge, or faith, as these pertain to the understanding, that he sought first to communicate, but a spirit life to the inmost heart. * * As he did not begin with a creed, he did not end with a creed or anything like a creed. When he parted with his personal friends, who were to be his successors in the work which he had commenced, he did not deliver to them a list of articles of faith. * * I can hardly conceive of any mental darkness or confusion more complete than that in which the disciples of Jesus found themselves when he left them. They knew not what to believe, they knew not what to think even." Dr. N. L. Frothingham said,—"In every nation, whether Christian or not, and in every Christian nation, believer or not, he that doeth righteousness is accepted,—of whatever color, or tribe, or name; Jew, Mussulman, deist, pagan. Deliver me from the narrowness of thinking otherwise!"

"Are we a denomination? We are such in some sense, but not so definitely such as most other bodies of Christians. * * We have not those things which are necessary to the existence of a defined and bounded denomination. We have no marks by which to designate those who belong to us, and no standards by which to test the fitness of their coming among us or remaining among us, or the fitness of their leaving us. * * There is no such thing as the Bible *only*, either for us or other Christians. We, like all others, must take with the Bible some means or principles of interpreting it,—ascertaining its purport and requirements. * * Shall we say we mean the Bible, as interpreted by fair rules of criticism,—our own, and not those of the Westminster divines or a Romish hierarchy? But what are fair rules of criticism? Are they rules based on the idea that the Scriptures were composed under the express guidance of inspiration, attending the writers throughout, as some of us maintain? or, on the idea that there is no such inspiration, and that the Bible is to be dealt with as freely as any other ancient books, as others hold?—for it makes a vast difference on which idea we base our rules of criticism. Or, again, on what system of philosophy shall the criticism and interpretation of the Bible proceed?—that system which makes miraculous attestations necessary to the confirmation of Christ's authority as divine, miracles a chief and essential voucher for the truth of what he taught? or, that system which finds the only and sufficient witness and verification of religious truth in the judgments and responses of the individual soul? Or, again, if we choose to be vague, and to say that common sense shall be the interpreter of the Bible, then whose common sense shall it be?— mine, which receives historical facts upon historical testimony and logical grounds? or, another man's, who alleges that no kind or amount

of testimony can overcome the antecedent improbability of facts which involve the supernatural? Both these kinds of philosophy and of common sense, and all kinds between them, are found among those who profess to base their religion upon the Bible, and to find in the life and teachings of Jesus Christ the best and a sufficient guide of faith and practice. We all, like other men, unite with the Bible one means or principle of interpretation or another, one kind of philosophy or common sense or another. And hence there are almost as great differences among ourselves, or those who are numbered with us, as between us and other denominations. That, therefore, which we have usually held forth as our denominational test,—' the Bible only,'—is not sufficiently definite or distinctive to serve as a real test. We have not, then, any defined and authorized tests, by complying with which a man belongs to our denomination rather than some other, or by departing from which he can properly be excluded from it. We have not the essential requisites of a denominational existence. I am glad it is so. * * There are, indeed, some persons, imperfectly acquainted with us, who, thinking they have an affinity with us, and who, from always living among sects, have not yet risen to a conception of the possibility of being a Christian man, or a Christian church, without wide ecclesiastical relations, definite standards, a denominational union, and an aggressive array,—there are some such who desire to know where we stand, demand to know where to find us. And it is a common complaint among those who dislike and oppose us, that they do not know where to find us. But they cannot be informed where to find *us.* US! there is no US in any corporate sense, and it was never meant that there should be: I pray God there never may be. We properly consist of a scattered and indefinite number of free minds and free churches, all forming their opinions for themselves. * * If you wish to find any given individual preacher or writer, you can ascertain; but you will never know where to find *us.* Our strength lies in our freedom." Dr. Putnam's Discourse at the Installation of Rev. David Fosdick, as Pastor of the Hollis Street Church, Boston, March 3, 1846. Whatever may be thought of this freedom as a bond of sectarian union, it is one that any sect may lawfully adopt: it is the principle of constitutional parochial independence.

In a tract written by Dr. Andrew P. Peabody, published by the American Unitarian Association, and distributed for many years as an authoritative exposition of Unitarianism, entitled " FIDELITY IN DUTY, NOT ACCURACY IN BELIEF, OUR TEST OF THE CHRISTIAN CHARACTER " (" 1st series, No. 137 "), that eminent divine says,—" We do not pretend to any degree of uniformity of faith. * * We agree in making fidelity in duty, not accuracy in belief, our test of the Christian character. * * We regard no particular doctrine or set of doctrines as essential. * * With regard to modes of faith, the Bible and the church are entirely at issue. This church has its five points; that, its thirty-nine articles: here, there is a creed full of dark subtilties; there, a covenant by which a man enters into a contract with his Maker to

believe an indigestible mass of the metaphysics of the dark ages. And these standards are made a Procustes's bed to which every mind, great or small, must adapt its dimensions, or forego admission to heaven. But what says the Bible? A word of all this? By no means. One of the first things that strikes us on turning over its pages is the strictly practical character of its requisitions. It is the least technical book in the world. It makes no attempt at giving a system of theology.   *   * If in any heathen land there be one who has turned away from fraud and violence, who has done justice and loved mercy, and walked humbly before the God whom he has heard in the evening breeze, or beheld in the glow of nature, or felt in the deep workings of his own spirit, he has done the will of his Father in heaven, and belongs to the Christian family. If there be a Jew, who with contrite heart mourns for the desolation of Zion, and prays for the peace of Jerusalem, and serves the God of Abraham, Isaac, and Jacob, he, too, as a doer of God's will, belongs to the household of the Saviour, whom his brethren set at nought. If faith be the standard, the devout pagan, the pious Jew, are reprobates; but if those who do God's will shall enter his kingdom, they are heirs of that kingdom."

In the Unitarian extremity nearest to orthodoxy, there has been no higher human authority since the death of Channing than Dr. Peabody. According to his test, sanctioned, avowed, and promulgated by the whole Unitarian denomination, Abbott is a Christian in the Unitarian sense. If a different spirit or a different creed can now be found in any professed Unitarians, it merely divulges their recent progress towards orthodoxy. The Unitarian Christianity of 1829 is truly set forth in that Unitarian tract, "1st series, No. 137." It is useless to accumulate Unitarian authorities to substantiate a fact so well known to everybody who knows anything of Unitarian history, and whose understanding is not warped by interest or feeling. The Unitarian Christianity of 1829 was the Unitarian Christianity of the founders of this Dover parish. The testimony of a minister, whose Unitarianism is unquestioned, and who was the public teacher of this parish from 1840 to 1850, with an interval of two years, shows that the parish has been Unitarian in the belief that Christ "spoke with the authority that truth and goodness will ever have over what is highest and best in the human soul;" that Christ did not intend "to teach a system" of theology or "sharply defined dogmas;" that "if he had, he would have taken pains to have had it embodied in strict forms of expression, and with perfect verbal accuracy," in a duly attested and absolutely authoritative record made during his lifetime.

Even if the Unitarianism of 1829 superseded the constitution and the independent theological character guaranteed to the parish by the constitution, the plaintiffs have no case against Abbott. The decree, so far as it is meant to be a decree in favor of the plaintiffs and against the defendants, so far as it is understood and intended to establish a Unitarian creed and convict Abbott of heresy, and so far as it compels the defendants to pay the plaintiffs' costs as a penalty for allowing Ab-

bott to preach heresy " in the meeting-house of said society," overturns the fundamental principles of Unitarianism, as well as the constitution. Unitarians " regard no particular doctrine or set of doctrines as essential: " they accept the Bible; and the Bible, according to their interpretation of it, " makes no attempt at giving a system of theology." " The devout pagan, the pious Jew," belong to the Unitarian " Christian family." The word " Christian," in its Unitarian sense, has no theological significance. Whatever else Unitarian Christianity may be, it is the abolition of heresy. They who erroneously suppose that Unitarians, in calling themselves liberal Christians, use the word " Christians " in a theological and orthodox sense, cannot comprehend Unitarian consistency; but no one has any difficulty in understanding why they call themselves " liberal:" and, in their sense of the words, the noun is as appropriate as the adjective. Abbott, giving the word " Christian " a theological meaning that Unitarianism does not give it, asserts that he is neither a Unitarian nor a Christian. The devout pagan and pious Jew assert the same thing of themselves. The Unitarian denomination, using language in the Unitarian Christian sense, asserts the contrary; and the denomination knows better than Abbott, pagan, or Jew, whom it regards as Christians in its sense of the word, and whom it intends to include in its " Christian family." " Every theological inquirer * * finds a fruitful, almost an exhaustless and endless task, in settling the meaning of theological terms, in coming to an understanding with others about their use of those terms, in asking whether all who employ them connect the same sense with them. * * Nor are the perplexities which arise from this source relieved by our agreeing to use Scripture terms in our theological discussions. All the terms used in these discussions become technical. They are generally chosen from other languages than our own, and are perplexed with etymological niceties of definition, or they are used in a sense different from that which associates them with common, earthly things. These technical theological terms are adopted as if more expressive or comprehensive in their signification than any which our household speech affords; but certainly one prevailing reason with theologians for keeping them in use is, that they are often so vague and indefinite, and so burdened with double meanings, like old oracles, as to allow those who employ them a considerable range of liberty, and to excuse them from being too explicit. If we take any one of the contested problems in doctrinal or speculative theology, we find it to be involved with terms each of which asks for a re-definition or a rectification of its popular or scholarly interpretation, before any new writer can profitably use it in discussion. He must, at any rate, tell us in what sense and with what limitations he intends to use each of these test words. * * Any one, who will undertake the hard task of reading the old controversial pamphlets on the orthodox side, will find them to abound in the most scorching denunciations of Unitarians as infidels, and of Unitarianism as bald, malignant, and wicked infidelity. * * Our own brethren were always aware that their ' use of language not very unlike that of their orthodox

brethren,' when dealing with ' some of the great truths of the Bible,' was regarded as a very remarkable phenomenon by their opponents. Time was when Unitarians were considered trespassers and deceivers, if they ventured to use the dear and consecrated terms and phrases of a traditional piety.  The orthodox imagined that they had monopolized or appropriated even Scriptural epithets and texts, by having assigned to them an interpretation which might claim to be a part of their signification forever after.  It was wicked for a Unitarian to employ the language in which orthodoxy spoke its own convictions.  Still, the Unitarians would not be warned off the sacred precincts.  They considered that Bible terms, and even the affectionately treasured phrases of devotional literature, formed a part of the common stock of the language.  Orthodoxy now concedes that liberal Christians feel at liberty, in consistency with honesty, to use such terms and phrases; and, instead of admitting its own error in its former charges of hypocrisy, accounts for the fact by supposing something like a reaction among Unitarians."  Ellis's Half-Century of the Unitarian Controversy 379, 380, 410, 411.  The right of Unitarians to use language in a Unitarian sense can no more be denied, than the right of Trinitarians to use the same language in a Trinitarian sense.  All that can be required is, that both parties explain their meaning so as not to mislead any one who is not versed in their ecclesiastical dialects.  And Unitarians have explained their meaning quite as clearly as the other party.  They are not in fault for being misunderstood or misrepresented.  No one ever complained that their negations of orthodoxy were equivocal.  And as to their affirmative faith, when they assert, in the language of Dr. Peabody, that the Bible "makes no attempt at giving a system of theology," no one can fail to understand what they mean.  Their doctrine, of " FIDELITY IN DUTY, NOT ACCURACY IN BELIEF, OUR TEST OF THE CHRISTIAN CHARACTER " (Tract No. 137, 1st series), is, in explicitness, not inferior to any other creed published in the English language.  A person, accustomed to the Trinitarian and ignorant of the Unitarian idiom, hearing Unitarians affirm the divinity (not the deity) of Christ and the inspiration of the Christian Scriptures, and not understanding how human perfection can be divine, nor how a human being can properly be called a child or son of the Creator, nor how all truth can be fairly said to be revealed by a divine influence, or made known by a divine power, government, or law, might easily fall into the error of supposing that Unitarians use theological language in the orthodox sense, that they believe in Christ as the Messiah in the orthodox sense, in revelation and inspiration, the Trinity and the atonement, in the orthodox sense, and that they are Christians in the orthodox sense.  Forty years ago, when they built this meeting-house, they were understood : then they were infidels in the orthodox sense. Now their infidelity is judicially established, by the decree in this case, as a kind of Christianity at least equal to any other.

Where is the theology of Christ to be found, if not in the record of his teachings in the gospels according to Matthew, Mark, Luke, and

John? If that record "makes no attempt at giving a system of theology," what other revealed Christian theology have we, except that of natural religion, revealed through natural instrumentalities of human reason and human knowledge? One of the plaintiffs testifies that Abbott's idea is, that a Christian is one who has the spirit of Christ, or is Christ-like in spirit. That is a familiar Unitarian idea, free from all doctrinal limitations. Abbott objects to the Christian name in the doctrinal sense in which it is now used by some to describe a class of men whose theology, in his belief, is non-Christian. He is admitted to be, in the Unitarian Christian sense, a model of piety, morality, and Christian spirit—as perfect an illustration of "fidelity in duty" as any denomination has produced. His exclusion from the Unitarian Christian family of devout pagans and pious Jews, is as mysterious as the operation of the nominally-Christian test that condemns him for accepting the religion of Christ as he understands it. Such is the work of nominalism usurping ecclesiastical jurisdiction in behalf of Unitarianism.

But why protest against a decree that establishes a non-theological Unitarianism? Because it will be understood to be, and is meant to be, an exercise of ecclesiastical authority, a vindication of Unitarians as Christians, a condemnation of the religion of a theist, a judgment compelling the majority of an incorporated parish to pay costs for allowing Abbott to preach theism in the meeting-house of the parish, and forbidding all wardens and members of the parish "to hire, employ, allow, suffer, or permit said Francis E. Abbott, or any other person," to preach anti-Unitarianism there, under penalty of fine and imprisonment, and because, in these respects, it is a violation of constitutional rights.

The further we look into the inadmissible evidence upon which the plaintiffs rely, the more untenable is their position found to be. When the parish was organized, and when the meeting-house was put under its control, the evidence tends to show that there were not more than eight parishes in the state controlled by Unitarians, and that six of those parishes had apostatized from orthodoxy without forfeiting their parochial rights of property. The plaintiffs, in their bill, allege that this meeting-house was dedicated by Unitarian-ministers. Ten parishes were invited to dedicate the house, and, at the same time and place, to ordain the first public teacher elected by the parish. And those ten parishes accepted the invitation, were present by their delegates and public teachers, and rendered the service requested. To one of the ten,—the Unitarian parish nearest Dover,—Jonathan Edwards had preached, at the ordination of one of Dr. Peabody's predecessors. Of that parish, Dr. Peabody was a Unitarian public teacher nearly twenty-seven years. 13 New Am. Cycl. 64. In his published history of his apostate parish, Dr. Peabody says,—"We have a history on which we can look back with unmingled satisfaction." P. 89. One of the plaintiffs, who is substantially the party instituting and carrying on this suit, officiated as a delegate from that parish (of which he was then a prominent

member), at the dedication of the meeting-house of this Dover parish. Every one of the ten parishes had, in its parochial capacity, apostatized from the orthodox faith, without losing its corporate property, or its corporate control of property, and without any suggestion or suspicion that any liability of loss was incurred. Apostate parishes alone were invited to dedicate this house, because leading and influential parishes were selected, whose presence would tend to strengthen the ecclesiastical and social standing of the new parish; and it happened that all the Unitarian parishes of that description in the country were of the apostate class. Into the fellowship of a denomination of apostate parishes, this Dover parish entered: as an heir of a known and asserted right of parochial apostasy, in the exercise of which the Unitarian power in America had been chiefly attained, it voluntarily came into existence: to an appreciated inheritance of parochial freedom, it chose to be born. Its members, in the selection of friends to dedicate their house to the uses of that freedom, did not overlook the prominent position of the parish of King's chapel, who had inaugurated the apostate movement with the express and public assertion of their right to apostatize "by virtue of the third article in the declaration of rights," from which "third article" the New Hampshire constitutional guaranty of that right had been copied. And it may be taken for granted that the invitation given to King's chapel, and the nine other apostate parishes, to perform the ceremony of dedication, was not a request publicly to confess themselves guilty of wrongfully and unlawfully appropriating parochial property, and committing ten breaches of trust. They were not called to Dover to receive an affront, or to expose themselves to ridicule. Their ceremony was not a satire upon their own history and the apostate parochial origin and career of their denomination in this country.

Nothing is wanted to expose the plaintiffs' case to that abhorrence which, under Providence, is one of the punishments of the spirit of persecution. The plaintiffs, in their bill, have not asked the court, and the court has not undertaken, to remove the wardens from office, to expel the majority from the parish, or to transfer the corporate power from the majority to the minority. The avowed object of the minority in bringing this suit was, the expulsion of Abbott from the pulpit of the parish. But, before the case was submitted to the court for decision, Abbott, obeying a conscience of extraordinary acuteness and activity, had refused to remain a public teacher of the parish, or to be in any way connected with it, or to preach in its house. The corporate name of the parish had no effect upon its constitutional independence: the parish had a legal right to allow him to preach theism in its house, and had legally exercised that right; but, disclaiming for himself the name Unitarian Christian, in a certain non-Unitarian sense, he feared that, by occupying the position of a public teacher of the parish while it retained its corporate name, he might be misunderstood or misrepresented. The name of the corporation had, in law, no theological significance; but the name, in fact, might be made to carry a

sectarian meaning to persons more familiar with a sectarian idiom than with the constitution: the name might be understood or represented to give a support to doctrines which he discarded ; and, to avoid the possibility of misconstruction and misrepresentation, he refused to be any longer employed by the other defendants as the majority of the parish, and retired, declaring he could preach in that house no more. It is incredible that a man, who writes as he does, can think his theological position in any danger of being misunderstood : and his renunciation of his legal rights, on the ground that somebody might, against his protest, insist upon calling him a Unitarian Christian in the Unitarian sense, when he calls himself a theist, is a phenomenon, which, if it be judged by the highest Unitarian or Trinitarian standards exhibited in practice, must be attributed to a morbid sensitiveness or abnormal development of his moral faculty.

On his retirement, the counsel of the other defendants endeavored to pacify the plaintiffs, and to open negotiations with them for a parochial peace.   He gave them a proposition in writing, that the defendant wardens would apply to the American Unitarian Association for a pastor, and the majority would employ such as the association should send,—the pastor's salary to be raised by subscription in the usual way,—counsel saying at the time, " that he made the proposition on his own responsibility, but he thought the defendants would assent to it."   One of the defendant wardens was present, and made no objection.   He says in his deposition that he should not feel satisfied with an agreement that the association should supply the pulpit *all* the time, because some of those who subscribed largely might wish to hear some one else occasionally.   He sees no objection to the parish putting itself under the general guardianship of the association: but it seems to him reasonable that the members, who pay the salary of the minister sent by the association, should occasionally be allowed the privilege of hearing somebody else, if they should desire to do so.   But even this modest qualification of an absolute guardianship he did not suggest.   No objection or qualification was suggested by anybody on the defendants' side.   The written proposition was made without any conditions.   When counsel for the defendants said, at the time he made it, that he thought the defendants would assent to it, he was familiar with the views of his clients, as counsel generally are.   He was one of the defendants himself.   He was the member who offered the compromise resolution of April 27 (*ante*, p. 235).   He has all along sought the restoration of harmony in the parish, and his clients have magnanimously concurred with him in following after the things that make for peace.   He knew, and the plaintiffs knew, that he was right in thinking the other defendants would assent to his proposition, or any other reasonable one, as a basis of settlement.   The whole course of the majority, and particularly their adoption of the compromise resolution, showed that conciliatory spirit, and that anxiety to prevent the dissolution of the parish, which they expressed in that resolution.   And here was a formal offer in writing, made by

their counsel, that they would accept any public teacher sent to the parish by the highest authority of the Unitarian body. It was not an ultimatum. It was a tentative proposition, declaring the continued readiness of the defendants to agree to any reasonable adjustment, and inviting the plaintiffs to treat about the terms of accommodation. That invitation the plaintiffs rejected. They would entertain no overtures. They would enter into no negotiation. It was not enough that Abbott banish himself from this pulpit; that the majority allow the plaintiffs, and public teachers of the plaintiffs' choice, to occupy the pulpit and the house as much as they desire; and that the majority employ the public teachers sent to the parish by the acknowledged representatives of the Unitarian denomination. The cause of contention had ceased, and the defendants' counsel requested a cessation of the plaintiffs' hostilities: the plaintiffs would neither go peaceably out of court themselves, nor permit the defendants to go. The object of litigation had disappeared: the lawsuit continued for the purpose of employing the court as the ecclesiastical tribunal of a state church, in excommunicating Abbott, and convicting him of the crime of unlawful religion. The plaintiffs are contending for something more important, in their estimation, than the harmony of the parish, or the propagation of Unitarian Christianity. They demand that the court follow Abbott out of the parish, and investigate the question whether he is a Christian in the Unitarian sense of the word, whatever that may be. They insist that he be publicly stigmatized for his theology, by authority of the government, in the solemn form of a judicial condemnation. The court are not authorized, by the law or the justice of the case, to engage in the pursuit, the inquisition, or the anathema.

The plaintiffs, in argument, have informed us that Abbott's theology is heterodox (that is, in conflict with the prevailing religion of the country), with no great show of success as yet; and inflammatory appeals have been made, calculated to rouse the prejudice of influential classes and powerful ecclesiastical organizations against him, on account of his religion, and to excite their sympathy in behalf of his persecutors. We certainly needed not to be informed that his religion is not a fashionable one. These harangues are not made for our information. For what purpose are they made? To what motives are they addressed? If it were the duty of the court not to be impartial in the administration of justice to the few and the many, the feeble and the strong, but to be influenced by hope of favor and fear of personal consequences; if commanding a man to be smitten contrary to the law, when it is popular and safe to do so, were not an abuse of judicial power, an act of perjured tyranny and cowardly corruption, these harangues might be adapted to the occasion.

Whatever views the plaintiffs may entertain of the proper grounds of judicial decision, they repudiate the spirit of Unitarian Christianity, as set forth by its American apostle. "It is necessary that religion should be held and professed in a liberal spirit. Just as far as it assumes an intolerant, exclusive, sectarian form, it subverts instead of strengthen-

ing the soul's freedom, and becomes the heaviest and most galling yoke which is laid on the intellect and conscience. Religion must be viewed, not as a monopoly of priests, ministers, or sects, not as conferring on any man a right to dictate to his fellow-beings, not as an instrument by which the few may awe the many, not as bestowing on one a prerogative which is not enjoyed by all, but as the property of every human being, and as the great subject for every human mind. It must be regarded as the revelation of a common Father, to whom all have equal access, who invites all to the like immediate communion, who has no favorites, who has appointed no infallible expounders of his will, who opens his works and word to every eye, and calls upon all to read for themselves, and to follow fearlessly the best convictions of their own understandings. Let religion be seized on by individuals or sects, as their special province; let them clothe themselves with God's prerogative of judgment; let them succeed in enforcing their creed by penalties of law or penalties of opinion; let them succeed in fixing a brand on virtuous men, whose only crime is free investigation; and religion becomes the most blighting tyranny which can establish itself over the mind. You have all heard of the outward evils which religion, when thus turned into tyranny, has inflicted; how it has dug dreary dungeons, kindled fires for the martyr, and invented instruments of exquisite torture. But, to me, all this is less fearful than its influence over the mind. When I see the superstitions which it has fastened on the conscience, the spiritual terrors with which it has haunted and subdued the ignorant and susceptible, the dark, appalling views of God, which it has spread far and wide, the dread of inquiry which it has struck into superior understandings, and the servility of spirit which it has made to pass for piety,—when I see all this, the fire, the scaffold, and the outward inquisition, terrible as they are, seem to me inferior evils. I look with a solemn joy on the heroic spirits who have met freely and fearlessly pain and death in the cause of truth and human rights. But there are other victims of intolerance, on whom I look with unmixed sorrow. They are those who, spell-bound by early prejudice, or by intimidations from the pulpit and the press, dare not think; who anxiously stifle every doubt or misgiving in regard to their opinions, as if to doubt were a crime; who shrink from the seekers after truth as from infection; who deny all virtue which does not wear the livery of their own sect; who, surrendering to others their best powers, receive unresistingly a teaching which wars against reason and conscience; and who think it a merit to impose, on such as live within their influence, the grievous bondage which they bear themselves. How much to be deplored is it, that religion, the very principle which is designed to raise men above the judgment and power of man, should become the chief instrument of usurpation over the soul. Is it said that, in this country, where the rights of private judgment, and of speaking and writing according to our convictions, are guaranteed with every solemnity by institutions and laws, religion can never degenerate into tyranny; that here its whole influence must conspire to the liberation

and dignity of the mind? I answer, we discover little knowledge of human nature, if we ascribe to constitutions the power of charming to sleep the spirit of intolerance and exclusion. Almost every other bad passion may sooner be put to rest; and for this plain reason, that intolerance always shelters itself under the name and garb of religious zeal. Because we live in a country where the gross, outward, visible chain is broken, we must not conclude that we are necessarily free. There are chains not made of iron, which eat more deeply into the soul. An espionage of bigotry may as effectually close our lips and chill our hearts, as an armed and hundred-eyed police. There are countless ways by which men in a free country may encroach on their neighbors' rights. In religion, the instrument is ready made and always at hand. I refer to opinion, combined and organized in sects, and swayed by the clergy. We say we have no inquisition. But a sect skilfully organized, trained to utter one cry, combined to cover with reproach whoever may differ from themselves, to drown the free expression of opinion by the denunciations of heresy, and to strike terror into the multitude by joint and perpetual menace,—such a sect is as perilous and palsying to the intellect as the inquisition. It serves the ministers as effectually as the sword. The present age is notoriously sectarian, and therefore hostile to liberty. One of the strongest features of our times is the tendency of men to run into associations, to lose themselves in masses, to think and act in crowds, to act from the excitement of numbers, to sacrifice individuality, to identify themselves with parties and sects. At such a period, we ought to fear and cannot too much dread lest a host should be marshalled under some sectarian standard, so numerous and so strong as to overawe opinion, stifle inquiry, compel dissenters to a prudent silence, and thus accomplish the end, without incurring the odium, of penal laws. We have indeed no small protection against this evil, in the multiplicity of sects. But let us not forget that coalitions are as practicable and as perilous in church as in state; and that minor differences, as they are called, may be sunk, for the purpose of joint exertion against a common foe. Happily, the spirit of this people, in spite of all narrowing influences, is essentially liberal. Here lies our safety. The liberal spirit of the people, I trust, is more and more to temper and curb that exclusive spirit which is the besetting sin of their religious guides." 4 Channing's Works 85.

The plaintiffs seek a coalition reprobated by Channing; they rely upon influences execrated by MANSFIELD,—*Rex* v. *Wilkes*, 4 Burr. 2527, 2561, 2562, 2563,—and subversive of every principle of judicial duty. They would have a decision indorsing their own orthodoxy, and covering Abbott with reproach, not merely as an outcast from fashionable ecclesiastical society, but also as a heretic branded by law. The law does not authorize such a decision to be made upon any questions that can be raised either in this suit or in any other that can be brought.

If there were no such thing as constitutional parochial independence, and this meeting-house had been devoted to a religious use by ambig-

*nous terms* in an ancient instrument, which left it doubtful whether a Unitarian use was authorized, and the plaintiffs had brought this suit to obtain an injunction against a Unitarian use, claiming that, by the true construction of the instrument, such a use was not authorized, there are authorities going to show that evidence of an original and long continued Unitarian use of the house would be considered by the court as furnishing ground for an inference that such use would not have been submitted to if it had been considered illegal. *The Dublin case*, 38 N. H. 512, 546. Although in this case there is such a thing as parochial independence; and although there is no ambiguity to be resolved; and although nobody claims that a Unitarian use is illegal,— the plaintiffs have offered evidence tending to show that the parish has employed Unitarian public teachers nearly forty years. They seem to understand that any parish can abolish the constitution of the state; and they seem not to understand that parochial independence includes the right of perpetual adherence, as well as the right of daily apostasy. They claim that the founders of this parish, by continuing to be Unitarians after they became a parish, lost their constitutional right to be anti-Unitarian. The manner in which the parish has exercised its independence, is put forward as proof upon which the court is asked to hold that its independence is extinguished. A constitutional right, decided to be worn out by a forty years' Unitarian use of it, might discourage those who have entertained a hope of the perpetuity of free institutions. But the danger has a certain limit. The list of Unitarian parishes in the Unitarian Year Book seems to show that at least thirty-seven (and probably many more) of those parishes were orthodox for the space of more than one hundred years before they became Unitarian, and some of them for the space of nearly two hundred years, the Plymouth parish of the pilgrim fathers, " founded at Leyden, Holland, 1602," being one. It is only by a Unitarian exercise of the constitutional right of parochial independence, that the plaintiffs claim the right is annihilated.

Notwithstanding the unfavorable light in which all the evidence, admissible and inadmissible, presents the plaintiffs, they should be judged leniently, in consideration of the intemperate and blinding excitement with which human nature, engaged in any strife, is apt to be transported. Misrepresentations and distortions of facts, insinuations and calumnies poured out upon the victims, are what everybody expects the persecuting party to be guilty of. To that party, many of the best of men have generally belonged. And we ought not hastily to conclude that the plaintiffs are less respectable than the defendants. The scrupulously frank and fair, the singularly meek, gentle, and forbearing manner in which the evidence shows the defendants have carried themselves, under circumstances of extreme provocation, from the beginning of this controversy till now, may be due, in some measure, to peculiar and temporary influences. It is not improbable that there is something transient in the situation of the parties, that depresses the plaintiffs below, and exalts the defendants above, the real level of their characters.

But inadmissible evidence and extraneous considerations (upon which the plaintiffs rely, and which are as fatal to their case as the admissible evidence and the relevant considerations) must not be allowed to divert our attention from the legal views upon which alone the court is authorized to act.   The questions presented are, whether "the meeting-house of said society" is under the control of an independent parish, and whether the parish has exercised and proposes to exercise its control for parochial purposes.   These questions, by the plaintiffs' implacability, the court is constrained to answer, however unjustifiable and vexatious the further prosecution of the suit; and, upon legal grounds and legal evidence, they should be answered in the affirmative, and the bill should be dismissed.

These questions concern interests of greater consequence than the doctrinal sermons to be preached, by leave of the court, in the meeting-house of this parish.   They comprise the inquiry whether this is an ecclesiastical court, with papal or prelatic powers and general jurisdiction in parochial heresy, liable to be called upon by parochial minorities to dictate the theology of every pulpit, superintend the clergy, and regulate the ordinances of religion.   They involve the independence of every parish in the state, the parochial privilege of choosing public teachers, the sovereign prerogatives of electing and being elected to executive and legislative office, and the comprehensive birthright of religious freedom and equality.   When such investigations are forced upon the court, and natural, unalienable rights, established institutions of society, and first principles of free government are attacked, under whatever pretexts or with whatever disclaimers the attack may be made, it becomes necessary to resist, with firmness proportioned to the vigor and audacity of the assault.

A division of society into two ranks, a theological aristocracy on one side, a lower caste on the other,—the former wielding all the instruments of the law and all the power of the government to degrade men of the faith of Jefferson, Franklin, Ethan Allen, or Governor Plumer; commanding what doctrines shall not be preached; suppressing the freedom of the pulpit; abolishing the rights of property given to independent religious uses; and confiscating such property for the use of a state religion,—all this is as repugnant to the plain and vital principles of the constitution, as to the sense and spirit of the people who made the constitution.   The governmental work of that generation has been sufficiently extolled for eighty-five years past as a triumphant vindication of human rights, affording a sure protection against ecclesiastical oppression in particular, and perpetuating throughout the state such refuge as Wheelwright found for a season at Exeter in exile for conscience' sake.   That work must be undone, and a degenerate age must be ready to welcome the return of the worse despotisms, before a system of religious caste can be introduced.   When an infidel does not stand as well in law before the tribunals of justice as a Christian, in any sense of the word, our free institutions are a failure.   To sneer at free-thinkers or free thought is to make a thoughtless use of free speech,

and to scoff at a privilege which we are bound to protect. The constitution does not assume to create religious rights or to distribute them. It reverently recognizes and maintains them as original and universal, as rights which human government can neither grant nor withhold, which are not of human tenure, and which no man can give up. A single unresisted infringement, established as a precedent, subjugates the weak, and leaves them at the mercy of the strong. Every man and every parish is liable to hold unpopular theological opinions. And when the right to hold and inculcate such opinions is not sacred, and the violation of it is not sacrilege; when the constitutional defences of that right are dismantled, and it is left with no better security than the generosity and tolerance of an ecclesiastical court, or the caprice of a ruling class; when freemen are reduced to the consolation of remembering that the writ for burning heretics is obsolete, and of hoping that civilization will not suffer it to be revived,—the theory of our government is exploded and its original authority at an end.

Unless Abbott's religion is unconstitutional, the majority of this Dover parish, in allowing him to preach it " in the meeting-house of said society," did what they had an obvious constitutional right to do. We cannot adjudge his faith to be a heretical departure from a state religion until we destroy the constitution, establish a state religion, and annex a supreme bishopric to the judicial office. If we can condemn this man as a heretic, and his religion as an offence against the state, or as legally inferior to any other, we can anathematize and outlaw any other person, and any other form of religion. Abbott's cause, strenuously opposed in the field of theology, becomes, in law, the common cause of religious liberty, and the indestructible interest of mankind. The decree cannot be aimed at him until it batters down constitutional bulwarks, erected by our ancestors for the defence of a possession, which, through ages of suffering and struggle, cost too much, and, after being long enjoyed in apparent safety, has been found worth too much, to be voluntarily surrendered.